UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)

STEVEN R. KINCAID,

        Plaintiff,

                                Civil Action No. 04-11522-WGY

BANK OF AMERICA
CORPORATION,

        Defendant.

_____


PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL DISCOVERY AND FOR SANCTIONS


David J. Fine, BBO # 165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA 02108
(617) 720-2941

Attorney for Plaintiff

## Table of Contents

Discovery Conference                                                                    ..... 1

Nature of the Case ...

Statement of Facts

    Facts Regarding Mr. Kincaid's Underlying Claims                              2

    Facts Relevant to Discovery Matters to be Decided                      …….. 4

    Facts Showing Bank's Misconduct in Providing Discovery                  .. 6

Argument                                                                                    8

I.    Mr. Kincaid Is Entitled to Discovery
    Regarding Other Claims of Discrimination ....                              8

    A.    Document Requests and
        Interrogatories Raising Issue                                    8

    B.    Mr. Kincaid's Position ……                                          11

II.    Mr. Kincaid is Entitled to Discovery Regarding
    the Bank's Internal Investigation of Mr.
    Kincaid's April 25, 2003 Claim of
    Mistreatment and Discrimination ......................                   14

    A.    Mr. Kincaid's Interrogatory, Document Requests
        and Deposition Question, and Items in the Bank's
        Privilege Log, Raising Issue ……………………                           14

    B.    Mr. Kincaid's Position                                           17

        1    The Documents and Information Are Not
            Protected by the Work Product
            Doctrine or the Attorney-Client Privilege              17

2.    Even Assuming -- Contrary to Fact -- the Documents and Information Were Protected by the Work Product Doctrine and/or the Attorney-Client Privilege, Such Protection Would Be Overcome By Virtue of the Bank's Wrongful Destruction of E-mail Evidence    19

III.    Given the Bank's Wrongful Destruction of E-Mail Evidence, the Court Should Review In Camera the Documents the Bank Has Withheld From Production on the Ground of Privilege to (1) Ascertain Whether Any of These Documents Cast Light on the Destruction of Evidence, and (2) Determine Whether Any of These Documents Should, in Fairness, Be Disclosed to Mr. Kincaid. ........................................    20

A.    Much E-mail Evidence Has Been Destroyed

B.    The Bank's Destruction of E-Mail Evidence Was Wrongful ...........    ... 20

C.    In Light of the Bank's Wrongful Destruction of E-Mail Evidence, the Court Should Examine In Camera the Documents the Bank Has Withheld from Production on the Ground of Privilege .......    22

IV.    In View of the Bank's Wrongful Destruction of E-mail Evidence and Wrongful Delay in Providing Fair Discovery, the Court Should (A) Shorten the Bank's Time to Respond to Mr. Kincaid's Follow-Up Discovery Requests; and (B) Order the Bank to Reimburse Mr. Kincaid for the Costs He Has Incurred, and Will Incur, as a Result of the Bank's Misconduct .......................................................

## Discovery Conference

The parties held a discovery conference by telephone on July 28, 2005 from approximately 2:05 to 4:15 p.m. Plaintiff was represented by undersigned counsel, David J. Fine. Defendant was represented by attorneys Richard F. Kane and Steven T. Ackermann of McGuire Woods LLP. The matters on which the parties reached agreement are reflected in two letters and two e-mails following the conference -- a letter dated July 28, 2005 from undersigned counsel to attorney Kane, a letter dated August 1, 2005 from attorney Ackermann to undersigned counsel, an e-mail dated August 3, 2005 from undersigned counsel to attorneys Kane and Ackermann, and an e-mail dated August 5, 2005 from attorney Ackermann to undersigned counsel. These two letters and two e-mails are reproduced collectively as Exhibit 1 hereto The issues remaining to be decided by the Court are reflected in the foregoing letters and e-mails, and in this memorandum

## Nature of the Case

In this action, the plaintiff, Steven R. Kincaid ("Mr. Kincaid"), seeks redress on account of the conduct of the defendant Bank of America Corporation (the "Bank") in connection with Mr. Kincaid's employment by the Bank, employment which the Bank wrongfully terminated on June 13, 2003. Mr. Kincaid's Complaint asserts four Counts: Count One for age discrimination in violation of 29 U.S.C. § 621 et seq.; Count Two for retaliation in violation of 29 U.S.C. § 623(d); Count Three for wrongful harassment and discharge in violation of public policy as set forth in the North Carolina Equal Employment Practices Act and the North Carolina Retaliatory Employment Discrimination Law; and Count Four for breach of the implied covenant of good faith and fair dealing.

Statement of Facts

Facts Regarding Mr. Kincaid's Underlying Claims

     Mr. Kincaid, born July 19, 1953, received a B.A. from Oklahoma State University in

975, an M.A. from the University of Illinois in political science in 1977, and a Ph.D. from the

University of Illinois in American politics and economics in 1980.  By 2002, Mr. Kincaid had

had over 20 years of experience as a market research professional with advanced skills in

multivariate statistics and application of statistical models, and extensive knowledge of customer

satisfaction tracking systems.

     In the spring of 2002, Mr. Kincaid was contacted by a management consulting firm

seeking to recruit him for employment with the Bank.  At the time, Mr. Kincaid was operating a

consulting business from his residence in Boxford, Massachusetts, having moved to

Massachusetts in 1993 and having worked for Abt Associates from 1993 to 1995 and for Fidelity

Investments from 1995 to 2001

     Thereafter, the recruiter and representatives of the Bank interviewed Mr. Kincaid by

telephone, and the Bank paid for Mr. Kincaid to travel to North Carolina for in-person

interviews.  In July 2002, the Bank offered Mr. Kincaid a position with the Bank's Customer

Analysis, Modeling and Research Team ("CAMR") in Charlotte, North Carolina as a Market

Information Manager with the corporate title of Vice President.  In seeking to persuade Mr

Kincaid to move from Massachusetts to North Carolina, the Bank promised Mr. Kincaid long-

term employment and fair treatment, free of unlawful discrimination

     In reliance on the Bank's promises and representations, Mr. Kincaid moved from

Massachusetts to North Carolina, sold his house in Massachusetts, and began working for the

Bank on August 20, 2002

2

From the commencement of Mr. Kincaid's work with the Bank in August 2002 until

April 2003, Mr. Kincaid's work with the Bank received consistently positive feedback. This

positive feedback included, without limitation: oral and written praise from Mr. Kincaid's

immediate supervisor, Sheila Burroughs, and Ms. Burroughs' supervisor, Alec Kotopoulos; from

Mr. Kincaid's co-worker in the customer satisfaction unit, Susan Haloulos; and from Paul

Rubenstein, Chuck Andrews, Alan Church and Vele Galovski, individuals in other areas at the

Bank to whom Mr. Kincaid provided information and guidance regarding how to use a statistical

methodology Mr. Kincaid developed for evaluating customer satisfaction data.

In mid-April 2003, Mr. Kincaid's job situation changed dramatically, however, when his

immediate supervisor, Sheila Burroughs, gave Mr. Kincaid a quarterly evaluation filled with

criticisms and negative observations about his performance. The substance of what Ms.

Burroughs said, and her demeanor when she said it, was so out of keeping with everything that

had preceded this evaluation that Mr. Kincaid became immediately concerned and suspicious --

suspicious that something very different from a true evaluation of his work was being

communicated to him, and that he was being set up to be dismissed.

Accordingly, Mr. Kincaid promptly retained counsel, attorney Deborah Martin Norcross

and, on April 25, 2003, Ms. Norcross sent a letter to the Bank stating that Mr. Kincaid had

"reason to believe that the Bank and his immediate supervisor, Sheila Burroughs, have

undertaken to eliminate older highly paid employees, and Mr. Kincaid in particular" and that,

"[i]n an effort to avoid its severance and other economic obligations," the Bank had "begun

creating fictitious reputation-damaging records of performance deficiencies." The letter

proceeded, among other things, to give several examples of how "Ms. Burroughs [had] levied

3

unwarranted criticism against Mr. Kincaid in her effort to create a false and defamatory record against him."

On April 30, 2003, the Bank's Assistant General Counsel Eric Montgomery sent a letter to attorney Norcross acknowledging receipt of her April 25, 2003 letter and stating, "We are investigating the facts and circumstances of your client's claims and will respond to your letter shortly."

On May 20, 2003, attorney Norcross, having received no further communication from the Bank, wrote a follow-up letter to Assistant General Counsel Montgomery. In this letter, attorney Norcross stated that Mr. Kincaid had been "receiving contradictory messages from Ms Burroughs regarding his performance," expressed her concern "that Mr. Kincaid's position not be made any more untenable than it already has become," and requested that the Bank send her "a substantive response to [her] April 25, 2003 letter as quickly as possible, hopefully by no later than early next week."

On June 13, 2003, without the Bank's making any response whatever to attorney Norcross's May 20, 2003 letter, the Bank terminated Mr. Kincaid.

Facts Relevant to Discovery Matters to be Decided

On March 16, 2005, Mr. Kincaid served by telecopier and mail on the Bank a First Request for Production of Documents and a First Set of Interrogatories. Claiming that it needed extra time to assemble the documents and information requested, the Bank asked for an extra 21 days to respond to these discovery requests. On May 9, 2005, after the Bank had had Mr. Kincaid's discovery requests for 54 days, the Bank produced a grand total of 56 Bates-numbered documents in response to Mr. Kincaid's document request.

4

On May 24, 2005, Mr. Kincaid's undersigned counsel sent a letter to one of the Bank's attorneys, Steven Ackermann, reproduced as Exhibit 2 hereto, detailing what Mr. Kincaid believed to be the deficiencies in the Bank's discovery responses and asking the Bank to cure these deficiencies voluntarily, thus obviating the need for Mr. Kincaid to file a motion to compel The Bank never responded to this letter. On June 1, 2 and 3, 2005, Mr. Kincaid took the depositions of four Bank witnesses in Charlotte, North Carolina: Eric Montgomery, the Assistant General Counsel referred to above; Sheila Burroughs, Mr. Kincaid's immediate supervisor, referred to above; Alec Kotopoulos, Ms. Burroughs' immediate supervisor during the relevant period; and Vipin Mayar, Alec Kotopoulos's immediate supervisor during the relevant period. A prominent topic during each of these depositions was the documents requested by Mr Kincaid that the Bank had failed to produce.

On June 7, 2005, Mr. Kincaid's undersigned counsel had a telephone conversation with the Bank's counsel Richard Kane, to go over categories of relevant documents, the existence of which the depositions either confirmed or implied, but which the Bank had failed to produce, and the production of which Mr. Kincaid was demanding. Mr. Kincaid's undersigned counsel followed up on this June 7, 2005 telephone conversation with a letter dated June 23, 2005, reproduced as Exhibit 3 hereto.

The Bank failed to produce a single document beyond the 56 pages of documents it had originally produced, until July 1, 2005, the last day of the originally allotted period for fact discovery. On July 1, 2005, the Bank produced an addition 215 pages of Bank documents, Bates-stamped BA 57 through BA 270; a Privilege Log; several schedules supplementing its original answers to interrogatories; and a covering letter dated July 1, 2005, reproduced as Exhibit 4 hereto.

5

Facts Showing Bank's Misconduct in Providing Discovery

The facts showing that the Bank has engaged in discovery misconduct include, without limitation, the following:

First, in violation of Fed.R.Civ.P. 26(a)(1)(B) and in violation of its discovery obligations under Fed.R.Civ.P. 34, the Bank failed to identify in its Initial Disclosures and failed to include in its May 9, 2005 document production

any documents recording or reflecting communications regarding Mr. Kincaid between Mr. Kincaid's immediate supervisor Sheila Burroughs and the Bank's call-in personnel center. Such documents include the five-page document headed "Perf. Mgmt. - Steven Kincaid," Bates-stamped BA 11 - BA 115, produced by the Bank for the first time on July 1, 2005, and reproduced as Exhibit 5 hereto. There is no excuse for the Bank not having identified this document in its Initial Disclosures and not including it in its May 9, 2005 production. This is especially clear in light of Eric Montgomery's testimony at his June 1, 2005 deposition that "one of the first things [he] would have done" to investigate the claims made in Deborah Norcross's April 25, 2003 letter was "to contact the personnel center to see" whether it had "any records of any kind" regarding Mr. Kincaid. Montgomery Dep. 58, included in excerpts from Montgomery deposition reproduced as Exhibit 6 hereto.

2.      Elizabeth Janak's August 13, 2003 e-mail to Alec Kotopoulos and Alec Kotopoulos's August 13, 2003 responding e-mail to Elizabeth Janak, Bates-stamped BA 116, produced by the Bank for the first time on July 1, 2005, and reproduced as Exhibit 7 hereto. The relevance and importance of this exchange of e-mails, in which Ms. Janak tells Mr. Kotopoulos she wants to discuss with him, among other things, "terminations over the past 12 months - B4 B5 voluntary and involuntary terminations over the past 12 months suggest potential age bias --

6

8/10 (80%) were 40 yrs or older," terminations which Mr. Kotopoulos's responding e-mail recognizes as including the termination of Mr. Kincaid, could not be more clear. Again, the Bank's failure to identify this document in its Initial Disclosures and its failure to include the document in its May 9, 2005 document production, were inexcusable.

Second, the Bank has been continually dilatory not only in providing discovery, but in advising Mr. Kincaid of its position regarding Mr. Kincaid's claims that the Bank's discovery responses were deficient. For example, a review of the correspondence between Mr. Kincaid's undersigned counsel and the Bank's counsel shows that while Mr. Kincaid's counsel has been claiming since his May 24, 2005 letter (reproduced as Exhibit 2 hereto) that the Bank was required to provide discovery regarding other claims of discrimination, the Bank's counsel avoided taking a clear position refusing to provide such discovery until counsel's August 5, 2005 e-mail (reproduced as part of Exhibit 1 hereto). This dilatoriness had the effect of delaying until now the time Mr. Kincaid could properly file his motion to compel such discovery

Third, the Bank has engaged in continual misconduct regarding disclosure of e-mails

      a.     Incredibly, the Bank produced not a single e-mail in its May 9, 2005 document production.

      b.     When Mr. Kincaid's counsel drew attention to this extraordinary gap in the Bank's production of documents during the June 1-3, 2005 depositions of Bank witnesses, the Bank still failed to produce any e-mails.

      c.     Even after Mr. Kincaid's undersigned counsel highlighted the Bank's stonewalling regarding e-mails in his June 23, 2005 letter (reproduced as Exhibit 3 hereto) and demanded that "a further search for pertinent e-mails be made, including, without limitation, a thorough search of all Bank back-up systems" (id.), the Bank continued to be obstructionist, (i)

7

arguing in its July 1, 2005 letter (reproduced as Exhibit 4 hereto) that while the Bank was then, finally, producing some e-mails, its previous non-production of e-mails had been justified; and (ii) stating that

> even if the Bank is able to locate backup tapes for the period covered by Plaintiff's employment, [Plaintiff] will need to narrow [his] request to a more reasonable search. Further, absent unusual circumstance, [the Bank] would expect Plaintiff to pay the costs of such a search

Id. at p. 1

d.    Only when threatened with a motion to compel and for sanctions did the Bank finally, in its August 5, 2005 e-mail (reproduced as part of Exhibit   hereto) "agree to search the Bank's e-mail backup tapes" at the Bank's "own expense." Nevertheless, even now the Bank's foot-dragging continues with the Bank failing, in spite of undersigned counsel's repeated requests by voicemail and e-mail, to commit itself to a deadline by which its search of backup tapes for e-mails will be completed. Consequently, as of today, Mr. Kincaid still does not know whether the Bank will be producing any e-mails beyond the few it produced on July 2005, and also does not know by what date the Bank will be producing any such additional e-mails if the Bank manages to find them

## Argument

I.    MR. KINCAID IS ENTITLED TO DISCOVERY
REGARDING OTHER CLAIMS OF DISCRIMINATION

A.    Document Requests and Interrogatories Raising Issue

Mr. Kincaid's Document Request 15

All documents CONCERNING claims against defendant of improper harassment, discrimination or retaliation made by any Market Information Manager at any time from January 1, 2002 to the date defendant responds to this documents request.

8

### Bank's Response to Document Request 15

Defendant objects to this Request to the extent it seeks information protected from disclosure on the basis of the attorney-client privilege, the attorney work product doctrine, and/or the consulting expert privilege, or seeks information or materials prepared in anticipation of litigation or the discovery of trial strategies and mental impressions. Defendant further objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive. Defendant objects that this Request is vague in that it fails to define "claims." Furthermore, this Request is not sufficiently limited in scope and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## Mr. Kincaid's Document Request 16

All documents CONCERNING claims against defendant of improper harassment, discrimination or retaliation made by any person formerly or currently employed in defendant's Customer Analysis Modeling & Research Department at any time from January 1, 2000 to the date defendant responds to this document request.

### Bank's Response to Document Request 16

Defendant objects to this Request to the extent it seeks information protected form disclosure on the basis of the attorney-client privilege, the attorney work product doctrine, and/or the consulting expert privilege, or seeks information or materials prepared in anticipation of litigation or the discovery of trial strategies and mental impressions. Defendant further objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive. Defendant objects that this Request is vague in that it fails to define "claims." Furthermore, this Request is not sufficiently limited in scope and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## Mr. Kincaid's Document Request 17

All documents CONCERNING claims against defendant of improper harassment, discrimination or retaliation made by any person who left the employ of defendant's Competitive Analysis unit at any time between October 1, 2002 and May 31, 2003.

### Bank's Response to Document Request 17

Defendant objects to this Request to the extent it seeks information protected from disclosure on the basis of the attorney-client privilege, the attorney work product doctrine, and/or the consulting expert privilege, or seeks information or materials prepared in anticipation of litigation or the discovery of trial strategies and mental impressions. Defendant objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive. Defendant objects that this Request is vague in that it fails to define "claims." Defendant further objects to this Request on the grounds that it is overly broad because Plaintiff was not a member of a unit named "Competitive Analysis" at any time. In addition, this Request is not sufficiently limited

9

in scope, and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Mr. Kincaid's Interrogatory 11

IDENTIFY each person employed by defendant as a Market Information Manager at any time from August 20, 2002 to June 13, 2003. For each such person, state: (a) the person's date of birth; (b) the date the person was first hired by defendant; (c) whether the person is still employed by defendant and, if not, the date the person ceased to be employed by defendant, and the circumstances of the person's cessation of employment, including, without limitation, whether the person was terminated; (d) the person's salary and whether the person's salary was ever increased and, if so, when it was increased and by how much; and (e) <u>whether the person ever made a claim that the defendant improperly harassed, discriminated against or retaliated against the person and, if so, describe the substance of the claim and whether the defendant ever investigated the claim.</u>

(emphasis added)

Bank's Response to Interrogatory 11

Defendant objects to this Interrogatory on the grounds that it is overly broad. Defendant further objects that this Interrogatory is not sufficiently limited in scope and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Mr. Kincaid's Interrogatory 12

IDENTIFY each person employed by defendant in the Customer Analysis Modeling & Research Department at any time from August 20, 2002 to June 13, 2003. For each such person state: (a) the person's date of birth; (b) the date the person was first hired by defendant; (c) whether the person is still employed by defendant and, if not, the date the person ceased to be employed by defendant, and the circumstances of the person's cessation of employment, including, without limitation, whether the person was terminated; (d) the person's salary and whether the person's salary was ever increased and, if so, when it was increased and by how much; and (e) <u>whether the person ever made a claim that the defendant improperly harassed, discriminated against or retaliated against the person and, if so, describe the substance of the claim and whether the defendant ever investigated the claim.</u>

(emphasis added)

Bank's Response to Interrogatory 12

Defendant objects to this Interrogatory on the grounds that it is overly broad. Defendant further objects that this Interrogatory is not sufficiently limited in scope and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Mr. Kincaid's Interrogatory 13

10

IDENTIFY each person in the defendant's Competitive Analysis unit who ceased to be employed by defendant at any time between October 1, 2002 and May 31, 2003 by virtue of having been terminated by defendant or having left the company for any other reason. For each such person, state: (a) the person's date of birth; (b) the date the person left defendant's employment; (c) whether the person was terminated by defendant and, if so, the grounds for the termination; and (d) whether the person ever claimed that defendant had improperly harassed, discriminated against or retaliated against the person and, if so, describe the substance of the claim and whether defendant ever investigated the claim.

(emphasis added)

### Bank's Response to Interrogatory 13

Defendant objects to this Interrogatory on the grounds that it is overly broad in that Plaintiff was not a member of a unit named "Competitive Analysis" at any time. Accordingly, this Interrogatory is not sufficiently limited in scope and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## Mr. Kincaid's Interrogatory 14

IDENTIFY each person who has made a chare and/or brought a lawsuit against defendant alleging age discrimination, harassment and/or retaliation at any time from January 1, 2000 to the date defendant answers theses interrogatories and, with regard to each such charge or lawsuit, describe the substance of the claim made and state the date and place of the alleged misconduct. Further with regard to each such lawsuit, state the title of the case, the court where the case was filed, the case's docket number and the case's current status.

### Bank's Response to Interrogatory 14

Defendant objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and oppressive. Defendant further objects that this Interrogatory is not sufficiently limited in scope and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**B.     Mr. Kincaid's Position**

The Bank should be ordered to produce the documents requested by Requests 15, 16 and 17 and should be ordered to answer Interrogatories 11(e), 12(e), 13(d) and 14, all quoted above.

It has long been "recognized that since discrimination is often subtle and pervasive, plaintiffs must be able to rely on circumstantial evidence to prove discriminatory intent."

Cummings v. Standard Register Company, 265 F.3d 56, 64, (1st Cir. 2001); accord, Conway v.

1

Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987). Claims of discrimination made by other

employees constitute one of the classic forms of such circumstantial evidence. For example, in

Hebert v. Mohawk Rubber Company, 872 F.2d 104 (1st Cir. 1989), the First Circuit recognized

that Hebert's claim of age discrimination drew evidentiary support from the fact four other

employees had decided "to prosecute ADEA actions." 872 F.2d at 114

    At the discovery stage, a plaintiff such as Mr. Kincaid is entitled to obtain discovery

regarding other claims of discrimination not just because the claims themselves may be

admissible at trial but also because information regarding such claims may lead to evidence of

other acts of discrimination by the employer. It is well established that discriminatory conduct

by an employer prior, simultaneous, or subsequent to the conduct at issue may be "probative in

an employment discrimination case on the issue of motive or intent     That the [discriminatory

conduct] occurred subsequent, rather than prior, to the alleged discriminatory conduct does not

alter [its] admissibility." Brown v. Trustees of Boston University, 891 F.2d 337, 349-50 (1st Cir

1989).

    Nor is it appropriate to narrowly limit a plaintiff's discovery, as the Bank has argued (see

letter from Bank's counsel dated August 1, 2005 and e-mail from Bank's counsel dated August

5, 2005, reproduced in Exhibit 1 hereto), to other claims of discrimination solely against that

plaintiff's supervisors, and to other claims of only that particular type of discrimination alleged

by the plaintiff. As the First Circuit stated in Conway v. Electro Switch Corp., 825 F.2d 593 (1st

Cir. 1987),

> . . . [E]vidence of a corporate state-of-mind or a discriminatory atmosphere is not
> rendered irrelevant by its failure to coincide precisely with the particular actors or
> timeframe involved in the specific events that generated a claim of discriminatory
> treatment. The rationale underlying the admission of such evidence militates
> against its exclusion on those grounds. Evidence of institutional state-of-mind
> may be presented for the consideration of the trier-of-fact because an employer's

12

willingness to consider impermissible factors such as race, age, sex, national origin, or religion while engaging in one set of presumably neutral employment decisions . . . might tend to support an inference that such impermissible considerations may have entered into another area of ostensibly neutral employment decisions. . . . While this court has recognized that "proof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual," it may be one indication that the reasons given for the employment action at issue were "implicitly influenced" by the fact that the plaintiff was of a given race, age, sex or religion.

825 F.2d at 597-98

Further, the First Circuit stated in <u>Cummings v. Standard Register Company</u>, 265 F.3d 56 (1st Cir. 2001),

. . . [E]vidence of a discriminatory "atmosphere" may sometimes be relevant to showing the corporate state-of-mind at the time of the termination . . . . While such evidence does not in itself prove a claim of discrimination, see Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 249-50 (1st Cir. 1997), "[it] does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." Conway, 825 F.2d at 597 (citing Sweeney v. Bd. of Trs. of Keene State Coll., 604 F.2d 106, 113 (1st Cir. 1979)); see Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000).

265 F.3d at 63 (footnote omitted).

Applying the foregoing principles here, it is manifest that the Bank should be required to produce documents and proved answers to the full extent requested by the document requests and interrogatories quoted in A. above.

13

II.    MR. KINCAID IS ENTITLED TO DISCOVERY
REGARDING THE BANK'S INTERNAL
INVESTIGATION OF MR. KINCAID'S APRIL 25, 2003
<u>CLAIM OF MISTREATMENT AND DISCRIMINATION</u>

A.    Mr. Kincaid's Interrogatory, Document Requests and
<u>Deposition Question, and Items in the Bank's Privilege Log, Raising Issue</u>

<u>Mr. Kincaid's Document Request 8</u>

All documents which discuss, describe, mention or refer to plaintiff.

<u>Bank's Response to Document Request 8</u>

Defendant objects to this Request to the extent it seeks information protected from
disclosure on the basis of the attorney-client privilege, the attorney work-product doctrine, and/or
the consulting expert privilege, or seeks information or material prepared in anticipation of
litigation or the discovery or trial strategies and mental impressions. Defendant further objects to
this Request on the grounds that it is overly broad, unduly burdensome, oppressive, and vague.
Furthermore, this Request is not sufficiently limited in scope and seeks information that is not
relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to
and without waiving the foregoing objections, see documents attached hereto as Exhibits "A, C,
D, and E."

<u>Mr. Kincaid's Document Request 9</u>

In his April 30, 2003 letter to plaintiff's then attorney Deborah Martin Norcross,
defendant's Assistant General Counsel Eric A. Montgomery stated, in pertinent part, "We are
investigating the facts and circumstances of your client's claims and will respond to your letter
shortly." Please produce all documents which discuss, describe, mention refer to, or evidence:
(a) any such investigating conducted prior to the writing of counsel Montgomery's letter; and (b)
any such investigating done subsequent to the writing of counsel Montgomery's letter.

<u>Bank's Response to Document Request 9</u>

Defendant objects to this Request to the extent it seeks information protected form
disclosure on the basis of the attorney-client privilege, the attorney work-product doctrine, or
seeks information or materials prepared in anticipation of litigation or the discovery of trial
strategies and mental impressions. Defendant objects to this Request on the grounds that it is
vague and overly broad. Subject to and without waiving the foregoing objections, although an
investigation was planned in response to Norcross' letter, it had not begun prior to Plaintiff's
termination. Information regarding subsequent investigation after Plaintiff's termination is
protected from disclosure by the attorney client and work product privileges.

<u>Mr. Kincaid's Interrogatory 4</u>

14

IDENTIFY each person who participated in the investigation of the claims made by plaintiff in the letter of plaintiff's counsel Deborah Martin Norcross to J. Steele Alphin dated April 25, 2003 and, with regard to each such person, describe the role played and the actions taken by the person during the course of the investigation.

Bank's Response to Interrogatory 4

Defendants object this Interrogatory on the grounds that it is vague and overly broad. Subject to and without waiving the foregoing objections, although an investigation was planned in response to Norcross' letter, it had not begun prior to Plaintiff's termination. Information regarding subsequent investigation after Plaintiff's termination is protected from disclosure by the attorney client and work product privileges.

Excerpt from 6/1/05 Deposition of Eric Montgomery

Q.    What was said in this meeting with Alec Kotopoulos and Sheila Burroughs and your paralegal?

        MR. KANE:   Objection: attorney-client

        MR. FINE:    You're directing the witness not to answer?

        MR. KANE:    am.

                            Montgomery Dep. 53 (reproduced as part of Exhibit 6 hereto)

Excerpt from the Bank's 7/1/05 Privilege Log

| TYPE OF DOCUMENT | BATES NO. | DATE | PREPARER | RECIPIENTS | DESCRIPTION | PRIVILEGE |
|---|---|---|---|---|---|---|
| E-mail | N/A | 07/15/03 | Eric A. Montgomery, (Bank of America In-house legal counsel); Shiela Burroughs | Eric A. Montgomery (Bank of America In-house legal counsel); Martha W. Moore (Paralegal working at the direction of Eric Montgomery, Bank of America In- | Email with attachment from Sheila Burroughs to Eric Montgomery | Attorney-client and Work Product |

15

| TYPE OF DOCUMENT | BATES NO. | DATE | PREPARER | RECIPIENTS | DESCRIPTION | PRIVILEGE |
|---|---|---|---|---|---|---|
| | | | | house legal counsel) | | |
| Handwritten Notes | N/A | 07/10/03 | Martha W. Moore (Paralegal working at the direction of Eric Montgomery, Bank of America In-house legal counsel) | N/A | Notes from meeting between Eric Montgomery, Sheila Burroughs, Alec Kotopoulos on 7/10/03 | Attorney-client and Work Product |
| Handwritten Notes | N/A/ | 08/2002 | Martha W. Moore (Paralegal working at the direction of Eric Montgomery, Bank of America In-house legal counsel) | N/A | Handwritten notes regarding meeting between Eric Montgomery Sheila Burroughs, Alec Kotopoulos | Attorney-client and Work Product |
| Handwritten Letter | N/A | 07/18/03 | Sheila Burroughs | Eric A. Montgomery (Bank of America In-house legal counsel) | Handwritten correspondence from Sheila Burroughs to Eric Montgomery | Attorney-client and Work Product |
| Typewritten Memorandum | N/A | 07/15/03 | Sheila Burroughs | Eric A. Montgomery (Bank of America In-house legal counsel) | Typewritten memorandum regarding Plaintiff prepared by Sheila Burroughs at the request of Eric Montgomery | Attorney-client and Work Product |

16

B.    Mr. Kincaid's Position

The Bank should be ordered to:  produce the documents listed in the above-quoted

excerpt from the Bank's July 1, 2005 Privilege Log; provide a full, substantive answer to Mr

Kincaid's Interrogatory 4; and answer deposition questions regarding the Bank's internal

investigation up to the point the Bank received Mr. Kincaid's July 24, 2003 Charge of

Discrimination to the EEOC.

The Bank's objections to providing the foregoing discovery must be overruled for two

reasons: first, because, contrary to the Bank's position, the documents and information Mr.

Kincaid seeks are <u>not</u> protected by the work product doctrine or the attorney-client privilege;

second, because, even assuming -- contrary to fact -- that the documents and information were so

protected, the protection would be overcome by virtue of the Bank's wrongful destruction of e-

mail evidence.

The Documents and Information Are <u>Not</u>
Protected by the Work Product Doctrine
or the Attorney-Client Privilege.

As described in the Statement of Facts above, on April 25, 2003, Mr. Kincaid's then

counsel Deborah Martin Norcross sent a letter to the Bank claiming that the Bank was treating

Mr. Kincaid improperly and subjecting him to unlawful discrimination.  As also described above,

Ms.  Norcross's letter was referred to the Bank's Assistant General Counsel Eric Montgomery

The Bank's written Sexual Harassment and Discrimination Policy states, in pertinent

part, that the Bank conducts "a thorough investigation" of "reported incidents of sexual

harassment, other discrimination and retaliation," and Assistant General Counsel Montgomery

testified in his deposition that it was, indeed, the policy of the Bank to investigate claims such as

the claims made in Ms. Norcross's April 25, 2003 letter.  Montgomery Dep. 76-77.  Further, Mr.

17

Montgomery testified that he set up a meeting with Alec Kotopoulos and Sheila Burroughs for the purpose of "get[ting] all the information to provide an accurate response to [Deborah Norcross's April 25, 2003] letter." Montgomery Dep. 52. This is plainly the meeting identified in the Bank's July 1, 2005 Privilege Log as having taken place on July 10, 2003

Because the foregoing July 10, 2003 meeting was held as part of the Bank's standard internal investigation, and because Mr. Kincaid did not file a Charge of Discrimination with the EEOC until two weeks later, on July 24, 2003, the situation here is directly analogous to the situation addressed in <u>Miller v. Federal Express Corp.</u>, 186 F.R.D. 376 (W.D. Tenn. 1999). Just as in <u>Miller</u>, where the Court ruled that documents generated as part of Federal Express's internal investigation prior to the plaintiff's filing a discrimination charge with the EEOC were <u>not</u> protected from disclosure by the work product doctrine (186 F.R.D. at 387-88), so here, the July 10, 2003 meeting set up by Mr. Montgomery, the Bank's notes regarding that meeting, and the other documents identified on the Bank's Privilege Log as having been generated as part of the Bank's internal investigation prior to the Bank's receipt of Mr. Kincaid's July 24, 2003 EEOC Charge, are likewise <u>not</u> shielded by the work product doctrine. Nor are the Bank's foregoing oral and written communications protected by the attorney-client privilege because, just as in <u>Miller</u>, the Bank has not, and cannot, "carry its burden" of demonstrating that "the communications between corporate counsel and corporate employees" were for "the purpose of securr[ing] legal advice from counsel" (186 F.R.D. at 388). As Mr. Montgomery testified at his deposition, the purpose of his communications with Ms. Burroughs and Mr. Kotopoulos were <u>not</u> for this purpose but rather for the purpose of enabling Mr. Montgomery to obtain the information he needed to "provide an accurate response to [Deborah Norcross's April 25, 2003] letter." Montgomery Dep. 52

18

2.    Even Assuming -- Contrary to Fact -- the Documents
and Information Were Protected by the Work
Product Doctrine and/or the Attorney Client Privilege,
Such Protection Would Be Overcome By Virtue of the Bank's
Wrongful Destruction of E-mail Evidence.

Given the wrongful destruction of e-mail evidence discussed in the next section of this

Memorandum, it is manifest that even assuming -- contrary to fact    that documents generated as

part of the Bank's internal investigation were conditionally protected from disclosure by the

work-product doctrine, such protection would be overcome because Mr. Kincaid would clearly

meet the "substantial need" and "undue hardship" requirements of Fed.R.Civ.P. 26(b)(3).  Mr.

Kincaid would meet these requirements because, having been wrongfully deprived of

contemporaneous e-mail evidence pertinent to his claims of discrimination and retaliation, Mr

Kincaid would have "substantial need" of the Bank's internal investigation documents and

information as the closest available substitute for the wrongfully destroyed e-mail evidence -- a

substitute the "substantial equivalent" of which it would not simply be "unduly hard" but, by

virtue of the Bank's misconduct, literally impossible for Mr. Kincaid to obtain "by other means.

Moreover, even assuming -- contrary to fact -- that the internal investigation documents

and information were protected from disclosure by the attorney-client privilege, such protection

would also be overcome.  As a matter of basic fairness, the Court should review the documents

and information in camera for the reasons and purposes discussed in the next section of this

Memorandum.

19

III.    GIVEN THE BANK'S WRONGFUL DESTRUCTION
OF E-MAIL EVIDENCE, THE COURT SHOULD REVIEW
IN CAMERA THE DOCUMENTS THE BANK HAS
WITHHELD FROM PRODUCTION ON THE GROUND OF
PRIVILEGE TO (1) ASCERTAIN WHETHER ANY OF THESE
DOCUMENTS CAST LIGHT ON THE DESTRUCTION OF
EVIDENCE, AND (2) DETERMINE WHETHER ANY OF
THESE DOCUMENTS SHOULD, IN FAIRNESS, BE
DISCLOSED TO MR. KINCAID.

A.    Much E-mail Evidence Has Been Destroyed.

As indicated in the Statement of Facts above, the only e-mails the Bank has produced to date are the e-mails it produced on July   , 2005. Mr. Kincaid is attaching hereto as Exhibit 8 a listing in chronological order of all the e-mails the Bank has now produced, noting in each case the date of the e-mail, its author and recipient, and its Bates number. A review of this list reveals that the e-mails produced are clustered in just a few time periods. There are, for example, 21 e-mails from September 2002 alone, but no e-mails whatever from November 2002, December 2002, January 2003, February 2003 or March 2003. This pattern makes it obvious that a great deal of e-mail evidence has been destroyed, especially when deposition testimony of the Bank witnesses is also considered. See, e.g., Kotopoulos Dep. 30 ("Everyone communicated with everyone on e-mail all the time."); Montgomery Dep. 115 ("Q. And the bank conducts a lot of internal communications by e-mail, right? A. Yes.".

B.    The Bank's Destruction of E-Mail Evidence Was Wrongful.

As described in the Statement of Facts above, Mr. Kincaid's attorney, Deborah Martin Norcross, sent her initial letter to the Bank on April 25, 2003. It is apparent that if, upon receipt of that letter, Assistant General Counsel Montgomery or any other Bank employee had given a directive requiring the preservation of all e-mails discussing, describing, mentioning or referring to Mr. Kincaid, the Bank would have been able to produce many more e-mails regarding Mr.

20

Kincaid than the relatively few e-mails the Bank has produced. It is also apparent that, wholly apart from the issuance of any such directive, if the supervisory employees involved -- Sheila Burroughs, Alec Kotopoulos, Vipin Mayar and perhaps others -- had any sense of the need, in the interests of basic fairness, to preserve e-mails regarding an employee, such as Mr. Kincaid, who was at risk of being involuntarily terminated, the Bank would have been able to produce many more e-mails than it has produced

Consequently, the very dearth of the Bank's e-mail production evidences the absence of any such directive, and the absence of any such sense of need to preserve in the interests of basic fairness, and so gives rise to the unavoidable conclusion that the destruction of e-mail evidence regarding Mr. Kincaid was clearly wrongful

Or, to come at this in a somewhat different way, the Bank had, at all relevant times, a written anti-discrimination policy that represented, in pertinent part, that the Bank would conduct a "thorough investigation" of reported incidents of "sexual harassment, other discrimination and retaliation." The Bank clearly could not fulfill its stated commitment to conduct such a "thorough examination" unless the Bank had measures in place to ensure that e-mail evidence was preserved because, as Mr. Montgomery acknowledged in his deposition, "sometimes the evidence of the discriminatory intent could be in an e-mail." Montgomery Dep 15-16. The paucity of the Bank's e-mail production in this case shows that the Bank did not have such measures in place and was, therefore, not in a position to conduct the "thorough investigations" it promised to conduct.

21

C.    In Light of the Bank's Wrongful Destruction of E-Mail Evidence
the Court Should Examine In Camera the Documents the Bank
Has Withheld from Production on the Ground of Privilege.

As discussed in the Statement of Facts above, on August 5, 2005, the Bank stated for the

first time that it would conduct, at its own expense, a search of backup tapes to see whether it

could retrieve e-mails regarding Mr. Kincaid that the Bank has not otherwise been able to

produce.  As of the date this Memorandum is being submitted to the Court, August 11, 2005, it is

not yet clear what e-mails regarding Mr. Kincaid, if any, the Bank will be able to produce as a

result of this effort.  Consequently, it is premature for this Court to decide the full scope of

remedial measures the Court should take in light of the Bank's wrongful destruction of e-mail

evidence.  Nevertheless, there is at least one measure the Court should implement now, without

waiting for the uncertain outcome of the Bank's foregoing search.  That measure is to review in

camera all the documents the Bank has identified in its Privilege Log, reproduced as Exhibit 9

hereto, as having been withheld from production on the ground of privilege.

Such in camera review would clearly be justified and appropriate because one or more of

the withheld documents may:  (1) cast light on the issue of whether e-mail evidence, favorable to

Mr. Kincaid, was knowingly or willfully destroyed; and/or (2) be able to provide factual

information to Mr. Kincaid comparable to factual information the Bank should have provided to

Mr. Kincaid in the form of e-mail evidence but which the Bank has not been able to provide to

Mr. Kincaid as a result of the wrongful destruction of that evidence.

22

The foregoing remedy is solidly justified pursuant to the principles pertaining to the

wrongful destruction of e-mail evidence discussed in cases such as <u>Zubulake v. UBS Warburg</u>

<u>LLC</u>, 2004 WL 1620866 (S.D.N.Y. 2004) at *6 ("Spoliation is 'the destruction or significant

alteration of evidence, or the failure to preserve property for another's use as evidence in pending

or reasonably foreseeable litigation       The determination of an appropriate sanction for

spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-

by-case basis."), *12 (". . . [A] major consideration in choosing an appropriate sanction [for

spoliation]      is to restore [the litigant who is the victim of the spoliation] to the position that

[the litigant] would have been in had [the spoliator] faithfully discharged its discovery

obligations.")

<blockquote>
IV.    IN VIEW OF THE BANK'S WRONGFUL DESTRUCTION
OF E-MAIL EVIDENCE AND WRONGFUL DELAY IN
PROVIDING FAIR DISCOVERY, THE COURT SHOULD:
(A) SHORTEN THE BANK'S TIME TO RESPOND TO MR.
KINCAID'S FOLLOW-UP DISCOVERY REQUESTS; AND
(B) ORDER THE BANK TO REIMBURSE MR. KINCAID FOR
THE COSTS HE HAS INCURRED, AND WILL INCUR, AS A
<u>RESULT OF THE BANK'S MISCONDUCT.</u>
</blockquote>

Because of the Bank's discovery misconduct, described in the Statement of Facts above,

Mr. Kincaid has far less time than he should have to complete discovery. To enable Mr. Kincaid

to complete discovery in the time allotted, and to avoid rewarding the Bank for its discovery

misconduct, this Court should shorten from 30 days to 10 days the Bank's time to respond to Mr.

Kincaid's follow-up interrogatories and document requests.

Further, the Court should order the Bank to reimburse Mr. Kincaid for the costs he has

incurred, and will incur, as a direct result of the Bank's discovery misconduct. For example,

given the Bank's failure to produce several critically important documents prior to Ms.

Burroughs' and Mr. Kotopoulos's depositions in early June 2005 (<u>see</u> Statement of Facts above),

the Bank has agreed that Mr. Kincaid may take supplementary depositions of Ms. Burroughs and

Mr. Kotopoulos regarding such documents. But the Bank has refused to agree to reimburse Mr.

Kincaid for the cost of such supplementary depositions. Since such supplementary depositions

are necessary only because of the Bank's discovery misconduct, the cost of such supplementary

depositions is an example of a cost the Court should order the Bank to pay

Dated: August    , 2005

David J. Fine, BBO #165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Attorney for Plaintiff

Certificate of Service

I hereby certify that I have this day served the foregoing by causing true copies thereof to
be transmitted electronically and mailed, first class postage prepaid to, Richard F. Kane and
Steven T. Ackermann, Esqs., McGuire Woods LLP, Bank of America Corporate Center, 100
North Tryon Street, Suite 2900, Charlotte, NC 28202, and to George P. Kostakos, Edwards &
Angell, LLP, 2800 Financial Plaza, Providence, RI 02903, attorneys for defendant.

Dated: August 11, 2005

David J. Fine

24