UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STEVEN R. KINCAID, ) | |
| ) | |
| Plaintiff, ) | CA No. 04 CV 11522 WGY |
| ) | |
| vs. ) | |
| ) | |
| BANK OF AMERICA CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## AFFIDAVIT OF SIOBHAN SWEENEY, COUNSEL FOR DEFENDANT

Now comes Siobhan Sweeney, who deposes and swears as follows:

1.      My name is Siobhan Sweeney.  I am attorney with the firm of Edwards & Angell, LLP and I am counsel of record for Bank of America Corporation, Defendant in the above-captioned matter.

2.      Attached hereto in connection with Defendant's Statement of Material Facts In Support Of Its Motion For Summary Judgment, are the following exhibits:

Exhibit A      Excerpts of the depositions of Sheila K. Burroghs

Exhibit B      Affidavit of Sheila K. Burroughs

Exhibit C      Excerpts of the deposition of Steven R. Kincaid

Exhibit D      Excerpts of the deposition of Alec Kotopoulos

Exhibit E      Excerpts of the deposition of Eric A. Montgomery

Exhibit F      Complaint and Jury Demand

Exhibit G      Correspondence and Notice of Right to Sue from Equal Employment Opportunity Commission.

Signed under the penalties of perjury, this 21st day of October, 2005.

/s/ Siobhan Sweeney
Siobhan Sweeney
BBO No. 562118
Edwards & Angell, LLP
101 Federal Street
Boston, MA 02110
Phone:        617.439.4444
Fax:           617.439.4170

EXHIBIT C

1

1     Volume 1, Pages 1-111, Exhibits 1-9

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE DISTRICT OF MASSACHUSETTS

4   No. 04 CIV 11522 (WGY)

5   - - - - - - - - - - - - - - - x

6   STEVEN R. KINCAID              x

7      Plaintiff                   x

8      v.                          x

9   BANK OF AMERICA CORPORATION    x

10     Defendant                   x

11  - - - - - - - - - - - - - - - x

12

13     DEPOSITION of STEVEN RANDALL KINCAID, Ph.D.

14   Wednesday, May 18, 2005, 10:15 a.m. to 2:23 p.m.

15        Offices of Edwards & Angell, LLP

16     101 Federal Street, Boston, Massachusetts

17

18  - - - - - - - - - -  JONATHAN H. YOUNG, RDR, CRR  - - - - - - - - - - -

19               COURT REPORTER

20           EPPLEY COURT REPORTING

21               P. O. Box 382

22        Hopedale, Massachusetts 01747

23     508.478.9795    Fax 508.478.0595

24            leppley@msn.com

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

33

```
 1              [Recess taken]

 2      Q.   Mr. Kincaid, let's talk a little more about

 3   the process whereby you obtained employment with

 4   Bank of America.

 5              After you provided information to

 6   Management Recruiters, take me through the process,

 7   if you would, up to the point of your actually

 8   obtaining employment with Bank of America.

 9      A.   There were three parts.  First, there were

10   some interviews; and they made a formal offer, and

11   we negotiated briefly, and I accepted.

12      Q.   Who did you interview with?

13      A.   I interviewed with Kim Heenan.

14      Q.   What was her position with the bank?

15      A.   Personnel.

16      Q.   She was in the personnel department?

17      A.   Or human resources; personnel department.

18      Q.   Who else did you interview with?

19      A.   There was somebody in San Francisco that I

20   interviewed with over the phone, but I can't

21   remember the gentleman's name.

22      Q.   It was a male?

23      A.   It was.

24      Q.   Was that before or after the Kim Heenan
```

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

1  negotiate the terms.

2      Q.  What did you attempt to negotiate?

3      A.  It was some aspect of the relocation

4  policy.  I think that I wanted to be able to have

5  more than one trip to Charlotte to look for housing.

6  I'm not absolutely certain, but that's the best I

7  can recall.

8      Q.  Do you know who made the decision to offer

9  you employment with Bank of America?

10     A.  The management recruiter suggested to me

11  that it was Sheila's decision.  In response to your

12  question, I can't say...

13     Q.  I'm sorry; you tailed off.

14     A.  I was led to believe by the management

15  recruiter that Sheila had made the decision, but

16  that's based on just information from him.  I don't

17  have other independent information about that.

18              [Kincaid Exhibit 6 marked for

19  identification]

20     Q.  If you would, Mr. Kincaid, take a look at

21  what's been handed to you and marked as Exhibit

22  Number 6.

23              Is that a copy of the offer letter you

24  received from Bank of America?

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

38

1      A.  To the best of my ability to look at it

2  here, yes, it is.

3      Q.  And I note that it's signed by Kim Heenan

4  and dated July 22.  Is it after you got this letter

5  that you attempted to negotiate on the relocation

6  package; or before?

7      A.  I think I asked before the letter came

8  would I be able to have more than one trip; and the

9  management-search person said, I believe, that he

10  thought it was doubtful, and probably wouldn't

11  happen.

12      Q.  If you'll turn to the third page of this

13  document, directing your attention to the first full

14  paragraph below the typewritten portion that is in a

15  block; do you follow me?

16      A.  I do.

17      Q.  Where it starts This letter?

18      A.  Yes.

19      Q.  Would you read that for us, please?

20      A.  [Reading] This letter does not constitute

21  an employment contract.

22          Nothing contained in this letter or in

23  any other communications you have had with Bank of

24  America representatives should be construed in any

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

39

1    way as a guarantee of continued employment for any

2    period of time, but rather your employment is on an

3    at-will basis.

4                    That is, you or Bank of America may end

5    the employment relationship with or without notice

6    or cause.

7                    No officer or representative of Bank of

8    America has any authority to make any agreement,

9    express or implied, which is contrary to the

10    foregoing.

11        Q.    Would you turn to the next page.  Is that

12    your signature on that page?

13        A.    Yes, it is.

14        Q.    You did not have a written contract of

15    employment with Bank of America; is that correct?

16                    MR. FINE:    Objection.

17        Q.    Go ahead.

18                    MR. FINE:    If you understand the

19    question, you can answer it.

20        A.    I didn't have a contract other than this

21    with Bank of America; that is, a written contract.

22        Q.    This is the only written document relating

23    to your employment with Bank of America?

24                    MR. FINE:    Objection.

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

40

```
 1        Q.   Is that what you're saying?

 2             MR. FINE:   Objection.

 3        A.   No.   There are some other documents that

 4   related to it.

 5        Q.   Okay.

 6        A.   What I'm saying is that that's the only

 7   piece of paper that dealt with these issues that

 8   we're talking about now.

 9             [Kincaid Exhibit 7 marked for

10   identification]

11        Q.   Would you examine Exhibit Number 7, which

12   you have in front of you now.

13             Is that your signature on the last page,

14   Page Number 4, of Exhibit Number 7?

15        A.   Yes, it is.

16        Q.   If you'll flip over to the first page, I

17   note that the form is entitled Applicant

18   Acknowledgment Form; correct?

19        A.   That's correct.

20        Q.   What's the date of this document?

21        A.   6/27/02.

22        Q.   Directing your attention to Paragraph G

23   towards the bottom of the first page, I ask you

24   if you'll read that into the record, please.
```

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

1    A.   [Reading] I understand that if I am

2    offered a position with Bank of America the offer

3    will be for employment on an at-will basis; that is,

4    the employment relationship is not guaranteed for

5    any specific period of time, and may be ended by

6    Bank of America or me at any time with or

7    without notice or cause.

8    Q.   Was June 27 of 2002 the date that you came

9    to Charlotte for the interviews?

10    A.   I can't recall.

11    Q.   When you came for the interviews, did you

12    fill out some forms with the bank?

13    A.   Yes, I did.

14    Q.   Do you recall when you reported for work at

15    Bank of America?

16    A.   I believe it was August 19, 2002.

17    Q.   And who was your supervisor when you

18    started with the bank?

19    A.   Sheila Burroughs.

20    Q.   Was she still at that time reporting to

21    Vipin Mayer?

22    A.   Yes, she was.

23    Q.   Did there come a time when the supervisor

24    or manager to whom Sheila Burroughs reported changed

Steven Randall Kincaid, Ph.D.
May 18, 2005

54

```
 1        A.   Sheila Burroughs.

 2        Q.   And what was the reason that she told you?

 3        A.   The reason was that CAMR had negotiated

 4   a broad agreement with Forbes to get reduced prices

 5   on research consulting and research execution in

 6   exchange for giving them a certain dollar volume

 7   of business.

 8              MR. FINE:  Did you finish your answer?

 9              MR. KANE:  I thought so.

10        Q.   Did you finish?

11        A.   Yes.

12              MR. FINE:   Okay.

13        Q.   While you were employed at Bank of America,

14   Sheila Burroughs was your supervisor the entire

15   time; correct?

16        A.   Correct.

17        Q.   While you were employed, did anyone ever

18   praise your work performance?

19        A.   Yes.

20        Q.   Who praised your work performance?

21        A.   Susan Halumis.  Alec Kotopoulos.

22   Sheila Burroughs.

23              Vale, which was the nickname of the

24   guy we mentioned earlier whose name I couldn't
```

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

55

1   pronounce.  V-a-l-e; his nickname was Vale.

2            Paul.  And Chuck, the head of the

3   credit-card unit.

4       Q.  And with regard to Paul and Chuck, you

5   can't recall their last names either?

6       A.  I'm sorry; I can't, no.

7       Q.  Now, what did Susan Halumis say about your

8   performance in praising it?

9       A.  Well, Susan Halumis said that she nominated

10  me for an award the first month I was employed at

11  the Bank of America, let me rephrase that.

12            She entered my name to be entered on

13  a bulletin-board notification area, for lack of a

14  better term, saying, there was an acronym for it but

15  I forget what it was, that you had gone above and

16  beyond the call of duty in service to customer

17  satisfaction.  My name was on the board for a

18  month or so.

19      Q.  And Susan was the person that nominated you

20  for that award?

21      A.  That's correct, yes.

22      Q.  How about Alec?  What did he say in praise

23  of your performance?

24      A.  Let me just finish with the Susan, if I

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

56

1    can, before I move on.

2        Q.   Okay; sure.

3        A.   On a second occasion, when I had

4    come up with a new and innovative way to measure

5    statistical significance for the study that she

6    worked on, she made a point of calling me after

7    the telephone meeting we had had to say I had

8    done an excellent job;

9            and she called Sheila Burroughs shortly

10   after the phone call to me to notify Sheila I had

11   done an excellent job.

12       Q.   Were you a participant in that conversation

13   between Susan and Sheila?

14       A.   No, I was not.

15       Q.   How do you know she did that?

16       A.   Susan told me when she called me that she

17   was going to call Sheila and tell her.  There was a

18   telephone meeting.  I and Vale were in a room, and

19   Susan was on the phone.  Susan lived in South

20   Carolina.

21           We had a very favorable, a very

22   exciting, meeting.  I presented my idea; it was

23   very warmly received.  I went back to my office; and

24   then Susan called me at my office and used a phrase

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

57

1   that was on television at the time, You De Man, and

2   said what she had said on the phone, and told me I

3   had done a excellent job.

4           And she said during the telephone

5   conversation that she was going to call Sheila and

6   tell her what a great job I had done, and apparently

7   she did that.  I was not involved in the

8   conversation with Sheila.

9           And Sheila, I can't recall if she

10  e-mailed me or called me directly after, saying, I

11  heard from Susan, and I heard that you had a really

12  outstanding success in your meeting with Vale.

13      Q.  When was the meeting held that you're

14  referring to, that was so successful?

15      A.  Sometime in the fall of 2002.  I remember

16  it was on a Friday afternoon.

17      Q.  How long after you had reported for work?

18      A.  I'm guessing it was in October sometime.

19      Q.  What was the subject matter of the meeting?

20      A.  There was a difficulty in this large bank

21  tracking study that involved measurement of

22  statistical significance.

23          Because measuring statistical

24  significance involves the sample size that is

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

58

1   in a survey, it's very difficult in big banking

2   tracking studies to ever achieve statistical

3   significance, because you really can't

4   interview that many people.

5           You would have to interview literally

6   millions of people every quarter to get enough

7   people to make it be statistically significant.

8           And the people in Vale's group were

9   struggling with how to generate action from the

10  bank's senior management when they were unable to

11  say that satisfaction had improved significantly or

12  declined significantly.

13          And this was a quandary or a problem

14  that was kind of amenable to my skills, and I came

15  up with a way to solve their problem and presented

16  it to them.

17  Q.   What was your method for solving the

18  problem?

19  A.   Well, the method was not to abandon the use

20  of the formal or kind of old-fashioned management of

21  statistical significance.

22          If you use a different analysis

23  technique, multiple regression, you can identify

24  the band within which a result would fall if it was

1    part of a trend; and you can say, if it's outside

2    the band, above or below of what you would expect

3    from the continuation of the current trend, you

4    can say that is an exceptional result, you are

5    exceptionally good or exceptionally bad.

6              The advantage of this technique is that

7    it doesn't rely on the number of interviews that are

8    required to gather a survey result; it relies on the

9    number of data points in the past.

10             So, by doing that, you're able to

11   circumvent this hindrance or obstacle to

12   measuring statistical significance.

13       Q.  So you're breaking it down in kind of a

14   regression analysis?

15       A.  Well, what you're doing is you're looking

16   at it with a different lens.

17             Instead of using kind of an old-

18   fashioned and traditional tool -- which really

19   handcuffs you, because you can't really ever get

20   enough interviews to break out, and you can't get

21   statistical significance -- you're looking at it

22   with a different lens and saying, if we look at a

23   trend that's been established by previous data

24   points, what would constitute a meaningful

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

1   departure from that trend, either higher

2   or lower.

3       Q.   What about Mr. Kotopoulos?  You say he also

4   praised your work; is that correct?

5       A.   Yes.

6               When I finished my monograph about

7   how to redo, or a better way to do, the statistical

8   driver analysis, his specific words I believe were

9   This is a big win for the bank; and he told me

10  I had done a good job.

11      Q.   And when was that?

12      A.   That would have been in probably December

13  of 2002.

14      Q.   And that's when you completed the

15  monograph?  Is that ph?

16      A.   Monograph, ph, yes.

17              The time that the monograph was

18  actually done is not clear; because there were a

19  number of drafts of it, and the substance of the

20  work was done at the end of 2002, in December.

21              For reasons unclear to me, the monograph

22  was not publicized and was not rolled out, as they

23  say, until several months into 2003.

24      Q.   Do you know if the bank is still using that

61

```
 1    monograph?
 2        A.   I do not know.
 3        Q.   Any other praise from Mr. Kotopoulos?
 4        A.   That's all I can recall.
 5        Q.   How about Sheila Burroughs?
 6        A.   On I guess occasions kind of too many to
 7    mention individually, she said I was doing a good
 8    job, I had met her expectations, I was providing
 9    effective stimulation and leadership to the people
10    in the bank, and I was being successful in
11    bringing ideas to them that they had not
12    had previously.
13        Q.   Was this throughout your employment that
14    Sheila...
15        A.   I would say it was up until February or
16    March of 2003.
17        Q.   Did something change in your relationship
18    in February or March of 2003?
19        A.   Well, in April of 2003 she dramatically
20    changed her relationship with me, and gave me a very
21    negative personnel evaluation, and told me that my
22    position was in jeopardy.
23        Q.   Did she praise your performance at any time
24    after that April appraisal?
```

Steven Randall Kincaid, Ph.D.
May 18, 2005

65

```
 1   the people in his work group a number of times,

 2   and as a result of his recommendation of my work I

 3   did individual consulting sessions with a number of

 4   people that were in his real-estate research group.

 5        Q.   Anyone else praise your performance or your

 6   work?

 7        A.   That's all I can think of at this time.

 8             [Kincaid Exhibit 8 marked for

 9   identification]

10        Q.   Mr. Kincaid, would you examine the document

11   that's been handed to you as marked Exhibit 8.

12             Is that the performance evaluation

13   you referred to earlier when you were talking about

14   Sheila Burroughs' change in her assessment of your

15   performance?

16        A.   There is more than one document.  This is

17   one of the documents.

18        Q.   What was the other document?

19        A.   I was given a document; I don't know how to

20   describe it.

21             It was kind of in a memo form, and

22   it just listed points that were the shortcomings

23   of my work; and then she verbally said that this is

24   a serious matter, and there is urgency attached to
```

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

66

1    it.

2                    [Kincaid Exhibit 9 marked for

3    identification]

4        Q.   Would you examine Exhibit Number 9, please.

5                    Is Exhibit Number 9 the document you

6    were just referring to?

7        A.   Yes, it is.

8        Q.   And this is, I agree, in somewhat of a memo

9    form.   Correct?

10       A.   Correct.

11       Q.   Is that your signature on the second page?

12       A.   Yes, it is.

13       Q.   Did you agree or disagree with this

14   assessment of your performance?

15       A.   I disagreed.

16       Q.   Could you tell me why you did not make any

17   comments in the section devoted to Associate

18   Comments, the second page?

19       A.   It was not pointed out to me that I had the

20   option to write down comments.   I verbally responded

21   to many of the points on the page, but to be honest

22   I didn't notice that.

23       Q.   Did you complain about this assessment to

24   anyone?

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

67

1    A.   Well, I told Sheila I disagreed with the

2    great majority of it, and thought that it was very

3    abrupt; and I was quite surprised at the nature of

4    what it said.

5         And I did complain to a colleague of

6    mine, who became a friend, named Tim Megeysey.

7    Q.   Did you complain to Ms. Burroughs'

8    superiors?

9    A.   No, I did not.

10   Q.   Did you complain or call the personnel

11   center after you received this performance

12   assessment?

13   A.   I personally did not call or communicate

14   with the personnel center.

15   Q.   Did anyone call on your behalf?

16   A.   I retained legal counsel, and my legal

17   counsel communicated with the legal department of

18   Bank of America.

19   Q.   But you didn't raise the issue directly

20   with anyone above Sheila Burroughs or in the human-

21   resource department?

22   A.   No, I did not personally.

23   Q.   How soon after you got this performance

24   assessment did you retain the services of an

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

68

1   attorney?

2       A.   Within two weeks.

3       Q.   And that was Ms. Norcross?

4       A.   That's correct.

5       Q.   Is Sheila Burroughs the only person that

6   criticized your performance?

7       A.   No.

8       Q.   Who else?

9       A.   Richard McFarland criticized my

10  performance.

11      Q.   What was the nature of his criticism?

12      A.   There was some ambiguity about our roles.

13  We both had statistics backgrounds; we both knew

14  advanced analysis.

15              He said to me on, probably, several

16  occasions that he thought I was encroaching on his

17  area of expertise.

18              And on more than on one occasion after

19  I had issued information, findings, recommendations,

20  to somebody else within CAMR, he sought out that

21  person to argue against my recommendations and

22  say that they were ill-founded.

23      Q.   At some point, of course, you were

24  terminated from your position with Bank of America;

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

69

```
 1   correct?

 2       A.   Correct.

 3       Q.   Do you know who made the decision to

 4   terminate your employment?

 5                MR. FINE:   Objection.

 6       A.   I don't know.   I suspect it was Sheila, but

 7   I don't know.

 8                [Lunch recess taken]

 9   BY MR. KANE:

10       Q.   Mr. Kincaid, did Ms. Burroughs meet with

11   you regarding your termination?

12       A.   Yes, she did.

13       Q.   Did she tell you what the reason was for

14   your termination?

15       A.   She said I had continued to not live up

16   to what her hopes were or her desires were for me

17   to improve, and that the time had come for me to

18   leave.

19       Q.   Did you complain to anyone over

20   Ms. Burroughs, that is any of her supervisors

21   or upper management, about your termination?

22       A.   No.

23       Q.   If you would refer to Exhibit Number 2,

24   which is the complaint in the stack next to you
```

Steven Randall Kincaid, Ph.D.
May 18, 2005

70

1    there, I think it's 2.  Let me get it.  Yes;

2    Exhibit Number 2.

3              And I'll preface my question with

4    acknowledging that this may just be stylistic; but

5    if you turn to Page 7, Paragraph 42 at the bottom,

6    do you see that?

7        A.  Yes.

8        Q.  It says, Defendant harassed plaintiff and

9    terminated plaintiff's employment because of

10   plaintiff's age.

11             Do you contend that you were harassed

12   because of your age; separate and apart from your

13   termination?

14       A.  I believe that her harassment of me was

15   related to my age.  That's what I would say.

16       Q.  Well, tell me in what manner you were

17   harassed because of your age.

18       A.  Well, when I got harassing messages from

19   Sheila, she did not directly make references to

20   my age;

21             but I believe that her continual pattern

22   of harassment and her continued kind of reinforcing

23   negative messages during the period between April

24   and June was related to her desire to have me

1    leave because of my age.

2       Q.  You say from April to June?

3       A.  Yes.

4       Q.  Is that the time period?

5       A.  Prior to April, she had been supportive,

6    she had been hospitable and very friendly towards

7    me; and prior to the meeting in April I had no

8    reason to believe that my performance was below

9    par or needed significant improvement.

10      Q.  But you say after that you started getting

11   harassing messages?

12      A.  After the meeting in April, Sheila's manner

13   toward me in all different aspects of our

14   relationship changed dramatically.

15      Q.  How so?

16      A.  She would frown if she saw me in the

17   Halumis.  She avoided contact with me.  She ceased

18   kind of friendly chitchat in the hall; activities

19   that she had engaged in prior to the meeting in

20   April.

21          Looking across all the spectrum of

22   activities that you engage in with a coworker, her

23   manner toward me changed very abruptly, and became

24   aloof and somewhat hostile.

Steven Randall Kincaid, Ph.D.
May 18, 2005

72

```
 1        Q.   Anything more specific than that; say a

 2   harassing voice-mail message or face-to-face

 3   message that you consider harassing?

 4        A.   The morning of the meeting in April, that's

 5   been referenced in these documents, I received news

 6   that my grandmother passed away.

 7             I was quite emotionally upset, and I

 8   immediately made plans with my sister on the phone

 9   to attempt to attend the funeral, which was going to

10   be the next day in Oklahoma City.

11             I notified Sheila early in the morning,

12   around eight or nine, that I had had a death in the

13   family, and I wished to be absent from work the next

14   day and the day after, because of a death in the

15   family, to attend a funeral.

16             And I didn't receive a reply back for an

17   hour or two, and we had our regular weekly meeting

18   that morning.

19             That was the meeting at which she gave

20   me this extremely negative review, and she said that

21   I could only attend the funeral if I was certain I

22   could get all my work done while I was at the

23   funeral.

24             And I was really shocked at her
```

Steven Randall Kincaid, Ph.D.
May 18, 2005

1   behavior, and I thought it was very callous and

2   harsh of her to effectively deny an employee the

3   right to attend a funeral of a family member.

4       Q.  But, as you said, your age was not

5   mentioned in that conversation?

6       A.  That's correct.

7       Q.  Any other forms of harassment other

8   than the change in her demeanor towards you and

9   the treatment you received pertaining to the funeral

10  of your grandmother?

11      A.  Sheila asked me to work on a specific

12  project for another group within the bank, and I

13  began work on this project.

14          Whenever I would go to Sheila to

15  get her reaction or input to things I had done,

16  she constantly contradicted earlier information or

17  earlier direction that she had given me.

18          Her tone and manner in these

19  meetings were hostile and attacking; and it

20  made me feel extremely uncomfortable, because

21  she seemed angry at me before I even walked into

22  the room.

23          And I made three or four different

24  attempts to come up with work that she felt was

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

74

```
 1    acceptable; and because she repeatedly contradicted
 2    earlier statements that she had said, time and time
 3    again, the result of the meeting was that I failed
 4    to perform as expected, and everything I had come
 5    up with had to be redone again.
 6              And after the third such meeting on this
 7    particular topic, I really began to believe that the
 8    meetings were being held for the purpose of
 9    discouraging me and harassing me.
10       Q.   What was this other project called?
11       A.   Well, it was work for someone in another
12    area, and involved acquiring information about, I
13    believe it was people's attitudes toward home
14    ownership.
15              I'm not completely sure what the topic
16    was.  It's been quite a while, but I believe it was
17    involving home ownership.
18       Q.   And who were you doing this project for?
19       A.   It was a lady in a different work group.
20    I can't remember her name.
21       Q.   And you testified earlier that you don't
22    know who made the decision to terminate your
23    employment; is that correct?
24       A.   Are we done with this?  Can I put this one
```

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

1  away now?

2      Q.  Yes, you can put that away.

3      A.  I'm sorry.  Could you rephrase the

4  question?

5      Q.  I believe you testified earlier that you

6  were not certain who made the final decision to

7  terminate you.  Is that correct?

8      A.  I am not certain; that's correct.

9      Q.  Who do you think it was?

10      A.  In the meeting the morning that Sheila

11  notified me I was being let go, she used the term

12  We.  She said, We've decided that your time at Bank

13  of America has come to an end.

14              So, that suggests to me that there was

15  someone else involved besides Sheila, but I don't

16  know who it was.

17      Q.  And on what basis do you attribute your

18  termination and Sheila Burroughs' demeanor towards

19  you to your age?

20      A.  I'm sorry; could you say that again?

21      Q.  On what basis do you attribute these acts

22  to your age?

23      A.  Talking with other people that worked in

24  CAMR and observing activities around CAMR, there

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

76

1   were several other employees that I believe were

2   being subjected to the same treatment as I was

3   at the same time period.  All of those

4   individuals were over 40 years old.

5        Q.   Who did you talk to that led you to this

6   conclusion?

7        A.   Well, my friend Tim Megeysey...

8        Q.   Tim who?

9        A.   Tim Megeysey.

10       Q.   Any others?

11       A.   One of the people who I believe was being

12   subjected to the same treatment worked for Paul, the

13   person I mentioned earlier.

14       Q.   Who was that individual?

15       A.   I can't recall his name.

16       Q.   And what happened to that individual that

17   worked for Paul?

18       A.   He left the firm.

19       Q.   Did you talk with that person?

20       A.   No, I did not.

21       Q.   So that's an observation?

22       A.   That's correct.

23       Q.   And that person, whoever it is, is over 40

24   years old?

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

77

1      A.   Correct.

2      Q.   What other observations, if you will, did

3  you make about how other people were being treated?

4      A.   At the time I was being treated in this

5  way, that was the only clear observation I remember

6  making.

7      Q.   Who made the decision to terminate the

8  person that worked for Paul?

9      A.   I do not know.

10      Q.   Tell me about your conversations with Tim

11  Megeysey.

12      A.   Well, I had social conversations with

13  him.  I had conversations directly related to the

14  substance of our work, and I had normal office-

15  politics conversations with him.

16      Q.   Did you have conversations with him about

17  what was going on in CAMR as it relates to your

18  treatment?

19      A.   Yes, I did.

20      Q.   You testified earlier that you based your

21  conclusion that you were terminated and harassed

22  because of your age upon certain conversations with

23  people, as well as observations; and I asked you who

24  you had conversations with, and you identified Tim

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

80

1    A.  I don't recall their individual names.

2  They were four or five people that worked in the San

3  Francisco office.

4    Q.  To your knowledge, were they all over the

5  age of 40?

6    A.  I don't know their ages.  Tim said they

7  were more experienced employees, that had been

8  around for a while.

9        From that comment, I surmised that they

10  probably were older than the average employee, but

11  I don't know the exact answer.

12    Q.  Any other conversations?

13    A.  That's all that I can recall now.

14    Q.  I assume he did in fact go on this trip to

15  San Francisco.

16    A.  That's correct.

17    Q.  Did he carry out his instructions to

18  terminate people while he was out there?

19    A.  Yes, he did.

20    Q.  And did he report that to you when he

21  returned?

22    A.  He mentioned he had done it.  He didn't

23  elaborate.

24    Q.  Any other conversations?

**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

83

1    small amount of relief or assurance that someone

2    will look into the issues that I had raised, and

3    would see, if they conducted a fair investigation,

4    that the things I raised were real issues, and

5    would cause this treatment of me to stop once

6    they looked into it.

7            I waited for someone to contact

8    me, or to receive some signal, I guess, that this

9    investigation was done; and weeks and weeks went by

10   and nothing ever really happened, or ever happened,

11   period.

12           And then Sheila came to terminate me;

13   and when she told me of this decision to terminate

14   me when, to my knowledge, no investigation had ever

15   taken place or had even begun, I began to believe

16   that one of the reasons I was terminated was that

17   they were striking back at me because I complained.

18       Q.   Do you know whether or not Ms. Burroughs

19   was aware that you had retained the services of an

20   attorney, Ms. Norcross?

21       A.   Sheila Burroughs never spoke of an

22   investigation or of Ms. Norcross.

23       Q.   Do you know whether or not Ms. Burroughs

24   was even aware of your attorney's correspondence

Steven Randall Kincaid, Ph.D.
May 18, 2005

84

```
 1   with the legal department or any other department

 2   of the bank?

 3       A.   I don't know directly about her knowledge.

 4   What I know directly about is the letter from Eric

 5   Montgomery, I think his name was.

 6       Q.   To your attorney?

 7       A.   To my attorney.

 8       Q.   As far as an investigation would be

 9   conducted; correct?

10       A.   He thanked me for my communication, and

11   said they would conduct an investigation and that

12   they would follow up or get back to Ms. Norcross.

13       Q.   But do you have any information that Sheila

14   Burroughs was aware of that?

15       A.   I do not.

16       Q.   How about anybody else involved in the

17   decision to terminate you?  Do you know of anybody

18   else that was aware of it other than Mr. Montgomery?

19       A.   I didn't receive any communication from

20   anybody regarding an investigation, or any issues

21   that were raised in the letter.

22       Q.   So the answer is no, you're not aware of

23   any?

24       A.   The answer is no, I'm not aware of any.
```

**Associate Counseling**
Steve Kincaid
4/16/04
Marketing Research
Marketing Information Manager

**Counseling Administered By:** Sheila Burroughs

**Written Counseling - Performance**

This is a written warning to address your failure to meet expectations in the position of Marketing Information Manager.  As discussed in your 1st quarter performance review, your performance has not been up to par for your level.  You continue to demonstrate performance problems and have not performed at a level expected to be successful in your job. Your failure to meet expectations is as follows:

Leadership
- Needs to identify improvement opportunities and proactively show initiative to figure out how to get them done
   o  Reference Hoshin goals 1.1.1, 3.1.1, 3.2 attached
- After 7 months still unable to appropriately determine who within the organization to involve in various projects/activities
   o  Should be linking Loyalty project to Valuation work

Consulting/Influence
- Has not shown ability to lead valuation topic
- Does not get along well with other statisticians/does not work through issues well
- Is limited in effectiveness of determining focus of influence and appropriate audience
- Although you effectively developed new key driver methodology standard, you have not been effective in providing oversight of key driver analysis
   o  Expectation is that you would be the expert in how key drivers are being applied throughout the company
   o  However, you required significant coaching regarding proper communication of the standards, determination of gaps in proper application of standards, and development of tools to track adherence to the standards.

Strategic Thinking
- Should be able to develop strategies and suggest approaches to the team – to date has not done so

Initiative/Project Value
- Needs to execute projects from conception to completion without significant assistance
- Needs to quickly grasp the nugget of a topic and expand it to be useful beyond the step by step tasks
   o  Standardization of customer sat survey questions
   o  Checking CTQ tracking document
- Needs to be able to identify all the steps needed and then execute them to add value; currently needs too much assistance at each step


You need to add value to the team through your leadership in the above areas, rather than requiring constant direction.  Although you are a good project manager with excellent statistical skills, the strategic nature of your current position demands that you develop your effectiveness in identifying consulting opportunities beyond key driver standards, and expand your influence.



EXHIBIT

9

Kincaid

You must also comply with all Bank of America policies, procedures, guidelines and conditions of employment, including but not limited to those set forth in the Associate Handbook and Bank of America Corporation Code of Ethics.

You are expected to demonstrate immediate and sustained improvement in the areas specifically addressed concerning your performance, and to comply with the policies, procedures, guidelines and conditions of employment set forth above. Failure to meet expectations may result in further disciplinary action up to and including termination.

_____
(Associate Signature)

___4/16/03___
(Date)

_____
(Manager Signature)

___4/16/03___
(Date)

**Associate Comments:**

EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEVEN R. KINCAID,                        )
                                          )
                    Plaintiff,            )
                                          )
        vs.                               )   CIVIL ACTION NO.
                                          )     04-11522-WGY
BANK OF AMERICA CORPORATION,              )
                                          )
                    Defendant.            )
_____          )

COPY

D E P O S I T I O N

OF

**ALEC KOTOPOULOS**

At Charlotte, North Carolina

June 2, 2005

Reporter:  Christine A. Taylor
           Notary Public



PO Box 471222
Charlotte, NC
28247

(704) 543-7103

Miller Reporting Services

1          A.    I started in October, very early October I

2     believe it was, I think.

3          Q.    So what's your best recollection of when you

4     first started to supervise?

5          A.    Early in the year.  I think it might have

6     been January.

7          Q.    When you became Sheila Burrough's supervisor,

8     was that part of a modification in your

9     responsibilities?

10         A.    It was a broadening, if you will.

11         Q.    And how were your responsibilities broadened

12    at that time?

13         A.    Picked up more responsibility, more people,

14    another area, if you will, of coverage for the bank.

15         Q.    And what area did --

16         A.    Customer satisfaction and loyalty.

17         Q.    And was Sheila Burroughs in that area, the

18    customer satisfaction and loyalty group?

19         A.    Correct.

20         Q.    And at the time that Sheila Burroughs started

21    to report to you, how many employees did she have

22    working with her?

23         A.    A handful.  I mean she might have had, let's

24    see -- I mean, I don't want to guess, but, you know, a

25    handful, a small number.

1          A.    Right.

2          Q.    -- what did you see the function of that

3     group as being?

4          A.    I saw the function as being measuring

5     customer satisfaction and loyalty, working with the

6     key six sigma people on issues of customer

7     satisfaction and loyalty, working with other areas in

8     the bank that touched the issue of customer

9     satisfaction and loyalty.  So phone centers, on-line

10    service, field service of branches, if you will.

11         Q.    Okay.  Anything else?

12         A.    That's the heavy stuff.

13         Q.    Okay.  And during the time that that group

14    was under you, did you monitor that group's

15    performance?

16         A.    Very carefully.

17         Q.    And what was your evaluation of that group's

18    performance in -- you became responsible for that

19    group in early of 2003?

20         A.    I believe so, yes.

21         Q.    And in the first three months that you had

22    responsibility for that group, what was your

23    assessment of that group's performance?

24         A.    Positive when it came to customer

25    satisfaction measurement and service measurement.

1        Q.    Yes?

2        A.    That's it.

3        Q.    And what do you mean by "customer

4    satisfaction measurement"?

5        A.    Well, the question before this one talked to

6    the areas of focus.

7        Q.    Yes.

8        A.    And I would, you know, make that congruent

9    and say that in those areas that the bank was

10   concerned about measuring satisfaction.  I thought

11   Sheila's group was doing a good job around that.  So,

12   again, the branches, phones, on-line stuff, and other

13   areas of the bank.  Also I had -- I believe there was

14   some positive feedback from the six sigma people

15   around Sheila's interaction on some global questions,

16   global issues of satisfaction, all satisfaction.

17       Q.    And who were the six sigma people?

18       A.    What do you mean?

19       Q.    What were their names?

20       A.    Back then, Val Galovsky -- pardon me, I can

21   see faces, I can't put names with faces.  Mike -- what

22   was Mike's last name?  I forget Mike's last name.  It

23   will come to me later.  Danny Cox, C-o-x, I believe.

24   These are the ones that pop in my head.

25       Q.    Okay.  And your assessment was that Sheila's

1    group interaction with the six sigma people was good?

2        A.    Positive, yes.

3        Q.    And your assessment was that Sheila's group's

4    interaction with the customer satisfaction --

5        A.    Work.

6        Q.    -- work --

7        A.    Was positive, uh-huh.

8        Q.    Now, at some point did your assessment of the

9    performance of Sheila's group change?

10       A.    A piece of Sheila's group.  When knowledge

11   came to me through Sheila of Steve and issues with

12   Steve, that changed my opinion to some degree.

13       Q.    Okay.  Just with regard to --

14       A.    Just with regard to Steve.

15       Q.    Okay.

16       A.    Susan and Allison were knocking it out of the

17   park.  And this was also direct client feedback, not

18   just Sheila's feedback.

19       Q.    Okay.  So explain to me something though.

20   Okay.  Your assessment of the group and particularly

21   Sheila, Susan, and Allison was very positive?

22       A.    Yes.

23       Q.    Yet within six months Sheila has gone to

24   another part of the bank, Mr. Kincaid has been

25   terminated, and what happened to Susan and Allison?

1        A.    Susan is still there.   Allison went to

2   another part of the bank.

3        Q.    So of the four people in that group, three of

4   them are gone?

5        A.    That's correct.

6        Q.    Is that inconsistent with the positive

7   assessment of that group that you had?

8        A.    No.  Allison moved on for good reasons.

9   Sheila moved on for good reasons.  The bank promotes

10  people moving around.  They had been in their

11  positions for a while.  They were ready for a good

12  change and challenge.  That's a healthy environment.

13       Q.    Where did Allison Hart go?

14       A.    Somewhere else within the bank.  I'm not sure

15  exactly the group.  It was credit card area.

16       Q.    And when did she move?

17       A.    I don't know.

18       Q.    And did you speak to Allison about her desire

19  to move?

20       A.    Oh, yes.

21       Q.    And what did she say and what did you say on

22  that subject?

23       A.    Again, specifics are very -- you know, a long

24  time ago.  It was all positive.  Good opportunity for

25  a young smart kid, good for the bank.  Everybody wins.

```
 1    told that they have 60 do 90 days to turn things

 2    around or was that really just something internal to

 3    your consideration?

 4         A.    Oh, no, everything was spelled out on paper

 5    to people.  It's a formal letter.

 6         Q.    Including the 60 to 90 days?

 7         A.    (Witness nodded head.)

 8         Q.    You need to verbalize for the --

 9         A.    Yes.

10         Q.    When was the possibility of terminating Steve

11    Kincaid first discussed?

12         A.    I don't recall.

13         Q.    Who was involved in the discussion?

14         A.    Sheila.

15         Q.    And?

16         A.    And I.

17         Q.    And as between the two of you, who initiated

18    discussion of the possibility of terminating

19    Mr. Kincaid?

20         A.    I honestly don't remember.

21         Q.    Do you remember anything of the circumstances

22    which caused the possibility of termination of

23    Mr. Kincaid to come up?

24         A.    Sheila presenting me with performance issues

25    related to Steve, underperformance and concerns.
```

1         Q.    And when did this happen that she presented

2    this to you?

3         A.    Again, I'm very sketchy on time.

4         Q.    You had assumed control for this group in

5    January of 2003; correct?

6         A.    I believe so, yes.

7         Q.    And the quarterly review would have been

8    given to Mr. Kincaid in mid April of 2003; right?

9         A.    That follows standard, yes.

10        Q.    So do you recall whether the possibility of

11   terminating Mr. Kincaid was first discussed by you and

12   Ms. Burroughs before or after Mr. Kincaid --

13        A.    I do not --

14        Q.    -- got this quarterly review?

15              MR. KANE:  Let him finish.

16              THE WITNESS:  Sorry.

17              BY MR. FINE:

18        Q.    You do not recall?

19        A.    I do not recall.

20        Q.    It could have before, it could have been

21   after?

22        A.    Possibility.

23        Q.    When the possibility of terminating him first

24   came up between you and Ms. Burroughs, what did

25   Ms. Burroughs say on that subject and what did you

1        A.    You know, there's a process in place and

2   everybody had a fair shot and, you know, see it to its

3   end.

4        Q.    In other words, that Mr. Kincaid should be

5   given the full 90 days?

6        A.    Yeah.

7        Q.    And was Mr. Kincaid given the full 90 days?

8        A.    I don't remember.  Honestly, I don't

9   remember.

10       Q.    Well --

11       A.    Sheila will know.

12       Q.    Was it your practice when you decided that an

13  employee should be given 90 days that the employee

14  was, in fact, given the full 90 days?

15       A.    Absolutely.

16       Q.    Did it ever come to your attention that a

17  lawyer retained by Mr. Kincaid wrote a letter to the

18  bank of America making certain claims about the way

19  that he had been treated?

20       A.    No.

21       Q.    I take it -- do you know that today, that

22  such a letter was sent?

23       A.    I do know that today.

24       Q.    When did you first learn that?

25       A.    Well, today.  This morning.  Actually, I do

1    know because of the Eric Montgomery meeting that

2    something had happened.  I didn't know any details,

3    just that something had happened.  I'm sorry, I

4    misspoke.

5        Q.    Okay.  And the Eric Montgomery meeting was

6    after Mr. Kincaid had already been terminated?

7        A.    Yes.

8        Q.    Now that you know --

9        A.    Right.

10       Q.    -- that such a letter was sent by

11   Mr. Kincaid's lawyer to the Bank of America, is that

12   letter something that you would have wanted to know

13   about at the time?

14       A.    At what time?  I'm sorry.

15       Q.    At the time that it was sent?

16       A.    Not necessarily, no.

17       Q.    Well --

18       A.    This is a legal issue.  To me, it's HR and

19   legal, it's not my area of expertise.

20       Q.    Have you read the letter that Mr. Kincaid's

21   lawyer sent to the bank?

22       A.    I have never read the letter.  I've never

23   seen the letter.

24       Q.    Okay.  At some point did you have a further

25   discussion with Sheila Burroughs on the subject of

1        Q.    Did you, in fact, ever have such a

2    discussion?

3        A.    About finding a replacement for Mr. Kincaid?

4        Q.    Yes.

5        A.    Sure.  After Mr. Kincaid was gone.

6        Q.    Who did you have the discussion with?

7        A.    Recruiters.

8        Q.    How many such discussions did you have?

9        A.    A couple.

10        Q.    Who did you have the discussions with?

11        A.    This gentleman, Frank Black, and probably

12    Paul Fafard, two recruiters.

13        Q.    And was a replacement for Mr. Kincaid

14    ultimately hired?

15        A.    No.

16        Q.    Why not?

17        A.    Because we brought -- because Sheila moved on

18    and we brought somebody into Sheila's old role and we

19    brought Leroy Leiker over, and we never replaced

20    Mr. Kincaid's position.

21        Q.    My question is:  Why did you never replace

22    his position?

23        A.    Because the gentleman who had come in, Gerry

24    McDonough, basically had lots of customer satisfaction

25    and loyalty background.  We felt comfortable with his

EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 04-11522-WGY


STEVEN R. KINCAID,                    )
                                 )
              PLAINTIFF,     )
                                 )
    VS.                            )
                                 )
BANK OF AMERICA                 )
CORPORATION,                   )
                                 )
              DEFENDANT.     )


## DEPOSITION

OF

## ERIC A. MONTGOMERY


AT CHARLOTTE, NORTH CAROLINA

JUNE 1, 2005


REPORTER: IRA ANDERSON
             NOTARY PUBLIC





PO Box 471222
Charlotte, NC
28247

(704) 543-7103

Mr. Montgomery                                            44

1    A.    Not necessarily.

2    Q.    Wouldn't that, in fact, be an occasion for

3          making sure that you would maintain the file?

4    A.    More than likely, yes.

5                MR. FINE:  I'd like to have

6                this document marked.

7                (Whereupon, Plaintiff's Exhibit

8                Number 1 was marked and

9                identified for the record.)

10   Q.    Mr. Montgomery, I'm handing you and Mr. Kane a

11         document that has been marked as Exhibit 1.

12         It bears Bates numbers KI-14 through KI-16.

13         I'd ask you to look at this for the purpose of

14         determining whether you recognize it.

15   A.    (Witness reviews document.)  I've seen it.

16   Q.    What is it?

17   A.    It's a letter sent to Mr. Alphin regarding

18         Mr. Kincaid.

19   Q.    Okay.  And was this a letter that was sent to

20         you?

21   A.    No.

22   Q.    Did you receive it at some point?

23   A.    Yes.

24   Q.    How did you receive it?

25   A.    I don't remember exactly how.



# MASON, GRIFFIN & PIERSON

A PROFESSIONAL CORPORATION

### COUNSELLORS AT LAW

101 POOR FARM ROAD
P.O. BOX 391
PRINCETON, NEW JERSEY 08542

TELEPHONE:   (609) 921-6543
FACSIMILE:   (609) 683-7978

mgp@mgplaw.com
www.mgplaw.com

RALPH S. MASON (1913-1988)
GORDON D. GRIFFIN
KESTER R. PIERSON
EDWIN W. SCHMIERER
CRAIG H. DAVIS (1947-1997)
KRISTINA P. HADINGER
DONALD B. VEIX, JR.†
CHARLES F. HARRIS
EDMOND M. KONIN*•
VALERIE L. HOWE•
SHAWN M. NEUFELD•
CARLEEN M. STEWARD
GEORGIA M. FRASER†
TRISHKA WATERBURY†
LISA M. RANDAZZESE†
ALLISON S. ZANGRILLI•
RAYMOND M. KANG†
PETER P. PERLA•

OF COUNSEL

WILLIAM P. DENI
32 Church Street
Flemington, NJ 08822

Telephone: (908) 782-2900
Facsimile: (908) 782-2428
E-mail: denilaw@erols.com

DEBORAH MARTIN NORCROSS*†
Princeton Office

ALSO ADMITTED IN:
†PA    ºNY
*FL    •VA

Direct Dial:  (609) 436-1230
E-mail:  dmnorcross@mgplaw.com

April 25, 2003

**By Federal Express**
J. Steele Alphin
Corporate Personnel Executive
Bank of America
201 North Tryon
Charlotte, NC  28255



Re:   *Steven Kincaid*

Dear Mr. Alphin:

Mr. Steven Kincaid has retained our firm to represent him in relation to his employment with Bank of America. Mr. Kincaid has reason to believe that the Bank and his immediate superior, Sheila Burroughs, have undertaken to eliminate older highly paid employees, and Mr. Kincaid in particular. In an effort to mask its true objectives and to avoid its severance and other economic obligations, the Bank has begun creating fictitious reputation-damaging records of performance deficiencies. Mr. Kincaid does not wish to allow Bank of America to further damage his reputation in this manner. Before taking more formal action, he wishes to give you the opportunity to work out a mutually advantageous resolution.



The Bank recruited Mr. Kincaid in September 2001 to join its Charlotte, North Carolina staff as a Marketing Information Manager. At the time, Mr. Kincaid was living in the Boston, Massachusetts area. Relying on what the Bank told him about the long-term potential of joining Bank of America and other promises made to him, Mr. Kincaid sold his house and relocated.

Mr. Kincaid's first project, and a key task emphasized in recruiting, was to overhaul the manner in which the Bank conducted certain statistical analyses and to prepare a monograph explaining his methodology for the benefit of the Bank. He finished that project in January 2003.

As soon as Mr. Kinkaid completed the monograph, and the Bank having thereby obtained the benefit of his knowledge and expertise, Ms. Burroughs began harassing him and giving him conflicting instructions, ensuring that he would be unable to make any progress toward completing his 2003 Hoshin goals. Here are but a few examples of Ms. Burroughs having levied unwarranted criticism against Mr. Kincaid in her effort to create a false and defamatory record against him:

- Ms. Burroughs has criticized Mr. Kincaid for allegedly failing to demonstrate leadership skills and not demonstrating an ability to "work the organization." However, Ms. Burroughs delayed release of Mr. Kincaid's key project, the customer satisfaction standards, for ten weeks after its completion, thus preventing Mr. Kincaid from demonstrating leadership and consulting skills on the main project in which he was engaged.

- Under the Consulting/Influence category, Ms. Burroughs has characterized Mr. Kincaid as not showing "ability to lead the valuation topic" and as not getting along well with others. Ms. Burroughs fails to note, however, that she specifically ordered Mr. Kincaid NOT to attempt to lead the valuation work. Moreover, Mr. Kincaid has had disagreement with one co-worker, a disagreement the two have resolved and who now enjoy a fine working relationship.

- Ms. Burroughs has described Mr. Kincaid as failing to exhibit and communicate "strategic thinking". Again, she fails to note the many occasions when Mr. Kincaid has suggested innovative approaches to matters relating to, for example, scales in measurement and customer satisfaction surveys, only to have his suggestions ignored or rejected out-of-hand by Ms. Burroughs.

- Ms. Burroughs has criticized Mr. Kincaid for his allegedly unsatisfactory performance in executing projects from completion to end without assistance. What she does not acknowledge, however, is that she has interfered with Mr. Kincaid's efforts. For example, Ms. Burroughs discouraged Mr. Kincaid from expanding the circle of financial people

 

involved in the Loyalty project, saying she wished to identify alternative financial personnel. She then failed to follow through at all, leaving the project hanging.

Again, these are but a few examples of the manner in which Mr. Kincaid is being mistreated.

Mr. Kincaid is aware of the manner in which Bank of America previously has effectuated reductions in its workforce through tactics such as what it now appears to be applying to Mr. Kincaid. Mr. Kincaid is not willing to permit his professional reputation to be tarnished further while waiting for the ax that has fallen on so many of his co-workers.

Mr. Kincaid has authorized us to discuss with you or your counsel how this situation may be resolved. It seems clear that Bank of America no longer wishes to engage Mr. Kincaid and is doing everything possible to cause him to leave. Mr. Kincaid is willing to consider that alternative, provided we can agree to a satisfactory arrangement that will provide him with an appropriate severance package, protect him from any further damage to his reputation, and ensure that all harassment of him stops immediately.

Once you have had the opportunity to review the contents of this letter, please contact me to discuss Mr. Kincaid's situation. In the interim, I am sure I do not have to remind you about state and federal laws protecting employees from unlawful discrimination and retaliation.

Thank you for your time. I look forward to hearing from you.

Very truly yours,

MASON, GRIFFIN & PIERSON, P.C.

Deborah Martin Norcross

DMN:ld

KI-0016

EXHIBIT F

RECEIPT # 57056
AMOUNT $ 150
SUMMONS ISSUED Y-1
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. m
DATE 7-7-04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUL -7 P 2:36

U.S. DISTRICT COURT
DISTRICT OF MASS.

```
STEVEN R. KINCAID,              )
                               )
              Plaintiff,        )
                               )
       vs.                      )
                               )
BANK OF AMERICA CORPORATION,    )
                               )
              Defendant.        )
```

Civil Action No.

COMPLAINT AND JURY
DEMAND

## 04 cv 11522 JLT

MAGISTRATE JUDGE Cohen

### NATURE OF THE ACTION

1.      This is an employment termination action brought under the Age
Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 *et seq.* (ADEA)
for unlawful discrimination and retaliation; and for wrongful discharge in violation of
public policy and breach of the implied covenant of good faith and fair dealing under
state law.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiff's federal law claims under 28
U.S.C. §1331 and supplemental jurisdiction over Plaintiff's pendant state law claims
under 28 U.S.C. §1367(a).

3.      Plaintiff has complied with all conditions precedent to the filing of this
action:

a.    On July 25, 2003, Plaintiff filed a timely charge of employment discrimination on the bases of age and retaliation with the Equal Employment Opportunity Commission (EEOC).

b.    On April 8, 2004, Plaintiff received a Notice of Right to Sue issued by the EEOC.

c.    This complaint is filed within ninety (90) days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

4.    Plaintiff resides, and Defendant maintains offices and conducts substantial business, within the District of Massachusetts. Venue therefore is proper in this District under 28 U.S.C. §§1391(b) and (c).

## PARTIES

5.    Plaintiff Steven R. Kincaid is a citizen of the United States and resides at 8 Towne Lane, Topsfield, Massachusetts.

6.    Plaintiff's date of birth is July 19, 1953.

7.    At all times relevant to this action, Plaintiff was and is a member of the class of persons protected by the ADEA.

8.    Upon information and belief, Defendant Bank of America Corporation is a Delaware corporation with its principal place of business located at 201 North Tryon Street, Charlotte, North Carolina.

9.    Upon information and belief, Defendant owns and operates more than 250 banking centers and more than 1290 automated teller machines (ATMs) within the District of Massachusetts.

10.    Defendant is engaged in an industry affecting commerce.

11.    Defendant employs twenty (20) or more employees.

12.    Defendant is an employer within the meaning of §11(b) of the ADEA, 29 U.S.C. §630(b).

## FACTS

13.    In and before 2002, Plaintiff operated a consulting business located at 11 Carleton Circle, Boxford, Massachusetts, where Plaintiff also resided.

14.    In or around the spring of 2002, a management recruiting firm contacted Plaintiff at his Massachusetts office/residence for the purpose of recruiting Plaintiff for employment with Defendant.

15.    Thereafter, the recruiter and representatives of Defendant interviewed Plaintiff in telephone conferences placed to Plaintiff's office/residence in Massachusetts. Defendant also paid for Plaintiff to travel to North Carolina for in-person interviews.

16.    In or around July 2002, Defendant offered Plaintiff a position as Vice President, Market Information Manager in Charlotte, North Carolina. The offer was extended through a telephone call placed to Plaintiff's office/residence in Massachusetts and confirmed in a letter sent to Plaintiff in Massachusetts.

17.    In seeking to persuade Plaintiff to relocate from Massachusetts to North Carolina and thereby obtain for itself a statistical analysis methodology Plaintiff had developed, Defendant promised Plaintiff long-term employment and fair treatment free of unlawful discrimination.

18.    The recruiter asked Plaintiff if he would be comfortable reporting to someone with less experience.

3

19.    Defendant advised Plaintiff he would have three primary projects:   to develop a definition of customer loyalty, to develop a statistical driver monograph, and to develop a means of valuing loyalty.

20.    Defendant promised to continue to employ Plaintiff in a position commensurate with his experience and background once the primary projects were completed.

21.    In reliance on Defendant's promises, Plaintiff relocated to North Carolina and commenced employment with Defendant on or about August 20, 2002.

22.    Plaintiff's area of expertise was and is the design and overhaul of methodology used to perform statistical analyses. Plaintiff's first assignment after commencing employment with Defendant was to create a statistical driver monograph detailing this methodology.

23.    Plaintiff's immediate supervisor was Sheila Burroughs (Burroughs). Upon information and belief, during the time Plaintiff was employed by Defendant, Ms. Burroughs was approximately 33 years old.

24.    Burroughs and other management directed Plaintiff to write the monograph "as if he would be hit by a bus" as soon as it was completed.

25.    Plaintiff began writing the monograph and working on the definition of loyalty project soon after beginning his employment with Defendant.

26.    Plaintiff completed the monograph in or around January 2003.

27.    Between Plaintiff's date of hire and the date on which he completed the monograph, Burroughs praised Plaintiff's work performance as excellent and did not, on any occasion, criticize any substantive aspect of Plaintiff's performance.

4

28.    After completing the monograph, and performing substantial work on the loyalty definition project, and after Defendant had obtained the benefit of Plaintiff's years of experience, knowledge, and expertise, Burroughs' approach to Plaintiff and his work performance changed dramatically.

29.    Burroughs began harassing Plaintiff and giving him conflicting instructions in an effort to ensure that Plaintiff would be unable to meet his 2003 performance goals. For example:

a.    Burroughs delayed release of the statistical driver monograph for more than ten weeks after its completion, thus preventing Plaintiff from demonstrating his leadership and consulting skills on the main project in which he was engaged.

b.    Burroughs ordered Plaintiff not to attempt to lead the loyalty valuation work, then improperly criticized him for not showing "ability to lead the valuation topic."

c.    Burroughs ignored or rejected Plaintiff's suggestions relating to, for example, scales in measurement and customer satisfaction surveys, then improperly criticized him for failing to exhibit and communicate strategic thinking.

d.    Burroughs ordered Plaintiff not to engage other financial staff in the definition of loyalty project, saying she wished to do so herself. She failed to follow through at all, making it impossible for Plaintiff to complete the project. Burroughs then criticized Plaintiff for not concluding the project.

5

e.    When Plaintiff requested time off to attend his grandmother's funeral in Oklahoma, Burroughs set an arbitrary deadline for a small work project and made it clear that he would not be able to complete the work on time if he attended the funeral.

30.    Upon information and belief, Plaintiff was the oldest employee, and most highly compensated employee at his level, in his department.

31.    Upon information and belief, Defendant, having obtained Plaintiff's unique methodology, began harassing Plaintiff in an attempt to force him to resign and thereby rid itself of an older, highly compensated employee.

32.    Upon information and belief, Defendant's treatment of Plaintiff was consistent with its pattern of forcing the resignations of other employees in the protected age group.

33.    Upon information and belief, Defendant had a practice of firing older workers to manipulate earning results and to avoid the severance payments and financial accountability that would accompany layoffs.

34.    By letter dated April 25, 2003, Plaintiff, through his counsel, registered a written discrimination complaint with J. Steele Alphin, Corporate Personnel Executive for Defendant.

35.    By letter dated April 30, 2003, Eric A. Montgomery, Assistant General Counsel for Defendant, acknowledged receipt of Plaintiff's complaint and advised, "We are investigating the facts and circumstances of your client's claim and will respond to your letter shortly."

6

36.    Defendant never responded to Plaintiff's complaint. Upon information and belief, Defendant did not conduct any investigation into Plaintiff's discrimination claims.

37.    Instead, Defendant terminated Plaintiff's employment, without notice or cause, on June 13, 2003. Upon information and belief, Defendant retained younger, less qualified similarly situated employees who had not complained of discrimination.

38.    Upon information and belief, Defendant harassed and discharged Plaintiff because of Plaintiff's age, in retaliation for Plaintiff's complaint of unlawful discrimination, in violation of public policy, and in violation of the implied covenant of good faith and fair dealing.

39.    In engaging in the acts described above, Defendant acted knowingly, willfully, and maliciously.

40.    As a result of Defendant's acts as described above, Plaintiff has suffered damage, including without limitation: termination of employment; deprivation of income and benefits; loss of future earning capacity; loss of future income and benefits; damage to career and reputation; and pain and suffering, emotional distress, and mental anguish.

## COUNT ONE
## AGE DISCRIMINATION IN VIOLATION OF 29 U.S.C. §621 *ET SEQ.*

41.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42.    Defendant harassed Plaintiff and terminated Plaintiff's employment because of Plaintiff's age.

7

43.    Defendant's termination of Plaintiff because of his age violated §4(a)(1) of the ADEA, 29 U.S.C. §623(a)(1).

44.    Defendant's discrimination against Plaintiff was willful and undertaken with malice and reckless indifference to Plaintiff's federally protected rights.

45.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

## COUNT TWO
### RETALIATION IN VIOLATION OF 29 U.S.C. §623(d)

46.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 above as if fully set forth herein.

47.    Defendant harassed Plaintiff and terminated Plaintiff's employment because Plaintiff opposed Defendant's discriminatory practices and because of Plaintiff's assertion of his rights under the ADEA, in violation of §4(d) of the ADEA, 29 U.S.C. §623(d).

48.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

## COUNT THREE
### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

49.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 above as if fully set forth herein.

50.    Defendant's harassment of Plaintiff and termination of Plaintiff's employment violated public policy as set forth in the North Carolina Equal Employment

8

Practices Act, Ch. 143, Secs.143-422.1 through 143-422.3 of the North Carolina General Statutes, and in the North Carolina Retaliatory Employment Discrimination Law, Ch. 95, Sec. 95-240 through 95-245 of the North Carolina General Statutes.

51.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

## COUNT FOUR
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

52.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51 above as if fully set forth herein.

53.    Defendant's acts as described above breached the implied covenant of good faith and fair dealing that existed in Plaintiff's at-will employment contact.

54.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

**WHEREFORE,** Plaintiff respectfully requests that the Court award the following relief:

1)    Judgment declaring that Defendant's acts violated Plaintiff's rights as secured by applicable federal and state laws;

2)    Damages to make Plaintiff whole, including but not limited to back pay with interest, adjusted for any increase Plaintiff would have received had he not been unlawfully terminated;  reimbursement of Plaintiff's lost benefits and replacement costs; and reimbursement for medical, relocation, and other costs

9

resulting from Plaintiff's termination, all in an amount to be determined at trial;

3) Front pay in lieu of reinstatement;

4) Compensatory damages, including but not limited to emotional distress, pain and suffering, and mental anguish; and relocation, job search, business development, and other damages incurred by Plaintiff as a result of his unlawful termination.

5) Punitive damages in an amount not less than $5,000,000;

6) Liquidated damages for Defendant's willful violation of the ADEA;

7) Attorneys' fees, interest, costs, and disbursements; and

8) Such other relief as the Court deems just and proper.

### PLAINTIFF REQUESTS TRIAL BY JURY

Plaintiff,
STEVEN R. KINCAID
By his attorneys,

_John Harkavy_

John B. Harkavy, Esquire, BBO No. 541900
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300

Of Counsel:
DEBORAH MARTIN NORCROSS, ESQ.
60 Marion Road West
Princeton, New Jersey 08540
Telephone:     (609) 279-0191
Facsimile:     (609) 279-0526
*(Motion for Admission Pro Hac Vice to be Filed)*
#294004 v1/99999/1

Dated: July 6, 2004

EXHIBIT G



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Charlotte District Office**

129 West Trade Street, Suite 400
Charlotte, NC 28202
(704) 344-6682
TTY (704) 344-6684
FAX (704) 344-6734 & 6731

MAR 1 1 2004

Charge No.: 140-2003-05093
Respondent: Bank of America

Steven R Kincaid
900 Laurel Park Ln
Charlotte NC 28270

Dear Mr. Kincaid:

The processing of your charge of employment discrimination in the above referenced matter has been completed.   The Equal Employment Opportunity Commission (EEOC) is dismissing your charge and is issuing to you a Notice of Right to Sue.

The evidence obtained by the Commission does not indicate that your age was a factor in your employment including your discharge or that you engaged in protected activity specifically covered by the Act. Evidence indicates that the same person who hired you was the same person who disciplined you and terminated you after less than one year of employment. Further, there was no change in your age during your employment. Evidence indicates that you were coached and/or disciplined about your job performance not meeting the employer's expectations and eventually discharged. Evidence does not indicate that a similarly situated employee had a comparable work record and was not discharged.

In view of these facts, it is unlikely that further investigation of your charge will result in a finding that a violation of the law(s) under which you filed your charge has occurred. For that reason, we have dismissed your charge and closed your file.

Enclosed you will find a Dismissal Notice of Right to Sue and an Information Sheet which describes your right to pursue the matter in court by filing a lawsuit within 90 days of your receipt of the dismissal notice. This 90-day period of filing a private lawsuit cannot be waived, extended, or restored by EEOC.

I regret that we cannot be of further assistance to you in this matter.

Sincerely,

Charles Bryant
Investigator

Enclosures
cc: Deborah Martin Norcross, Esq.

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Steven  Kincaid**
   **8 Towne Lane**
   **Topsfield, MA 01983**

From:  **Charlotte District Office**
    **129 W. Trade Street**
    **Suite 400**
    **Charlotte, NC 28202**

|  |  |
|---|---|
| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **140-2003-05093** | **Charles  Bryant,** Investigator | **(704) 344-6766** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐  While reasonable efforts were made to locate you, we were not able to do so.

☐  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒  Other *(briefly state)*    **Efforts to conciliate failed.**

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*James M. Bowley*

**Reuben Daniels, JR,**
**District Director**

MAR 1 1 2004

Enclosure(s)

*(Date Mailed)*

cc:  **Mark C. Noble, Vice President**
   **Advice & Counsel Case Manager**
   **BANK OF AMERICA**
   **Personnel Center NC1 021 02 02**
   **401 North Tryon Street**
   **Charlotte, NC 28255**

**Deborah M. Norcross, ESQ**
**Mason, Griffin & Pierson**
**Counsellors at Law**
**PO Box 391**
**Princeton, NJ 08542**




Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*