UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN R. KINCAID,<br><br>  Plaintiff,<br><br>vs.<br><br>BANK OF AMERICA CORPORATION,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)  CA No. 04 CV 11522 WGY<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Bank of America Corporation ("Bank of America" or "the Bank") submits this statement of undisputed material facts in support of its motion for summary judgment.

**II.   STATEMENT OF FACTS[1]**

**Plaintiff's Employment with Bank of America.**

1. In or around February 2002, Bank of America sought to hire a Market Information Manager within its Customer Analysis Modeling and Research ("CAMR") department in Charlotte, North Carolina. Affidavit of Siobhan

---

[1] All Exhibits referenced in this Memorandum are appended to the Affidavit of Siobhan Sweeney In Support of Defendant's Motion for Summary Judgment ("Sweeney Aff. "), filed herewith. All facts contained in this statement are deemed undisputed for purposes of this Motion only, and Defendant does not waive any right to dispute such facts during this litigation.

1

Sweeney, Counsel for Defendant, Exhibit A, Deposition of Sheila Burroughs, vol. I, June 1, 2005, pp. 13-14.[2]

2. Market Information Manager is a job title used across various groups within the marketing function at the Bank and can mean different things to different groups. Sweeney Aff., Affidavit of Sheila K. Burroughs, ¶ 14.

3. Specifically, the position was within the Bank's Customer Satisfaction group, a group of only four employees, within the marketing department. Specifically, Customer Satisfaction was concerned with measuring the satisfaction of the Bank's customers across its various lines of business, interpreting those measurements in the context of the Bank's various businesses, and consulting with and advising the senior managers of the Bank as to ways they could increase the level of satisfaction and loyalty felt by the Bank's customers, thereby increasing the Bank's revenues. Id. ¶ 5.

4. The Customer Satisfaction group was doing something new at the Bank. Prior to its formation, the Bank had individuals in each line of business and in marketing who were concerned about the level of customer satisfaction in their particular customers. Ultimately, the Customer Satisfaction group filled a gap within the Bank's marketing function by looking at the data collected from various products or business lines (e.g. credit card customers, checking account customers, branch banking customers, etc.) and comparing them to each other to create a picture of the whole customer. The Customer Satisfaction group gave formal recognition to the fact that the Bank's customers were customers across various lines of business

---

[2] Affidavit of Siobhan Sweeny In Support of Defendant's Motion for Summary Judgment (hereafter "Sweeny Aff."). Excerpts of transcripts of depositions taken in this matter and all exhibits in support of Defendant's Motion for Summary Judgment are appended as exhibits to the Sweeny Aff.

and didn't separately think about their satisfaction with one part of the Bank or one particular Bank product. Instead, how a customer felt about her checking account could affect how she felt about her Bank credit card and ultimately about all of her interactions with the Bank. Id. ¶ 6.

5. The Customer Satisfaction group was charged with identifying opportunities to increase customer satisfaction by looking at the whole customer relationship rather than focusing on one particular aspect of the relationship. For example, the Customer Satisfaction group cared how branch customers felt about fees and how credit card customers felt about fees and whether branch banking customers felt the same or differently about fees. With this information, could advise the Bank as to how the actions and changes made in one area of its business might affect its customer relationships, positively or negatively. Id. ¶ 7.

6. Customer Satisfaction was not a research project group. Instead, the group set standards for measuring customer satisfaction, interpreted research, identified the important and significant findings, translated those findings into concrete suggestions in the form of strategies that the Bank could use to increase customer satisfaction and effectively communicated this information to the senior business executives within the Bank in order to inflence their decision making and get their approval, or buy-in, to implement the group's strategies within the Bank's lines of business. Id. ¶ 8.

7. To fill the Market Information Manager position within the Customer Satisfaction group, the Bank was looking for a candidate with the ability to complete complex marketing measurement and research, who also had the ability to think

strategically and to influence senior level managers at the Bank. Sweeny Aff. Ex. A. vol. I., pp. 13-21.

8. Bank of America enlisted the services of a management recruiting firm, Management Recruiters International, to help it fill the Market Information Manager position. Id. p. 13.

9. In the spring of 2002, the recruiting firm contacted Plaintiff regarding potential employment with Bank of America. Sweeny Aff., Ex. C, Deposition of Plaintiff Steven Kincaid, May 18, 2005, p. 33.

10. Plaintiff seemed to satisfy the characteristics the Bank was seeking. Sweeny Aff., Ex. A, vol. I, pp. 13-21.

11. Upon completion of the interview process in July 2002, Sheila Burroughs made the decision to hire Plaintiff as Vice President, Market Information Manager. Id. vol. I., p. 14 and Sweeny Aff., Ex. C, p. 33, 37.

12. At the time Plaintiff was offered employment with Bank of America, he was 49 years of age. Id. pp. 4, 41.

13. The Bank sent Plaintiff a formal offer of employment letter on or about July 22, 2002. Id. pp. 37-38.

14. Pursuant to the terms of the Bank's offer, Plaintiff's employment was "on an at-will basis" and was not "a guarantee of continued employment for any period of time . . . ." Id. pp. 38-39.

15. In addition, on June 27, 2002, Plaintiff executed an Applicant Acknowledgment Form in which he agreed that if he was "offered a position with Bank of America the offer [would] be for employment on an at-will basis. That is, the employment

relationship is not guaranteed for any specific period of time, and may be ended by Bank of America or [Plaintiff] at any time with or without notice or cause." Id. pp. 40-41.

16. Plaintiff began working at Bank of America on August 19, 2002, and reported directly to Ms. Burroughs. Id. p. 41.

**Plaintiff's Performance Problems.**

17. Plaintiff was not hired for an entry level position and Ms. Burroughs expected a level of performance commensurate with Plaintiff's many years of experience in market research. Sweeny Aff., Ex. A, vol. I, pp. 13-21.

18. The Bank expected that Plaintiff would perform as both an analyst and a consultant to the lines of business he supported. Id. vol. I, pp. 15-16.

19. Essentially, Ms. Burroughs expected that Plaintiff would be a leader in developing the strategy of what needed to be done to prove and establish the value of customer satisfaction to the Bank's senior managers. Id. vol. I. p 70.

20. At the time Ms. Burrough's hired Mr. Kincaid, she was looking for someone who could manage, direct and lead the customer satisfaction measurement effort and act as an effective in-house consultant to the lines of business we supported. Based on Mr. Kincaid's resume, his interviews with Ms. Burroughs and others and the information the Bank had from the recruiter, Ms. Burroughs believed that Mr. Kincaid had these attributes. Sweeney Aff., Ex. B, ¶ 9.

21. Once Mr. Kincaid started with the Bank, Ms. Burroughs discovered that he was a much more passive individual than I had expected, and more passive than the job required. Although he was a good market research project manager, that was not

the job he was hired to do. The job he was hired to do required that he take a leadership role within the Bank's business organization, that he network with individuals responsible for customer satisfaction across the Bank's organization and that he take the reigns of his area of responsibility. Id. ¶ 10.

22. Plaintiff consistently failed to provide the leadership and deliver the strategic initiatives that Ms. Burroughs expected of him as a consultant. Sweeney Aff., Ex. A., vol. I, pp. 63-71.

23. In her role as Mr. Kincaid's supervisor, Ms. Burroughs assisted him to develop the goals for his position. She expected that he would seek out the senior executives of the lines of business that Customer Satisfaction supported and that he would make the connections that were essential to his success in his position. In Ms. Burroughs' observation, Mr. Kincaid simply did not do this. Sweeney Aff., Ex. B, ¶ 11.

24. One example of Mr. Kincaid's failure to do this was his lack of significant active participation in a group that was dedicated to issues related to customer satisfaction. In order to facilitate communication across the Bank on customer satisfaction issues, Ms. Burrough's had established a community of practice, or interest group, related to customer satisfaction. Many of the same key individuals that she expected Mr. Kincaid to consult with and influence as part of his job were active members of this community of practice. The group held monthly meetings and at the meetings the members would share ideas about customer satisfaction and discuss experiences they had had in the past in order to try to learn from these experiences or to take our ideas to the next level. Although Ms. Burroughs

encouraged Mr. Kincaid to become an active member in this group and even hoped that someday he would take over leadership of this group from her, he was apathetic about his participation. He did not come to some of the meetings, and at those he did attend, he was often very passive and had very little to contribute and share with the other members. Id. ¶ 12.

25. Similarly, Mr. Kincaid was a member of the Bank's valuation team, which was charged with demonstrating the value of customer satisfaction, but he did not take the active role on the team that Ms. Burrough's expected him to take. Ms. Burrough's felt that Mr. Kincaid should have been a leader of this team. Instead he performed tasks, when asked, but remained very passive with respect to leading and motivating this team. Id. ¶ 13 and Sweeney Aff., Ex. A, vol. I, p. 70.

26. In addition to not demonstrating the leadership necessary to be effective in his position, Mr. Kincaid also seemed not to understand the Bank's culture and the context within which the Customer Satisfaction group was working. While there might be 100 rights ways to do something, the group was charged with choosing the way that was right for the Bank in the context of its business organization and culture and the real barriers presented by that context. Mr. Kincaid did not see this bigger picture at times. For example, Mr. Kincaid suggested that the Bank change the scale that it was using in its customer satisfaction surveys. Mr. Kincaid failed to appreciate the fact that the Bank had already invested a great deal of time, effort and expense in developing a standard survey scale to be used across the Bank's lines of business and that it had already collected a substantial amount of data using this standard scale. His suggestion would have rendered

past survey data obsolete for purposes of the Customer Satisfaction group's work. Ms. Burroughs expected that Mr. Kincaid would not suggest changing the standard scale, given the natural and obvious consequences of such a change. Sweeney Aff., Ex. B, ¶ 14 and Ex. A, pp. 80-81.

27. In addition, Plaintiff's recommendations came at a time when line of business executives were evaluated based on the current measurement standard and the managers' incentives were based on their performance in customer satisfaction surveys. Id. Had the Bank changed the measurement scale in accordance with Mr. Kincaid's suggestions, the performance goals would have had to be substantially redone. Id.

28. Ms. Burroughs was required to provide step-by-step instructions to Plaintiff in order for him to complete even minor projects. Id. vol. I, pp. 77-83.

29. In some instances, Plaintiff failed to complete even elementary tasks. Id. vol. I., pp. 80-81.

30. In order lead and influence people, Ms. Burroughs expected some very basic actions by Mr. Kincaid. For example, she expected that he would be able to call a meeting, prepare an agenda for a meeting and lead the meeting. An example of when he did not do this, was with respect to standards he had developed for surveys. He proposed the standards to the key executives, but failed to follow through and get them to buy-in to the standards. Ms. Burroughs recalls that Mr. Kincaid told her that he had distributed the standards and had not heard back from anyone. Ms. Burroughs thought that he should have done more. For example, he should have reached out to the executives, held a meeting, lead them through a

discussion of the standards and gained their approval. Instead, Ms. Burroughs and her supervisor, Alec Kotopoulos ("Mr. Kotopoulos"), had to reach out to the executives and get their buy-in and agreement on the new standards. Ms. Burroughs felt that Mr. Kincaid did not perform the follow through that was necessary on this project. Sweeney Aff., Ex. B, ¶ 15.

31. A lack of follow through was a recurring issue with Mr. Kincaid's work. For example, Ms. Burroughs had asked him to analyze the key drivers, or most important factors, to customer satisfaction across the Bank's business groups. Ms. Burroughs expected him to list the key drivers and provide an analysis of how those drivers were similar and not similar for the different business lines. In this way, she hoped to get a clearer picture of the Bank's whole customer. Mr. Kincaid was able to identify the drivers, but he could not prepare an analysis that would communicate the information in an effective and meaningful way. Ultimately, Ms. Burroughs assigned a more junior person, Allison Hart, to complete this project. Id. ¶ 16 and Sweeney Aff., Ex. A, vol. I, pp. 77-83.

32. Ms. Burroughs not see Mr. Kincaid build relationships with the key executives in the Bank that he was supposed to be influencing. For example, on one project for the valuation team, he identified an individual, Mindy Felcman, as his contact in the area of finance. What should have been obvious to him was that Kathryn Little was the finance executive in the customer satisfaction area, not Ms. Felcman. Ms. Burroughs felt that it was fine to include Ms. Felcman. Her participation would not detract from the project, but Kathryn Little, who was

already an active member of the valuation team, was the person he should have identified as the key individual for the project. Sweeney Aff., Ex. B, ¶ 17.

33. Throughout his employment, Ms. Burroughs met with Plaintiff on a weekly basis to provide feedback regarding his work. Sweeney Aff., Ex. A, vol. I, pp. 21-33.

34. Despite these weekly meetings, Plaintiff's performance did not improve. Id. vol. I, pp. 48-59.

35. Beginning in or around January 2003, Mr. Kotopoulos became Ms. Burroughs' supervisor. Affidavit of Sweeney Aff. Ex. D, Deposition of Alec Kotopoulos, June 2, 2005, p. 27.

36. In this capacity, Mr. Kotopoulos assessed the performance of his group. Id. pp. 94-97.

37. Ms. Burroughs informed Mr. Kotopoulos of the problems with Plaintiff's performance. Id. pp. 104-05.

**Plaintiff's Performance Review And Warning**

43. In April 2003, Ms. Burroughs conducted Plaintiff's formal performance review and presented Plaintiff with a written performance evaluation in which he was given an overall rating of "does not meet expectations." Sweeny Aff., Ex. A, vol. I, pp. 48-59, Dep. Ex. 2.

44. Around this time, Ms. Burroughs also presented Plaintiff with a formal written counseling memorandum cautioning Plaintiff that he may be terminated if he did not improve his performance. Sweeny Aff., Ex. C, Dep. Ex. 9.

45. Despite this written warning and the prospect of termination, Plaintiff's performance did not improve. Sweeny Aff., Ex. A, vol. II, p. 2.

46. Plaintiff asserts that he received some positive feedback and recognition from his coworkers. Sweeny Aff., Ex. B, pp. 54-61.

47. Plaintiff further asserts that the Bank utilized his statistical models. Id. pp. 54-61.

48. By June 2003, it became clear to Burroughs that Plaintiff's performance was not going to improve. Sweeny Aff., Ex. A, vol. II, p. 2.

49. Accordingly, on June 13, 2003, Burroughs terminated Plaintiff's employment at Bank of America. Id. vol. II, p. 9.

50. Following his termination, Plaintiff was not replaced by another employee. Id. vol. I. p. 128; Sweeny Aff., Ex. D, p. 121.

**Plaintiff's Complaint of Discrimination.**

51. Unknown to Ms. Burroughs or her supervisors, Plaintiff retained attorney Deborah Martin Norcross within two weeks of receiving his performance evaluation in April 2003. Sweeny Aff., Ex. C, pp. 65-68.

52. On April 25, 2003, Plaintiff's counsel wrote a letter to Bank of America's Chief Personnel Executive Steele Alphin asserting that Plaintiff had "reason to believe that the Bank and his immediate supervisor, Sheila Burroughs, have undertaken to eliminate older, highly-paid employees, and Mr. Kincaid in particular." Sweeney Aff., Ex. E, Deposition of Eric Montgomery, June 1, 2005, Dep. Ex. 1.

53. The letter from Plaintiff's attorney was forwarded to Bank of America's legal department. Id. p. 44.

54. The Bank's Assistant General Counsel, Eric Montgomery, replied to the letter on April 30, 2003, stating that the Bank was investigating Plaintiff's complaint. Affidavit of Siobhan Sweeny, Counsel for Defendant, Ex. F, Plaintiff's Complaint ¶ 34.

55. Mr. Montgomery did not forward the letter to Ms. Burroughs or to any of Ms. Burroughs' supervisors. Sweeny Aff., Ex. A vol. I pp. 98, 120.

56. In fact, Ms. Burroughs and her supervisors did not become aware of Plaintiff's allegations of age discrimination until July 2003, after Plaintiff's termination. Id. vol. I. pp. 20-21, 78-79.

57. In her deposition, Ms. Burroughs testified regarding Plaintiff's allegations of retaliation as follows: "I didn't understand it, given that I couldn't have retaliated since I didn't know he had brought any kind of action." Id. vol. I. p. 100.

58. Plaintiff did not complain to Ms. Burroughs' or any of CAMR management regarding his treatment. Sweeny Aff., Exhibit C pp. 68-69.

59. Plaintiff did not complain of any alleged discrimination to Ms. Burroughs, the Bank of America Personnel Center, or any of Ms. Burroughs' supervisors. Id. p. 67; Sweeny Aff., Ex. A, vol. I, pp. 20-21, 78-79; Sweeny Aff., Ex. D, p. 116-17.

60. The only complaint made by Plaintiff was through his attorney, Ms. Norcross. Sweeny Aff., Ex. C, p. 68.

61. Plaintiff has no evidence that Ms. Burroughs or other CAMR supervisors knew of Ms. Norcross' letter or that Plaintiff had complained of discrimination. Id. pp. 83-84.

62. Plaintiff admitted that Burroughs never made any reference to Plaintiff's age. Id. pp. 70-77.

63. Plaintiff asserts that his termination was based on his age because he heard that other employee had been terminated. Id. p. 80.

64. Although Plaintiff did not know the employees' names, nor did he know the employees' ages, he heard that they were "more experienced employees, that had been around for a while." Id.

65. From that, Plaintiff surmised that the employees were "older than the average employee." Id.

66. Plaintiff filed a charge with the Equal Employment Opportunity Commission on July 25, 2003, alleging that he had been discriminated against on the basis of age and retaliated against for complaining about discrimination. Sweeny Aff., Ex. F, Complaint, ¶ 3.

67. On March 11, 2004, the EEOC mailed a Notice of Right to Sue and cover letter to both Plaintiff and his attorney Deborah Martin Norcross. Sweeney Aff., Ex. G, EEOC Notice of Right to Sue and cover letter.

68. Plaintiff alleges that he did not receive the EEOC's right-to-sue notification until April 8, 2004. Sweeny Aff., Ex. F , ¶ 3.

69. Plaintiff did not file his complaint until July 7, 2004, more than 90 days after the EEOC right-to-sue notice was sent. Sweeny Aff., Ex. F and Ex. G.

Respectfully submitted,
Bank of America Corporation,
Defendant
By its attorneys,


/s/ Siobhan Sweeney
Siobhan Sweeney
BBO No. 562118
Edwards & Angell, LLP
101 Federal Street
Boston, MA 02110
Phone:        617.439.4444
Fax:          617.439.4170

Richard F. Kane (admitted pro hac vice)
Steven T. Ackermann (admitted pro hac vice)
McGuireWoods LLP
Bank of America Corporate Center
100 North Tryon Street, Suite 2900
Charlotte, North Carolina 28210
Telephone:    704.373.8999
Facsimile:    704.373.8827

Dated:  October 21, 2005

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been served by first-class mail, postage prepaid, upon the attorneys for the Plaintiff at the address listed below:

>   David J. Fine, Esq.
>   Three Center Plaza, Suite 400
>   Boston, Massachusetts 02108-2003

This the _____ day of October 2005.

_s/_____