UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEVEN R. KINCAID,

          Plaintiff,

                                  )
                                  )               Civil Action No. 04-11522-WGY
                                  )

BANK OF AMERICA
CORPORATION,

          Defendant.

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

David J. Fine, BBO # 165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA  02108
(617) 720-2941

Attorney for Plaintiff

Table of Contents

Mr. Kincaid's Federal Discrimination Claim is Trialworthy     1

A.    Mr. Kincaid's Evidence <u>Does</u> Establish a Prima Facie Case of Age Discrimination

    1    Mr. Kincaid's Performance <u>Did</u> Meet the Bank's Legitimate Expectations ..

    2.    The Bank Did <u>Not</u> Treat Age Neutrally and <u>Did</u> Have a Continuing Need for the Services Mr. Kincaid Had Been Rendering ..............     3

B.    Mr. Kincaid's Evidence <u>Does</u> Show that the Bank's Purported Reason for Firing Him Was a Pretext for Age Discrimination .................................................     .5

    Poor documentation, and vague articulation, of the ways in which Mr. Kincaid's performance was allegedly deficient ............................     .5

    2.    Premature termination of 90-day period to improve performance precipitated not by genuine concern regarding Mr. Kincaid's ability to improve but rather by concern that Mr. Kincaid "might have disability thoughts" ...................................................     7

    3.    Statistical evidence showing age discrimination at the Bank     9

      a.    Statistical analysis performed by Elizabeth Janak     9

      b.    Statistical analyses performed by Mr. Kincaid's expert, Joel Wiesen, Ph.D. .........................     10

    4.    Other evidence supporting Mr. Kincaid's claim of age discrimination ......................................

      a.    Bank's failure to investigate Mr. Kincaid's written complaint of discrimination in violation of the Bank's policy ...........................................

b.   Elizabeth Janak's failure to follow up on her discovery of age bias ……………….......... ........................14

c.   Bank's efforts to hide Mr. Kotopoulos' primary role in the Bank's decision to terminate Mr. Kincaid ……………………………………………………15

II.   Mr. Kincaid's Federal Retaliation Claim is Trialworthy. ...…………… ………17

III.   Mr. Kincaid's Federal Age Discrimination and Retaliation Claims are Timely. ……………………………………… …………...19

IV.   Mr. Kincaid's Claim for Wrongful Discharge in Violation of North Carolina Public Policy, Is Trialworthy. …………………………… ….19

Conclusion ……………………… ……………...20

I.    MR. KINCAID'S FEDERAL AGE
DISCRIMINATION CLAIM IS TRIALWORTHY.

A.    Mr. Kincaid's Evidence <u>Does</u> Establish
a Prima Facie Case of Age Discrimination.

In the <u>McDonnell Douglas</u> burden-shifting framework, "the elements of the prescribed prima facie case vary, within the age discrimination context, depending on whether or not the plaintiff was dismissed as part of a reduction in force." <u>LeBlanc v. Great American Insurance Company,</u> 6 F.3d 836, 842 (1st Cir. 1993). If there was no reduction in force, the plaintiff establishes the prima facie case by demonstrating "(1) that he was at least forty years old when he and his employer parted company; (2) that his job performance met the employer's legitimate expectations; (3) that he lost his position through an adverse employment action attributable to the employer (typically, a firing); and (4) that the employer had a continuing need for the services that he had been rendering." <u>Suarez v. Pueblo International, Inc.,</u> 229 F. 3d 49, 53 (1st Cir. 2000). On the other hand, in cases stemming from reductions in force, "the fourth prong of the test differs slightly" with the plaintiff being able to satisfy it "by a showing that the employer, in the course of downsizing, did not treat age neutrally." 229 F.3d at 53 n. 4

The Bank concedes that Mr. Kincaid's evidence satisfies the first and third elements of the foregoing test. Bank Mem. 4. The Bank argues, however, that Mr. Kincaid's evidence fails to satisfy the second and fourth elements. <u>See id</u>. The Bank's argument is meritless

1.    <u>Mr. Kincaid's Performance Did Meet the Bank's Legitimate Expectations.</u>

Sheila Burroughs herself rated Mr. Kincaid's performance as "solid" at the end of December 2002 (see BA 115); stated in her April 16, 2003 Associate Counseling memorandum that Mr. Kincaid was "a good project manager with excellent statistical skills"; and acknowledged that, prior to April 2003, she had <u>not</u> put into writing even so much as a single

item of negative feedback regarding Mr. Kincaid's performance (6/1/05 Burroughs Dep. 35).

Beyond this, as discussed in section B. below, there is a substantial amount of evidence from

which a jury could infer that all Ms. Burroughs' criticisms of Mr. Kincaid's performance were

meritless and concocted to appease Alec Kotopoulos's demand that Ms. Burroughs help Mr

Kotopoulos fabricate a basis for terminating Mr. Kincaid

Second, Mr. Kotopoulos testified at his deposition that, at the time he and Ms. Burroughs

decided to put Mr. Kincaid on performance warning in mid-April 2003, Mr. Kotopoulos and Ms

Burroughs also decided that Mr. Kincaid should be given 90 days to try to turn things around

6/2/05 Kotopoulos Dep.  11-12 (see Fine Aff. Ex. 6).  Since Ms. Burroughs put Mr. Kincaid on

performance warning on April 16, 2003, this means that Mr. Kincaid was to have 90 days from

that date, or until July 15, 2003, to improve his performance to a level that Mr. Kotopoulos and

Ms. Burroughs would find acceptable   What occurred, however, was that the Bank terminated

Mr. Kincaid on June 13, 2003, more than a month prior to the expiration of the 90 days Mr

Kincaid was supposed to have.  So, to state matters precisely, the adverse employment action

that the Bank must justify is not simply firing Mr. Kincaid, but firing him more than a month

prior to the expiration of the 90-day period Mr. Kotopoulos and Ms. Burroughs had agreed Mr

Kincaid deserved to have to try to turn things around.  Consequently, it is plain that Mr

Kincaid's evidence establishes, at the least, a prima facie case that his job performance was

sufficiently meeting the Bank's legitimate expectations that Mr. Kincaid was entitled to the full

90-day period.

---

[1] All documents and deposition excerpts cited in this Memorandum are attached as exhibits to the accompanying affidavit of Mr. Kincaid's undersigned counsel (the "Fine Aff."). Thus, Ms. Burroughs' rating of Mr. Kincaid as "solid" at the end of 2002 is referred to on the last page (BA 115) of the Personnel Center's "Perf Mgmt - Steven Kincaid" memorandum, which is attached as Exhibit 1 to the Fine Aff. Ms. Burroughs' 4/16/03 Associate Counseling memorandum regarding Mr. Kincaid is attached as Exhibit 2 to the Fine Aff. Excerpts from the three volumes of Ms. Burroughs' deposition are attached as Exhibit 5 to the Fine Aff.

2.    The Bank Did <u>Not</u> Treat Age Neutrally and <u>Did</u> Have a
<u>Continuing Need for the Services Mr. Kincaid Had Been Rendering.</u>

First, in analyzing the fourth prong, there is sufficient evidence to justify treating this

case as a reduction in force case in which the Bank failed to "treat age neutrally." Thus, the

evidence shows that, when Mr. Kincaid was hired by the Bank in August 2002, he was assigned

to the Customer Satisfaction unit within the Customer Analysis, Modeling & Research

("CAMR") department. At the time Mr. Kincaid commenced work for the Bank, there were four

employees in the Customer Satisfaction unit: (1) Sheila Burroughs, the head of the unit; (2)

Allison Hart; (3) Susan Haloulos; and (4) Mr. Kincaid. Sheila Burroughs testified at her

deposition that she began looking to leave the Customer Satisfaction unit and the CAMR

department in the spring of 2003, possibly in May; that she applied for at least two other

positions in the Bank; that the position she ultimately obtained was posted on May 27, 2003; that

she applied for the position after it was posted, was offered this position on June 13, and

accepted it on June 23, 2003; and that her official start date in her new position at the Bank was

July 15, 2003. 10/19/05 Burroughs Dep. 3-8, 16 (<u>see</u> Fine Aff. Ex. 5). Ms. Burroughs further

testified that Allison Hart expressed interest in leaving the Customer Satisfaction unit before Ms.

Burroughs herself began to look for another position; that Ms. Burroughs did not remember

when Ms. Hart first expressed this interest but believed Ms. Hart had expressed such interest

"over a number of months"; and that Ms. Hart ultimately applied for a position outside the

CAMR department which was offered to Ms. Hart, and which Ms. Hart accepted, on June 5,

2003. 10/19/05 Burroughs Dep. 8-12. A June 30, 2003 organizational chart for a division of

CAMR department shows that, by June 30, 2003, Ms. Hart was no longer working in the

Customer Satisfaction unit. <u>See</u> BA 233 (<u>see</u> Fine Aff. Ex. 7). Accordingly, by July 2003, of the

3

four people who had been working in the Customer Satisfaction unit in the last months of 2002 and the first months of 2003, three were gone -- Sheila Burroughs and Allison Hart having "left" for positions in other parts of the Bank, and Mr. Kincaid having been terminated on June 13, 2003

The foregoing is highly significant because it supports an inference: (1) that a decision was made to disband or overhaul the existing Customer Satisfaction unit; and (2) that, in the disbanding or overhauling process, age was <u>not</u> "treated neutrally" because whereas Mr. Kincaid (date of birth July 19, 1953) was fired, his younger colleagues, Sheila Burroughs (date of birth October 7, 1967) and Allison Hart (date of birth February 8, 1976) were encouraged or permitted to take positions in other parts of the Bank.

Second, even if this case is not treated as a reduction in force case, Mr. Kincaid still meets the fourth prong of the prima facie case test because the Bank clearly did have a continuing need for the services Mr. Kincaid had been performing. Thus, Vipin Mayar, the head of the CAMR department during the pertinent time period, testified "[a] lot of what the [CAMR] group did was analysis that was based on statistical methods" and "[w]e always were looking for people with statistical expertise." 6/3/05 Mayar Dep. 56 (see Fine Aff. Ex. 8). Further, Sheila Burroughs testified that the work Mr. Kincaid was being asked to do was important and integral to the operation of the Customer Satisfaction unit. 6/1/05 Burroughs Dep. 127-28. Further still, Mr. Kotopoulos testified that, after Mr. Kincaid was terminated, the Bank "found other ways to get done what Steve [Kincaid] was doing." 6/2/05 Kotopoulos Dep. 124. Among the ways the Bank did this, according to Mr. Kotopoulos, was to bring in other employees to do the work Mr. Kincaid had been doing, including "a Ph.D. stats guy." <u>Id</u>. at 124-25.

4

B.    Mr. Kincaid's Evidence <u>Does</u> Show that the Bank's Purported
      Reason for Firing Him Was a Pretext for Age Discrimination.

Contrary to the impression the Bank tries to create, the record of this case is replete with

"specific facts which would enable a jury to find that the reason given" by the Bank for firing

Mr. Kincaid -- namely, his alleged poor performance -- "is not only a sham, but a sham intended

to cover up the [Bank's] real motive: age discrimination." <u>Mesnick v. General Electric</u>

<u>Company</u>, 950 F.2d 816, 824 (1st Cir. 1991)(quoting <u>Medina-Munoz v. R. J. Reynolds Tobacco</u>

<u>Co.</u>, 896 F.2d 5, 9 (1st Cir. 1990)).  To demonstrate that an employer's stated reason for firing an

employee, is actually a pretext for age discrimination, a plaintiff may mine "many veins of

circumstantial evidence." <u>Mesnick v. General Electric Company</u>, <u>supra</u>, 950 F.2d at 824.

Further, a plaintiff "can . . . establish pretext by showing 'weakness, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

such that a factfinder could 'infer that the employer did not act for the asserted non-

discriminatory reasons.'" <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56

(1st Cir. 2000)(quoting <u>Hodgens v. General Dynamics Corp.</u>, 144 F.3d 151, 168 (1st Cir. 1998))

Applying these principles here, the probative veins of circumstantial evidence include, without

limitation, the following:

Poor documentation, and vague articulation, of the ways in
which Mr. Kincaid's performance was allegedly deficient

Vipin Mayar, the head of the CAMR department during the relevant time period,

acknowledged in his deposition that "one of the things that a good manager wants to make sure

of is that if somebody is terminated, there is a real clear record as to precisely why they were

terminated" (6/3/05 Mayar Dep. 45), that "the more specific and the better documented the

termination is, the better the termination process was done" (<u>id</u>.), and that, "conversely, if the

5

process of termination was not well documented and not specific, that represents a failing on --
in management in some sense" (id. at 45-46). Given these principles, the fact that the
documentation regarding Mr. Kincaid's termination was extremely sparse and non-specific, is
highly significant, and strongly supports Mr. Kincaid's claim that the purported reason for the
termination -- alleged poor performance   was a pretext and a sham.

As stated in section A.1 above, Sheila Burroughs herself rated Mr. Kincaid's
performance as "solid" at the end of December 2002 and acknowledged that, prior to April 2003,
she had not put into writing even so much as a single item of negative feedback regarding Mr.
Kincaid's performance (6/1/05 Burroughs Dep. 35). Given this, one would have thought that, in
giving Mr. Kincaid his first written negative feedback, and going so far as to put him on
performance warning, in April 2003, Ms. Burroughs would have gone out of her way to make
this negative feedback and performance warning as detailed and specific as possible. But, in
fact, this negative feedback and performance warning are conspicuously devoid of detail and
lacking in specifics. Ms. Burroughs fails to describe in any detail anything that Mr. Kincaid did
that was wrong or less than optimal, and also fails to describe in any detail any steps, approaches
or techniques that Mr. Kincaid should be taking or adopting in order to improve his performance
One indication of just how vague the documents prepared by Ms. Burroughs are is that they fail
to contain the names of any co-workers or supervisors, the names of any clients, the names of
anyone whatsoever. See documents reproduced as Exhibits 2, 3 and 4 to the Fine Aff.

To drive home just how vague and unhelpful Ms. Burroughs' purported documentation
was, Mr. Kincaid's undersigned counsel questioned Mr. Kotopoulos about them at his
deposition. Although obviously resistant to doing so, Mr. Kotopoulos ultimately conceded, over
the course of 20 pages of deposition transcript, the documentation's lack of specificity in every

6

significant respect. 6/2/05 Kotopoulos Dep. 154-74. In sum, a jury could conclude that Ms.

Burroughs' documents were just the tissue of unverifiable generalities one could expect a

supervisor like Ms. Burroughs to concoct if her aim were to purport to document grounds for a

termination when she knew very well that no valid grounds for such a termination existed.

    2.    Premature termination of 90-day period to improve performance precipitated
           not by genuine concern regarding Mr. Kincaid's ability to improve but rather by
           concern that Mr. Kincaid "might have disability thoughts"

As stated in section A.1. above, when Mr. Kotopoulos and Ms. Burroughs put Mr.

Kincaid on performance warning on April 16, 2003, they decided that, in accordance with the

Bank's usual practice, they would give Mr. Kincaid 90 days to improve his performance to an

acceptable level. 6/2/05 Kotopoulos Dep. 111-12. Further, Mr. Kotopoulos testified that when

he decided that an employee should be given 90 days, it was "absolutely" his practice to give the

employee "the full 90 days." Id. at 116. However, Mr. Kotopoulos and Ms. Burroughs later

apparently changed their minds, terminating Mr. Kincaid on June 13, 2003, more than a month

prior to the expiration of the 90-day period. Because this early termination was contrary to the

Bank's usual practice and contrary to what, by their own admission, Mr. Kotopoulos and Ms.

Burroughs had originally envisioned, the Bank would need particularly compelling evidence that

such a termination was truly justified by what Mr. Kotopoulos and Ms. Burroughs claimed

justified it -- namely, conduct by Mr. Kincaid allegedly demonstrating that he was not going to

be able to improve.

But, in actuality, the Bank has no such compelling evidence. Quite the contrary, the

evidence justifying Mr. Kincaid's premature termination on June 13, 2003 is, if anything, even

poorer than the evidence allegedly showing inadequacies in Mr. Kincaid's performance in

general. For the alleged inadequacies in Mr. Kincaid's performance in general, the Bank at least

7

has Ms. Burroughs' April 2003 performance warning memorandum and other documents

however trumped up those documents may appear. For the conduct by Mr. Kincaid allegedly

demonstrating that he was not going to be able to improve, the Bank has no documentation

whatever. All that the Bank has is Mr. Kotopoulos' and Ms. Burroughs' conspicuously vague

and unconvincing oral testimony. See 6/2/05 Kotopoulos Dep.    5; 6/2/05 Burroughs Dep. 20

      To be contrasted with the foregoing oral testimony is the Personnel Center's

memorandum (Fine Aff. Ex. 1) memorializing Ms. Burroughs' communications with the

Personnel Center regarding Mr. Kincaid  This memorandum shows that Ms. Burroughs spoke to

the Personnel Center regarding Mr. Kincaid on April 8, April 15 and April 17, 2003, and then

did not speak to the Personnel Center regarding Mr. Kincaid again until June 11, 2003, two days

before Mr. Kincaid was fired. The Personnel Center's record of this June 11, 2003 telephone

conversation with Ms. Burroughs reads in full as follows:

> ee tech skills exceptnl, consulting skills not evident. ee is respons
> for consulting. ee presentd wrtn couns in April.  mgr plannd to present
> final wrtn couns today.  in the last week ee has been having back
> trouble and had been going home early.  not feeling well.  this morning
> mgr was concernd that ee might have disability thoughts.
> mgr. wants to term.

Based on the foregoing, a jury would be more than justified in concluding: (1) that the

premature firing of Mr. Kincaid on June 13, 2003 was prompted not by any conduct

demonstrating that he was not going to be able to improve his performance, but rather by Mr

Kotopoulos' and Ms. Burroughs' concern that Mr. Kincaid might soon make a disability claim;

(2) that Mr. Kotopoulos' and Ms. Burroughs' testimony that Mr. Kincaid's June 13, 2003 firing

was prompted by conduct of Mr. Kincaid's allegedly showing that he was not going to be able to

improve his performance, was perjurious; (3) that Mr. Kotopoulos and Ms. Burroughs, having

8

proven to be unworthy of belief regarding the true circumstances of Mr. Kincaid's June 13, 2003

firing, were also unworthy of belief regarding the alleged deficiencies in Mr. Kincaid's job

performance generally; and (4) that the entire notion that Mr. Kincaid's job performance was

deficient was, indeed, a pretext and a sham.

      3      <u>Statistical evidence showing age discrimination at the Bank</u>

One of the well-accepted means for supporting a claim of unlawful discrimination is to

adduce "statistical evidence showing disparate treatment by the employer of members of the

protected class." <u>Mesnick v. General Electric Company</u>, 950 F.2d 816, 824 (1st Cir. 1991))

Thus, in both <u>Olivera v. Nestle Puerto Rico Inc.</u>, 922 F.2d 43, 49 (1st Cir. 1990) and <u>Currier v.</u>

<u>United Technologies Corp.</u>, 393 F.3d 246, 250-53 (1st Cir. 2004), statistical evidence was found

to have supported a claim of unlawful age discrimination.

Here there are two different types of statistical analyses supporting Mr. Kincaid's age

discrimination claim:  the first performed by Bank executive Elizabeth Janak in August 2003 in

the routine discharge of her duties; the second performed by Mr. Kincaid's statistical expert, Joel

Wiesen, Ph.D.  We will address these two types of statistical analyses in turn.

      a.      <u>Statistical analysis performed by Elizabeth Janak.</u>

Elizabeth Janak is today, by her own description, "the communications partner support

for [the] CEO" of the Bank (8/24/05 Janak Dep. 17-18)(see Fine Aff. Ex. 9), which, it may be

inferred, is a very high position in the Bank hierarchy.  Ms. Janak joined the Bank in October

2001, became leadership development partner to Cathy Bessant, chief marketing officer for the

Bank, in March 2002, and took on the additional role of personnel executive for the Bank's

marketing organization (an organization that included the CAMR department) in the summer of

2003. 8/24/05 Janak Dep. at 9-17.  Ms. Janak performed the statistical analysis at issue shortly

9

after taking on her new role as personnel executive for the Bank's marketing organization. Id. at

52-53, 61-62  What occurred was that Ms. Janak asked her personnel analyst, Ryan Frosch, "to

pull the turnover data for the AMN hierarchy for the past 12 months," "AMN hierarchy"

referring to "Alec [Kotopoulos]'s organization" within the CAMR department. Id. at 59-61

What Ms. Janak received from Mr. Frosch was the table and circle graph headed "CAMR

 urnover As of 8  1.03" (BA 117)(see Fine Aff. Ex. 10).  After receiving this document from

Mr. Frosch, Ms. Janak reviewed it, made some handwritten notations on it and, on August 18,

2003, sent an e-mail to Alec Kotopoulos (BA 116)(see Fine Aff. Ex   1) stating, in pertinent

part, that she would like to meet with Mr. Kotopoulos to discuss with him

> -Terminations over the past 12 months
> -B4-B5 voluntary and involuntary terminations over the past
> 12 months suggest potential age bias -- 8/10 (80%) were 40 yrs or older

BA 116

One of the involuntary terminations Ms. Janak was describing in her August 18, 2003 e-mail as

being over the age of 40 and part of the pattern of potential age bias, one of the terminations

specifically listed in the table Ms. Janak received from Mr. Frosch, was that of Mr. Kincaid

The statistical analysis performed by Ms. Janak constitutes particularly compelling

evidence in support of Mr. Kincaid's age discrimination claim because it is obvious that Ms

Janak herself believed that the data suggested potential unlawful discrimination and was a matter

of sufficient concern that she needed to meet with Mr. Kotopoulos to discuss it with him

     b.    Statistical analyses performed by Mr. Kincaid's
             expert, Joel Wiesen, Ph.D.

Mr. Kincaid obtained in discovery from the Bank data regarding terminations among

three categories of Bank employees:  (1) market information managers employed at any time

10

from August 20, 2002 to June 13, 2003; (2) persons employed in the CAMR department at any time from August 20, 2002 to June 13, 2003; and (3) persons employed at the level of Vice President or higher in July 2002. Mr. Kincaid focused on these three categories because he was a member of each of them. Mr. Kincaid's expert, Joel Wiesen, Ph.D., performed statistical analyses on the foregoing data and found that in each of the three categories employees 40 years of age or older were terminated at a higher rate than employees younger than 40 years, and that for each group the difference in termination rates was statistically significant. See Fine Aff. Ex 12. In addition, Dr. Wiesen also analyzed data, obtained by Mr. Kincaid in discovery, related to a reduction in force in the CAMR department that took place less than a year after Mr. Kincaid left the Bank. Here, too, Dr. Wiesen found that employees 40 years of age or older were terminated at a higher rate than employees younger than 40 years, and that the difference in termination rates was statistically significant. See id. Further, Dr. Wiesen formed the opinion that the fact that analyses of all four of the foregoing groupings of employees showed adverse impact on employees 40 or older underscored the statistical significance for each group. Id

In sum, Dr. Wiesen's analyses provide powerful evidence that the Bank routinely discriminated on the basis of age, and this evidence in turn supports Mr. Kincaid's claim that his own termination was the product of unlawful age discrimination

    4.    <u>Other evidence supporting Mr. Kincaid's claim of age discrimination</u>

        a.    <u>Bank's failure to investigate Mr. Kincaid's written complaint of discrimination in violation of the Bank's policy</u>

The Bank's written Sexual Harassment and Discrimination Policy (BA 24)(<u>see</u> Fine Aff. Ex. 13) in effect at the Bank at all relevant times provided in pertinent part

> <u>The company investigates reported incidents of sexual harassment, other discrimination and retaliation.</u> Investigations are conducted in as discreet

1

a manner as is compatible with <u>a thorough investigation of the complaint</u>

(emphasis added)

On April 25, 2003, only nine days after Ms. Burroughs gave Mr. Kincaid an Associate

Counseling memorandum advising him that he needed to improve his performance or risk

termination, Mr. Kincaid's then attorney, Deborah Martin Norcross, wrote the Bank a formal

letter of complaint. This letter (<u>see</u> Fine Aff. Ex. 14) challenged the criticisms Ms. Burroughs

had made of Mr. Kincaid's performance as "fictitious reputation-damaging records of

performance deficiencies" concocted by the Bank and Ms. Burroughs as part of an unlawfully

discriminatory campaign "to eliminate older highly paid employees, and Mr. Kincaid in

particular." It is manifest that attorney Norcross's letter was precisely the kind of claim of

discrimination which the Bank's above-quoted anti-discrimination policy required the Bank to

investigate and investigate "thorough[ly]." And indeed, on April 30, 2003, Eric Montgomery, an

Assistant General Counsel for the Bank, wrote back to attorney Norcross acknowledging receipt

of her letter and stating, "We are investigating the facts and circumstances of your client's claims

and will respond to your letter shortly." <u>See</u> Fine Aff. Ex. 15. In the event, however,

notwithstanding what Assistant General Counsel Montgomery had stated in his letter, and

notwithstanding that attorney Norcross sent Counsel Montgomery yet a further letter on May 20,

2003 (<u>see</u> Fine Aff. Ex. 16) "to inquire about the status of [the Bank's] investigation" and to

report intensified concern regarding the Bank's treatment of Mr. Kincaid, Counsel Montgomery

and the Bank apparently did nothing to investigate Mr. Kincaid's claims of unlawful

discrimination, and Mr. Kincaid was fired on June 13, 2003 while these claims were still pending

and unresolved.

At his deposition, Counsel Montgomery acknowledged that a fair reading of the Bank's

12

above-quoted Sexual Harassment and Discrimination Policy was that it was the Bank's policy
not simply to investigate claims of discrimination but to do so "before [the Bank] decides to take
an action as drastic as terminating the employee" (Montgomery Dep. 110)(emphasis added)(see
Fine Aff. Ex. 17).  Counsel Montgomery further acknowledged that the Bank's apparent failure
to conduct an investigation of Mr. Kincaid's claim of unlawful discrimination prior to
terminating Mr. Kincaid was "a mistake" (id. at 106-07).  Counsel Montgomery testified he
became aware of this mistake when he "got information that [Mr. Kincaid] had been terminated"
(id. at 113).  Nevertheless, upon learning of the mistake, Counsel Montgomery did not notify Mr
Kincaid (id. at  14), and the Bank took no action to try to make up for this mistake vis-à-vis Mr
Kincaid.  To make matters even worse, when Mr. Kincaid subsequently filed a charge of
discrimination with the EEOC, the Bank made no reference to this violation of its own written
anti-discrimination policy in its communications with the EEOC.  Quite the contrary, in the
formal response to Mr. Kincaid's Charge of Discrimination that the Bank submitted to the
EEOC, the Bank actually enclosed a copy of the Bank's foregoing, written anti-discrimination
policy in support of its purported demonstration of just how committed the Bank was to "an
environment free from discrimination" while making no mention whatever that the Bank had
violated this policy in failing to investigate Mr. Kincaid's claim of discrimination prior to
terminating him.  See 9/8/03 Letter from the Bank to the EEOC (Fine Aff. Ex. 18).

   The Bank's failure to investigate Mr. Kincaid's claim of unlawful discrimination, in
violation of the Bank's own written anti-discrimination policy, the Bank's failure to notify Mr.
Kincaid of this violation or to take any other remedial action, and the Bank's concealment of this
violation in its subsequent communications with the EEOC, constitute direct evidence of
discrimination against Mr. Kincaid.  This is especially true because the Bank does not even

attempt to explain or defend its failure to investigate. Indeed, when asked whether he had any explanation as to how the failure to investigate occurred, all Counsel Montgomery could say was, "I think about the only explanation that could be offered would be it fell through the cracks." Montgomery Dep. 125.

Among the conclusions a jury could draw from such a seemingly unaccountable failure to investigate, is that the true explanation is that, in actuality, Counsel Montgomery knew that age discrimination was such an accepted fact of life at the Bank that an investigation of Mr Kincaid's claim would simply be pointless and not worth the effort. At the very least, the jury could infer that Counsel Montgomery's failure to investigate, the Bank's utter failure to take remedial action upon discovery of this violation of its anti-discrimination policy, and the Bank's concealment of this violation from the EEOC, all evidenced a callous indifference to, if not a reckless disregard of: (a) whether the Bank was guilty of age discrimination; (b) whether the Bank's anti-discrimination policy was worth the paper it was written on; and (c) whether discrimination was an important enough issue to require the Bank to be candid about a violation of its anti-discrimination policy in communications with an agency of the federal government

   b.  <u>Elizabeth Janak's failure to follow up on her discovery of age bias</u>

As discussed in section B.3.a. above, Bank executive Elizabeth Janak came upon data in mid-August 2003 that she recognized as evidencing a statistical pattern in the terminations in Alec Kotopoulos' hierarchy in the CAMR department in the previous 12 months, of potential age discrimination. Having identified such a pattern, and being sufficiently concerned about it to send an e-mail to Mr. Kotopoulos requesting a meeting to discuss this matter, Ms. Janak unaccountably failed to follow through on her concern in a manner appropriate to the importance of what she had discovered. Indeed, a jury could well find that Ms. Janak's deposition testimony

14

about what she did in the wake of her discovery was both puzzling and evasive. In response to Ms. Janak's e-mail expressing her concern about "potential age bias," Mr. Kotopoulos sent an e-mail that, a jury could well find, totally failed to address Ms. Janak's concern in any genuine way. See BA 116. Rather than acknowledge the patently unsatisfactory nature of Mr. Kotopoulos's response, however, Ms. Janak claimed at her deposition that there was nothing about Mr. Kotopoulos's e-mail that concerned her and that she was actually reassured by what the e-mail said. 8/24/05 Janak Dep. 66-71. Further, Ms. Janak testified that her concern about potential age bias was completely allayed by a one-hour meeting she had with Mr. Kotopoulos the next day, and that she did not investigate or feel the need to do a single thing to check out whether what Mr. Kotopoulos told her was true. Id. at 74, 100, 102. Ms. Janak testified that, after meeting with Mr. Kotopoulos, she did not do anything further to check on whether there was potential age bias in terminations anywhere in the marketing area. Id. at 85. Further still, when asked whether she communicated to anyone else at the Bank the concern about potential age bias that she communicated to Alec Kotopoulos in her August 18, 2003 e-mail, Ms. Janak testified, "I don't recall." Id. at 81.

Given the foregoing, a jury could conclude that Ms. Janak's testimony and conduct were yet further evidence that there was widespread age discrimination at the Bank, and that one of the reasons it flourished was because when a high executive such as Ms. Janak found age discrimination staring her in the face, the executive did nothing to stop or redress it.

        c.    **Bank's efforts to hide Mr. Kotopoulos' primary role**
              **in the Bank's decision to terminate Mr. Kincaid**

The Bank's summary judgment memorandum claims that "[w]hile Mr. Kotopoulos was involved in the timing of [Mr. Kincaid's] termination, the primary evaluation of his work and

ultimate decision to discharge [Mr. Kincaid] was made by Ms. Burroughs." Bank Mem. 12.  Not

only is this statement contrary to the facts, it is but the latest episode in a campaign the Bank has

waged for over a year to try to hide Mr. Kotopoulos' true role in the firing of Mr. Kincaid

Fed.R.Civ.P. 26(a)(1) provides that, in its initial disclosures, "a party must . . . provide to

other parties:  (A) the name      of each individual likely to have discoverable information that

the disclosing party may use to support its claims or defenses.    ."  In its Initial Disclosures,

served on November 30, 2004, the Bank identified seven individuals.  Conspicuously absent

from the Bank's list was Alec Kotopoulos

In contrast to the impression the Bank sough to create in its Initial Disclosures and in its

summary judgment memorandum, the decision to fire Mr. Kincaid was made primarily by Mr

Kotopoulos, not Ms. Burroughs.  Thus, when asked at her deposition who first "raised the

possibility of terminating Mr. Kincaid's employment," Ms. Burroughs responded, "I don't

remember for sure.  Maybe Alec."  6/1/05 Burroughs Dep. 126.  Further, when asked at his

deposition, "Who made the decision [in June 2003] -- as between you and Ms. Burroughs, who

made the decision that, okay, now is the time to really terminate Mr. Kincaid?," Mr. Kotopoulos

answered, "Well,   made the ultimate decision, yes."  6/2/05 Kotopoulos Dep. 119-20.  Further

still, the Personnel Center's memorandum of Sheila Burroughs' communications with it

regarding Mr. Kincaid, confirm that Ms. Burroughs regarded Mr. Kotopoulos as the ultimate

decision-maker.  Accordingly, the Center's record of Ms. Burroughs' April 8, 2003 telephone

conversation with the Center records Ms. Burroughs as having stated, "Sd her mgr Alec

Kotoupolis [sic], is ready to move frwrd quickly  Sd Alec has cleaned house since took ovr group

in Dec[.]" BA 115.  Similarly, the Center's record of Ms. Burroughs' June 13, 2003 telephone

conversation with the Center records Ms. Burroughs as having stated, "mgr [Ms. Burroughs] sd

16

her mgr [Mr. Kotopoulos] does not give finals ["finals" being shorthand for a second, written performance warning]    sr mgr [Mr. Kotopoulos] sd has termd others w/o gvg 2 wrttns [i.e., two written performance warnings]." BA  12.

Given the foregoing, a jury would be justified in concluding that the Bank was purposely seeking to inflate Ms. Burroughs' role and deflate Mr. Kotopoulos' role not because the Bank believed this was the truth, but rather because the Bank knew that the truth about Mr. Kotopoulos' primary role in the firing of Mr. Kincaid, supported Mr. Kincaid's claim that his firing was, indeed, the product of age discrimination. <u>See</u>, for example, the discussion of Elizabeth Janak's August 18, 2003 e-mail to Mr. Kotopoulos in sections B.3.a. and B.4.b. above

## II    MR. KINCAID'S FEDERAL RETALIATION CLAIM IS TRIALWORTHY.

Deborah Martin Norcross's April 25, 2003 and May 20, 2003 letters to the Bank complaining of discriminatory treatment of Mr. Kincaid, constituted protected activity.  The Bank's firing of Mr. Kincaid on June 13, 2003 was sufficiently close in time to the Bank's receipt of Ms. Norcross's letters to raise an inference that the firing was retaliatory.  <u>See</u> <u>Wyatt v. City of Boston</u>, 35 F.3d 13, 16 (1st Cir. 1994); <u>Shirley v. Chrysler First, Inc.</u>, 970 F.2d 39, 42-43 (5th Cir. 1992).  This is especially true because, as discussed in section I.B.2. above, the June 13, 2003 firing was premature    almost a month prior to the expiration of the 90-day period Mr. Kotopoulos and Ms. Burroughs had originally decided Mr. Kincaid would have to improve his performance -- and the Bank has produced no evidence of any legitimate justification for firing Mr. Kincaid when it did.

The only evidence the Bank offers to rebut the inference of retaliation is the self-serving deposition testimony of Sheila Burroughs and Alec Kotopoulos that they were not informed of

17

attorney Norcross's letters.  However, the Bank conveniently overlooks the deposition testimony

of Bank Assistant General Counsel Eric Montgomery, the Bank attorney to whom attorney

Norcross's April 25, 2003 letter was referred, and to whom attorney Norcross's May 20, 2003

letter was sent directly.  Counsel Montgomery testified that, during the relevant period of time, it

was his practice, upon receipt of a letter like attorney Norcross's April 25, 2003 letter, to notify

the people in the complaining employee's business unit of the employee's complaint as soon as

practicable.  6/1/05 Montgomery Dep. 36-38.  When pressed for whether he had a memory of

notifying Sheila Burroughs and the other members of Mr. Kincaid's business unit, of the

complaint made on Mr. Kincaid's behalf by attorney Norcross, Counsel Montgomery stated he

was "not sure" whether he actually did notify them or not, but Counsel Montgomery

acknowledged that it would have been his practice to do so.  Id., at 70-73.

Given the foregoing testimony by Counsel Montgomery, the Bank's claim that it is

beyond dispute that Ms. Burroughs and Mr. Kotopoulos had no knowledge of the complaint

made by attorney Norcross as of the time they decided to fire Mr. Kincaid on June 13, 2003, is

clearly meritless.  This is especially true because:  (1) Counsel Montgomery's deposition

testimony on the subject of whether he notified Sheila Burroughs and others, of attorney

Norcross's complaint, could be seen by the jury as highly evasive; (2) the jury could conclude

that Ms. Burroughs' and Mr. Kotopoulos' self-serving denial of knowledge of the complaint

letters was, like so many other aspects of their testimony, simply not credible; and (3) the jury

could conclude, as a matter of common sense, that the notion that an Assistant General Counsel

of a company like Bank of America, would somehow forget to tell Ms. Burroughs and Mr.

Kotopoulos about letters as serious as Attorney Norcross's letters obviously were, was simply

too far-fetched to be worthy of belief.

18

III.    MR. KINCAID'S FEDERAL AGE DISCRIMINATION
AND RETALIATION CLAIMS ARE TIMELY.

The affidavits of Mr. Kincaid and Deborah Martin Norcross submitted herewith establish
(1) that Mr. Kincaid did not receive the EEOC's Notice of Right to Sue until April 8, 2004; (2)
that attorney Norcross had no notice and no knowledge of the EEOC's disposition of Mr.
Kincaid's July 24, 2003 Charge of Discrimination until April 8, 2004, when Mr. Kincaid advised
her of his receipt of the foregoing Notice from the EEOC; (3) that attorney Norcross never
received a copy of the EEOC's Notice directly from the EEOC; and (4) that the envelope
containing the Notice Mr. Kincaid received from the EEOC on April 8, 2004 was postmarked
April 5, 2004.  Given the foregoing, it is plain that, contrary to the Bank's contention, the filing
of Mr. Kincaid's lawsuit on July 7, 2004 was within 90 days from Mr. Kincaid's receipt of the
EEOC's Notice of Right to Sue, and was, therefore, timely.  The only evidence the Bank points
to as being contrary to the foregoing conclusion is the fact that the EEOC's Notice bears a date
of March 11, 2004.  But as Sherlock v. Montefiore Medical Center, 84 F.3d 522 (2d Cir. 1996), a
case cited by the Bank, and numerous other cases have established, the date on the EEOC's
Notice is not dispositive of when the Notice was either sent or received, and a claimant is free to
show by other evidence, as Mr. Kincaid has shown here, what the true date of receipt actually
was.  84 F.3d at 526.

IV.    MR. KINCAID'S CLAIM FOR WRONGFUL
DISCHARGE IN VIOLATION OF NORTH
CAROLINA PUBLIC POLICY, IS TRIALWORTHY.

The Bank argues for dismissal of Mr. Kincaid's Count Three solely on the ground that
Mr. Kincaid's evidence is allegedly insufficient to raise a triable issue as to whether the Bank
discharged Mr. Kincaid in violation of the public policy of North Carolina.  Since the evidence

19

discussed in the preceding sections of this Memorandum amply creates a triable issue as to whether the Kincaid firing was in violation of North Carolina public policy, the Bank's argument is meritless and must be rejected.

Further, it must be emphasized that even assuming -- contrary to fact -- that Mr. Kincaid's federal claims were untimely for the reason advanced by the Bank, Mr. Kincaid's North Carolina claims would be timely.

<u>Conclusion</u>

The Bank's Motion for Summary Judgment must be denied.

Dated: November 28, 2005

Respectfully submitted,

David J. Fine, BBO #165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Attorney for Plaintiff

<u>Certificate of Service</u>

I hereby certify that I have this day served the foregoing by causing true copies thereof to be transmitted electronically and mailed, first class postage prepaid, to Siobhan M. Sweeney, Esq., Edwards & Angell, LLP, 101 Federal Street, Boston, Massachusetts 02110 and Mark A. Pogue, Esq., Edwards & Angell, LLP, 2800 Financial Plaza, Providence, Rhode Island, 02903, attorneys for defendant.

Dated: November 28, 2005

David J. Fine

20