**EXHIBIT 5**

DEPOSITION OF SHEILA BURROUGHS

---

PAGE 1  SHEET 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 04-11522-WGY

STEVEN R. KINCAID,

    PLAINTIFF,

VS.

BANK OF AMERICA
CORPORATION,

    DEFENDANT.

DEPOSITION

OF

SHEILA K. BURROUGHS

AT CHARLOTTE, NORTH CAROLINA

JUNE 1, 2005

REPORTER: IRA ANDERSON
          NOTARY PUBLIC

---

PAGE 2

Ms. Burroughs - Vol. I    2

A P P E A R I N G

FOR THE PLAINTIFF:   Mr. David J. Fine
                         LAW OFFICES OF DAVID J. FINE
                         Three Center Plaza, Suite 400
                         Boston, Massachusetts 02108-2003

FOR THE DEFENDANT:   Mr. Richard T. Kane
                         McGUIRE WOODS, L.L.P.
                         Suite 2900
                         Bank of America Corporate Center
                         100 North Tryon Street
                         Charlotte, North Carolina 28202

IN ATTENDANCE:   Mr. Steven R. Kincaid

* * * * *

I N D E X

                                PAGE
Examination by Mr. Fine             3

E X H I B I T S

PLAINTIFF'S:

No. 1     Copy of the Affidavit     12
          of Sheila K. Burroughs

No. 2     Copy of Page from     53
          Mr. Kincaid's Review

No. 3     Copy of Defendant's     101
          Responses to Plaintiff's
          First Set of Interrogatories
          to Defendant

Miller Reporting Services
(704) 543-7103

---

PAGE 3

Ms. Burroughs - Vol. I    3

1      This is the deposition of Sheila K. Burroughs,
2   taken in accordance with the Federal Rules of Civil
3   Procedure in connection with the above case.
4      Pursuant to Notice, this deposition is being
5   taken in the offices of Hamilton, Fay, Moon, Stephen,
6   Steele & Martin, P.L.L.C., 2020 Charlotte Plaza,
7   201 South College Street, Charlotte, North Carolina,
8   beginning at 1:47 p.m. on June 1, 2005, before Ira
9   Anderson, Notary Public.
10
11      Sheila K. Burroughs, upon first being duly
12   sworn, testified as follows:
13
14             Examination by Mr. Fine
15   Q.   Please state your full name.
16   A.   Sheila Burroughs.
17   Q.   Where do you reside?
18   A.   Charlotte, North Carolina.
19   Q.   How are you employed?
20   A.   At Bank of America.
21   Q.   In what capacity?
22   A.   I'm currently a customer experience
23       relationship manager.
24   Q.   Do you have any other job titles?
25   A.   Yes, senior vice president.

Miller Reporting Services
(704) 543-7103

---

PAGE 4

Ms. Burroughs - Vol. I    4

1   Q.   When were you first employed by the bank?
2   A.   1989.
3   Q.   In what capacity?
4   A.   I was a marketing research analyst.
5   Q.   How long were you employed in that capacity?
6   A.   I think about two years.
7   Q.   And how did your employment change at that
8       point?
9   A.   After that I was asked to join the branch
10      development group.
11   Q.   The branch development group?
12   A.   Uh-huh (yes).
13   Q.   What was your job title?
14   A.   I don't remember. Branch development analyst,
15      probably.
16   Q.   How long were you in the branch development
17      group?
18   A.   A couple years.
19   Q.   Okay. Then where did you go?
20   A.   After branch development I went to, I was a
21      quality consultant in the services company.
22   Q.   A quality consultant to what?
23   A.   In the services company.
24   Q.   How long did you do that?
25   A.   A couple years.

Miller Reporting Services
(704) 543-7103

PAGE 33  SHEET 5

Ms. Burroughs - Vol. I                                    33

1      year conversation, no.
2  Q.  This is the end of --
3  A.  End-of-year conversation.
4  Q.  Yes, okay. Okay. What is the first positive
5      feedback that you remember ever giving to
6      Mr. Kincaid?
7  A.  I'm not sure. I know he did a nice job
8      managing projects early on.
9  Q.  Okay. What is the earliest positive feedback
10     that you remember?
11 A.  I remember giving him positive feedback
12     regarding a White paper that he wrote on
13     margin of error.
14 Q.  And when did he write this White paper on
15     margin of error?
16 A.  I don't recall specifically, probably in the
17     fall of 2002.
18 Q.  Okay. And was this positive feedback that you
19     gave him with regard to the White paper, how
20     did you communicate that to him?
21 A.  Verbally.
22 Q.  Was anybody else present?
23 A.  I don't remember specifically. Very likely.
24 Q.  What did you say to him?
25 A.  I don't recall the specific words.

PAGE 34

Ms. Burroughs - Vol. I                                    34

1  Q.  What did you say in substance?
2  A.  In substance, it was a very useful work and
3      written in a way that laypeople could
4      understand.
5  Q.  Who was that White paper circulated to?
6  A.  Various numbers of the customer satisfaction
7      community within the bank.
8  Q.  Can you name any of them?
9  A.  I believe Val Galovski would have had a copy,
10     my team would have had a copy.
11 Q.  I'm sorry, Val, what's the last name?
12 A.  Galovski, G-a-l-o-v-s-k-i.
13 Q.  Okay. And what position did that person hold?
14 A.  He was the customer satisfaction and loyalty
15     executive for the bank.
16 Q.  Okay. Who else?
17 A.  I can -- do you want me to make some guesses?
18     I can't remember the actual distribution --
19     MR. KANE: I don't want you to
20     guess.
21 Q.  All right. Now, did you get positive comments
22     about Mr. Kincaid's White paper from any of
23     the people to whom it was circulated?
24 A.  I don't recall.
25 Q.  Did you keep a copy of this White paper?

PAGE 35

Ms. Burroughs - Vol. I                                    35

1  A.  I would have at the time.
2  Q.  Would you expect that White paper to be in the
3      records of the bank today?
4  A.  It might be, it might not be.
5  Q.  Did you ever communicate with Mr. Kincaid by
6      e-mail?
7  A.  Yes.
8  Q.  Did you ever give Mr. Kincaid any positive or
9      negative feedback by e-mail?
10 A.  I might have.
11 Q.  Do you remember any occasions on which you
12     did?
13 A.  No.
14 Q.  What is the earliest documentation of negative
15     feedback that you gave to Mr. Kincaid?
16 A.  His performance review for the first quarter
17     2003.
18 Q.  All right. And that's a performance review
19     that's dated April 16 of 2003?
20 A.  Probably, thereabouts.
21 Q.  Okay. So Mr. Kincaid starts at the bank in
22     August of 2002, and you're saying that the
23     first documentation of any negative feedback
24     that you gave to Mr. Kincaid is this
25     documentation on April 16 of 2003?

PAGE 36

Ms. Burroughs - Vol. I                                    36

1  A.  Formal documentation, yes.
2  Q.  Well, any other documentation?
3  A.  I don't have any, no.
4  Q.  Did you have any at the time?
5  A.  No.
6  Q.  Was there any documentation of any positive
7      feedback that you had given to Mr. Kincaid at
8      any time?
9  A.  There is some positive feedback in that review
10     as well.
11 Q.  Okay. Is there any documentation of positive
12     feedback to Mr. Kincaid prior to that?
13 A.  No.
14 Q.  So if I understand this correctly, there is no
15     record whatsoever of any feedback that you
16     gave to Mr. Kincaid, positive or negative,
17     prior to April 16 of 2003?
18 A.  Right.
19 Q.  Was it consistent with your practice that
20     there be no record of positive or negative
21     feedback to an employee for such a long time
22     after the employee is hired?
23 A.  When you say your practice, who do you mean?
24 Q.  You, Sheila Burroughs.
25 A.  Me? Yes, unfortunately, it is consistent.

PAGE 125

Ms. Burroughs - Vol. I                                          125

```
 1            ongoing thereafter.
 2   Q.   Okay.  And your team was transitioned to
 3        Mr. Kotopoulos when?
 4   A    In the December time frame.  I can't remember
 5        when the formal date was.
 6   Q.   Okay.  And so how many different employees did
 7        you discuss with Mr. Kotopoulos at that time?
 8   A    Including myself, four.
 9   Q    Okay.  And so there was you, Mr. Kincaid, and
10        who were the other two?
11   A    Susan Haloulos and Alison Hart.
12   Q.   Susan Haloulos still works for the bank today,
13        right?
14   A.   She does.
15   Q.   What about Alison Hart?
16   A.   She still works here too.
17   Q.   Okay.  And so you talked to, started talking
18        to Alec Kotopoulos regarding you and
19        Mr. Kincaid and Ms. Haloulos and Ms. Hart
20        starting in around December of 2002 or January
21        of 2003?
22   A    Yes.
23   Q    Okay.  When is the first time that you
24        discussed with Mr. Kotopoulos the possibility
25        of terminating Mr. Kincaid's employment?
```

PAGE 126

Ms. Burroughs - Vol. I                                          126

```
 1   A    The possibility?
 2   Q    Yes.
 3   A    That would have been in the late March, early
 4        April time frame is the discussion regarding
 5        the performance is not really, not meeting
 6        expectations.  And I would have discussed
 7        prior to the memo that we gave him, as that
 8        was the first step to ensuring that an
 9        associate understands that their performance
10        must improve.
11   Q    Who raised the possibility of terminating
12        Mr. Kincaid's employment?
13   A.   I don't remember for sure.  Maybe Alec.
14   Q    And what did he say on that subject?
15   A    I don't remember his specific words.  The
16        sentiment was, we need to make sure that he
17        meets expectations.  And since he's not at
18        this point, we need to make sure that he makes
19        the relevant, proper improvement in a timely
20        way.
21   Q    Okay.  And when -- and was the discussion of
22        the possibility of terminating Mr. Kincaid's
23        employment referred to in any e-mails between
24        you and Mr. Kotopoulos?
25        don't think so
```

PAGE 127

Ms. Burroughs - Vol                                             127

```
 1   Q.   Did you have any discussion with
 2        Mr. Kotopoulos about who was going to take
 3        over Mr. Kincaid's responsibilities if he was
 4        terminated?
 5   A.   No.
 6   Q.   Why not?
 7   A.   Because the plan is to make sure that an
 8        associate understands where they're not
 9        meeting expectations and to help them to
10        improve.
11   Q.   Well, wouldn't it have been natural, if you
12        were thinking of terminating an employee, to
13        talk about how long it would take you to get a
14        replacement for that employee?
15   A.   No.  Not at -- we did not at that point, no.
16   Q.   I understand you're saying that you didn't at
17        that point.  I'm asking you whether wouldn't
18        it have been natural to do that?
19   A.   I'm not sure I understand the question.  We
20        didn't.
21   Q.   Right.  I take it you thought that
22        Mr. Kincaid's job, what Mr. Kincaid was being
23        asked to do in your group was important,
24        right?
25   A.   Yes.
```

PAGE 128

Ms. Burroughs - Vol. I                                          128

```
 1   Q.   You thought that it was integral to the
 2        operation of your group, right?
 3   A    It was.
 4   Q    Okay.  Who did you get to replace Mr. Kincaid
 5        after you terminated him?
 6   A.   Actually, I was not there after that and so I
 7        do not know.
 8   Q    Well, you didn't say you didn't know in your
 9        answers to interrogatories, did you?
10   A    I don't believe that anyone was hired to take
11        on Steve's work.
12   Q    Okay.  Now, how is that possible if what
13        Mr. Kincaid was doing was so integral to the
14        operation of your group?  How is it possible
15        that you terminated him and then no one was
16        hired to take over his responsibilities?
17   A    Well, clearly, when there was not a project
18        manager to do the work and I was no longer
19        there to direct the work, the work at that
20        time was not, apparently, deemed a priority by
21        the folks that remained.
22   Q    When is the first time that you had a
23        discussion with anybody about your leaving the
24        group that you were in?
25   A.   don't remember
```

PAGE 17 SHEET 3

Burroughs                                                    17

1  Q.  In other words, do you talk to people who -- your
2      employees, your supervisees may have been working
3      with to see how good a job they've been doing?
4  A.  No. Incentive is based on the performance
5      evaluations and the evaluation -- the ongoing
6      evaluation of performance, and so all of that has
7      already been there. It's not specific to
8      incentive. You don't ask the clients should this
9      person get an incentive.
10 Q.  So you've got a record of what your evaluations
11     have been, you look at those, you think back on
12     the evaluations that you've given this person,
13     and you decide what to recommend; is that
14     basically it?
15 A.  Yes, although, I characterized it a little bit
16     differently. It's based on the performance that
17     you're seeing on a regular basis from that
18     person. It's not necessarily looking back on
19     formal evaluations done. It's the total picture
20     of that person's day-to-day and ongoing
21     performance.
22 Q.  Now, yesterday, I believe you testified that you
23     first discussed the possibility of terminating
24     Mr. Kincaid with Mr. Kotopoulos in the
25     March-April timeframe. March-April 2003

Miller Reporting Services
(704) 543-7103

PAGE 18

Burroughs                                                    18

1      timeframe?
2  A.  I think so, yes.
3  Q.  When you had that discussion with Mr. Kotopoulos,
4      did you discuss with him a period of time that
5      you were going to afford to Mr. Kincaid to turn
6      his performance around so that he wouldn't be
7      terminated?
8  A.  We had regular checkpoints. We had not
9      necessarily established a deadline. The approach
10     is typically performance needs to begin to show
11     improvement immediately and to sustain that
12     improvement.
13 Q.  So when you had this discussion with
14     Mr. Kotopoulos, did you discuss with him how much
15     time Mr. Kincaid was going to be afforded to turn
16     his performance around?
17 A.  We may have discussed general timelines, but
18     nothing specific that I can recall.
19 Q.  Okay. Was it common ground between you and
20     Mr. Kotopoulos at that point that Mr. Kincaid's
21     termination was not a fait accompli?
22 A.  Let me make sure I got the whole question
23     together.
24 Q.  Let me try it in a somewhat different way.
25 A.  Sorry.

Miller Reporting Services
(704) 543-7103

PAGE 19

Burroughs                                                    19

1  Q.  When you and Mr. Kotopoulos were talking about
2      potentially terminating Mr. Kincaid, you both
3      recognized that it was still possible for
4      Mr. Kincaid to turn things around?
5  A.  Absolutely. That's the preference, yes.
6  Q.  And I believe you testified yesterday -- well,
7      let me ask it this way. In the first weeks after
8      you had your meeting with Mr. Kincaid and you
9      gave him the counseling memorandum document that
10     we looked at yesterday, in the first weeks after
11     that did you see any positive signs with regard
12     to Mr. Kincaid's performance?
13 A.  I saw that he was earnest in wanting to address
14     the conversations we'd had. I didn't actually
15     see the change in behavior that I was looking
16     for.
17 Q.  And did you tell him that you -- did you give him
18     feedback?
19 A.  Yes, regularly.
20 Q.  Did there come a time when you became more
21     pessimistic about whether Mr. Kincaid was going
22     to be able to turn his performance around?
23 A.  Yes, increasingly so, because I was disappointed
24     as it became more and more clear about what the
25     issues were that I did not see a change in

Miller Reporting Services
(704) 543-7103

PAGE 20

Burroughs                                                    20

1      behavior and change in performance. So, yes, as
2      time went by, weeks and then months, much more
3      pessimistic that he was able to make the changes
4      that I was asking for.
5  Q   Was there some event that occurred which made
6      you -- which persuaded you you've got to terminate
7      him?
8  A.  Are you asking a timing question or just, okay,
9      something happened and that means we have to
10     terminate him? There wasn't an event that said
11     that event causes me to say that he's just not
12     going to get better. It's the culmination of the
13     lack of improvement seen across those months.
14 Q.  All right. Can you provide any insight as to why
15     June 13th was the date at which you decided that
16     that was the day he should be terminated?
17 A   I had a conversation with Alec and Alec asked,
18     "Do you believe that performance at this point is
19     going to improve," and I indicated that I hadn't
20     seen any evidence that showed that more time was
21     going to be beneficial. And he said, "Is there
22     any reason to continue this?" And I said, "There
23     is not." So he said, "Let's go ahead and do
24     this."
25 Q.  I'll show you what was marked as Montgomery

Miller Reporting Services
(704) 543-7103

## PAGE 1 SHEET 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEVEN R. KINCAID,  )
   )
            Plaintiff,  )
   )
   vs.  ) CIVIL ACTION NO.
   ) 04-11522-WGY
BANK OF AMERICA CORPORATION,  )
   )
            Defendant.  )
   )

DEPOSITION

OF

SHEILA BURROUGHS

(VOLUME III)

At Charlotte, North Carolina

October 19, 2005

Reporter: Christine A. Taylor
          Notary Public

## PAGE 2

Burroughs - Volume III                            2

APPEARING

For the Plaintiff:   DAVID J. FINE, ESQ.
                     Law Offices of David J. Fine
                     Suite 400
                     Three Center Plaza
                     Boston, Massachusetts 02108

For the Defendant:   SIOBHAN M. SWEENEY, ESQ.
                     Edwards & Angell, LLP
                     101 Federal Street
                     Boston, Massachusetts 02110

* * * * *

INDEX
                                                PAGE
Continued Examination By Mr. Fine                  3


EXHIBITS

Burroughs 7    Notes from Personnel Center        37


(Exhibit retained by counsel.)


Miller Reporting Services
       (704) 543-7103

## PAGE 3

Burroughs - Volume III                            3

1    This is the continued deposition of SHEILA
2  BURROUGHS, taken in accordance with the Federal Rules of
3  Civil Procedure in connection with the above case.
4       Pursuant to Notice, this deposition is being taken
5  in the Law Offices of McGuireWoods, LLP, Suite 2900,
6  100 North Tryon Street, Charlotte, North Carolina,
7  beginning at 1:38 p.m. on October 19, 2005, before
8  Christine A. Taylor, Notary Public.
9
10      SHEILA BURROUGHS, upon first being duly
11 sworn, further testified as follows:
12
13          CONTINUED EXAMINATION BY MR. FINE
14  Q.  Ms. Burroughs, I'm going to show you a document
15      that was marked as Exhibit 1 in Mr. Kotopoulos's
16      deposition the other day. And I want you to
17      first look at the second page of the document.
18      First of all, do you recognize what this document
19      is?
20  A.  I've not seen it before, but I recognize what it
21      is.
22  Q.  What is it?
23  A.  It's a summary of -- this particular one -- of a
24      job offer.
25  Q.  Okay. And this particular job offer refers to

Miller Reporting Services
       (704) 543-7103

## PAGE 4

Burroughs - Volume III                            4

1       you; correct?
2   A.  Yes.
3   Q.  Okay. And so how do you interpret what is
4       reported here?
5   A.  That for requisition number 32661 for Market
6       Information Manager II an offer was extended to
7       me June 13th transferring me from one area within
8       the bank to another, and the status is updated to
9       accepted on June 23rd.
10  Q.  Okay. And the position that was offered to you
11      on June 13, 2003, was that a position of Market
12      Information Manager II?
13      I'm just asking, the heading there is offers
14      for requisition, and then Market Information
15      Manager II?
16  A.  I'm interpreting this document the same as you
17      are, yes.
18  Q.  All right. And what was that position?
19  A.  That was a position within customer service and
20      support.
21  Q.  Okay. I'd now like you to go to the last page of
22      this document, the third page. Do you recognize
23      what this page is?
24  A.  It appears to be a summary of more detail for
25      that requisition.

Miller Reporting Services
       (704) 543-7103

PAGE 5

Burroughs - Volume III                                               5

1   Q.   Do you know who Megan Wilson is?
2   A.   It indicates she's a recruiter.
3   Q.   Was she a recruiter that you dealt with?
4   A.   Probably. I don't remember her specifically
5        though.
6   Q.   Do you know who Mark McCue is?
7   A.   Yes.
8   Q.   Who is Mark McCue?
9   A.   He was the hiring manager for that job.
10  Q.   And then there's an entry dated -- initiated
11       May 27, 2003?
12  A.   Uh-huh.
13  Q.   What is that?
14  A.   I'm going to assume from this that that was the
15       date that Mark opened the job requisition.
16  Q.   And what does that mean, "opened the job
17       requisition"?
18  A.   It means that's the date that he would have
19       formally opened that position for people to post
20       for, I believe, based on what we're looking at
21       here.
22  Q.   Now if you'll turn to the very first page of this
23       document. If you look at the last entry, there's
24       an entry for 32661, Market Information Manager
25       II; do you see that?

Miller Reporting Services
(704) 543-7103

PAGE 6

Burroughs - Volume III                                               6

1   A.   Uh-huh.
2   Q.   And then there's a status that says deactivated;
3        do you see that?
4   A.   Yes.
5   Q.   What does that signify to you?
6   A.   I don't know what it means.
7   Q.   All right. Might it possibly be that since that
8        job was offered to you on June 13, 2003 that they
9        then removed it from a general posting of some
10       sort?
11  A.   It might.
12           MS. SWEENEY: Objection.
13       BY MR. FINE:
14  Q.   That might -- I think Ms. Sweeney is objecting
15       for the record. So do you understand the --
16  A.   Do you want me to answer it?
17           MS. SWEENEY: You can answer it. I'm
18       objecting for the record.
19           THE WITNESS: Okay. It might.
20       BY MR. FINE:
21  Q.   Now, to summarize, if I might, these documents
22       seem to indicate that a job was posted on May 27,
23       2003, it was offered to you on June 13, 2003, and
24       you accepted it on June 23, 2003; is that fair?
25           MS. SWEENEY: Objection.

Miller Reporting Services
(704) 543-7103

PAGE 7

Burroughs - Volume III                                               7

1            THE WITNESS: Yes.
2        BY MR. FINE:
3   Q.   Okay. When was it that you first considered
4        getting another job within the bank?
5   A.   I'm not sure.
6   Q.   None of these documents tell you when that was;
7        is that right?
8   A.   None of these documents tell me when I first
9        considered getting a new job, no.
10  Q.   Okay. Before this particular job was offered to
11       you, what did you need to do?
12  A.   I don't understand the question.
13  Q.   Did you have to let somebody know that you were
14       interested in the job?
15  A.   Okay. I understand that part. So let me --
16       going back, before it was offered to me what did
17       I do? Can you repeat the question for me?
18  Q.   It looks like what happened was that this was a
19       job that was posted on May 27, 2003, and so
20       sometime after it was posted you indicated that
21       you were interested in it; is that fair?
22  A.   Yes.
23  Q.   And did you go in for an interview with somebody?
24  A.   Yes.
25  Q.   Who did you interview with?

Miller Reporting Services
(704) 543-7103

PAGE 8

Burroughs - Volume III                                               8

1   A.   Mark McCue.
2   Q.   Anyone else?
3   A.   I don't think so.
4   Q.   In addition to interviewing for it, did you need
5        to submit a written application?
6   A.   Yes. That's the formal process, to post within
7        the system. So it's written to the degree it's
8        on-line.
9   Q.   Was this the first job outside of the customer
10       satisfaction unit that you had applied for?
11  A.   No.
12  Q.   When was the first job that you had applied for?
13  A.   I don't remember right off.
14  Q.   Do you recall whether there was more than one job
15       that you had applied for before this one?
16  A.   I don't remember. There may have been.
17  Q.   Do you remember approximately when you started
18       looking?
19  A.   No. Maybe in May. I don't remember
20       specifically.
21  Q.   Do you associate it with any kind of event or
22       circumstance?
23  A.   No.
24  Q.   I'll show you what was marked as Exhibit 2 to
25       Mr. Kotopoulos's deposition. And, first of all,

Miller Reporting Services
(704) 543-7103

PAGE 9  SHEET 2

Burroughs - Volume III                                      9

1      you see that these three pages refer to Allison
2      Hart?
3   A. Yes.
4   Q. I'd like you to turn to the last page, the one
5      that bears the Bates number Bank of America 671.
6      And what does this page signify?
7   A. This appears to be an offer made to Allison for a
8      Market Product Manager I job on June 5th of 2003.
9   Q. And when was -- is there any indication of when
10     her application was accepted?
11  A. Well, again the status here says accepted. I'm
12     not familiar with the system enough to know. It
13     appears that me that that means she accepted the
14     position on June 5th, that her acceptance of the
15     position was entered into the system on that day.
16     I don't know when it means she actually accepted.
17  Q. Please turn to the previous page. Do you know
18     who Peter Sims is?
19  A. According to this he's a recruiter. I don't know
20     him myself.
21  Q. Do you know Rebecca Nellie?
22  A. I've spoken with her once or twice. I don't know
23     her well.
24  Q. Who is she?
25  A. She was the person who was hiring for the

Miller Reporting Services
(704) 543-7103

PAGE 10

Burroughs - Volume III                                     10

1      position Allison took.
2   Q. There's an entry here for date initiated,
3      April 9, 2003. What does that signify to you?
4   A. To me, that signifies this requisition was opened
5      in the system or entered into the system on that
6      day.
7   Q. Okay. Did there come a time when Allison Hart
8      spoke to you about wanting to look for another
9      position in the bank outside of the customer
10     satisfaction unit?
11  A. Yes.
12  Q. When was that?
13  A. I don't remember.
14  Q. Do you remember anything of what she said and
15     what you said on that subject?
16  A. Career development is a topic that we discussed
17     on a regular basis with associates. So I knew
18     that her ambition was to do more and different
19     work than she had been doing. And I recall that
20     essentially her feeling was that she had pretty
21     much learned what she could learn from managing
22     the program that she was managing, the survey,
23     and the other work that she was doing, and she
24     was ready to learn something different.
25  Q. And when Allison was being considered for this

Miller Reporting Services
(704) 543-7103

PAGE 11

Burroughs - Volume III                                     11

1      new position in the bank, were you contacted as a
2      reference for her?
3   A. I don't remember.
4   Q. Okay. Do you recall approximately when was the
5      first time that Allison talked to you about
6      wanting to go to a different part of the bank?
7   A. I don't remember, no.
8   Q. Do you recall whether it was before or after your
9      beginning to look yourself?
10  A. When she expressed interest in doing something
11     else or when she began looking for a particular
12     next position? They're very different.
13  Q. Let's break it down. Did she express interest
14     before you started looking?
15  A. Yes.
16  Q. Did she start looking before you started looking?
17  A. I don't know.
18  Q. Do you recall approximately how much before you
19     started looking she expressed interest?
20  A. I don't remember. Her interest was over a number
21     of months because, again, in normal career, you
22     know, development kinds of conversations, she
23     expressed interest that she would be happy to try
24     other things. So her interest initially
25     expressed in an interest sort of way, yes, I

Miller Reporting Services
(704) 543-7103

PAGE 12

Burroughs - Volume III                                     12

1      don't think I necessarily want to do market
2      research for my entire career, I would like to
3      learn different areas of the bank was expressed
4      at various intervals.
5   Q. In the first several months of 2003 what was the
6      market satisfaction unit working on?
7   A. The market satisfaction --
8         MS. SWEENEY: Objection.
9         THE WITNESS: -- unit? Can you clarify who
10     you mean?
11     BY MR. FINE:
12  Q. What was the unit that you were the head of?
13  A. The customer satisfaction research group.
14  Q. Thank you. What was the customer satisfaction
15     research group working on in the first several
16     months of 2003?
17  A. All of it? We --
18  Q. Can you give an overview of what you were working
19     on?
20  A. Sure. We, as a team, managed the customer
21     satisfaction and loyalty barometer survey. As a
22     team, we managed the banking center satisfaction
23     survey. We facilitated the customer delight
24     community of practice. We would have been
25     working on sympathizing results of the various

Miller Reporting Services
(704) 543-7103

PAGE 13

Burroughs - Volume III                                    13

customer satisfaction surveys. We would have been working on, I think, banking center incentive design. We would have been working, I think, on the loyalty measurement development. We were working on a project to identify how best to help people from a financial perspective when they're moving. And I'm sure there were other projects, I just don't recall specifically for all those months.
Q. Okay.
A. We were working on the valuation of work, the customer satisfaction valuation work.
Q. Of these various things that your unit was working on, did you consider any of them to be of primary importance or of greater importance than the other things?
A. No.
Q. Okay. I take it that as the head of this unit you felt responsibility for how the unit as a whole was performing with regard to the various things that it was doing, is that fair?
A. Yes.
Q. Okay. Were any of the projects that your unit had been working on coming to completion in the first months of 2003?

PAGE 14

Burroughs - Volume III                                    14

A. The nature of a lot of our work is ongoing, so for those pieces, no. And, no, I don't believe anything was coming to completion.
Q. Okay. Did you have any qualms in deciding to move to another part of the bank that you were leaving unfinished work that you had been supervising?
A. No.
Q. Why not?
A. If you waited to finish all the work you were doing before you left a job, you would never leave a job or grow or develop. So it is normal practice and normal for me that when you're ready to move on to the growth opportunity you do knowing that there are other people who will take on what you've been doing.
Q. What is the work that your unit completed that you were most proud of?
A. We developed the barometer.
Q. And by barometer you mean what?
A. The customer satisfaction and loyalty barometer survey. I'm also most proud of the development of community of practice that I facilitated.
Q. Now the first one that you mentioned, the customer satisfaction barometer, was that?

PAGE 15

Burroughs - Volume III                                    15

A. Yes.
Q. When was that work completed?
A. Creating it was completed in 2000, I think. But it is an ongoing survey, we're continually asking customers questions and continually analyzing the results.
Q. Was there any piece of that work that was completed after 2000?
A. Can you clarify what you mean by "that work"?
Q. The work in connection with the customer satisfaction barometer and survey.
A. Yes. Given that it was ongoing, the gathering of interviews and analyzing of information is ongoing.
Q. Okay.
A. It's hard when you use the word "completed," because the work to create it and develop it was completed in 2000 and 2001. After that it's an ongoing process that you gather more information and analyze more information. That, I guess you could say is completed every quarter.
Q. At the end of a quarter did your unit produce a report on what you had processed during that quarter?
A. Yes.

PAGE 16

Burroughs - Volume III                                    16

Q. Okay. And so you would have completed a report -- well, how much after the end of a quarter would such a report be prepared?
A. It varied. But typically sometime in the month following the end of a quarter.
Q. So you would have completed a report in April with regard to the first quarter of 2003?
A. Yes.
Q. But as to the second quarter of 2003, that quarter would not have ended until June 30th and you left your unit before that report was done; right?
A. I don't remember. I probably did.
Q. All right. Maybe I should go back and ask you with regard to the first document that we were looking at where it says that you accepted this position June 23, 2003 --
A. Uh-huh.
Q. -- does that mean you actually left the customer satisfaction unit at that time?
A. No.
Q. When did you actually leave the unit?
A. My official start date in my new job I believe was July 15th.
Q. Okay. And was that date chosen in connection --