**EXHIBIT 6**

DEPOSITION OF ALEX KOTOPOULOS

**PAGE 1  SHEET 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEVEN R. KINCAID,           )
                             )
            Plaintiff,       )
                             )
    vs.                      ) CIVIL ACTION NO.
                             ) 04-11522-WGY
BANK OF AMERICA CORPORATION, )
                             )
            Defendant.       )
                             )

DEPOSITION
OF
ALEC KOTOPOULOS

At Charlotte, North Carolina

June 2, 2005

Reporter: Christine A. Taylor
          Notary Public

---

**PAGE 2**

Kotopoulos                                                      2

APPEARING

For the Plaintiff:    DAVID J. FINE, ESQ.
                      Law Offices of David J. Fine
                      Suite 400
                      Three Center Plaza
                      Boston, Massachusetts 02108

For the Defendant:    RICHARD F. KANE, ESQ.
                      McGuireWoods, LLP
                      Suite 2900
                      100 North Tryon Street
                      Charlotte, North Carolina 28202

Also Present:         Steven Kincaid

* * * * *

I N D E X
                                                             PAGE
Examination By Mr. Fine                                         3

E X H I B I T S

(No exhibits were marked.)

Miller Reporting Services
(704) 543-7103

---

**PAGE 3**

Kotopoulos                                                      3

1       This is the deposition of ALEC KOTOPOULOS, taken
2  in accordance with the Federal Rules of Civil Procedure
3  in connection with the above case.
4       Pursuant to Notice, this deposition is being taken
5  in the Law Offices of Hamilton, Fay, Moon, Stephens,
6  Steele & Martin, 2020 Charlotte Plaza, 201 South College
7  Street, Charlotte, North Carolina, beginning at 9:00 a.m.
8  on June 2, 2005, before CHRISTINE A. TAYLOR, Notary
9  Public.
10
11      ALEC KOTOPOULOS, upon first being duly
12  sworn, testified as follows:
13
14              EXAMINATION BY MR. FINE
15  Q.   Please state your full name.
16  A.   Alec Kotopoulos.
17  Q.   Could you spell the last name?
18  A.   K-o-t-o-p-o-u-l-o-s.
19  Q.   Where do you reside?
20  A.   In Charlotte, North Carolina.
21  Q.   How are you employed?
22  A.   I'm not.
23  Q.   When is the last time you were employed?
24  A.   With Bank of America. So that would have
25  been 2004.

Miller Reporting Services
(704) 543-7103

---

**PAGE 4**

Kotopoulos                                                      4

1  Q.   When did you leave the bank in 2004?
2  A.   February.
3  Q.   What were the circumstances of your leaving?
4  A.   Merger.
5  Q.   Who merged with whom?
6  A.   Fleet and Bank of America. Bank of America
7  bought Fleet.
8  Q.   And at the time of the merger various people
9  at Bank of America were let go?
10 A.   That's my understanding.
11 Q.   Did you receive a severance package?
12 A.   I received a package. I was offered a
13 package and accepted the package.
14 Q.   What were the terms of the package?
15 A.   That's private between the bank and I.
16 Q.   Well --
17 A.   There were monetary, if that's what you're
18 asking.
19 Q.   Well, you're being called to testify as a
20 witness in this case and the financial terms would be
21 potentially relevant to your bias in the case, so I
22 think that it is a fair subject of examination.
23      MR. KANE:  Bias to?
24      MR. FINE:  How he feels about the bank. If
25 he got a good severance package, he might be more

Miller Reporting Services
(704) 543-7103

PAGE 109

Kotopoulos                                                          109

1  A. Oh, yes.
2  Q. It was something that was discussed?
3  A. Yes.
4  Q. Okay. What did you say on that subject and
5  what did Ms. Burroughs say on that subject?
6  A. I don't know. I don't remember the
7  specifics.
8  Q. Did both of you recognize the possibility
9  that Mr. Kincaid could turn things around so that it
10 would not be necessary to terminate?
11 A. The best of my knowledge, yes.
12 Q. And did you discuss any ideas with
13 Ms. Burroughs about how to coach or counsel
14 Mr. Kincaid so that it would not be necessary to
15 terminate him?
16 A. To the best of my knowledge, yes.
17 Q. Do you remember any of the ideas that you or
18 Ms. Burroughs discussed on that subject?
19 A. No. No.
20 Q. Did you discuss with Ms. Burroughs how long a
21 period of time Mr. Kincaid should be given to see
22 whether he could turn things around such that it would
23 not be necessary to terminate him?
24 A. No.
25 Q. You didn't discuss that?

Miller Reporting Services
(704) 543-7103

PAGE 110

Kotopoulos                                                          110

1  A. No.
2  Q. Was the time that Mr. Kincaid was going to be
3  given left open and indefinite?
4  A. No, because that's an advice and counsel
5  issue.
6  Q. What do you mean by that?
7  A. Again, that 60 or -- I forget whether it was
8  60- or 90-day period.
9  Q. In other words -- are you saying that you had
10 no discretion about how long Mr. Kincaid was going to
11 be given to try to turn things around?
12 A. Oh, sure, I had discretion, yes.
13 Q. So who made the decision about how long he
14 was going to be given to try to turn things around?
15 A. Sheila and I jointly.
16 Q. Okay. And what did you decide?
17 A. We decided that we had heard a lot of bad
18 stuff from clients, we had decided that we had
19 internal feedback from Pierce and direct reports of
20 mine that was not positive with respect to the work he
21 was working on, and we had a situation here where we
22 felt Steve had been given a fair amount of time to
23 prove himself, so now it's time to give him a chance
24 through the probationary period to work through this
25 process. Either it was going to work or it wasn't

Miller Reporting Services
(704) 543-7103

PAGE 111

Kotopoulos                                                          111

1  going to work.
2  Q. Mr. Kotopoulos, do you remember the question
3  that I asked you?
4  A. Yeah, the period of time.
5  Q. That you and Ms. Burroughs decided you were
6  going to give Mr. Kincaid to try to turn things
7  around?
8  A. Right.
9  Q. What did you decide?
10 A. Just like with everybody else, the 90-day
11 period.
12 Q. Okay. And did you and Ms. Burroughs discuss
13 the fact that Ms. Burroughs should say to Mr. Kincaid
14 you are going to be given 90 days to try to turn
15 things around?
16 A. Ask the question again please.
17 Q. Did you discuss with Ms. Burroughs that she
18 should say to Mr. Kincaid that he was going to be
19 given 90 days to try to turn things around?
20 A. I instructed Sheila to talk to advice and
21 counsel just like I did with everybody else.
22 Q. So is your response to my answer no?
23 A. No. The answer is no.
24 Q. So you didn't say to Sheila Burroughs tell
25 Mr. Kincaid he's got 90 days to try to turn things

Miller Reporting Services
(704) 543-7103

PAGE 112

Kotopoulos                                                          112

1  around?
2  A. I don't recall that.
3  Q. Okay. You do recall that you decided that he
4  should be given 90 days to turn things around?
5  A. Yes.
6  Q. That you decided?
7  A. Yes. Absolutely.
8  Q. But you decided -- not -- or you didn't say
9  to Ms. Burroughs that you should tell Mr. Kincaid that
10 he's being given 90 days; right?
11 A. Again, I don't remember these things. I
12 don't remember. That's the answer.
13 Q. Okay. So you might have told her to tell
14 Mr. Kincaid he's got 90 days?
15 A. Possibly.
16 Q. Okay. And you remember that you told
17 Ms. Burroughs to talk to advice and counsel?
18 A. Absolutely.
19 Q. And did Ms. Burroughs report back to you at
20 some point that she had spoken to advice and counsel
21 regarding Mr. Kincaid?
22 A. Yes.
23 Q. And what did she say?
24 A. She said we need to set up an action plan.
25 Q. And what did you understand action plan to

Miller Reporting Services
(704) 543-7103

PAGE 113 SHEET 15

Kotopoulos                                                          113

1  mean?
2    A.   Action plan was written documentation of what
3  Steve needed to achieve in a set timeframe such that a
4  determination would be made at the end of that
5  timeframe as to whether or not Steve would, you know,
6  still be around or would be terminated.
7    Q.   Okay. And was that done?
8    A.   Yes.
9    Q.   And Mr. Kincaid was given a written action
10 plan telling him --
11   A.   Yes.
12   Q.   -- what you just said?
13   A.   Yes.
14   Q.   You're quite sure of that?
15   A.   I am 90 percent sure that that was done.
16   Q.   Now, when did you first discuss with Vipin
17 Mayar the possibility that Mr. Kincaid would be
18 terminated?
19   A.   I don't know.
20   Q.   Was it --
21   A.   An educated guess would be around the time
22 when Sheila had talked with me and told me there were
23 issues. I always made him aware of issues.
24   Q.   So it would have been your practice that when
25 you discussed for the first time the possibility of

Miller Reporting Services
(704) 543-7103

PAGE 114

Kotopoulos                                                          114

1  terminating Mr. Kincaid that at that time or shortly
2  thereafter you would have had a discussion on that
3  same subject with Vipin Mayar?
4    A.   Yes.
5    Q.   Do you remember having such a discussion with
6  Vipin Mayar?
7    A.   Yes.
8    Q.   Okay. And what did you say and what did he
9  say in that discussion?
10   A.   I absolutely don't remember.
11   Q.   You remember that you had a discussion with
12 Vipin Mayar, but you don't remember what either of you
13 said in that discussion; is that right?
14   A.   I cannot remember the specifics, that's
15 correct.
16   Q.   What is the next thing that you remember
17 regarding Mr. Kincaid after that conversation with
18 Sheila Burroughs?
19   A.   What is the next thing I remember about Steve
20 Kincaid post the conversation with Sheila Burroughs.
21   Q.   Yes.
22   A.   That he was working toward the goals that
23 were set forth.
24   Q.   Okay. So Sheila was reporting to you that --
25   A.   On a weekly basis.

Miller Reporting Services
(704) 543-7103

PAGE 115

Kotopoulos                                                          115

1    Q.   -- that Steve Kincaid was making an effort to
2  comply with the goals that you and Sheila had decided
3  on?
4    A.   Initially, yes.
5    Q.   And you used the word "initially"?
6    A.   Yes, because my recollection tells me there
7  may have been a petering out at some point. Sheila
8  will know the details, but I do vaguely remember there
9  was some big fall off.
10   Q.   And what do you remember about this big fall
11 off?
12   A.   All I can think of is that he had given up.
13   Q.   Okay. You said all you can think of. Do you
14 remember Sheila Burroughs saying to you something
15 which led you to believe that Mr. Kincaid had given
16 up?
17   A.   I don't recall the specifics.
18   Q.   Well, do you remember you were getting
19 communication from Ms. Burroughs along that line in
20 substance?
21   A.   Yes.
22   Q.   And how did you respond to that information
23 from Ms. Burroughs?
24   A.   See it to its end.
25   Q.   And what did you mean by that?

Miller Reporting Services
(704) 543-7103

PAGE 116

Kotopoulos                                                          116

1    A.   You know, there's a process in place and
2  everybody had a fair shot and, you know, see it to its
3  end.
4    Q.   In other words, that Mr. Kincaid should be
5  given the full 90 days?
6    A.   Yeah.
7    Q.   And was Mr. Kincaid given the full 90 days?
8    A.   I don't remember. Honestly, I don't
9  remember.
10   Q.   Well --
11   A.   Sheila will know.
12   Q.   Was it your practice when you decided that an
13 employee should be given 90 days that the employee
14 was, in fact, given the full 90 days?
15   A.   Absolutely.
16   Q.   Did it ever come to your attention that a
17 lawyer retained by Mr. Kincaid wrote a letter to the
18 bank of America making certain claims about the way
19 that he had been treated?
20   A.   No.
21   Q.   I take it -- do you know that today, that
22 such a letter was sent?
23   A.   I do know that today.
24   Q.   When did you first learn that?
25   A.   Well, today. This morning. Actually, I do

Miller Reporting Services
(704) 543-7103

PAGE 117

Kotopoulos                                                        117

1  know because of the Eric Montgomery meeting that
2  something had happened. I didn't know any details,
3  just that something had happened. I'm sorry, I
4  misspoke.
5      Q.  Okay. And the Eric Montgomery meeting was
6  after Mr. Kincaid had already been terminated?
7      A.  Yes.
8      Q.  Now that you know --
9      A.  Right.
10     Q.  -- that such a letter was sent by
11 Mr. Kincaid's lawyer to the Bank of America, is that
12 letter something that you would have wanted to know
13 about at the time?
14     A.  At what time? I'm sorry.
15     Q.  At the time that it was sent?
16     A.  Not necessarily, no.
17     Q.  Well --
18     A.  This is a legal issue. To me, it's HR and
19 legal, it's not my area of expertise.
20     Q.  Have you read the letter that Mr. Kincaid's
21 lawyer sent to the bank?
22     A.  I have never read the letter. I've never
23 seen the letter.
24     Q.  Okay. At some point did you have a further
25 discussion with Sheila Burroughs on the subject of

                 Miller Reporting Services
                      (704) 543-7103

PAGE 118

Kotopoulos                                                        118

1  terminating Mr. Kincaid?
2      A.  I don't understand the question. At some
3  point?
4      Q.  Well, you've talked about this initial
5  meeting where the subject first came up?
6      A.  Correct.
7      Q.  You talked about weekly reports that you got
8  from Sheila about his performance?
9      A.  Yes.
10     Q.  You've spoken about this conversation that
11 you had with Sheila about the falling off?
12     A.  Yes.
13     Q.  After that discussion --
14     A.  Right.
15     Q.  -- when was the next time you spoke to
16 Ms. Burroughs on the subject of possibly terminating
17 Mr. Kincaid?
18     A.  I believe on the day that Sheila terminated
19 Mr. Kincaid.
20     Q.  Okay.
21     A.  Or early -- a period probably within that day
22 prior to the time that she terminated him.
23     Q.  Who initiated that discussion?
24     A.  Sheila.
25     Q.  And what did Sheila say to you and what did

                 Miller Reporting Services
                      (704) 543-7103

PAGE 119

Kotopoulos                                                        119

1  you say to her?
2      A.  She let me know that today was going to be
3  the day that Steve was going to be terminated. I
4  believe she said there would be somebody either in the
5  room or on the phone from advice and counsel, and that
6  was it, or HR, I forget.
7      Q.  Okay. And did Sheila Burroughs tell you how
8  it was that she had selected that particular day to
9  terminate Mr. Kincaid?
10     A.  I believe it was the end of the period.
11     Q.  The end of the 90 days?
12     A.  I believe so.
13     Q.  And so she said to you in words or substance,
14 "Today being the end of the 90-day period, we should
15 terminate Mr. Kincaid today"?
16     A.  No. I think it was more -- again, we had
17 kept a weekly communication and, you know, we both
18 knew that this was it.
19     Q.  And why was it that you both knew that this
20 was it?
21     A.  Because we communicated. I would communicate
22 with her. She would communicate with me.
23     Q.  Who made the decision -- as between you and
24 Ms. Burroughs, who made the decision that, okay, now
25 it was the time to really terminate Mr. Kincaid?

                 Miller Reporting Services
                      (704) 543-7103

PAGE 120

Kotopoulos                                                        120

1      A.  Well, I made the ultimate decision, yes.
2      Q.  Now, earlier you spoke about a conversation
3  that you had with Vipin Mayar about terminating
4  Mr. Kincaid; right?
5      A.  Uh-huh.
6      Q.  After that conversation when was the next
7  time that you discussed terminating Mr. Kincaid with
8  Vipin Mayar?
9      A.  I don't remember. I don't remember.
10     Q.  Was there another such discussion?
11     A.  There was certainly a discussion, I'm sure,
12 before -- just before the termination.
13     Q.  And you're sure of that because that was your
14 practice?
15     A.  That was the standard practice, yes.
16     Q.  Do you, in fact, remember anything that was
17 said in that discussion with Mr. Mayar?
18     A.  Just that Mr. Kincaid was going to be
19 terminated on, you know, this date. It was maybe the
20 next day but very close in time, and that's it, so
21 that he was aware.
22     Q.  When was the first time that you discussed
23 with anybody the subject of finding a replacement for
24 Mr. Kincaid?
25     A.  I don't know.

                 Miller Reporting Services
                      (704) 543-7103

PAGE 121 SHEET 16

Kotopoulos                                                          121

1  Q.  Did you, in fact, ever have such a
2  discussion?
3  A.  About finding a replacement for Mr. Kincaid?
4  Q.  Yes.
5  A.  Sure. After Mr. Kincaid was gone.
6  Q.  Who did you have the discussion with?
7  A.  Recruiters.
8  Q.  How many such discussions did you have?
9  A.  A couple.
10 Q.  Who did you have the discussions with?
11 A.  This gentleman, Frank Black, and probably
12 Paul Fafard, two recruiters.
13 Q.  And was a replacement for Mr. Kincaid
14 ultimately hired?
15 A.  No.
16 Q.  Why not?
17 A.  Because we brought -- because Sheila moved on
18 and we brought somebody into Sheila's old role and we
19 brought Leroy Lelker over, and we never replaced
20 Mr. Kincaid's position.
21 Q.  My question is: Why did you never replace
22 his position?
23 A.  Because the gentleman who had come in, Gerry
24 McDonough, basically had lots of customer satisfaction
25 and loyalty background. We felt comfortable with his

Miller Reporting Services
(704) 543-7103

PAGE 122

Kotopoulos                                                          122

1  background and comfortable enough with what he needed
2  to do at the bank to get things done going forward.
3  Q.  And so it was no longer necessary to have
4  someone in Mr. Kincaid's position; right?
5  A.  Well, we had a number of Ph.D. statisticians
6  in the CAMR unit including Mr. --
7  Q.  Can you answer my question, please?
8  A.  Say it again, please.
9  Q.  And so you decided it was no longer necessary
10 to have someone in Mr. Kincaid's position?
11 A.  Yes.
12 Q.  Now, stepping back from the situation and
13 looking at all the facts that we've talked about
14 today, isn't it consistent with those facts that what
15 really happened here was you decided to lay
16 Mr. Kincaid off because you had made a determination
17 that it was no longer necessary to have someone in his
18 position?
19     MR. KANE: Object to the form. Go ahead and
20 answer if you know, if you understand.
21     THE WITNESS: The answer is no.
22     BY MR. FINE:
23 Q.  What about the facts is inconsistent with
24 that?
25 A.  It was pretty simple, black and white to me.

Miller Reporting Services
(704) 543-7103

PAGE 123

Kotopoulos                                                          123

1  Performance. Performance. Performance. Significant
2  underperformance; significant internal client opinion
3  that was not positive; you know, significant opinion
4  of the person who was directly managing him, Sheila
5  Burroughs, on a daily basis, performance was an issue.
6  Q.  And you were concerned about the performance
7  because the kinds of things that Mr. Kincaid were
8  doing were important; right?
9  A.  Yes.
10 Q.  They were integral to the operation of the
11 group; right?
12 A.  Yes.
13 Q.  So why didn't you hire a replacement?
14 A.  We found other ways to get it done. We had
15 vendors. We had some internal Ph.D.s. We brought in
16 Gerry McDonough who had a very solid background.
17 Business needs sometimes shift.
18 Q.  And the perception that you no longer needed
19 somebody in Mr. Kincaid's position was a perception
20 that you had no inkling of prior to Mr. Kincaid's
21 termination?
22 A.  I'm sorry. Break it down for me. I
23 understand it, but I don't want to answer unless I
24 really got it.
25 Q.  Ultimately you came to the conclusion that

Miller Reporting Services
(704) 543-7103

PAGE 124

Kotopoulos                                                          124

1  you no longer needed somebody in Mr. Kincaid's
2  position; right?
3  A.  I don't agree with that. We found other ways
4  to get done what Steve was doing but in a much
5  superior way without the underperformance.
6  Q.  And --
7  A.  We have lots of smart people.
8  Q.  So what you found was that you could get the
9  work of this group -- the work that had been done by
10 four employees, you could have it done by three
11 employees; right?
12 A.  No, because we brought in -- we brought Leroy
13 over, we brought Gerry in, we worked more with the
14 vendor or vendors.
15 Q.  Well, Mr. Kotopoulos, prior to the time that
16 Mr. Kincaid was terminated there were four people in
17 this group; there was Sheila Burroughs --
18 A.  I know the names.
19 Q.  -- Allison Hart, Susan Haloulos, and there
20 was Steve Kincaid?
21 A.  Correct.
22 Q.  After Mr. Kincaid was terminated there were
23 only three people in that group; correct?
24 A.  Right after, yes.
25 Q.  And it continued that way; right?

Miller Reporting Services
(704) 543-7103

PAGE 125

Kotopoulos                                                      125

1    A.   No.  Gerry brought some people over too.
2  Gerry brought over -- oh, God, I forget the
3  gentleman's name.  He brought in a Ph.D. stats guy.
4  Was it -- this is terrible, I cannot remember the
5  gentleman's name.  He brought in an individual.
6    Q.   And when did he do that?
7    A.   I don't know.  I don't remember.
8    Q.   What's this Ph.D. stats guy's name?
9    A.   That's what I can't remember, I apologize.
10 I'm not purposefully forgetting.  I just don't
11 remember.
12   Q.   By the way, that's what you considered
13 Mr. Kincaid to be, a Ph.D. stats guy; right?
14   A.   I did not know about Steve's -- I didn't even
15 know what Steve had a Ph.D. in.  I did not hire Steve.
16   Q.   Well, you referred to this guy that Gerry
17 brought in as a Ph.D. stats guy; right?
18   A.   Yeah.
19   Q.   When you said that, did you have in mind that
20 that Ph.D. stats guy was comparable to what
21 Mr. Kincaid was?
22   A.   Yes.
23   Q.   Okay.  And you say that you don't know the
24 name of this Ph.D. stats guy?
25   A.   I can't remember.

Miller Reporting Services
(704) 543-7103

PAGE 126

Kotopoulos                                                      126

1    Q.   If somebody at the bank were going to try to
2  find out the name of that Ph.D. stats guy, what would
3  they do?
4    A.   Call Gerry McDonough.
5    Q.   And what's Gerry McDonough's position?
6    A.   He's -- I don't know exactly what his
7  position is right now, but he's involved in customer
8  satisfaction and loyalty, measurement.
9    Q.   How old is Gerry McDonough?
10   A.   Well in his forties.
11   Q.   How old is this new Ph.D. stats guy?
12   A.   Probably in his fifties.  Well in his
13 fifties, mid fifties, I think.
14   Q.   Are you guessing or do you know that?
15   A.   Well, he's got grown kids, so I'm guessing
16 intelligently and he looks the part.
17   Q.   Okay.  You were last at the bank how long
18 ago?
19   A.   February.
20   Q.   February of?
21   A.   What are we in now?  '05.  So '04.
22   Q.   So when is the last time that you saw this
23 Ph.D. stats guy?
24   A.   It would have been, you know, December,
25 January of that period.

Miller Reporting Services
(704) 543-7103

PAGE 127

Kotopoulos                                                      127

1    Q.   December, January of 2003 -- December 2003,
2  January 2004?
3    A.   Right.
4    Q.   And on how many occasions did you see that
5  person?
6    A.   I saw him a fair amount because Gerry -- he
7  and I were working together on some important stuff.
8    Q.   And what was the important stuff that you
9  were working on with this person?
10   A.   Gerry was working heavily on drivers of
11 satisfaction and loyalty, models to try to predict the
12 stuff.
13   Q.   And what was the Ph.D. stats guy working on?
14   A.   Well, he was the modeler, if you will, the
15 person doing the pure analytics and building the
16 models.  Gerry was more the strategist and the direct
17 face-to-face with the internal clients.
18   Q.   You were let go in February of 2004?
19   A.   Correct.  Yeah.
20   Q.   Was anybody in Gerry McDonough's group let go
21 at the same time?
22   A.   Not that I know of, no.
23   Q.   Do you know who's in that group today?
24   A.   Well, the group has been taken out of CAMR
25 and put into the six sigma world.  That's all I know.

Miller Reporting Services
(704) 543-7103

PAGE 128

Kotopoulos                                                      128

1    Q.   When was that done?
2    A.   I have no idea.
3    Q.   How do you know that it was done?
4    A.   Because I hear from people all the time here
5  and there.
6    Q.   From people still at the bank?
7    A.   Sure.
8    Q.   Can you name any of the people who told you
9  that?
10   A.   No.
11   Q.   Now, earlier you testified that initially you
12 made two telephone calls to try to find a replacement
13 for Mr. Kincaid; right?
14   A.   Yes.
15   Q.   And you testified that you stopped doing that
16 because you made a determination that it was not
17 necessary to fill his position; right?
18   A.   Yes.
19   Q.   Okay.  And later on at some point, you don't
20 know when, Gerry McDonough made a different decision?
21   A.   Different decision meaning?
22   Q.   He decided that it would be good to fill that
23 position?
24   A.   Yes.
25   Q.   Did he discuss that with you?

Miller Reporting Services
(704) 543-7103