**EXHIBIT 9**

PAGE 1  SHEET 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Civil Action No. 04-11522-WGY

STEVEN R. KINCAID,
         PLAINTIFF,
vs.
BANK OF AMERICA CORPORATION,
         DEFENDANT.

D E P O S I T I O N
OF
ELIZABETH ANNE JANAK

At Charlotte, North Carolina
August 24, 2005

REPORTED BY:    KAREN KIDWELL, RMR, CRR
                Notary Public

---

PAGE 2

                    A P P E A R I N G

For the Plaintiff:    David J. Fine, Esquire
                      LAW OFFICES OF DAVID J. FINE
                      3 Center Plaza, Suite 400
                      Boston, Massachusetts 02108-2003
                      617-720-2941

For the Defendant:    Richard E. Kane, Esquire
                      MCGUIRE WOODS, L.L.P.
                      Bank of America Corporate Center
                      100 North Tryon Street
                      Suite 2900
                      Charlotte, North Carolina 28202
                      704-373-8999

In Attendance:        Steven Kincaid

Miller Reporting Services  (704) 543-7103

---

PAGE 3

                    I N D E X
WITNESS/EXAMINATION                              Page
ELIZABETH ANNE JANAK
  By Mr. Fine                                      4

                  E X H I B I T S
No.        Description                           Page

Plf. No. 1    Copy of 8/18/03 Emails              51
              between Kotopoulos and
              Janak

Plf. No. 2    Copy of CAMR Turnover               59
              As of 8.11.03,
              BofA-0117

Plf. No. 3    Copy of New Hires-AMN,              84
              BofA-0118 through
              BofA-0121

Plf. No. 4    Copy of 2003 Talent                 90
              Planning Profile,
              BofA-0122, 0123, 0127,
              0128, 0129

Plf. No. 5    Copy of Organizational              93
              Charts, BofA-0229
              through BofA-0236

          E X H I B I T S   R E F E R E N C E D
No.                                              Page
Lamano No. 2                                      88

Miller Reporting Services  (704) 543-7103

---

PAGE 4

Exam by Mr. Fine
                    * * * * * *
         This is the Deposition of ELIZABETH ANNE JANAK
taken in accordance with the Federal Rules of Civil
Procedure in connection with the above case.
         Pursuant to Notice and/or consent, this
Deposition is being taken in the offices of MCGUIRE
WOOD, L.L.P., 100 North Tryon Street, Suite 2900,
Charlotte, North Carolina, beginning at 9:34 a.m. on the
24th day of August, 2005, before KAREN K. KIDWELL, RMR,
CRR, Registered Professional Reporter and Notary Public.
         The deponent does not waive reading and signing
of this deposition.
*    *    *    *    *    *    *    *    *    *
              ELIZABETH ANNE JANAK
being first duly sworn, testified as follows:
              EXAMINATION
BY MR. FINE
    Q.    Please state your full name and spell your
last name.
    A.    Sure.  Elizabeth Anne Janak.  J-A-N-A-K.
    Q.    Where do you reside?
    A.    My permanent residence is in Davidson, North
Carolina.  Currently I'm on a temporary assignment in
London.
          MR. KANE:  Mr. Fine.

Miller Reporting Services  (704) 543-7103

PAGE 9  SHEET 2

Exam by Mr. Fine

1  of the CFO.
2          And then was offered a role as a personnel
3  partner, personnel exec in the marketing organization
4  and took that. It was during the summer of '03, but I
5  don't remember exact dates. So I was in a personnel
6  capacity until November of '04.
7          And I was offered a role in corporate
8  communication which is part of the marketing
9  organization. And so I joined the marketing
10 organization in November of '04, and I've been in
11 marketing since then.
12         MR. KANE: That's probably more than you
13 needed to know or wanted to know, Mr. Fine.
14         MR. FINE: No, actually, everything that the
15 witness said was things that I was going to ask, so --
16         MR. KANE: Okay.
17         THE WITNESS: I'm older than I look. Done a
18 lot of stuff.
19 BY MR. FINE
20     Q.   So you joined Bank of America in October of
21 2001, right?
22     A.   Uh-huh.
23     Q.   Okay. And you say that you worked in
24 executive development and you worked on leadership
25 development?

Miller Reporting Services  (704) 543-7103

PAGE 10

Exam by Mr. Fine

1     A.   Executive development is actually a team
2  within the leadership development. It's executive
3  development. I ran executive development programs. So
4  they were, we have, we develop and deliver programs that
5  are focused on developing our executive levels. And,
6  you know, executive levels basically are band 1 through
7  3 in the organization. So it encompasses, you know,
8  maybe the top 4 or 5,000 people in Bank of America. And
9  they're programs like, you know, like seminars, you
10 know, like that focus really on developing leadership
11 capability, that kind of stuff.
12    Q.   Okay. And you did that from October 2001
13 until when?
14    A.   Until probably nine months from October, so
15 what would that be? It would take me into about June or
16 July of --
17    Q.   2002?
18    A.   Yeah.
19    Q.   Okay. And then what did you start doing
20 then?
21    A.   Well, what, the way my job changed from '01
22 to '03 was the way, the best way to think about it was,
23 if you divide the job into two aspects, 50 percent, you
24 know, 50 and 50. So my, you know, 50 percent would
25 leave. Another new 50 percent would come on. So I

Miller Reporting Services  (704) 543-7103

PAGE 11

Exam by Mr. Fine

1  always had kind of a 50 percent core that I would
2  maintain every 6 months, but it would, it was constantly
3  changing. So it's not really accurate to say at this
4  date, I stopped this and started a whole new role. It
5  was kind of changing, it was morphing so to speak.
6      Q.   And the, if I understand you correctly, in
7  the beginning, it was 100 percent executive development?
8      A.   Right.
9      Q.   And then you started taking on?
10     A.   Leadership development, client management
11 responsibilities. So in March of '02, for example, I
12 kept, I still kept executive development in the work I
13 had been doing for the first 6 months of my job, but I
14 picked up another 50 percent. So it became kind of like
15 150 percent, so to speak. But I picked up client
16 management responsibility for Cathy Bessant in the
17 marketing organization.
18     Q.   Okay. Explain what that, what that was.
19     A.   Primarily, the leadership development partner
20 is responsible for managing the processes of leadership
21 development including talent planning, including
22 executive coaching. You get involved in a lot of
23 things, but those are your two, those are the two big
24 processes that you own. And you're a support partner,
25 if you will, to both the line of business leader, in

Miller Reporting Services  (704) 543-7103

PAGE 12

Exam by Mr. Fine

1  this case was Cathy Bessant, and to the personnel
2  executive, who is the, you know, think of them as the
3  quarterback, so to speak. And the personnel partner,
4  they're the generalist.
5          And then they have three primary support
6  behind them. They have a compensation partner. They
7  have the leadership development partner, and they have a
8  staffing partner. And so the personnel exec faces off
9  to the line of business execs, and leadership
10 development partner supports both personnel exec but
11 then also works directly with the line of business exec
12 and their team.
13    Q.   Okay. So please identify who held those
14 various slots. Cathy Bessant was the head of the
15 marketing function?
16    A.   Yeah. She was chief marketing officer for
17 the Bank.
18    Q.   Okay.
19    A.   And Cathy took that role, I was her, I was --
20 she took that role in like January of '02, and then I,
21 and she didn't have a leadership development partner
22 until March. And I was just, I became her leadership
23 development partner.
24    Q.   Okay. And then you referred, you said that
25 one of the people that Cathy Bessant worked with was a

Miller Reporting Services  (704) 543-7103

PAGE 13

Exam by Mr. Fine

1 personnel executive, did you say?
2    A.   Yeah.
3    Q.   And who was that?
4    A.   Well, in 2002, it was Mike Clement for I
5 don't know how many months. And then, and I don't know
6 any of the dates on this, but then it became, the
7 personnel partner changed, and Tony Marino took on the
8 personnel executive responsibilities for marketing. And
9 then at some point in '03, '03 or 04, I don't even
10 remember the dates, Mike Carroll took on the
11 responsibilities.
12   Q.   Okay. So there was the personnel executive,
13 the chief marketing executive, the leadership
14 development partner, who was you, and then I believe you
15 mentioned a fourth person or fourth position?
16   A.   Well, the compensation partner.
17   Q.   Okay. And who was that?
18   A.   Boy, people's jobs change so quickly. So
19 Christine Lamano was a compensation partner for Cathy at
20 one point. It was a fraction of her job.
21   Q.   A fraction of?
22   A.   Of Christine's job. She had other comp
23 responsibilities. Another compensation partner at some
24 point was Kevin Raines, and he also had other
25 responsibilities.

Miller Reporting Services  (704) 543-7103

PAGE 14

Exam by Mr. Fine

1    Q.   Okay. You were Cathy Bessant's leadership
2 development partner from, did you say March 2002?
3    A.   Uh-huh.
4    Q.   Until when?
5    A.   Summer of '03. So I think it was June or
6 July or something like that. I know it was the summer
7    Q.   Okay. And --
8    A.   August. I don't know.
9    Q.   I'm sorry?
10   A.   Or August. I don't know.
11   Q.   Okay. The, and what was your role as
12 leadership development partner?
13   A.   I managed the leadership development
14 processes, talent planning process, executive coaching
15 process.
16   Q.   For the, for the executives in the marketing
17 area?
18   A.   Yes.
19   Q.   Okay.
20   A.   For the marketing organization. Talent
21 planning is, think of it as, it's an assessment and
22 succession planning tool. At the Bank, we call it
23 talent planning. That's just the name of the process.
24 But it's succession planning.
25        And with, we apply that process, we applied

Miller Reporting Services  (704) 543-7103

PAGE 15

Exam by Mr. Fine

1 it in marketing down to band 5. The Bank is organized,
2 you know, the comp structure is by band. So bands 1
3 through bands 9.
4        And so you apply talent planning, Cathy
5 wanted to apply it down to band 5 in the organization.
6 It's up to the discretion of the executive how deep they
7 want to go. The requirement is that it be applied to
8 all bands 1 through 3 associates. And then the exec has
9 a prerogative to go deeper if they so wish, and Cathy
10 wanted to.
11   Q.   Okay. Cathy Bessant herself was band what?
12 What band was she?
13   A.   Cathy is a band 1.
14   Q.   Okay.
15   A.   And she was a direct report to Ken Lewis, the
16 CEO.
17   Q.   And what band were you?
18   A.   Band 3.
19   Q.   Okay. Now, in the summer of 2003, you took
20 on some additional responsibilities?
21   A.   Uh-huh.
22   Q.   And what were the additional responsibilities
23 you took on at that point?
24   A.   Actually, at that point, I took on personnel
25 responsibilities so, personnel generalist

Miller Reporting Services  (704) 543-7103

PAGE 16

Exam by Mr. Fine

1 responsibilities.
2    Q.   You say personnel generally?
3    A.   Generalist, meaning, you've probably heard it
4 referred to as personnel manager or personnel executive.
5 The distinction between personnel manager and personnel
6 executive is primarily what band level you are. Anybody
7 band 3 or above is referred to as an executive. Anybody
8 band 4 is referred to as a personnel manager. So I took
9 on personnel responsibilities, so I would be referred to
10 as a personnel exec.
11   Q.   Okay. And was the personnel responsibility
12 that you had to a particular portion of the Bank? Was
13 it a particular area that you had personnel
14 responsibility for?
15   A.   Yeah, it was within the marketing
16 organization.
17   Q.   Okay. And what were your duties and
18 responsibilities as the personnel executive within the
19 marketing organization?
20   A.   I characterize it in two main areas. The
21 first is the personnel partner is responsible for
22 managing personnel processes, so you're responsible for
23 managing processes like performance management. You're
24 the primary manager of selection processes.
25        And by that, in that management capacity, you

Miller Reporting Services  (704) 543-7103

PAGE 17 SHEET 3

**17**

Exam by Mr. Fine

1  give guidance. You work, in a perfect world, you work
2  in partnership with the manager, with the executives and
3  how, and how they need to utilize you in the
4  organization.
5        So, you know, in Bank terms, people say
6  they're business partners. So you partner with the
7  executive you would say on what, you know, what's the
8  business strategy? What are you trying to do with the
9  business? And then what does it mean as it applies to
10 talent that you need? Or you know, the, how do you
11 operationalize that strategy from human terms if you
12 will.
13     Q. Okay. And you did that until when, from the
14 summer of 2003 until when?
15     A. November of '04.
16     Q. And then in November of '04, you went into
17 communications?
18     A. Uh-huh. I was asked to take a role in
19 communications as the communications partner support for
20 our CEO. So I thought it would be a nice change.
21     Q. And the CEO --
22     A. Of Bank of America.
23     Q. Yes. In November 2004 was who?
24     A. Ken Lewis.
25     Q. And is he still the CEO?

Miller Reporting Services (704) 543-7103

PAGE 18

**18**

Exam by Mr. Fine

1     A. Yes.
2     Q. Okay. Now, when you became the communication
3  partner for Mr. Lewis, did you cease these other things
4  that you were doing?
5     A. Yeah.
6     Q. Okay. And the temporary assignment in London
7  that you're on now is as part of your function as a
8  communication partner to him or is that something else
9  again?
10    A. Didn't seem that complicated before. So
11 based on the work that I had done in my communications
12 job, I was asked to take on this project of developing
13 the marketing strategy because that was fundamentally
14 the work that I did in supporting Mr. Lewis. I put
15 together a communications strategy for the, for the
16 Bank. And so my responsibilities are being, they're
17 being supported temporarily by two folks who reported in
18 to me.
19       So, yeah, yes and -- yes. But I'm --
20 recently the organization split, and communications is
21 now under a different executive than Cathy Bessant. So
22 I'm working for Cathy Bessant, but I'll go back to my
23 old job when I'm finished with this project. Am I
24 overcomplicating?
25    Q. No, no, no. In -- when you were the

Miller Reporting Services (704) 543-7103

PAGE 19

**19**

Exam by Mr. Fine

1  personnel executive within the marketing organization,
2  did you work with people in the personnel department?
3  Was that part of your job?
4     A. I reported into personnel so I reported into
5  Tony Marino as a personnel executive when he was
6  personnel executive. I reported in to Mike Carroll as
7  his personnel executive. So they were my boss, my, you
8  know, direct reporting relationship boss. and I
9  supported the executives within marketing.
10    Q. Okay.
11    A. It's just how it's aligned in the Bank.
12    Q. Okay. At any point in your various jobs with
13 the Bank, have you had any responsibility with regard to
14 the Bank's policies and practices with regard to
15 discrimination?
16    A. Well, as, as a personnel person, you, you
17 work within the guidelines set forth by the Bank. And
18 you provide advice and counsel and guidance to the line
19 of business managers.
20    Q. Okay. Was any part of your job formulating
21 policy or practice with regard to the implementation of
22 the Bank's antidiscrimination policy?
23    A. What do you mean formulating policy?
24 Policies are set at a corporate level.
25    Q. Okay.

Miller Reporting Services (704) 543-7103

PAGE 20

**20**

Exam by Mr. Fine

1     A. So I don't understand, I don't understand the
2  question maybe.
3     Q. Okay. Well, let me try getting at this a
4  different way. The, I think one of your functions was
5  to help in training for executives at the Bank?
6     A. When I was in executive development, uh-huh.
7  Yes.
8     Q. Okay. Did you ever, were you ever involved
9  in training with regard to executives' sensitivity to
10 discrimination issues?
11       MR. KANE: Objection. Go ahead.
12       THE WITNESS: I wasn't responsible for
13 developing diversity training if that's the question,
14 no.
15 BY MR. FINE
16    Q. Okay. You use the term "diversity training."
17 What does that term mean to you?
18    A. Diversity is basically the appreciation of
19 diverse backgrounds, genders, EEO, ethnicity, et cetera.
20    Q. And is diversity training something that all
21 Bank executives go through at some point?
22    A. I don't know.
23    Q. Okay. In your work with the Bank, did, were
24 you ever asked to help out in terms of the Bank's
25 dealing with a discrimination problem?

Miller Reporting Services (704) 543-7103

PAGE 49 SHEET 7

49

Exam by Mr. Fine

1  BY MR. FINE
2     Q.  Well, don't you agree --
3     MR. KANE:  Objection.
4  BY MR. FINE
5     Q.  -- that the Bank should do that?
6     A.  I'm just not sure that I do.  I don't know.
7     Q.  Okay.  Before you take a break, can you tell
8  me why you think the Bank shouldn't do that?
9     MR. KANE:  Objection.
10    THE WITNESS:  Well, I go, the reason why is,
11 and going back to where we started was I'd look, I'd
12 first look at the data to see whether it, you know,
13 whether it warrants that kind of process.  And, you
14 know, does the data suggest that there are enough
15 occurrences of claims of discrimination that it's
16 something that we should be dedicating the resources to
17 keep track of and report on.  And that's, that's it.
18 That's why I don't know if we should be doing that.
19    MR. FINE:  Okay.  Take your break.
20    (A recess transpired from 10:52 a.m. until
21    11:04 a.m.)
22 BY MR. FINE
23    Q.  Ms. Janak, I believe that before the break,
24 one of the things that you said was that the problem of
25 the executive who might be prone to discriminate is a

Miller Reporting Services  (704) 543-7103

PAGE 50

50

Exam by Mr. Fine

1  problem that could be handled in the selection process?
2     A.  I suggest, I meant that I would suggest
3  addressing it in selection, and I think that would come
4  out through the reference process.
5     Q.  Okay.  And does that mean that one of the
6  things that the Bank would consider relevant or should
7  consider relevant is whether an executive had been the
8  target of claims of discrimination at his previous place
9  of employment?
10    A.  I don't know that, in the reference process
11 that's a specific question, but it, you know, we probe
12 people on prior performance and prior management if
13 they're coming in to be a manager.
14    Q.  Okay.  But should the Bank consider it to be
15 relevant information if a prospective executive to be
16 employed by the Bank had been the subject of multiple
17 claims of discrimination at previous places of
18 employment?
19    MR. KANE:  Objection.
20    THE WITNESS:  Would the Bank consider it
21 relevant?
22 BY MR. FINE
23    Q.  Yes.
24    A.  Yeah.
25    Q.  And in your view, the Bank should consider it

Miller Reporting Services  (704) 543-7103

PAGE 51

51

Exam by Mr. Fine

1  relevant, right?
2     MR. KANE:  Objection.
3     THE WITNESS:  In my, yeah, in my view.
4     MR. FINE:  I'd like to have marked as an
5  exhibit document bearing Bates number BA 116.
6     (Plf. Exhibit No. 1, Copy of 8/18/03 Emails
7     between Kotopoulos and Janak, was marked for
8     identification.)
9     MR. KANE:  Do you have a copy -- well,
10 generally, it's professional courtesy to have a copy for
11 the lawyer to look at, too, whether he's seen it before
12 or not.
13    MR. FINE:  That is certainly true, and if you
14 would make your Xerox machine available, I have a bunch
15 of documents that I could have made copies of.
16    MR. KANE:  Well, do you want to do that?
17    MR. FINE:  Sure.
18    MR. KANE:  Okay.
19    (A recess transpired from 11:07 a.m. until
20    11:11 a.m.)
21 BY MR. FINE
22    Q.  Ms. Janak, I ask you to read the document
23 that was just marked as an exhibit to yourself.  And
24 then I have some questions about it.
25    Have you read it?

Miller Reporting Services  (704) 543-7103

PAGE 52

52

Exam by Mr. Fine

1     A.  Uh-huh.
2     Q.  Okay.  Now, first of all, this is a print-out
3  of two emails, right?
4     A.  Uh-huh.
5     MR. KANE:  You need to answer audibly.
6     THE WITNESS:  I'm sorry.  Yes.  Yes, it is.
7  BY MR. FINE
8     Q.  Okay.  And the first email in time is the one
9  that appears at the bottom of the page?
10    A.  Yes.
11    Q.  Okay.  And that's an email that you sent to
12 Alec Kotopoulos, correct?
13    A.  Correct.
14    Q.  All right.  Now, above the words "original
15 message," there is "From Janak, Elizabeth."  And above
16 it, it says, "original message," and then above that,
17 there's a "P.S."?
18    A.  Yes.
19    Q.  Was that P.S. part of your email or
20 Mr. Kotopoulos' responding email or something else?
21    A.  It was part of Alec's responding email,
22 although unrelated to the content of my initial email.
23    Q.  Okay.  Now, as of the time you sent this
24 email to Alec Kotopoulos, had your duties and
25 responsibilities changed?  You said there was a change

Miller Reporting Services  (704) 543-7103

PAGE 53

Exam by Mr. Fine

1  in the summer of 2003?
2  A. Uh-huh.
3  Q. And was this email sent before the change or
4  after the change?
5  A. After the change when I had the personnel
6  responsibilities.
7  Q. Okay. Prior to sending this email, did you
8  know Alec Kotopoulos?
9  A. Yes.
10 Q. How did you know him?
11 A. He was a manager in the marketing
12 organization and reported into Vipin Mayar. I know
13 because I was leadership development partner, and I
14 worked with Vipin and his team in talent planning
15 process.
16 Q. All right. Now, in the course of working
17 with Vipin on the talent planning process, what kind of
18 interactions did you have with Mr. Kotopoulos, if any?
19 A. I facilitated, the, you know, I would
20 facilitate the team meeting. The, what did we call it?
21 Talent planning. We call it a calibration meeting.
22 Q. The talent planning meeting?
23 A. Uh-huh.
24 Q. And was the talent planning meeting the
25 meeting at which associates were rated for purposes of

Miller Reporting Services (704) 543-7103

PAGE 54

Exam by Mr. Fine

1  the bonus program?
2  A. Technically, no. The associates were
3  rated -- as part of talent planning, associate
4  performance is discussed, and additional feedback is
5  solicited across the team. So that's really what we do
6  in talent planning meeting.
7  Q. Okay. Were you ever at a talent planning
8  meeting in which Steven Kincaid was discussed?
9  A. I don't remember any discussion about Steven
10 Kincaid in talent planning.
11 Q. Okay. Were you ever in a situation where you
12 gave any kind of assessment of Alec Kotopoulos to Vipin
13 Mayar?
14    MR. KANE: Objection.
15    THE WITNESS: No, I did not give Vipin an
16 assessment of Alec.
17 BY MR. FINE
18 Q. Okay. Did you ever do that with any
19 executives? Did you ever give, was that part of your
20 role to help the executives that you work with evaluate
21 other executives?
22 A. I would give Cathy Bessant input into her
23 direct reports as part of talent planning and the
24 feedback process. I'd facilitate those discussions. I
25 would probe or have people describe their feedback. But

Miller Reporting Services (704) 543-7103

PAGE 55

Exam by Mr. Fine

1  it wasn't my role to give Vipin an assessment of each of
2  his direct reports, no.
3  Q. Okay. Did you, would you give, did you give
4  Cathy Bessant your views of Vipin?
5  A. Yes.
6  Q. Okay. In -- were you ever at a talent
7  planning meeting when Alec was discussed?
8  A. Yes.
9  Q. Okay. Did you yourself ever say anything
10 about Alec?
11    MR. KANE: Objection.
12    THE WITNESS: I don't really remember, if I
13 had any input.
14 BY MR. FINE
15 Q. Okay. Do you remember what any other people
16 said about Alec's strengths as manager?
17    MR. KANE: Objection.
18    THE WITNESS: I don't remember the details of
19 the feedback. I remember that Alec was rated very
20 highly. Performances and potential was rated highly.
21 BY MR. FINE
22 Q. The, do you remember anyone saying anything
23 about any weaknesses that Alec may have had?
24    MR. KANE: Objection.
25    THE WITNESS: I don't remember any specifics.

Miller Reporting Services (704) 543-7103

PAGE 56

Exam by Mr. Fine

1  BY MR. FINE
2  Q. Do you remember anything general about
3  whether Alec was perceived to have any weaknesses?
4     MR. KANE: Objection.
5     THE WITNESS: I couldn't, I don't, I couldn't
6  comment on what his strengths or weaknesses would be or
7  how they were evaluated. Every associate, though, we
8  discuss what we call the T-chart, you know, the
9  strengths on one side, developmental needs on the other
10 side. So, but I don't remember any specifics or in
11 general what the development needs were for Alec.
12 BY MR. FINE
13 Q. I'm going to read you something and ask you
14 whether this is at all similar to anything that you may
15 have heard about Alec. Okay? His style was rough, was
16 not people centric. He was more work centric than
17 people centric?
18    MR. KANE: Let me look at the document you're
19 reading from.
20    MR. FINE: You don't have a right to that.
21    MR. KANE: Yes, she does. You don't have the
22 right to read something and represent -- when you have
23 the document there, she's entitled to look at it.
24    MR. FINE: No.
25

Miller Reporting Services (704) 543-7103

PAGE 57 SHEET 8

57

Exam by Mr. Fine

BY MR. FINE
Q. Did you ever hear something like that --
MR. KANE: Objection.
BY MR. FINE
Q. -- about Alec?
A. That he was not people centric?
Q. That his style was rough?
MR. KANE: Objection.
THE WITNESS: I don't know that I ever, I don't know if I've ever heard that. I don't remember.
BY MR. FINE
Q. Did you ever hear something along the lines that he was not people centric?
MR. KANE: Objection.
THE WITNESS: I don't remember that phrase.
BY MR. FINE
Q. Do you remember anybody saying something in substance like that about him?
MR. KANE: Objection.
THE WITNESS: I'm sorry. I just don't recall.
BY MR. FINE
Q. From your perception of Alec, does what I just read sound to you to be inept?
MR. KANE: Objection.

Miller Reporting Services (704) 543-7103

---

PAGE 58

58

Exam by Mr. Fine

THE WITNESS: Inept? Alec was very goal driven. And he operated with a lot of speed.
BY MR. FINE
Q. A lot of?
A. Speed. Urgen -- sense of urgency. I could see how his sense of urgency could be interpreted as aggressive. I think was the word you used.
Q. All right. Now, in this August 18th, 2003 email that you sent to Alec, you referred to "our meeting on Tuesday." Do you see that?
A. Yes.
Q. What meeting were you referring to?
A. Alec and I were going to the meeting. We had scheduled a meeting. I believe it was the following day.
Q. Okay. And who was going to be present at this meeting?
A. Just he and I.
Q. What was the purpose of the meeting?
A. Well, Alec and I had, I had scheduled some ongoing touch bases with all of Vipin's team members because I was coming into a new job, so I was coming up to speed. So it was a scheduled touch base. And I also wanted to discuss this topic with him.
Q. Okay. So you say here, "I'd like to discuss

Miller Reporting Services (704) 543-7103

---

PAGE 59

59

Exam by Mr. Fine

the following: Associates who are on performance improvement, who, why, actions, time frame." Do you see that?
A. Yes.
Q. Was that something that you were discussing with each of Vipin's direct reports?
A. I don't remember that.
Q. Do you remember whether there was something specific as to why you wanted to discuss that subject with Alec or was this just a general kind of inquiry?
A. To be honest, I'd be speculating as to, you know, specifically, but I had pulled the data that I know you've seen, and so that's, I wanted to discuss that information with him.
MR. FINE: Okay. Could you please read back the answer?
(The Court Reporter read the answer commencing on page 59 line 11.)
MR. FINE: Okay. I'd like to have marked as the next exhibit BA 117.
(Plf. Exhibit No. 2, Copy of CAMR Turnover As of 8.11.03, BofA-0117, was marked for identification.)
BY MR. FINE
Q. Do you recognize this document?

Miller Reporting Services (704) 543-7103

---

PAGE 60

60

Exam by Mr. Fine

A. Yes.
Q. What is it?
A. It's the CAMR turnover data. 12-month turnover as of August 11th of '03.
Q. And is this a document that you had requested?
A. Uh-huh. Yes. I'm sorry. Yes.
Q. And how did you go about getting this document?
A. I asked our personnel analyst to pull the data for me.
Q. Okay. And who was the personnel analyst?
A. Ryan Frosch, F-R-O-S-C-H.
Q. And what department did Ryan Frosch work in?
A. Personnel.
Q. And was he assigned to the marketing area in particular?
A. Yes. He reported in to me.
Q. Okay. And what request did you make that you got this in response to?
A. I asked him to pull the turnover data for the AMN hierarchy for the past 12 months.
Q. All right. What does AMN stand for?
A. I believe that was, well, I believe that was Alec's organization. Each manager has a letter that

Miller Reporting Services (704) 543-7103

PAGE 61

Exam by Mr. Fine

1  they're assigned. And so as you go, you know, depending
2  on where you are in the organization. So Alec was AMN.
3  Cathy was known as A. Vipin Mayar was M. Alec was AMN.
4  And then the, the letters following the N are different
5  managers under Alec, his direct reports.
6      Q.  Okay. So --
7      A.  Or associates. I'm not really sure, but --
8      Q.  Okay. So the left hand column is headed
9  Hierarchy?
10     A.  Uh-huh.
11     Q.  What does that mean?
12     A.  Reporting relationship. It's the
13  identification of the managers in the hierarchy.
14     Q.  Okay. And all right. So the first entry
15  under that is AMNG?
16     A.  Uh-huh.
17     Q.  Okay. AMN refers to Alec. What does AMNG
18  refer to?
19     A.  Probably a manager under Alec. I'm not
20  really sure at this point.
21     Q.  Okay. All right. Now, there's some
22  handwriting. Whose handwriting is that?
23     A.  Mine.
24     Q.  Okay. Now, did you ask for CAMR turnover,
25  turnover on any other occasion?

Miller Reporting Services   (704) 543-7103

PAGE 62

Exam by Mr. Fine

1      A.  Probably. I don't remember. You know, as I
2  was coming into a new job, that's just some of the
3  information I was looking at.
4      Q.  Okay. Now, CAMR had approximately how many
5  people in it as of August 2003?
6      A.  I don't, I don't remember. It was over a
7  hundred.
8      Q.  And what this reports is these are the
9  terminations within the previous 12 months?
10     A.  Uh-huh.
11     Q.  When you looked at this, did this strike you
12  as being a high level of turnover, a low level of
13  turnover or an average legal of turnover?
14     A.  I don't remember specifically, but turnover
15  generally ran about ten percent.
16     Q.  Okay.
17     A.  Ten or fifteen at the time.
18     Q.  Okay. All right. Now, going back to the
19  email, was this the data that you were referring to that
20  prompted you to write the email the way that you did or
21  was there different or other data?
22     A.  This was the data that I referenced in this
23  email.
24     Q.  Okay   Did you send this to Alec along with
25  your email?

Miller Reporting Services   (704) 543-7103

PAGE 63

Exam by Mr. Fine

1      A.  I don't know if I did that.
2      Q.  Okay. Then going back to your email, I'm
3  going to read this for the record, and then I have some
4  questions for you. "Terminations over the past 12
5  months. B4-B5 voluntary and involuntary terminations
6  over the past 12 months suggest potential age bias --
7  8/10 (80%) were 40 years or older." Have I read that
8  correctly?
9      A.  Uh-huh. Yes.
10     Q.  Okay. Now, when you got this print-out from
11  Ryan Frosch, did -- the first time that you got the
12  print-out, did it give the dates of birth of each of
13  these people?
14     A.  I requested that, I believe.
15     Q.  Okay. And why did you request the dates of
16  birth?
17     A.  Well, I was interested in looking at -- I
18  requested gender. I requested ethnicity. I requested
19  all the demographic information that made sense, you
20  know, that I should request because I was looking at
21  turnover.
22     Q.  And is the reason why you requested this
23  because you wanted to make sure there was an appropriate
24  sensitivity to patterns?
25     A.  Well, I wanted to, I wanted to understand the

Miller Reporting Services   (704) 543-7103

PAGE 64

Exam by Mr. Fine

1  data myself. And so I was looking at all three of these
2  areas and bands. But -- in addition.
3      Q.  Okay. All right. In your email, you refer
4  to B4-B5?
5      A.  Uh-huh.
6      Q.  What does that mean?
7      A.  Those are band levels, bands 4 and 5.
8      Q.  Okay.
9      A.  They're referred to as H in the data
10  document.
11     Q.  Okay. Going back to the CAMR Turnover
12  document, there is a column that's headed Term Code.
13     A.  Yes.
14     Q.  What do those letters signify in this column?
15     A.  Term code and term reason are kind of the
16  same thing. The term reason, if you will, gets
17  categorized into a code so CCH means career change, for
18  example.
19     Q.  Okay. All right. And if you go, look to the
20  column that says "term reason," there is a 0 or a 1 in
21  front of the wording. What does the 0 or 1 signify?
22     A.  Zero signifies a voluntary turnover. One
23  signifies involuntary.
24     Q.  Okay. All right. Now, is it fair to say
25  that when you got this from Ryan Frosch, there were

Miller Reporting Services   (704) 543-7103

PAGE 65   SHEET 9

65

Exam by Mr. Fine

1  certain aspects of this that caused you some concern?
2         MR. KANE: Objection.
3         THE WITNESS: I wouldn't say concern. It was
4  a topic that I wanted to discuss with Alec. I wanted to
5  understand further.
6  BY MR. FINE
7      Q. Okay. And what about it did you want to
8  understand further?
9      A. I wanted to understand, I wanted more
10 information on reasons for termination, and I wanted, I
11 also wanted to ensure that, you know, that Alec was
12 sensitive to either intended or unintended consequences
13 or actions. So I wanted him to understand, I wanted him
14 to see this data from a broader perspective rather than
15 just individual perspectives on each associate.
16     Q. Okay. And is it fair to say that what you
17 perceived was that the pattern here suggested potential
18 age bias?
19     A. Well, as per my note to Alec, some of the way
20 I was interpreting the data, I, yeah, I suggested that
21 there could be, you know, optically, it looked like
22 there could be something there. And I wanted him to
23 understand that, what the data looked like from a
24 broader perspective. I also wanted him to understand
25 that, as personnel partner, that, like he was on my

Miller Reporting Services   (704) 543-7103

PAGE 66

66

Exam by Mr. Fine

1  watch, so to speak, and that I wanted to, I wanted him
2  to know how we needed to work together.
3      Q. Okay. All right, now, you send this email to
4  him on August 18th, 2003 at 3:27 p.m., correct?
5      A. Yes.
6      Q. When you sent the email to him, did you
7  anticipate that he was going to be sending you a
8  responding email or did you rather anticipate that this
9  was simply something you were going to be discussing the
10 next day or some combination?
11     A. I don't really remember what I anticipated.
12 It didn't surprise me to get a response.
13     Q. Did it surprise you at how fast the response
14 came back?
15     A. No, actually it didn't. Alec was pretty
16 diligent.
17     Q. All right. You send this at 3:27 p.m. He
18 responds at 3:54 p.m. That's what, 27 minutes later?
19     A. Okay.
20     Q. Did that strike you that he was perhaps being
21 a little bit defensive?
22         MR. KANE: Objection.
23         THE WITNESS: Actually, no, it didn't. If
24 you catch somebody at their desk when they're reading
25 their email, you usually get quick responses. And so I

Miller Reporting Services   (704) 543-7103

PAGE 67

67

Exam by Mr. Fine

1  interpreted it more as great, Alec's at his desk and
2  reading his email. I'm not trying to be flippant, but
3  that was how I interpreted it.
4         MR. FINE: Could you read back the answer,
5  please?
6         (The Court Reporter read the answer
7  commencing on page 66 line 23.)
8  BY MR. FINE
9      Q. Okay. What did you, what was your reaction
10 when you read Alec's response to your email?
11     A. It made a lot of sense to me. I know that,
12 and I knew at this time that the CAMR organization was
13 going through a change of, really in terms of a change
14 in model and what they were driving towards. And the,
15 you know, like just the performance goals that they had.
16 And so Alec's response made complete sense to me as he
17 talked about, I understood that they were going from a
18 model of what they had and what Alec walked into in that
19 role was good researchers but not necessarily, he had a
20 lot of talent that couldn't really translate the
21 research to business recommendations.
22         And so I knew that they were going through a
23 change in model and a change in talent based on that,
24 you know, that, what they were driving towards. So this
25 made perfect sense.

Miller Reporting Services   (704) 543-7103

PAGE 68

68

Exam by Mr. Fine

1      Q. Okay. When you said this made perfect sense,
2  are you referring to what Alec wrote in his email or are
3  you referring to something that Alec said to you orally
4  perhaps in the meeting the next day?
5      A. Probably a little bit of both. But when I
6  first read the email, I thought, okay, this made sense.
7  And we'll discuss it more the following day.
8      Q. Okay. Well, you say that, in your email that
9  the terminations of the past 12 months suggest potential
10 age bias, 8 to 10, 80 percent were 40 years or older.
11 Is there anything in just the email that caused you to
12 have less concern on that score?
13     A. Yes. In the email, Alec referred more, his
14 priority of focus seemed to be, he was kind of guessing
15 at the ages. And so, for example, he went through, you
16 know, I have, people left for, you know, there are three
17 different reasons. And then he kind of guessed at the
18 ages.
19         And as he went through, for example, the
20 resignations, he said, well, these two were on
21 performance warning. I don't know what their ages were
22 So immediately, it suggests to me that what he was more
23 focused on was, you know, the task, if you will, and he
24 wasn't really focused on how old are these people or
25 what gender are these people or anything else.

Miller Reporting Services   (704) 543-7103

## PAGE 69

Exam by Mr. Fine

1  Q. And you felt that you could draw that
2  conclusion based just on the email that he sent you?
3  A. Well, you asked me for my interpretation of
4  the email. He and I had a follow-up conversation the
5  next day. So my conclusions overall were based on a
6  combination of the email and the meeting that we had.
7  Q. Okay. I understand that. And what I want to
8  try to do is just focus on the email part of it first.
9  A. Okay.
10 Q. Okay? And if you can separate those things
11 out.
12 A. Okay.
13 Q. Was there anything in the email alone that
14 lessened the level of your concern?
15 A. Yes. We had -- the fact that he had three,
16 he called them buckets of, he had terminations, job
17 eliminations, resignations. And then he actually had
18 another bucket. So his, you know, his, the fact that he
19 separated like -- he separated voluntary, involuntary,
20 and then he even detailed job elimination. That -- I
21 mean, that was my first, my first inclination that he
22 was, he was managing to task.
23 Q. And what do you mean by that?
24 A. He was managing, he was managing to a goal.
25 He was managing to a goal of changing that organization.

## PAGE 70

Exam by Mr. Fine

1  And he was taking it from a broader picture.
2  Q. Well, remember, at this point, I'm just
3  asking you about the email.
4  A. Right. Well, I mean, that's what -- when I
5  looked at, okay, he has three, three buckets plus
6  another. I think we're, you know, that was just an
7  inclination. I didn't draw any conclusions. I wouldn't
8  say I drew any conclusions from this email alone.
9  Q. Right. Because I mean, if you look at
10 terminations, there are, he talks about four
11 terminations. Every one of them is over forty. Right?
12 A. Uh-huh. Well, he says, "not sure of age.
13 Probably in his 40s."
14 Q. Well, but certainly -- I mean, you send him a
15 letter. You send him an email saying, gee, looks like
16 there's a pattern of age discrimination or potential age
17 bias here.
18    And then he writes back to you and he talks
19 about the terminations. And there were, there are just
20 four terminations that he talks about. Every one of the
21 terminations is somebody that he identifies as being
22 over forty. Right?
23 A. Yeah. I -- okay.
24 Q. So you couldn't have been reassured by that,
25 right?

## PAGE 71

Exam by Mr. Fine

1  MR. KANE: Objection.
2  THE WITNESS: I, what I indicated, though,
3  that I was reassured by was that he simply identified
4  that there were different buckets. I --
5  BY MR. FINE
6  Q. Okay. I understand that. That's fair.
7  A. Yeah.
8  Q. But if you look at just that part of it,
9  that's not reassuring. In fact, that's worse.
10 MR. KANE: Objection.
11 BY MR. FINE
12 Q. Right? You talked about eight out of ten.
13 He's talking about four out of four.
14 A. That part is not necessarily reassuring, but
15 I wasn't --
16 Q. In fact, it's the -- I'm sorry.
17 A. I wasn't really focused on that. What
18 reassured me was he gave, he was able to give me
19 information on terminations, job eliminations,
20 resignations and other. I mean, that was kind of like,
21 great, we're going to have a good discussion tomorrow.
22 Q. Okay. All right. And then you met with him
23 the next day?
24 A. Correct.
25 Q. And it was just the two of you?

## PAGE 72

Exam by Mr. Fine

1  A. Correct.
2  Q. At the meeting? Okay. How long did the
3  meeting last?
4  A. It was probably scheduled for 60 minutes. I
5  don't remember the details of how long it lasted.
6  Q. Okay. What did you say in the meeting and
7  what did he say?
8  A. I don't remember any specifics. I remember
9  we had a conversation about, about contents of this
10 email basically, and he walked me through the
11 terminations, the reasons for termination. He walked me
12 through the job eliminations. He walked me through, he
13 walked me through each of these buckets. And
14 understanding the change that they were driving in that
15 organization, I was satisfied that they were following
16 the process, that they were really focused on driving
17 performance in that organization. And that he was
18 making decisions based on performance, and that was his
19 focus.
20 Q. Okay. And that was true of the job
21 eliminations and the resignations as well as the
22 terminations?
23 A. Yes.
24 Q. And I believe that you said that one of the
25 things that he talked to you about was that he was

Miller Reporting Services  (704) 543-7103

## PAGE 73  SHEET 10

73

Exam by Mr. Fine

1  changing the direction of his group from a research
2  direction to a, how did you put it?
3      A.   I don't remember exactly what I said, but
4  when Alec came into that job, what he walked into
5  basically was an organization that had some good
6  research or good statisticians, but he had a lot of
7  resources that, a lot of talent that did not have
8  business acumen required for the role that that
9  organization needed to play.
10     Q.   And so there were, you know, that was kind of
11 his, there was a general understanding of that
12 assessment.  And so what he was doing was really, he was
13 like upgrading, he was trying to upgrade the performance
14 through driving more business approach, if you will, to
15 the research and the recommendations that was driven by
16 the research.
17     Q.   Okay.  And did his explanation in that, did
18 that explanation that he gave you cause you any concern?
19     A.   No.  What do you mean by --
20     Q.   Well, essentially, as I understand it, he was
21 saying that there were certain terminations that he made
22 because he was changing the direction of the
23 organization from a research direction to more of a
24 business direction, right?
25     A.   The goal of that organization had always been

Miller Reporting Services   (704) 543-7103

## PAGE 74

74

Exam by Mr. Fine

1  to do research for the business.
2      Q.   Right.
3      A.   What Alec was faced with when he came into
4  that organization was, were researchers who weren't
5  necessarily adding value to the business.  So he wasn't
6  changing direction per se, but what he was trying to do
7  was get them aligned in the direction that they should
8  have already been in.
9           And so he, it wasn't like he was saying,
10 okay, we're not going to do this anymore.  We're going
11 to do this.  It wasn't like a job change like, he wasn't
12 changing the jobs of the organization.  What he was
13 doing was saying, what you're doing is necessary but not
14 sufficient.
15          It was like the job was undone I guess maybe
16 is the best way to say it.  People would, they would be
17 great research projects where if, you know, the final
18 recommendations were not necessarily something that
19 either they weren't really provided or they weren't
20 applicable to the business, and they weren't adding the
21 value that they could have or should have been adding.
22     Q.   Did you do anything to try to assess whether
23 what Alec was telling you was correct or not?
24     A.   I didn't investigate what, you know, no.  I
25 guess the short answer is no.

Miller Reporting Services   (704) 543-7103

## PAGE 75

75

Exam by Mr. Fine

1           MR. KANE:  Okay.
2  BY MR. FINE
3      Q.   Do you remember anything that you said or
4  that Alec said about Steve Kincaid?
5      A.   No.
6      Q.   Did he mention that by the time of this
7  meeting that he was having with you that Mr. Kincaid had
8  filed a complaint with the EEOC?
9      A.   I don't recall that.
10     Q.   Do you recall whether you knew that or not?
11     A.   No.
12     Q.   You think that you did not know it?
13     A.   Oh, let's see.  I don't remember the timing
14 of when I found out about that.  I think, I just don't
15 remember the timing.
16     Q.   Okay.  You found out at some point?  And you
17 just don't remember whether you had found out about it
18 by the time of this meeting with Mr. Kotopoulos, right?
19     A.   I'm just blanking on it right now.
20     Q.   Okay.  Did you ask Alec whether anybody had
21 made a claim of discrimination against him?
22          MR. KANE:  During the meeting?
23          THE WITNESS:  I don't remember doing that.  I
24 don't remember.
25

Miller Reporting Services   (704) 543-7103

## PAGE 76

76

Exam by Mr. Fine

1  BY MR. FINE
2      Q.   When is the first time that you had
3  learned -- when is the first time you learned that
4  somebody had made a claim of discrimination against Alec
5  Kotopoulos?
6      A.   Is there a claim of discrimination against
7  Alec Kotopoulos?  I guess I'm, maybe I -- maybe I'm
8  confused with what we're talking about here.  Because I
9  thought the -- well, Sheila Burroughs was the manager in
10 this case, not Alec.  And so --
11     Q.   So it was your understanding that the
12 decision to terminate Mr. Kincaid hadn't even been made
13 by Alec?
14     A.   Well, Sheila Burroughs was the manager, yeah.
15 So -- I'm sorry.  Am I going down the wrong path?
16     Q.   I want, I want to be sure that we're precise
17 here.  Okay?
18     A.   Okay.
19     Q.   At the time you were meeting with
20 Mr. Kotopoulos.
21     A.   Right.
22     Q.   Did you understand that the decision to
23 terminate Mr. Kincaid had been made by Sheila Burroughs
24 and not by Alec Kotopoulos?
25     A.   I -- yeah, I understand that Mr. Kincaid had

Miller Reporting Services   (704) 543-7103

PAGE 81 SHEET 11

81

Exam by Mr. Fine

1  but no investigation had been done prior to the time
2  that Mr. Kincaid was terminated. And if the only way
3  that you know that is from a privileged communication,
4  you're going to turn to Mr. Kane. But if you know about
5  it from some other way --
6      MR. KANE: That's how you know about it.
7  Okay. Assert the privilege.
8      MR. FINE: Okay.
9  BY MR. FINE
10     Q.  Did you know anything about Herb Schaffer?
11     A.  No.
12     Q.  This information that you put in your
13 August 18th email to Alec Kotopoulos that there was a
14 pattern that suggested potential age bias, did you
15 communicate that to anybody else at the Bank?
16     A.  I don't recall.
17     Q.  Did -- when you were, other than this one
18 occasion when you saw this pattern, during your time at
19 the Bank, did you ever see a turnover record that
20 suggested that, also suggested potential age bias or was
21 this the only time that it happened?
22     A.  I didn't see any other data that suggested
23 age bias.
24     Q.  Okay. The, I want you to turn your attention
25 to this document, the print-out that you got. Other

Miller Reporting Services  (704) 543-7103

PAGE 82

82

Exam by Mr. Fine

1  than the potential age bias, was there anything else in
2  this document that caused your attention, that caught
3  your attention or that caused you any concern?
4      MR. KANE: Objection.
5      THE WITNESS: No.
6  BY MR. FINE
7      Q.  Okay. I want to direct your attention to the
8  entries next to Herman Schaffer, Allan Fitch, and Craig
9  Giudici. Giudici.
10         I'd like you to look at the data there and
11 tell me if you see anything with regard to those, the
12 entries with regard to those three people that catch
13 your attention.
14     A.  Okay.
15     Q.  Do you see any such thing?
16     A.  All white, all male. All terminated on the
17 same day. All involuntary terminations.
18     Q.  Okay. Does the fact that they were all
19 terminated on the same day, did that strike you at the
20 time as being perhaps something that you should discuss
21 with Mr. Kotopoulos?
22     A.  I don't remember if we discussed that.
23     Q.  Based on your experience at the Bank, is that
24 unusual for three people in the same area to be
25 terminated for unsatisfactory performance on the same

Miller Reporting Services  (704) 543-7103

PAGE 83

83

Exam by Mr. Fine

1  day?
2      A.  If this were an organization that wasn't
3  going through a major performance improvement, then I'd
4  say yes. But given the circumstances of the
5  organization and the, you know, the upgrade that Alec
6  was leading, it doesn't surprise me that much, if -- he
7  was going through a process of identifying performance
8  issues with his team. So actually, you'd expect them to
9  be relatively consistent in timing if -- or close in
10 timing.
11     Q.  Well, don't the guidelines of the Bank
12 provide a procedure whereby when somebody is put on a
13 performance warning, they're supposed to be given the
14 opportunity to improve their performance, et cetera, et
15 cetera?
16     A.  Yes. As part of the guiding principles, what
17 you call it, associates are given an opportunity, a time
18 frame with which to improve their performance.
19     Q.  Okay. And so does the fact that they're
20 supposed to be given consideration in that way, is that
21 a cause for concern when you see that they're all
22 terminated on the same day?
23     A.  Not if they were all warned in the same time
24 frame, not if they were all put into, you know, part of
25 that process in the same time frame.

Miller Reporting Services  (704) 543-7103

PAGE 84

84

Exam by Mr. Fine

1      Q.  Did you discuss that with Mr. Kotopoulos?
2      A.  I don't recall.
3      MR. FINE: Okay. I'd like to have marked as
4  the next exhibit BA 118 through BA 121.
5      (Plf. Exhibit No. 3, Copy of New Hires-AMN,
6      BofA-0118 through BofA-0121, was marked for
7      identification.)
8      MR. FINE: 118 through 121.
9  BY MR. FINE
10     Q.  Now, directing your attention first to the
11 first three pages of this document?
12     A.  Okay.
13     Q.  Each of these pages is headed New Hires --
14 AMN, 1/1/2001 to 11/30/03.
15     A.  Uh-huh.
16     Q.  Is this a document that was generated at your
17 request?
18     A.  I don't remember why it was generated. I
19 don't remember if I requested it or if it was just part
20 of, you know, normal -- I don't know the date that it
21 was generated.
22     Q.  Okay. Well, presumably, it was generated
23 some time after 11-30-2003, right?
24     A.  Uh-huh.
25     Q.  Did this document -- let me just explain

Miller Reporting Services  (704) 543-7103

PAGE 85

Exam by Mr. Fine

something. When documents are produced by the Defendant, I don't know where they come from.
A. Okay.
Q. So did this document come from your file?
A. Yes, it did. This document came from, you know, these are, this is a list of the hires into the organization over a two-year period.
Q. Okay. And as you sit here today, you don't remember --
A. The specifics of why I requested it or why it came to be.
Q. All right. So you don't even know that you were the one who requested this document; is that right?
A. I, you know, I would presume that I was.
Q. Okay. This was a document that was in your file?
A. Right.
Q. Following the sending of your August 18th, 2003 email and your August 19th, 2003 meeting with Alec Kotopoulos, did you do anything further to check on whether there was a possible potential age bias in terminations anywhere in the marketing area?
A. No.
Q. Okay. I'd now like to, you to turn to BA 121 which is the last page of this. Was this a document in

PAGE 86

Exam by Mr. Fine

your file as well?
A. Yes.
Q. Was this a document that you requested be generated?
A. I presume, yes.
Q. Do you remember why you had it generated?
A. I don't remember the details.
Q. Okay. Do you remember anything about it, why you had it generated?
A. No, I'm sorry, I don't.
Q. Okay. All right. Going back to the first exhibit, the, your August 18th email and Mr. Kotopoulos's response. I want you to look at his PS.
And he says, "Can you send the final talent planning grids for band 4 and 5 for CAMR? I need to be prepared to have discussions with Y associates, especially given your mention to associates at CB's meeting on Friday--Vipin mentioned that you have them."
Have I read that correctly?
A. Uh-huh. Yes.
Q. Okay. First of all, there's a reference to Y associates. Do you see that?
A. Yes.
Q. What was Mr. Kotopoulos referring to there?

PAGE 87

Exam by Mr. Fine

What does Y associates mean?
A. I think it's a typo. I think it should read my associates.
Q. Okay. And then there's a reference to your mention to associates at CB's meeting on Friday. Who is CB?
A. Cathy Bessant.
Q. And what's the meeting that Mr. Kotopoulos is referring to?
A. Cathy Bessant at that time had a monthly two-deep meeting with the marketing organization meaning two, two levels below Cathy Bessant. And so as part of that meeting, I probably had given a status of where we were with the talent planning process.
And so I was giving, I believe, I think, I'm presuming that I was giving a status on the talent planning, and so Alec was looking for the final talent planning grids to make sure that all his records were updated.
Q. Okay. And this was in preparation for a talent planning meeting.
A. Well, the process kind of culminates in a meeting with Cathy, with, between Cathy and Ken Lewis. But what I think Alec was referring to here was that associates get feedback as part of their process.

PAGE 88

Exam by Mr. Fine

There's a circle back to associates to give them the feedback.
(Lamano Exhibit No. 2 was referred to.)
BY MR. FINE
Q. Okay. I show you what was marked as Lamano Exhibit 2. Do you recognize that document?
A. Yes.
Q. What is it?
A. It's the 2003 roll-up of all band 5s in the marketing organization and their performance assessment, talent planning assessment, performance, and potential.
Q. Is this the talent planning grid that Alec Kotopoulos was asking for?
A. He would not have access to this, to all of this information because it, it's confidential. He would only have access to his organization.
Q. Okay. And what does this cover?
A. This covers all band 5s within marketing and communications.
Q. Ahh.
A. So everybody under Cathy Bessant, band 5.
Q. Okay. Now, this says, 2003 Performance Summary, Band 5.
A. Uh-huh.
Q. Can you tell or do you know as of what date

PAGE 97  SHEET 13

97

Exam by Mr. Fine

1   walked through in more details.
2       Q.   Okay.  Is there some necessary connection
3   with the fact that he was trying to get rid of
4   researchers who were not contributing in a business way
5   to the organization and the fact that most of the
6   researchers that he was getting rid of were over the age
7   of 40?
8       MR. KANE:  Objection.
9       THE WITNESS:  Alec wasn't focused on getting
10  rid of, getting rid of anybody.  What he was focused on
11  was improving the performance of his organization.
12  BY MR. FINE
13      Q.   Okay.  But the sequence of events as I
14  understand it is you had this data pulled.  You saw that
15  a disproportionate number of the terminations in the
16  past 12 months were terminations, voluntary and
17  involuntary, of people over the age of 40.
18      A.   Uh-huh.
19      Q.   You have a discussion with Alec Kotopoulos.
20  The explanation that you reported that Alec Kotopoulos
21  gave you didn't have anything to do with age.  Right?
22      A.   Uh-huh.
23      Q.   So how was the explanation that he gave
24  logically related to your concern?
25      A.   Alec wasn't focused on age as a criteria in

Miller Reporting Services   (704) 543-7103

PAGE 98

98

Exam by Mr. Fine

1   improving performance.  He was focused on performance
2   So he wasn't paying attention to age.
3       Q.   And couldn't that have been part of the
4   problem?
5       MR. KANE:  Objection.
6   BY MR. FINE
7       Q.   In other words, you said earlier that one of
8   the reasons why you did this is you wanted to call
9   attention to patterns that the person himself or herself
10  might not be aware of.  Right?
11      A.   Uh-huh.
12      Q.   Okay.
13      A.   Or may not be paying attention to, yeah.
14      Q.   Right.  And so you called attention to Alec
15  Kotopoulos that there is a disproportionate number of
16  the terminations happen to be of people over the age of
17  40, which to your mind, I believe, quite appropriately
18  suggested to you that somebody involved with those
19  terminations might unconsciously have a discriminatory
20  attitude towards older workers.  Right?
21      A.   I wasn't thinking that somebody might
22  unconsciously have a discriminatory attitude towards
23  older workers.  When I talked to Alec, he was able to
24  explain the performance reasons for any termination, for
25  every termination.  And the decisions were made on an

Miller Reporting Services   (704) 543-7103

PAGE 99

99

Exam by Mr. Fine

1   individual basis, based on individual performance.
2       Q.   Well, that's -- you don't have any
3   independent way of knowing that.  You're just, you're
4   just saying what he told you.  Right?
5       MR. KANE:  Objection.
6   BY MR. FINE
7       Q.   You didn't check this out?
8       A.   The --
9       Q.   Did you?
10      A.   Well, I guess I don't understand your
11  question.  The manager gave me rationale, the
12  performance deficiencies.  And I don't understand your
13  question.
14      Q.   Okay.  The question is this:  You discovered
15  something important and significant which there was, and
16  what you discovered was that there was not just a subtle
17  but a strong pattern of age bias in the terminations in
18  the previous 12 months in Mr. Kotopoulos' area.  And you
19  bring that to Mr. Kotopoulos's attention.  And he
20  doesn't respond to you by saying, look, let's talk about
21  age.  What he responds to you is saying, look,
22  everything I did was justified.  And you testified
23  earlier that you didn't do a single thing to check out
24  whether what he was saying to you was true.  Right?
25      MR. KANE:  Object to form.

Miller Reporting Services   (704) 543-7103

PAGE 100

100

Exam by Mr. Fine

1   BY MR. FINE
2       Q.   Just answer that part.  That's correct, you
3   didn't do a single thing to check out whether what he
4   said to you was true, right?
5       A.   I did not pursue the data further.  But a
6   point of clarification is that the past 12 months on
7   this data were not, Alec wasn't in role for that 12
8   months, so not all of these exits from the business were
9   while he was the manager.
10      Q.   That's true.
11      A.   So what I --
12      Q.   And did you look at when the terminations of
13  the older employees got started?
14      A.   Well, if I remove the '02 data -- and that's
15  what would be accurate to look at -- I just wanted to
16  clarify that when you look at this data, anything in '02
17  was really not made while Alec was a manager of that
18  organization.
19      Q.   Yes.  But, for example, there are these, the
20  four terminations for alleged unsatisfactory performance
21  were all in the first six months of 2003, right?
22      A.   Uh-huh.
23      Q.   All on Alec's watch.  So, in fact, the
24  pattern of age bias was even stronger than what you said
25  in your email to him, wasn't it?

Miller Reporting Services   (704) 543-7103

PAGE 101

Exam by Mr. Fine

1  A.  I didn't pursue looking deeper into it, no.
2  Q.  Right. And looking back on it, that was
3  perhaps not a good thing, right?
4      MR. KANE:  Objection.
5      THE WITNESS:  I disagree.
6  BY MR. FINE
7  Q.  Well, the Bank had a policy against age
8  discrimination, right?
9  A.  I believe so.
10 Q.  And you're a high executive in this company,
11 right?
12 A.  Relatively speaking, yeah.
13 Q.  Okay. You came across evidence of age
14 discrimination?
15     MR. KANE:  Objection.
16     THE WITNESS:  I disagree. I came across
17 data -- I looked at the data. The -- based on the
18 conversations that I had with Alec, I was confident that
19 he was not discriminating based on age.
20 BY MR. FINE
21 Q.  Yes. And the universe of information that
22 you had on the basis of which you were willing to
23 totally close your eyes to this evidence of age
24 discrimination was what Alec Kotopoulos told you?
25     MR. KANE:  Objection.

Miller Reporting Services  (704) 543-7103

PAGE 102

Exam by Mr. Fine

1  BY MR. FINE
2  Q.  In a single meeting?
3      MR. KANE:  Objection.
4  BY MR. FINE
5  Q.  Right?
6  A.  I disagree with this, with your phrase of my
7  "willingness to close my eyes." That's not accurate.
8  That's completely inaccurate.
9  Q.  Well, I guess the court and jury in this case
10 will make up their own mind. But the fact of the matter
11 is, you pulled this data. You sent it to Alec
12 Kotopoulos. And thereafter, you did one thing and one
13 thing only, and that was, you had a one-hour meeting
14 with Mr. Kotopoulos. Right?
15 A.  Yes.
16 Q.  Did you do a single thing other than that?
17     MR. KANE:  Objection.
18     THE WITNESS:  Don't think there was any need
19 to.
20 BY MR. FINE
21 Q.  Okay. Now I want to question the witness in
22 her capacity as a 30(b)(6) representative. Did the Bank
23 have any policy or practice in place at any time in the
24 period from August 20th, 2002 to June 13th, 2003
25 requiring supervisors to document and/or maintain

Miller Reporting Services  (704) 543-7103

PAGE 103

Exam by Mr. Fine

1  records of their supervisees' job performance?
2  A.  The short answer on that is no, the Bank
3  didn't require that level of maintenance of records.
4  Bank required that associates have an annual performance
5  review.
6  Q.  An annual performance review?
7  A.  (Nodding head up and down.)
8  Q.  I thought there was a requirement of a
9  quarterly review?
10 A.  That's a, it's a, it was not a requirement at
11 the time.
12 Q.  Was it a practice at the time, that people
13 generally got quarterly reviews?
14 A.  It was not -- that was not consistently
15 implemented. There was no requirement that people have
16 quarterly performance reviews.
17 Q.  Okay. Was there any policy or practice at
18 the Bank that required supervisors to maintain records
19 of positive as well as negative comments and feedback
20 regarding their supervisees' job performance?
21 A.  No.
22 Q.  Okay. At any point in your work at the Bank,
23 have you talked to executives about how they should go
24 about terminating people?
25     MR. KANE:  Objection.

Miller Reporting Services  (704) 543-7103

PAGE 104

Exam by Mr. Fine

1      THE WITNESS:  I don't advise -- it's not my
2  role to terminate folks in that capacity. Managers work
3  with personnel center, Advice and Counsel.
4  BY MR. FINE
5  Q.  Okay. I understand that that may not be a
6  standard part of your function. My question was: At
7  any time in your work at the Bank, did you ever do that?
8  Did you ever talk to executives in however general a way
9  about policies and practices and so forth in connection
10 with terminating employees?
11     MR. KANE:  Objection.
12     THE WITNESS:  I don't remember any specific
13 instances, no.
14 BY MR. FINE
15 Q.  Okay. Can you think of any reason why it
16 might be a good idea for the Bank to keep records
17 documenting a supervisees' job performance?
18     MR. KANE:  Objection.
19     THE WITNESS:  Can I think of a reason why it
20 would be important to keep a record of performance?
21 BY MR. FINE
22 Q.  Why it might be a good idea.
23     MR. KANE:  Objection.
24     THE WITNESS:  Yeah. I can, I can think of
25 reasons why, you know, and performance is, you know,

Miller Reporting Services  (704) 543-7103