**EXHIBIT 17**

DEPOSITION OF ERIC MONTGOMERY

PAGE 1   SHEET 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 04-11522-WGY

STEVEN R. KINCAID,
    PLAINTIFF,
VS.
BANK OF AMERICA CORPORATION,
    DEFENDANT.

DEPOSITION
OF
ERIC A. MONTGOMERY

AT CHARLOTTE, NORTH CAROLINA
JUNE 1, 2005

REPORTER: IRA ANDERSON
NOTARY PUBLIC

---

PAGE 2

Mr. Montgomery    2

APPEARING

FOR THE PLAINTIFF:    Mr. David J. Fine
LAW OFFICES OF DAVID J. FINE
Three Center Plaza, Suite 400
Boston, Massachusetts 02108-2003

FOR THE DEFENDANT:    Mr. Richard T. Kane
McGUIRE WOODS, L.L.P.
Suite 2900
Bank of America Corporate Center
100 North Tryon Street
Charlotte, North Carolina 28202

IN ATTENDANCE:    Mr. Steven R. Kincaid

* * * * *

INDEX

| | PAGE |
|---|---|
| Examination by Mr. Fine | 5 |
| Examination by Mr. Kane | 138 |
| Further Examination by Mr. Fine | 141 |
| Further Examination by Mr. Kane | 146 |
| Further Examination by Mr. Fine | 146 |

EXHIBITS

PLAINTIFF'S:

| | | |
|---|---|---|
| No. 1 | Copy of Letter dated 4/25/03 to Mr. Alphin from Ms. Norcross | 44 |
| No. 2 | Copy of Letter dated 4/30/03 to Ms. Norcross from Mr. Montgomery | 54 |
| No. 3 | Copy of Letter dated 5/30/03 to Mr. Montgomery from Ms. Norcross | 68 |

Miller Reporting Services
(704) 543-7103

---

PAGE 3

Mr. Montgomery    3

EXHIBITS
(continued)

PLAINTIFF'S:

| | | |
|---|---|---|
| No. 4 | Copy of Letter dated 7/22/03 to Ms. Norcross from Ms. Moore | 84 |
| No. 5 | Copy of Letter dated 9/8/03 to Ms. Barnett of the EEOC from Mr. Noble | 100 |
| No. 6 | Copy of Bank of America Sexual Harassment & Discrimination Policy | 108 |

Miller Reporting Services
(704) 543-7103

---

PAGE 4

Mr. Montgomery    4

1    This is the deposition of Eric A. Montgomery,
2  taken in accordance with the Federal Rules of Civil
3  Procedure in connection with the above case.
4    Pursuant to Notice, this deposition is being
5  taken in the offices of Hamilton, Fay, Moon, Stephen,
6  Steele & Martin, P.L.L.C., 2020 Charlotte Plaza,
7  201 South College Street, Charlotte, North Carolina,
8  beginning at 9:02 a.m. on June 1, 2005, before Ira
9  Anderson, Notary Public.
10
11    MR. FINE: This deposition is
12  being taken in accordance with
13  the Federal Rules of Civil
14  Procedure.
15    MR. KANE: Before we begin I
16  want the record to reflect that
17  by presenting Mr. Montgomery
18  for his deposition here, we are
19  not waiving any privilege as to
20  his role as assistant general
21  counsel for Bank of America,
22  including attorney-client and
23  work product privileges. Okay.
24
25    Eric A. Montgomery, upon first being duly

Miller Reporting Services
(704) 543-7103

DEPOSITION OF ERIC MONTGOMERY

PAGE 33 SHEET 5

Mr. Montgomery                                                                 33

```
            policy, right?
 1
 2      A.  Yes.
 3      Q.  And you also agreed with me that one of the
 4           things that an important policy means is that
 5           it's important for the people who are the
 6           right people to know about it be notified,
 7           right?
 8      A.  I think I said that before.
 9      Q.  Okay. And isn't it also part of what it means
10           to be an important policy that the people who
11           should be notified about something are
12           notified promptly?
13      A.  That would be good.
14      Q.  Was it your practice in 2003 to notify people
15           in the business unit affected by a claim of
16           discrimination promptly?
17      A.  I don't know. I can't say that it was. We
18           tried to.
19      Q.  Well, if you didn't notify people promptly,
20           you weren't doing your job correctly, right?
21      A.  I wouldn't say that.
22      Q.  Why not?
23      A.  Because I wouldn't.
24      Q.  Well, you've agreed that the policy against
25           discrimination is important, right?
```

Miller Reporting Services
(704) 543-7103

PAGE 34

Mr. Montgomery                                                                 34

```
 1      A.  Haven't I said that before? We've asked that
 2           a couple of times now.
 3      Q.  You've agreed that it's important, right?
 4      A.  Yes.
 5      Q.  And you agree that when a claim of
 6           discrimination is made, it's important that
 7           the right people know about it, right?
 8      A.  Sure.
 9      Q.  And you agree that the right policy include
10           the people in the business unit affected by
11           the claim of discrimination, right?
12      A.  I've said that, yes.
13      Q.  And therefore, it's your job to make sure that
14           those people know promptly, right?
15      A.  It's my job to make sure they are aware of it,
16           yes.
17      Q.  Promptly, right?
18      A.  What do you define promptly as?
19      Q.  Well, how do you define promptly?
20      A.  Depends on the situation.
21      Q.  Well, Mr. Montgomery, in your role as
22           assistant general counsel to Bank of America
23           you have responsibilities, right?
24      A.  Yes.
25      Q.  And one of your responsibilities is to make
```

Miller Reporting Services
(704) 543-7103

PAGE 35

Mr. Montgomery                                                                 35

```
 1           sure that the bank's policy against
 2           discrimination is properly implemented, right?
 3      A.  What do you mean by properly implemented?
 4      Q.  Do you ever use the word properly,
 5           Mr. Montgomery? Do you not know what that
 6           means?
 7      A.  Yes, but I'm trying to understand what you
 8           mean by the word implemented.
 9      Q.  Well, let me get at it this way: If you
10           received a claim of discrimination from a
11           lawyer, would you consider it to be okay if
12           you didn't notify anybody about that claim for
13           a year?
14      A.  No.
15      Q.  Would you consider it to be okay if you didn't
16           notify anybody about that claim for two weeks?
17      A.  I don't know how to answer that.
18      Q.  Well, Mr. Montgomery, if you don't know how to
19           answer that, who is going to make that
20           decision for you?
21           MR. KANE: Objection.
22      A.  I don't know.
23      Q.  You're the person who has to decide how
24           quickly you notify people of claims of
25           discrimination that you receive, right?
```

Miller Reporting Services
(704) 543-7103

PAGE 36

Mr. Montgomery                                                                 36

```
 1      A.  Yes.
 2      Q.  Okay. What was your practice in 2003 with
 3           regard to how quickly you notified the
 4           business unit affected when you received a
 5           claim of discrimination?
 6      A.  I can't say that we had a uniform policy or
 7           practice. I think we made every attempt to
 8           contact people as soon as practicable.
 9      Q.  And when you say we, you're talking about you?
10           My question was about you personally, right?
11           You understood that?
12      A.  I don't know if I would personally do it. I
13           would probably have my paralegal do it.
14      Q.  But it's your responsibility?
15      A.  Yes; yeah.
16      Q.  Okay. And did you have a practice in 2003 as
17           to how quickly you made sure that the business
18           unit affected would be notified of a claim of
19           discrimination that you received?
20      A.  Again, I don't know if we had a uniform
21           practice in place.
22      Q.  You use the word we. I'm not asking about we.
23           I'm asking if --
24      A.  I don't know if I had a uniform practice in
25           place at that time. I can't say that I had a
```

Miller Reporting Services
(704) 543-7103

PAGE 37

Mr. Montgomery                                                          37

            uniform practice.
2   Q.      Okay.
3   A.      We made an attempt to do it as soon as we
4           could.
5   Q.      And by saying we, you mean I?
6   A.      Yes.
7   Q.      Okay. In 2003 it was your personal practice
8           to try to notify people affected by a claim of
9           discrimination as soon as practicable, right?
10  A.      That's correct.
11  Q.      Okay. And what was your experience in terms,
12          in 2003, with regard to what as soon as
13          practicable meant in terms of days?
14  A.      It may have been a few days.
15  Q.      Okay. So it was your practice in 2003 to make
16          sure that the business unit affected was
17          notified of a claim of discrimination within a
18          few days, right?
19  A.      Yes.
20  Q.      And if that didn't happen, you would not be
21          doing your job correctly, right?
22  A.      What do you mean by doing my job correctly?
23          What do you mean, doing my job? What do you
24          mean by that?
25  Q.      Well, you said that it was your practice in

Miller Reporting Services
(704) 543-7103

PAGE 38

Mr. Montgomery                                                          38

1           2003 to make sure that people in the business
2           unit affected knew about a claim of
3           discrimination within a few days, right?
4   A.      Yes.
5   Q.      And if that didn't happen, that would be
6           contrary to your practice, right?
7   A.      Yes.
8   Q.      And if the people in the business unit didn't
9           learn about this for several weeks, that would
10          really be not good, right?
11          MR. KANE: Objection. The
12          question is, did he follow his
13          practice, not whether or not he
14          was doing his job, not whether
15          or not it was good or bad.
16          MR. FINE: Mr. Kane, you know
17          at least as well as I do that
18          that is a totally improper
19          objection.
20          MR. KANE: Well, you keep
21          beating a dead horse. We're
22          going to be here for days if
23          you continue to ask the same
24          questions until you get the
25          answer you think you want

Miller Reporting Services
(704) 543-7103

PAGE 39

Mr. Montgomery                                                          39

1           MR. FINE: I'm happy to stand
2           on the transcript. I'll submit
3           this to any judge who can make
4           a decision as to whether I am
5           being unreasonable or not.
6           MR. KANE: Fine; fine.
7   Q.      Mr. Montgomery, do you have the question in
8           mind?
9   A.      Could you repeat it, please?
10  Q.      If the people in the business unit affected by
11          a claim of discrimination that you are
12          responsible for didn't find out about it for
13          two weeks, that would be not good?
14          MR. KANE: Objection.
15  A.      I mean, I just don't know how to respond to
16          that. Not good by whose standards?
17  Q.      Well, suppose it was you who were making the
18          claim of discrimination. Suppose you
19          submitted a claim of discrimination to
20          somebody at the bank and you found out that
21          that claim of discrimination was not
22          communicated to the business unit affected for
23          two weeks. How would you feel about that?
24  A.      Maybe not good.
25  Q.      Right. Now, Mr. Montgomery, when you notified

Miller Reporting Services
(704) 543-7103

PAGE 40

Mr. Montgomery                                                          40

1           people in 2003 in the business unit affected
2           about a claim of discrimination, how did you
3           do it?
4   A.      It may have been either a phone call or
5           e-mail.
6   Q.      Okay. And when you notified them by phone,
7           did you make a record of your notifying them
8           by phone?
9   A.      Probably not.
10  Q.      If you were trying to determine today whether
11          you had notified people in the business unit
12          affected by phone of a claim of discrimination
13          that you had received in 2003, what would you
14          do?
15  A       I doubt I kept a record of a phone because I
16          rarely made phone calls.
17  Q.      You say you rarely made phone calls?
18  A.      (Witness nods head affirmatively.)
19  Q.      Okay. So did you usually notify people in the
20          business unit affected of claims of
21          discrimination by e-mail?
22  A.      More likely than not.
23  Q.      Okay. And did you keep a record of those e-
24          mails?
25  A       I can't -- doubt there is a record of those.

Miller Reporting Services
(704) 543-7103

**PAGE 69**

Mr. Montgomery                                                                 69

1      Deborah Norcross?
2  A.  Yes.
3  Q.  And did you receive it by fax on May 20, 2003?
4  A.  I'm assuming I did based on -- it says faxed
5      on that date, so I'm assuming it came through
6      on that date.
7  Q.  Okay. What did you do when you received this
8      letter?
9  A.  I'm not sure. I probably sent it to my
10     paralegal to put into the file. I reviewed
11     it.
12 Q.  You read it?
13 A.  Yes.
14 Q.  Okay. And you had written Deborah Norcross on
15     April 30, 2003, correct?
16 A.  Yes.
17     (Whereupon, Ms. Burroughs
18     joined the deposition.)
19 Q.  And this now was some three weeks later?
20 A.  Yes.
21     MR. FINE: Mr. Kane, off the record
22     for a minute.
23     (Whereupon, there was had a
24     discussion off the record which
25     was not reported and

Miller Reporting Services
(704) 543-7103

**PAGE 70**

Mr. Montgomery                                                                 70

1      Ms. Burroughs left the
2      deposition.)
3  Q.  You had written Deborah Norcross on April 30,
4      2003, correct?
5  A.  Yes.
6  Q.  And this now was almost three weeks later,
7      right?
8  A.  Yes.
9  Q.  Okay. By the time you received this May 20,
10     2003, letter, had you notified Sheila
11     Burroughs and the other people in the business
12     unit affected of Mr. Kincaid's claim of
13     discrimination?
14 A.  I'm not sure.
15 Q.  Well, earlier this morning you said that it
16     was your practice to notify people in the
17     business unit affected within several days,
18     right?
19 A.  Yes.
20 Q.  Okay. And it is now nearly a month from
21     Deborah Norcross's initial letter and three
22     weeks since the time that you responded to
23     Ms. Norcross's letter, right?
24 A.  Yes.
25 Q.  Okay. So wouldn't it have been your practice

Miller Reporting Services
(704) 543-7103

**PAGE 71**

Mr. Montgomery                                                                 71

1      to have been in touch with people in the
2      business unit affected by this date, by
3      May 20, 2003?
4  A.  Yes.
5  Q.  Okay. Do you recall whether you had, in fact,
6      been in touch with people in the business unit
7      affected?
8  A.  No, I don't.
9  Q.  You might have been in touch with them, you
10     might not have been?
11 A.  That's correct.
12 Q.  Okay. Now, if you look at the second -- well,
13     read the first paragraph of this letter to
14     yourself and then I have some questions about
15     it.
16 A.  (Witness reviews document.) Okay.
17 Q.  Okay. One of the first things that Deborah
18     Norcross does is she is asking about the
19     status of your investigation, right?
20 A.  Yes.
21 Q.  Did you ever respond to Ms. Norcross's inquiry
22     on that subject?
23 A.  Not in writing.
24 Q.  Did you respond any other way?
25 A.  I recall vaguely having a conversation with

Miller Reporting Services
(704) 543-7103

**PAGE 72**

Mr. Montgomery                                                                 72

1      her, but I couldn't tell you the details of
2      it.
3  Q.  Okay. If you had a conversation with her,
4      would you have made a note or a record of it?
5  A.  Possibly, but I don't recall.
6  Q.  Was it your practice that when you spoke with
7      attorneys for employees making claims of
8      discrimination against the bank in 2003, to
9      make records of such conversations?
10 A.  Depends on the substance of it.
11 Q.  All right. So that means that sometimes you
12     did and sometimes you didn't?
13 A.  Yes.
14 Q.  And what determined whether you made a record
15     of it or not?
16 A.  I guess if the conversation had any substance
17     or merit to it.
18 Q.  All right. In the third sentence of this
19     paragraph Ms. Norcross is saying to you that
20     Mr. Kincaid has been receiving contradictory
21     messages from Ms. Burroughs regarding his
22     performance. Do you see that?
23 A.  Yes.
24 Q.  Did that prompt you to contact Ms. Burroughs?
25 A.  I don't recall.

Miller Reporting Services
(704) 543-7103

DEPOSITION OF ERIC MONTGOMERY

PAGE 73  SHEET 10

Mr. Montgomery                                                      73

1  Q   Would it have been your practice to contact a
2      person like Ms. Burroughs once you had
3      received a statement like this in a letter in
4      2003?
5  A.  It may have. I just, I don't recall.
6  Q.  All right. Now, in the last sentence of this
7      letter, I mean of this first paragraph,
8      Ms. Norcross is saying that although
9      Mr. Kincaid has requested a copy of his hiring
10     letter several times, no one has provided it
11     to him. Do you see that sentence?
12 A.  Yes.
13 Q.  Okay. Now, was it your understanding in May
14     of 2003 that an employee of the bank had a
15     right to get a copy of his hiring letter if he
16     requested it?
17 A   I mean, I'm not familiar with all the
18     personnel file guidelines, but I don't know
19     where he asked for that from, I don't know.
20     I'm sure he could have gotten a copy of it
21     from somewhere.
22 Q.  Well, are you saying, Mr. Montgomery, that you
23     don't know, as you sit here today, whether an
24     employee of the bank has a right to get a copy
25     of his hiring letter on request?

Miller Reporting Services
(704) 543-7103

PAGE 74

Mr. Montgomery                                                      74

1  A   I mean, I'm sure that's governed by our
2      personnel file guidelines, I'm sure.
3  Q.  Okay. And as you sit here today you just
4      don't remember what it says on that subject?
5  A.  No, exactly; yeah.
6  Q.  Well, here's a lawyer for an employee who's
7      making a claim of discrimination against the
8      bank, right?
9  A.  Yes.
10 Q.  And this employee, his lawyer is saying, is
11     trying to get a copy of his hiring letter,
12     right?
13 A   Yes.
14 Q   Okay. Isn't that something that you would
15     have looked into on receiving this?
16 A   It could have been, yes.
17 Q   Okay. You might have looked into it, but you
18     just don't remember whether you did or not?
19 A   That's right.
20 Q   Would you have any reason for not looking into
21     it?
22 A   No.
23 Q   All right. Now, please read to yourself the
24     second paragraph of this letter.
25 A   (Witness reviews document.) Okay.

Miller Reporting Services
(704) 543-7103

PAGE 75

Mr. Montgomery                                                      75

1  Q.  Now, in that paragraph Ms. Norcross is
2      expressing concern on behalf of her client,
3      right?
4  A.  Yes.
5  Q.  Okay. And is that something that would have
6      been a concern of yours?
7  A.  Sure.
8  Q.  Okay. Because once an employee makes a claim
9      of discrimination, the bank has to be
10     scrupulous in the way that they deal with that
11     employee, right?
12 A.  Yes.
13 Q.  And here Mr. Kincaid's lawyer is writing you a
14     second letter saying that she's really
15     concerned, right?
16 A.  Yes.
17 Q.  Now, wouldn't it have been your practice in
18     2003 to do something when you received a
19     letter like this?
20 A.  Possibly, yes.
21 Q   Okay. And what would it have been your
22     practice to do?
23 A.  To follow up and make sure we're getting the
24     information to respond to it.
25 Q.  Okay. And did you do that?

Miller Reporting Services
(704) 543-7103

PAGE 76

Mr. Montgomery                                                      76

1  A.  I don't think so. I can't recall.
2  Q.  And why is it that you don't think that you
3      did follow up?
4      I just, I don't recall having followed up at
5      all at this time.
6  Q   All right. Now, you are familiar with the
7      Bank of America's policy against
8      discrimination, right?
9  A   Yes.
10 Q   And it's a part of that policy that Bank of
11     America promises its employees that when they
12     make claims of discrimination, the Bank of
13     America will carefully investigate those
14     claims, right?
15     I can't state those words there particularly,
16     but there is some implication of that.
17 Q.  Yeah. I mean, that's the general idea, right?
18 A   Without having seen the policy, I think that's
19     the gist of it, yes.
20 Q   In fact, that's one of the things that the
21     Bank of America does to encourage people to
22     work for it, right?
23 A.  That's what?
24 Q   In other words, the Bank of America says,
25     prospective employees of the bank, you can

Miller Reporting Services
(704) 543-7103

PAGE 105 SHEET 14

Mr. Montgomery                                                                    105

```
 1              basis of that?
 2         MR. KANE: You're making
 3              arguments, you're asking for
 4              his legal opinion. His legal
 5              opinion based upon what he
 6              learned is protected and the
 7              legal advice he gives.

 8         MR. FINE: I'm asking --
 9         MR. KANE: I mean, this is --
10         MR. FINE: I'm asking --
11         MR. KANE: So, you know, you
12              want to make argument? Where
13              is the harm that he didn't get
14              an investigation? Where is the
15              harm? He would have been
16              terminated anyway, wouldn't he?

17              Or would he not? Who can
18              answer? You're making legal
19              argument.
20   Q.    Mr. Montgomery, you've heard the statement
21         that the bank's attorney just made. Did you
22         hear that statement?
23         MR. KANE: I made my argument.
24   Q.    Yes, you heard Mr. Kane's argument, right?
25   A.    Yes.
```

Miller Reporting Services
(704) 543-7103

PAGE 106

Mr. Montgomery                                                                    106

```
 1   Q.    Do you agree with Mr. Kane that the fact that
 2         the bank didn't conduct an investigation that
 3         it said it was going to conduct and that it
 4         should have conducted was something that made
 5         no difference?
 6         MR. KANE: That's not what I
 7              said. I said would it have
 8              made a difference in his
 9              termination.
10   Q.    Well, let me ask it this way: Do you believe
11         in the ethical principle that when a person
12         makes a mistake, they ought to acknowledge it?
13   A.    Yes.
14   Q.    And the bank made a mistake here, right?
15         MR. KANE: In what way?
16   Q.    The bank didn't conduct an investigation that
17         it should have conducted, right?
18         MR. KANE: Object to the form.
19   A.    It ultimately conducted one.
20   Q.    They didn't conduct an investigation that they
21         should have conducted prior to the termination
22         of employee, right?
23   A     Probably not.
24   Q     Okay. And that was wrong?
25   A.    It was a mistake.
```

Miller Reporting Services
(704) 543-7103

PAGE 107

Mr. Montgomery                                                                    107

```
 1   Q.    It was a mistake, right?
 2   A.    Yes.
 3   Q.    And an ethical corporation acknowledges its
 4         mistakes, right?
 5   A.    Some do, some don't. I can't answer for all
 6         corporations in America.
 7   Q.    Well, what I'm asking you is, does an ethical
 8         corporation acknowledge its mistakes or does
 9         an ethical corporation conceal its mistakes,
10         especially when those mistakes relate to their
11         policy against discrimination, their
12         declared --
13         MR. KANE: Objection to the
14              form.
15   Q.    -- their declared and stated policy against
16         discrimination?
17   A.    What is your question again?
18   Q.    When it involves a corporation's stated policy
19         against discrimination, when the corporation
20         fails to conduct an investigation that it
21         should have conducted, does an ethical
22         corporation acknowledge that fact?
23         MR. KANE: Objection.
24   A.    I'm assuming some do and some don't.
25   Q.    Okay. Would you want to be associated with
```

Miller Reporting Services
(704) 543-7103

PAGE 108

Mr. Montgomery                                                                    108

```
 1         the kind of corporation that doesn't --
 2         MR. KANE: Objection; don't
 3              answer that. This is getting
 4              ridiculous.
 5   Q.    Would you?
 6         MR. KANE: Don't answer. Do
 7              you have any other lines of
 8              questions calling other than
 9              for what his opinions are?
10         MR. FINE: At this point I'd
11              like to take a brief break and
12              I think we're close to the end
13              of this witness.
14              (Whereupon, a recess was taken
15              from 11:38 a.m. to 11:47 a.m.)
16         MR. FINE: I'd like to have
17              marked as the next exhibit a
18              document Bates marked BofA-24.
19              (Whereupon, Plaintiff's Exhibit
20              Number 6 was marked and
21              identified for the record.)
22   Q     Mr. Montgomery, do you recognize what has just
23         been marked as an exhibit?
24   A.    Yes.
25   Q     What is that?
```

Miller Reporting Services
(704) 543-7103

PAGE 109

Mr. Montgomery                                                109

1  A.  It's the bank's policy on discrimination and
2      sexual harassment.
3  Q.  Okay. I'd like to direct your attention to
4      the next-to-last paragraph on this page.
5  A.  Sure.
6  Q.  And I'm going to read this paragraph for the
7      record and then I have some questions for you.
8  A.  Okay.
9  Q.  "The company investigates reported incidents
10     of sexual harassment, other discrimination,
11     and retaliation. Investigations are conducted
12     in as discreet a manner as is compatible with
13     a thorough investigation of the complaint."
14         Do you see that?
15 A.  Yes.
16 Q.  All right. Now, is one of your duties and
17     responsibilities at the bank to ensure that
18     this policy is complied with?
19 A.  Yes.
20 Q.  Okay. And that has been one of your duties
21     and responsibilities since you were first
22     employed by the bank in 2001, right?
23 A.  Yes.
24 Q.  Okay. Now, when it says the company
25     investigates reported incidents of sexual

Miller Reporting Services
(704) 543-7103

PAGE 110

Mr. Montgomery                                                110

1      harassment, other discrimination, and
2      retaliation -- do you see that?
3  A.  Yes.
4  Q.  Would you agree with me that a fair reading of
5      that sentence is that the company conducts
6      such investigations before it decides to take
7      an action as drastic as terminating the
8      employee?
9          MR. KANE: Object to the form.
10 A.  Yes.
11 Q.  All right. And if you look at the second
12     sentence there, not just is the bank saying to
13     its employees that it conducts investigations,
14     it's saying to its employees that it conducts
15     thorough investigations, right?
16 A   Yes.
17 Q   Okay. And here the bank conducted no
18     investigation of Mr. Kincaid's complaints of
19     discrimination prior to his being terminated,
20     right?
21 A   Probably not.
22 Q   Okay. And that was a violation of the bank's
23     stated policy, right?
24         MR. KANE: Objection.
25 A   It failed to happen

Miller Reporting Services
(704) 543-7103

PAGE 111

Mr. Montgomery                                                111

1  Q.  And that's a violation of the policy, right?
2          MR. KANE: Objection.
3  A.  I mean, if that's what you want to call it.
4  Q.  Well, Mr. Montgomery, you just told me that
5      one of your duties and responsibilities at the
6      bank is to ensure that this policy is
7      implemented, right?
8  A.  Yes.
9  Q.  And in order to ensure that this policy is
10     implemented, you have to know when something
11     is a violation of the policy and when
12     something is not a violation of the policy,
13     right?
14 A.  Yes.
15 Q.  Because if you don't know that, you can't do a
16     very good job of implementing the policy, can
17     you?
18 A.  That's correct.
19 Q.  Okay. So what I want from you is a clear and
20     affirmative statement, was the bank's failure
21     to conduct any investigation of Mr. Kincaid's
22     claim of discrimination prior to his
23     termination a violation of its policy?
24         MR. KANE: Objection.
25 A.  I guess I would characterize it as a failure

Miller Reporting Services
(704) 543-7103

PAGE 112

Mr. Montgomery                                                112

1      to act, a failure to investigate.
2  Q.  And the failure to investigate was a violation
3      of the bank's policy, right?
4          MR. KANE: Wait a minute. You
5      just asked him prior to his
6      termination?
7          MR. FINE: Right, and he said,
8      he testified earlier --
9          MR. KANE: There's nothing in
10     this that says anything about
11     when it will be conducted.
12         MR. FINE: Right, but I
13     asked --
14         MR. KANE: And it doesn't say
15     promptly, and you used the word
16     promptly.
17         MR. FINE: Yes, Mr. Kane, but
18     before we got here I asked
19     Mr. Montgomery several
20     questions ago, does he
21     interpret that as being before
22     the bank takes such a drastic
23     action as terminating the
24     employee, and Mr. Montgomery
25     said yes.

Miller Reporting Services
(704) 543-7103

PAGE 113  SHEET 15

Mr. Montgomery                                                      113

1        MR. KANE: To which I objected.
2        MR. FINE: Right, but he
3        answered it nonetheless.
4        MR. KANE: Okay.
5   Q.   So the ladies and gentlemen of this jury,
6        Mr. Montgomery, would like a clear and
7        forthright statement from you as to whether
8        the bank violated its policy or not. Can you
9        tell them, please?
10       MR. KANE: Objection.
11  A.   We conducted an investigation. It was,
12       unfortunately, late.
13  Q.   At what point did you realize that the bank
14       had made a mistake in its handling of
15       Mr. Kincaid's case?
16       MR. KANE: Objection. You're
17       talking with regard to the
18       investigation?
19       MR. FINE: Right.
20  A.   I guess it would have occurred when I got
21       information that he had been terminated.
22  Q.   Right. And upon getting that information, did
23       you do anything to try to remedy the fact that
24       the bank had violated its policy?
25  A.   I think we talked about that before. I

Miller Reporting Services
(704) 543-7103

PAGE 114

Mr. Montgomery                                                      114

1        think -- I can't recall what I did, but we
2        took some actions.
3   Q.   Okay. Did you give notice of any of those
4        actions to Mr. Kincaid himself?
5   A.   I would not have done that.
6   Q.   Well, what is the good of taking action unless
7        the victim of the action is notified?
8   A.   Notified when? I mean, shortly after he was
9        terminated he filed an EEOC charge. It put it
10       into a different form at that point.
11  Q.   Yes. And did the bank acknowledge to the EEOC
12       that it had violated its policy?
13       MR. KANE: Objection.
14  A.   I don't think so. I don't think -- no.
15  Q.   Right, they didn't, the bank didn't. So what
16       happened here was a double wrong. First of
17       all, the bank violated its policy, and second
18       of all, the bank has refused to admit it,
19       right?
20       MR. KANE: Objection. Don't
21       answer that.
22  Q.   Now, the Bank of America has a policy with
23       regard to the destruction of e-mails, right?
24  A.   I'm certain that it does.
25  Q.   Are you familiar with what that policy is?

Miller Reporting Services
(704) 543-7103

PAGE 115

Mr. Montgomery                                                      115

1   A.   I'm somewhat familiar.
2   Q.   What is it?
3   A.   Specifically, what are you asking me?
4   Q.   Well, does the bank permit the destruction of
5        e-mails on a routine basis?
6   A.   I think e-mails are purged from our system
7        within a certain period of time.
8   Q.   Okay. And do you know what that period of
9        time is?
10  A.   I think it's 90 days, I believe, yes.
11  Q.   Okay. Now, in your experience at the bank, in
12       all the investigations that you have
13       participated in regarding claims of
14       discrimination, have you ever examined
15       e-mails?
16  A.   I'm sure I may have.
17  Q.   And the bank conducts a lot of internal
18       communications by e-mail, right?
19  A.   Yes.
20  Q.   Okay. So if it's going to conduct a thorough
21       investigation of a claim of discrimination,
22       one of the things the bank has got to do is to
23       examine e-mails, right?
24  A.   That might be a part of the investigation.
25  Q.   Sure, because sometimes the evidence of the

Miller Reporting Services
(704) 543-7103

PAGE 116

Mr. Montgomery                                                      116

1        discriminatory intent could be in an e-mail,
2        right?
3   A    Possibly.
4   Q    Okay. So does the bank have a policy or a
5        practice that when a claim of discrimination
6        is made, that people have to be notified, do
7        not destroy your e-mails regarding this
8        person?
9   A.   I don't know if there is a policy that exists
10       particularly to discrimination claims.
11  Q.   Well, if the bank doesn't have that policy or
12       practice, shouldn't it have?
13       MR. KANE: Objection.
14  A.   I mean, I think it has a policy in terms of
15       the destruction of e-mails, but I don't know
16       if it's particular to discrimination claims,
17       is all I'm saying.
18  Q    I understand that. But what I'm saying, what
19       I'm asking, what I'm trying to get at is, the
20       bank has this policy that says when claims of
21       discrimination are made, we at the bank
22       conduct a thorough investigation?
23  A    Yeah.
24  Q    And you agreed with me a moment ago that one
25       of the things that needs to be done when a

Miller Reporting Services
(704) 543-7103

DEPOSITION OF ERIC MONTGOMERY

PAGE 125

Mr. Montgomery                                                        125

1   A.   I'm not aware. I mean, there may be. I'm not
2        sure. I don't know.
3   Q.   Okay. And you may have answered this question
4        before and, if you have, I apologize. But is
5        it the case that you don't recall whether
6        another claim of unlawful discrimination has
7        been made involving Sheila Burroughs?
8   A.   Not to my knowledge.
9   Q.   Are you aware of any other cases in which a
10       claim of discrimination was made and no
11       investigation was done prior to the time that
12       the employee was terminated?
13  A.   Not that I can recall.
14  Q.   Do you have any explanation as to how it
15       happened in this case?
16  A.   I think about the only explanation that could
17       be offered would be it fell through the
18       cracks.
19  Q.   I'm sorry?
20  A.   It fell through the cracks.
21  Q.   All right. Now, I believe one of
22       Mr. Kincaid's job titles was market
23       information manager. Are you aware of any
24       claims against the Bank of America of improper
25       harassment, discrimination, or retaliation

Miller Reporting Services
(704) 543-7103

PAGE 126

Mr. Montgomery                                                        126

1        made by any other market information manager?
2   A.   Not that I'm aware of.
3   Q.   Are you aware of any claims of improper
4        harassment, discrimination, or retaliation
5        made by any person formerly or currently
6        employed in Defendant's customer analysis
7        modeling and research department?
8   A.   Say that again, now.
9   Q.   Are you aware of any claims of improper
10       harassment, discrimination, or retaliation
11       made by any person formerly or currently
12       employed in Defendant's customer analysis
13       modeling and research department?
14  A    Not that I'm aware of. Unless you have some
15       names of employees, I don't know, because I'm
16       not quite sure who would have been in that
17       group. I'm not aware of that specific group.
18       I mean, it could be, but I'm not sure.
19  Q    Okay. In your entire tenure at the bank are
20       you aware of anybody else besides Mr. Kincaid
21       who has made a claim of improper harassment,
22       discrimination, or retaliation?
23  A    Anyone in the bank?
24  Q    Yes.
25  A    Sure, yes

Miller Reporting Services
(704) 543-7103

PAGE 127

Mr. Montgomery                                                        127

1   Q.   How many such claims have there been?
2   A.   Since I've been there?
3   Q.   Yes.
4   A.   Oh, gosh. I don't have an exact number. I
5        haven't -- you know, there have been numerous
6   Q.   Over 50?
7   A.   I'm sure.
8   Q.   Over 100?
9   A.   I'm sure.
10  Q.   Of those claims, how many involve claims of
11       age discrimination?
12  A.   Gosh, I have no way of telling that. I don't
13       know.
14  Q.   How many claims have there been of improper
15       retaliation?
16  A.   Again, I couldn't specify.
17  Q.   Are you aware of any claims against the bank
18       of improper harassment, discrimination, or
19       retaliation made by any person who left the
20       employ of Defendant's competitive analysis
21       unit?
22  A.   Not specifically.
23  Q.   Okay.
24  A.   I mean, without knowing a name, I couldn't
25       tell you because I just don't know.

Miller Reporting Services
(704) 543-7103

PAGE 128

Mr. Montgomery                                                        128

1   Q.   Okay. Is the competitive analysis unit a unit
2        where there have been claims of age
3        discrimination?
4   A.   Not to my knowledge.
5   Q.   Are you aware of any employees in the
6        competitive analysis unit who were terminated
7        between October 1, 2002, and May 31, 2003?
8   A.   No, I couldn't tell you any names of anybody.
9   Q.   Are you familiar with a person named Tim
10       Megacy?
11  A.   No.
12  Q.   With regard to the claims of discrimination,
13       retaliation, and harassment that you have
14       become aware of since you've been at the bank,
15       has the bank taken any remedial measures in
16       light of those claims?
17  A.   I can think of one case I handled.
18  Q.   Okay. Can you tell us about that?
19  A.   Very vaguely. It's been a long time. I can
20       recall an associate, and I believe she may
21       have worked in Atlanta, who was terminated and
22       she raised an issue. We investigated and
23       found that the termination probably was not
24       the right decision and she was offered some
25       remediation. What form, I couldn't tell you

Miller Reporting Services
(704) 543-7103