**Steven Randall Kincaid, Ph.D.**
**May 18, 2005**

1 (Pages 1 to 4)

### Page 1

```
 1         Volume 1, Pages 1-111, Exhibits 1-9
 2   IN THE UNITED STATES DISTRICT COURT
 3   FOR THE DISTRICT OF MASSACHUSETTS
 4   No. 04 CIV 11522 (WGY)
 5   ---------------x
 6   STEVEN R. KINCAID           x
 7     Plaintiff                 x
 8     v.                        x
 9   BANK OF AMERICA CORPORATION x
10     Defendant                 x
11   ---------------x
12
13       DEPOSITION of STEVEN RANDALL KINCAID, Ph.D.
14    Wednesday, May 18, 2005, 10:15 a.m. to 2:23 p.m.
15           Offices of Edwards & Angell, LLP
16         101 Federal Street, Boston, Massachusetts
17
18   ---------- JONATHAN H. YOUNG, RDR, CRR -----------
19              COURT REPORTER
20           EPPLEY COURT REPORTING
21              P. O. Box 382
22           Hopedale, Massachusetts 01747
23         508.478.9795   Fax 508.478.0595
24              leppley@msn.com
```

### Page 2

```
 1  PRESENT:
 2  David J. Fine, Esq.
 3    Three Center Plaza, Suite 400
 4    Boston, Massachusetts 02108-2003
 5    617.720.2942       Fax 617.720.0987
 6    dvdfine@aol.com
 7    for the Plaintiff
 8
 9  Richard F. Kane, Esq.
10  McGuireWoods LLP
11    Bank of America Corporate Center
12    100 North Tryon Street, Suite 2900
13    Charlotte, North Carolina 28202
14    704.373.8999       Fax 704.373.8935
15    rkane@mcguirewoods.com
16    for the Defendant
```

### Page 3

 1  May 18, 2005
 2       [Witness sworn]
 3       STEVEN RANDALL KINCAID, Sworn
 4       EXAMINATION
 5  BY MR. KANE:
 6    Q. State your name for the record, please,
 7  sir.
 8    A. Steven R. Kincaid.
 9    Q. What does the R stand for?
10    A. Randall; R-a-n-d-a-l-l.
11       MR. KANE: Let's mark this.
12       [Kincaid Exhibit 1 marked for
13  identification]
14    Q. Mr. Kincaid, I'm handing you a marked copy
15  of an amended notice of deposition. I've given you,
16  actually, two copies. One is marked with the yellow
17  sticker and the other is not. The other is for your
18  attorney, Mr. Fine.
19       Please take a look at Exhibit Number 1.
20       Mr. Kincaid, I understand you may or
21  may not have seen that document before, but it was
22  served on you through your counsel; and I'm most
23  interested in the second paragraph of the notice,
24  requesting that you bring documents, videos, and

### Page 4

 1  audio recordings in your possession which you
 2  believe support your claim.
 3       Do you have any such documents that have
 4  not been previously produced to the defendant Bank
 5  of America?
 6    A. No, I don't have any more.
 7       MR. FINE: Let me just note for the
 8  record that I've permitted the witness to answer
 9  that question; but I believe that this particular
10  paragraph in the notice of deposition is of no legal
11  force or effect, in that it's not a request for
12  production in accordance with the rules.
13       MR. KANE: All right. I disagree, but
14  we don't need to resolve that at this point.
15    Q. Mr. Kincaid, what is your current address?
16    A. Eight Towne Lane, Topsfield, Massachusetts
17  01983.
18    Q. How long have you lived there?
19    A. Two years.
20    Q. What is your date of birth?
21    A. July 19, 1953.
22    Q. Are you married?
23    A. No.
24    Q. Have you been married?

**57**

1  that was on television at the time, You De Man, and
2  said what she had said on the phone, and told me I
3  had done a excellent job.
4      And she said during the telephone
5  conversation that she was going to call Sheila and
6  tell her what a great job I had done, and apparently
7  she did that. I was not involved in the
8  conversation with Sheila.
9      And Sheila, I can't recall if she
10 e-mailed me or called me directly after, saying, I
11 heard from Susan, and I heard that you had a really
12 outstanding success in your meeting with Vale.
13     Q. When was the meeting held that you're
14 referring to, that was so successful?
15     A. Sometime in the fall of 2002. I remember
16 it was on a Friday afternoon.
17     Q. How long after you had reported for work?
18     A. I'm guessing it was in October sometime.
19     Q. What was the subject matter of the meeting?
20     A. There was a difficulty in this large bank
21 tracking study that involved measurement of
22 statistical significance.
23     Because measuring statistical
24 significance involves the sample size that is

**58**

1  in a survey, it's very difficult in big banking
2  tracking studies to ever achieve statistical
3  significance, because you really can't
4  interview that many people.
5      You would have to interview literally
6  millions of people every quarter to get enough
7  people to make it be statistically significant.
8      And the people in Vale's group were
9  struggling with how to generate action from the
10 bank's senior management when they were unable to
11 say that satisfaction had improved significantly or
12 declined significantly.
13     And this was a quandary or a problem
14 that was kind of amenable to my skills, and I came
15 up with a way to solve their problem and presented
16 it to them.
17     Q. What was your method for solving the
18 problem?
19     A. Well, the method was not to abandon the use
20 of the formal or kind of old-fashioned management of
21 statistical significance.
22     If you use a different analysis
23 technique, multiple regression, you can identify
24 the band within which a result would fall if it was

**59**

1  part of a trend; and you can say, if it's outside
2  the band, above or below of what you would expect
3  from the continuation of the current trend, you
4  can say that is an exceptional result, you are
5  exceptionally good or exceptionally bad.
6      The advantage of this technique is that
7  it doesn't rely on the number of interviews that are
8  required to gather a survey result; it relies on the
9  number of data points in the past.
10     So, by doing that, you're able to
11 circumvent this hindrance or obstacle to
12 measuring statistical significance.
13     Q. So you're breaking it down in kind of a
14 regression analysis?
15     A. Well, what you're doing is you're looking
16 at it with a different lens.
17     Instead of using kind of an old-
18 fashioned and traditional tool -- which really
19 handcuffs you, because you can't really ever get
20 enough interviews to break out, and you can't get
21 statistical significance -- you're looking at it
22 with a different lens and saying, if we look at a
23 trend that's been established by previous data
24 points, what would constitute a meaningful

**60**

1  departure from that trend, either higher
2  or lower.
3      Q. What about Mr. Kotopoulos? You say he also
4  praised your work; is that correct?
5      A. Yes.
6      When I finished my monograph about
7  how to redo, or a better way to do, the statistical
8  driver analysis, his specific words I believe were
9  This is a big win for the bank; and he told me
10 I had done a good job.
11     Q. And when was that?
12     A. That would have been in probably December
13 of 2002.
14     Q. And that's when you completed the
15 monograph? Is that ph?
16     A. Monograph, ph, yes.
17     The time that the monograph was
18 actually done is not clear; because there were a
19 number of drafts of it, and the substance of the
20 work was done at the end of 2002, in December.
21     For reasons unclear to me, the monograph
22 was not publicized and was not rolled out, as they
23 say, until several months into 2003.
24     Q. Do you know if the bank is still using that

**61**

1  monograph?
2  A. I do not know.
3  Q. Any other praise from Mr. Kotopoulos?
4  A. That's all I can recall.
5  Q. How about Sheila Burroughs?
6  A. On I guess occasions kind of too many to
7  mention individually, she said I was doing a good
8  job, I had met her expectations, I was providing
9  effective stimulation and leadership to the people
10 in the bank, and I was being successful in
11 bringing ideas to them that they had not
12 had previously.
13 Q. Was this throughout your employment that
14 Sheila...
15 A. I would say it was up until February or
16 March of 2003.
17 Q. Did something change in your relationship
18 in February or March of 2003?
19 A. Well, in April of 2003 she dramatically
20 changed her relationship with me, and gave me a very
21 negative personnel evaluation, and told me that my
22 position was in jeopardy.
23 Q. Did she praise your performance at any time
24 after that April appraisal?

**62**

1  A. Yes, she did.
2  Q. I'm sorry?
3  A. Yes, she did.
4  Q. On what occasions do you remember she
5  praised you?
6  A. On a couple of occasions in meetings we had
7  I had ideas about how to improve different aspects
8  of customer-satisfaction research, and she said that
9  they were good ideas; and in weekly meetings, which
10 we had every week, shortly after giving me a very
11 negative review, she said that my performance had
12 gotten better.
13 Q. Did you say that was shortly after the
14 negative review?
15 A. Correct; within two to three weeks after
16 the negative review.
17 Q. Any other praise following that?
18 A. No; none that I can remember at this time.
19 Q. We're talking Sheila Burroughs.
20 A. Right.
21 Q. How about the individual whose nickname is
22 Vale? What sort of praise did he direct towards
23 you?
24 A. Principally, I think that it was at

**63**

1  our exceptionally successful meeting that was in
2  October, that I mentioned earlier. He was quite
3  impressed with my idea about using regression
4  instead of formal significance testing.
5  Q. Any other occasion?
6  A. No.
7  Q. How about Paul, whose last name you can't
8  remember?
9  A. Paul and I worked together on training
10 his staff to carry out the new, different method
11 of driver analysis I developed; and Paul said that
12 I was welcome as a senior advanced resource on
13 statistical analysis, because they had not had
14 resources like that in the department
15 previously.
16      And he himself was highly interested in
17 this analysis, had not had a great deal of occasion
18 to practice it, but was very much interested in the
19 topic, and he was glad that I was there because I
20 was an experienced person in the area;
21      and he had had issues with Richard
22 McFarland, who was another advanced analyst but was
23 not necessarily well versed in analysis of survey
24 data.

**64**

1  Q. And how about Chuck?
2  A. Chuck's area was the area where I first
3  tested out my new method of driver analysis. He
4  gave me a set of data that had already been gathered
5  and asked me to try out, in terms of a dry run, my
6  method on his data.
7      And I did so; and the results my
8  analysis came up with were more focused and more
9  actionable than what he had received previously, and
10 remedied some problems he had had in trying to
11 communicate the results of the survey to his
12 clients.
13 Q. Any others who praised your performance?
14 A. Yes. I worked a great deal with an
15 individual named Alan Church.
16      He worked in Vale's area, and he
17 was in charge of working with people that helped in
18 the real-estate area or were customer-satisfaction-
19 advised in the real-estate area, and I helped them
20 redo their method of driver analysis in much the
21 same way as I helped people within CAMR, and I
22 worked quite a bit with Alan.
23 Q. And did he praise your work?
24 A. Frequently. He had me speak to all