**65**

1  the people in his work group a number of times,
2  and as a result of his recommendation of my work I
3  did individual consulting sessions with a number of
4  people that were in his real-estate research group.
5     Q. Anyone else praise your performance or your
6  work?
7     A. That's all I can think of at this time.
8        [Kincaid Exhibit 8 marked for
9  identification]
10    Q. Mr. Kincaid, would you examine the document
11 that's been handed to you as marked Exhibit 8.
12       Is that the performance evaluation
13 you referred to earlier when you were talking about
14 Sheila Burroughs' change in her assessment of your
15 performance?
16    A. There is more than one document. This is
17 one of the documents.
18    Q. What was the other document?
19    A. I was given a document; I don't know how to
20 describe it.
21       It was kind of in a memo form, and
22 it just listed points that were the shortcomings
23 of my work; and then she verbally said that this is
24 a serious matter, and there is urgency attached to

**66**

1  it.
2        [Kincaid Exhibit 9 marked for
3  identification]
4     Q. Would you examine Exhibit Number 9, please.
5        Is Exhibit Number 9 the document you
6  were just referring to?
7     A. Yes, it is.
8     Q. And this is, I agree, in somewhat of a memo
9  form. Correct?
10    A. Correct.
11    Q. Is that your signature on the second page?
12    A. Yes, it is.
13    Q. Did you agree or disagree with this
14 assessment of your performance?
15    A. I disagreed.
16    Q. Could you tell me why you did not make any
17 comments in the section devoted to Associate
18 Comments, the second page?
19    A. It was not pointed out to me that I had the
20 option to write down comments. I verbally responded
21 to many of the points on the page, but to be honest
22 I didn't notice that.
23    Q. Did you complain about this assessment to
24 anyone?

**67**

1     A. Well, I told Sheila I disagreed with the
2  great majority of it, and thought that it was very
3  abrupt; and I was quite surprised at the nature of
4  what it said.
5        And I did complain to a colleague of
6  mine, who became a friend, named Tim Megeysey.
7     Q. Did you complain to Ms. Burroughs'
8  superiors?
9     A. No, I did not.
10    Q. Did you complain or call the personnel
11 center after you received this performance
12 assessment?
13    A. I personally did not call or communicate
14 with the personnel center.
15    Q. Did anyone call on your behalf?
16    A. I retained legal counsel, and my legal
17 counsel communicated with the legal department of
18 Bank of America.
19    Q. But you didn't raise the issue directly
20 with anyone above Sheila Burroughs or in the human-
21 resource department?
22    A. No, I did not personally.
23    Q. How soon after you got this performance
24 assessment did you retain the services of an

**68**

1  attorney?
2     A. Within two weeks.
3     Q. And that was Ms. Norcross?
4     A. That's correct.
5     Q. Is Sheila Burroughs the only person that
6  criticized your performance?
7     A. No.
8     Q. Who else?
9     A. Richard McFarland criticized my
10 performance.
11    Q. What was the nature of his criticism?
12    A. There was some ambiguity about our roles.
13 We both had statistics backgrounds; we both knew
14 advanced analysis.
15       He said to me on, probably, several
16 occasions that he thought I was encroaching on his
17 area of expertise.
18       And on more than on one occasion after
19 I had issued information, findings, recommendations,
20 to somebody else within CAMR, he sought out that
21 person to argue against my recommendations and
22 say that they were ill-founded.
23    Q. At some point, of course, you were
24 terminated from your position with Bank of America;

### Page 69

1  correct?
2  A. Correct.
3  Q. Do you know who made the decision to
4  terminate your employment?
5      MR. FINE: Objection.
6  A. I don't know. I suspect it was Sheila, but
7  I don't know.
8      [Lunch recess taken]
9  BY MR. KANE:
10  Q. Mr. Kincaid, did Ms. Burroughs meet with
11  you regarding your termination?
12  A. Yes, she did.
13  Q. Did she tell you what the reason was for
14  your termination?
15  A. She said I had continued to not live up
16  to what her hopes were or her desires were for me
17  to improve, and that the time had come for me to
18  leave.
19  Q. Did you complain to anyone over
20  Ms. Burroughs, that is any of her supervisors
21  or upper management, about your termination?
22  A. No.
23  Q. If you would refer to Exhibit Number 2,
24  which is the complaint in the stack next to you

### Page 70

1  there, I think it's 2. Let me get it. Yes;
2  Exhibit Number 2.
3      And I'll preface my question with
4  acknowledging that this may just be stylistic; but
5  if you turn to Page 7, Paragraph 42 at the bottom,
6  do you see that?
7  A. Yes.
8  Q. It says, Defendant harassed plaintiff and
9  terminated plaintiff's employment because of
10  plaintiff's age.
11      Do you contend that you were harassed
12  because of your age; separate and apart from your
13  termination?
14  A. I believe that her harassment of me was
15  related to my age. That's what I would say.
16  Q. Well, tell me in what manner you were
17  harassed because of your age.
18  A. Well, when I got harassing messages from
19  Sheila, she did not directly make references to
20  my age;
21      but I believe that her continual pattern
22  of harassment and her continued kind of reinforcing
23  negative messages during the period between April
24  and June was related to her desire to have me

### Page 71

1  leave because of my age.
2  Q. You say from April to June?
3  A. Yes.
4  Q. Is that the time period?
5  A. Prior to April, she had been supportive,
6  she had been hospitable and very friendly towards
7  me; and prior to the meeting in April I had no
8  reason to believe that my performance was below
9  par or needed significant improvement.
10  Q. But you say after that you started getting
11  harassing messages?
12  A. After the meeting in April, Sheila's manner
13  toward me in all different aspects of our
14  relationship changed dramatically.
15  Q. How so?
16  A. She would frown if she saw me in the
17  Halumis. She avoided contact with me. She ceased
18  kind of friendly chitchat in the hall; activities
19  that she had engaged in prior to the meeting in
20  April.
21      Looking across all the spectrum of
22  activities that you engage in with a coworker, her
23  manner toward me changed very abruptly, and became
24  aloof and somewhat hostile.

### Page 72

1  Q. Anything more specific than that; say a
2  harassing voice-mail message or face-to-face
3  message that you consider harassing?
4  A. The morning of the meeting in April, that's
5  been referenced in these documents, I received news
6  that my grandmother passed away.
7      I was quite emotionally upset, and I
8  immediately made plans with my sister on the phone
9  to attempt to attend the funeral, which was going to
10  be the next day in Oklahoma City.
11      I notified Sheila early in the morning,
12  around eight or nine, that I had had a death in the
13  family, and I wished to be absent from work the next
14  day and the day after, because of a death in the
15  family, to attend a funeral.
16      And I didn't receive a reply back for an
17  hour or two, and we had our regular weekly meeting
18  that morning.
19      That was the meeting at which she gave
20  me this extremely negative review, and she said that
21  I could only attend the funeral if I was certain I
22  could get all my work done while I was at the
23  funeral.
24      And I was really shocked at her

**Page 73**

1 behavior, and I thought it was very callous and
2 harsh of her to effectively deny an employee the
3 right to attend a funeral of a family member.
4    Q. But, as you said, your age was not
5 mentioned in that conversation?
6    A. That's correct.
7    Q. Any other forms of harassment other
8 than the change in her demeanor towards you and
9 the treatment you received pertaining to the funeral
10 of your grandmother?
11    A. Sheila asked me to work on a specific
12 project for another group within the bank, and I
13 began work on this project.
14         Whenever I would go to Sheila to
15 get her reaction or input to things I had done,
16 she constantly contradicted earlier information or
17 earlier direction that she had given me.
18         Her tone and manner in these
19 meetings were hostile and attacking; and it
20 made me feel extremely uncomfortable, because
21 she seemed angry at me before I even walked into
22 the room.
23         And I made three or four different
24 attempts to come up with work that she felt was

**Page 74**

1 acceptable; and because she repeatedly contradicted
2 earlier statements that she had said, time and time
3 again, the result of the meeting was that I failed
4 to perform as expected, and everything I had come
5 up with had to be redone again.
6         And after the third such meeting on this
7 particular topic, I really began to believe that the
8 meetings were being held for the purpose of
9 discouraging me and harassing me.
10    Q. What was this other project called?
11    A. Well, it was work for someone in another
12 area, and involved acquiring information about, I
13 believe it was people's attitudes toward home
14 ownership.
15         I'm not completely sure what the topic
16 was. It's been quite a while, but I believe it was
17 involving home ownership.
18    Q. And who were you doing this project for?
19    A. It was a lady in a different work group.
20 I can't remember her name.
21    Q. And you testified earlier that you don't
22 know who made the decision to terminate your
23 employment; is that correct?
24    A. Are we done with this? Can I put this one

**Page 75**

1 away now?
2    Q. Yes, you can put that away.
3    A. I'm sorry. Could you rephrase the
4 question?
5    Q. I believe you testified earlier that you
6 were not certain who made the final decision to
7 terminate you. Is that correct?
8    A. I am not certain; that's correct.
9    Q. Who do you think it was?
10    A. In the meeting the morning that Sheila
11 notified me I was being let go, she used the term
12 We. She said, We've decided that your time at Bank
13 of America has come to an end.
14         So, that suggests to me that there was
15 someone else involved besides Sheila, but I don't
16 know who it was.
17    Q. And on what basis do you attribute your
18 termination and Sheila Burroughs' demeanor towards
19 you to your age?
20    A. I'm sorry; could you say that again?
21    Q. On what basis do you attribute these acts
22 to your age?
23    A. Talking with other people that worked in
24 CAMR and observing activities around CAMR, there

**Page 76**

1 were several other employees that I believe were
2 being subjected to the same treatment as I was
3 at the same time period. All of those
4 individuals were over 40 years old.
5    Q. Who did you talk to that led you to this
6 conclusion?
7    A. Well, my friend Tim Megeysey...
8    Q. Tim who?
9    A. Tim Megeysey.
10    Q. Any others?
11    A. One of the people who I believe was being
12 subjected to the same treatment worked for Paul, the
13 person I mentioned earlier.
14    Q. Who was that individual?
15    A. I can't recall his name.
16    Q. And what happened to that individual that
17 worked for Paul?
18    A. He left the firm.
19    Q. Did you talk with that person?
20    A. No, I did not.
21    Q. So that's an observation?
22    A. That's correct.
23    Q. And that person, whoever it is, is over 40
24 years old?

**101**

1 layoffs and severance pay.
2   Q. Did you believe that the way that Sheila
3 Burroughs changed her demeanor towards you and her
4 approach towards you was designed to get you to do
5 something?
6   A. I thought it was designed to intimidate me
7 into resigning my position, and there are two
8 reasons I thought that.
9     One was that in my mind there
10 was no real objective reason for criticizing my
11 performance, because so much of what she said was
12 artificially generated or trumped up, so to speak;
13     and I thought, since there appeared
14 to be no rational explanation of why they would be
15 so critical with so little justification, that the
16 intent must be to kind of scare me or intimidate
17 me into resigning.
18     And a supporting reason that
19 I believe that was true is that somewhere in
20 the details of all these employment documents
21 there is a clause that, if you resign your position
22 voluntarily before the end of a calendar year, that
23 much of the relocation money that you were paid as
24 part of a relocation package has to be returned

**102**

1 to the bank.
2     In my case, the sum would have
3 been significant, somewhere in the neighborhood
4 of $70,000 to $100,000; and, although I'm not sure
5 this is a primary reason they tried to force me to
6 resign, I thought the timing of what they were doing
7 was related to the fact that they would receive this
8 lump sum of cash back if I resigned before August
9 19, 2003.
10   Q. You referred to the conversation that you
11 had with Sheila Burroughs in which she informed you
12 that you were being terminated.
13   A. Yes.
14   Q. Was that the last conversation you ever had
15 with Sheila Burroughs?
16   A. No, it was not.
17   Q. What was the last conversation you ever had
18 with her?
19   A. I was told ahead to leave that day.
20     I packed up a box of my personal
21 belongings, took it from the building, put it in
22 my car, returned, and got another load of belongings
23 in another box.
24     I was carrying the box down the

**103**

1 aisleway between the cubicles heading for the
2 elevator; and Sheila came out of her aisle and
3 followed me partway down the main pathway, so to
4 speak, and stopped me as I was about to head down
5 toward the elevator and said, I'm really sorry this
6 has happened.
7     She handed me a slip of paper and said,
8 This is my home number. She said, Call me tonight
9 at home, and I'll tell you what really happened
10 here.
11   MR. FINE: Those are my questions.
12   EXAMINATION
13 BY MR. KANE:
14   Q. Just before your attorney, Mr. Fine, asked
15 you this series of questions, we took a break, did
16 we not?
17   A. Yes, we did.
18   Q. Did you and Mr. Fine discuss your testimony
19 during that break?
20   A. Yes, we did.
21   Q. Did you call Sheila Burroughs at home?
22   A. No, I did not.
23   Q. Why not?
24   A. I was very emotionally upset about the

**104**

1 events of the day; and because in my mind Sheila's
2 comments amounted to an admission that the campaign,
3 so to speak, to have me resign and/or to fire me had
4 been a sham, I was not sure if this also was another
5 trick or a sham that was trying to trick me in some
6 way into doing something that was adverse to my
7 interests.
8     And I just didn't trust that it was a
9 genuine communication.
10   Q. When did you leave the bank? When were you
11 fired; what date?
12   A. I believe it was June 16. I could be off
13 by a couple of days.
14   Q. Who told you that the bank terminated
15 people at the end of the quarter in order to boost
16 earnings?
17   A. Sheila Burroughs.
18   Q. When did she tell you that?
19   A. It was sometime in the fall of 2003, before
20 a staff meeting.
21   Q. How did this conversation come up?
22   A. There had been office gossip about layoffs
23 at the end of a quarter.
24   Q. Office gossip?