

# EXHIBIT 6

DEPOSITION OF ALEX KOTOPOULOS

PAGE 1  SHEET 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEVEN R. KINCAID,
    Plaintiff,
vs.                    ) CIVIL ACTION NO.
                     ) 04-11522-WGY
BANK OF AMERICA CORPORATION,
    Defendant.

DEPOSITION
OF
ALEC KOTOPOULOS

At Charlotte, North Carolina
June 2, 2005

Reporter: Christine A. Taylor
         Notary Public

PAGE 2

Kotopoulos                                    2

APPEARING

For the Plaintiff:   DAVID J. FINE, ESQ.
                     Law Offices of David J. Fine
                     Suite 400
                     Three Center Plaza
                     Boston, Massachusetts 02108

For the Defendant:   RICHARD F. KANE, ESQ.
                     McGuireWoods, LLP
                     Suite 2900
                     100 North Tryon Street
                     Charlotte, North Carolina 28282

Also Present:        Steven Kincaid

* * * * *

INDEX
                                              PAGE
Examination By Mr. Fine                         3

EXHIBITS

(No exhibits were marked.)

Miller Reporting Services
(704) 543-7183

PAGE 3

Kotopoulos                                    3

1   This is the deposition of ALEC KOTOPOULOS, taken
2   in accordance with the Federal Rules of Civil Procedure
3   in connection with the above case.
4       Pursuant to Notice, this deposition is being taken
5   in the Law Offices of Hamilton, Fay, Moon, Stephen,
6   Steele & Martin, 2020 Charlotte Plaza, 201 South College
7   Street, Charlotte, North Carolina, beginning at 9:08 a.m.
8   on June 2, 2005, before CHRISTINE A. TAYLOR, Notary
9   Public.
10
11      ALEC KOTOPOULOS, upon first being duly
12  sworn, testified as follows:
13
14          EXAMINATION BY MR. FINE
15  Q.  Please state your full name.
16  A.  Alec Kotopoulos.
17  Q.  Could you spell the last name?
18  A.  K-o-t-o-p-o-u-l-o-s.
19  Q.  Where do you reside?
20  A.  In Charlotte, North Carolina.
21  Q.  How are you employed?
22  A.  I'm not.
23  Q.  When is the last time you were employed?
24  A.  With Bank of America. So that would have
25  been 2004.

PAGE 4

Kotopoulos                                    4

1   Q.  When did you leave the bank in 2004?
2   A.  February.
3   Q.  What were the circumstances of your leaving?
4   A.  Merger.
5   Q.  Who merged with whom?
6   A.  Fleet and Bank of America. Bank of America
7   bought Fleet.
8   Q.  And at the time of the merger various people
9   at Bank of America were let go?
10  A.  That's my understanding.
11  Q.  Did you receive a severance package?
12  A.  I received a package. I was offered a
13  package and accepted the package.
14  Q.  What were the terms of the package?
15  A.  That's private between the bank and I.
16  Q.  Well --
17  A.  There were monetary, if that's what you're
18  asking.
19  Q.  Well, you're being called to testify as a
20  witness in this case and the financial terms would be
21  potentially relevant to your bias in the case, so I
22  think that it is a fair subject of examination.
23      MR. KANE: Bias to?
24      MR. FINE: How he feels about the bank. If
25  he got a good severance package, he might be more

Miller Reporting Services
(704) 543-7183

PAGE 109

Kotopoulos                                                    109

1   A.  Oh, yes.
2   Q.  It was something that was discussed?
3   A.  Yes.
4   Q.  Okay. What did you say on that subject and
5   what did Ms. Burroughs say on that subject?
6   A.  I don't know. I don't remember the
7   specifics.
8   Q.  Did both of you recognize the possibility
9   that Mr. Kincaid could turn things around so that it
10  would not be necessary to terminate?
11  A.  The best of my knowledge, yes.
12  Q.  And did you discuss any ideas with
13  Ms. Burroughs about how to coach or counsel
14  Mr. Kincaid so that it would not be necessary to
15  terminate him?
16  A.  To the best of my knowledge, yes.
17  Q.  Do you remember any of the ideas that you or
18  Ms. Burroughs discussed on that subject?
19  A.  No. No.
20  Q.  Did you discuss with Ms. Burroughs how long a
21  period of time Mr. Kincaid should be given to see
22  whether he could turn things around such that it would
23  not be necessary to terminate him?
24  A.  No.
25  Q.  You didn't discuss that?

Miller Reporting Services
(704) 543-7103

PAGE 110

Kotopoulos                                                    110

1   A.  No.
2   Q.  Was the time that Mr. Kincaid was going to be
3   given left open and indefinite?
4   A.  No, because that's an advice and counsel
5   issue.
6   Q.  What do you mean by that?
7   A.  Again, that 60 or -- I forget whether it was
8   60- or 90-day period.
9   Q.  In other words -- are you saying that you had
10  no discretion about how long Mr. Kincaid was going to
11  be given to try to turn things around?
12  A.  Oh, sure, I had discretion, yes.
13  Q.  So who made the decision about how long he
14  was going to be given to try to turn things around?
15  A.  Sheila and I jointly.
16  Q.  Okay. And what did you decide?
17  A.  We decided that we had heard a lot of bad
18  stuff from clients, we had decided that we had
19  internal feedback from Pierce and direct reports of
20  mine that was not positive with respect to the work he
21  was working on, and we had a situation here where we
22  felt Steve had been given a fair amount of time to
23  prove himself, so now it's time to give him a chance
24  through the probationary period to work through this
25  process. Either it was going to work or it wasn't

Miller Reporting Services
(704) 543-7103

PAGE 111

Kotopoulos                                                    111

1   going to work.
2   Q.  Mr. Kotopoulos, do you remember the question
3   that I asked you?
4   A.  Yeah, the period of time.
5   Q.  That you and Ms. Burroughs decided you were
6   going to give Mr. Kincaid to try to turn things
7   around?
8   A.  Right.
9   Q.  What did you decide?
10  A.  Just like with everybody else, the 90-day
11  period.
12  Q.  Okay. And did you and Ms. Burroughs discuss
13  the fact that Ms. Burroughs should say to Mr. Kincaid
14  you are going to be given 90 days to try to turn
15  things around?
16  A.  Ask the question again please.
17  Q.  Did you discuss with Ms. Burroughs that she
18  should say to Mr. Kincaid that he was going to be
19  given 90 days to try to turn things around?
20  A.  I instructed Sheila to talk to advice and
21  counsel just like I did with everybody else.
22  Q.  So is your response to my answer no?
23  A.  No. The answer is no.
24  Q.  So you didn't say to Sheila Burroughs tell
25  Mr. Kincaid he's got 90 days to try to turn things

Miller Reporting Services
(704) 543-7103

PAGE 112

Kotopoulos                                                    112

1   around?
2   A.  I don't recall that.
3   Q.  Okay. You do recall that you decided that he
4   should be given 90 days to turn things around?
5   A.  Yes.
6   Q.  That you decided?
7   A.  Yes. Absolutely.
8   Q.  But you decided -- not -- or you didn't say
9   to Ms. Burroughs that you should tell Mr. Kincaid that
10  he's being given 90 days; right?
11  A.  Again, I don't remember these things. I
12  don't remember. That's the answer.
13  Q.  Okay. So you might have told her to tell
14  Mr. Kincaid he's got 90 days?
15  A.  Possibly.
16  Q.  Okay. And you remember that you told
17  Ms. Burroughs to talk to advice and counsel?
18  A.  Absolutely.
19  Q.  And did Ms. Burroughs report back to you at
20  some point that she had spoken to advice and counsel
21  regarding Mr. Kincaid?
22  A.  Yes.
23  Q.  And what did she say?
24  A.  She said we need to set up an action plan.
25  Q.  And what did you understand action plan to

Miller Reporting Services
(704) 543-7103

DEPOSITION OF ALEX KOTOPOULOS

PAGE 113  SHEET 15

Kotopoulos                                                                 113

1  mean?
2     A.  Action plan was written documentation of what
3  Steve needed to achieve in a set timeframe such that a
4  determination would be made at the end of that
5  timeframe as to whether or not Steve would, you know,
6  still be around or would be terminated.
7     Q.  Okay.  And was that done?
8     A.  Yes.
9     Q.  And Mr. Kincaid was given a written action
10 plan telling him --
11    A.  Yes.
12    Q.  -- what you just said?
13    A.  Yes.
14    Q.  You're quite sure of that?
15    A.  I am 90 percent sure that that was done.
16    Q.  Now, when did you first discuss with Vipin
17 Mayar the possibility that Mr. Kincaid would be
18 terminated?
19    A.  I don't know.
20    Q.  Was it --
21    A.  An educated guess would be around the time
22 when Sheila had talked with me and told me there were
23 issues.  I always made him aware of issues.
24    Q.  So it would have been your practice that when
25 you discussed for the first time the possibility of

Miller Reporting Services
(704) 543-7103

PAGE 114

Kotopoulos                                                                 114

1  terminating Mr. Kincaid that at that time or shortly
2  thereafter you would have had a discussion on that
3  same subject with Vipin Mayar?
4     A.  Yes.
5     Q.  Do you remember having such a discussion with
6  Vipin Mayar?
7     A.  Yes.
8     Q.  Okay.  And what did you say and what did he
9  say in that discussion?
10    A.  I absolutely don't remember.
11    Q.  You remember that you had a discussion with
12 Vipin Mayar, but you don't remember what either of you
13 said in that discussion; is that right?
14    A.  I cannot remember the specifics, that's
15 correct.
16    Q.  What is the next thing that you remember
17 regarding Mr. Kincaid after that conversation with
18 Sheila Burroughs?
19    A.  What is the next thing I remember about Steve
20 Kincaid post the conversation with Sheila Burroughs.
21    Q.  Yes.
22    A.  That he was working toward the goals that
23 were set forth.
24    Q.  Okay.  So Sheila was reporting to you that --
25    A.  On a weekly basis.

Miller Reporting Services
(704) 543-7103

PAGE 115

Kotopoulos                                                                 115

1     Q.  -- that Steve Kincaid was making an effort to
2  comply with the goals that you and Sheila had decided
3  on?
4     A.  Initially, yes.
5     Q.  And you used the word "initially"?
6     A.  Yes, because my recollection tells me there
7  may have been a petering out at some point.  Sheila
8  will know the details, but I do vaguely remember there
9  was some big fall off.
10    Q.  And what do you remember about this big fall
11 off?
12    A.  All I can think of is that he had given up.
13    Q.  Okay.  You said all you can think of.  Do you
14 remember Sheila Burroughs saying to you something
15 which led you to believe that Mr. Kincaid had given
16 up?
17    A.  I don't recall the specifics.
18    Q.  Well, do you remember you were getting
19 communication from Ms. Burroughs along that line in
20 substance?
21    A.  Yes.
22    Q.  And how did you respond to that information
23 from Ms. Burroughs?
24    A.  See it to its end.
25    Q.  And what did you mean by that?

Miller Reporting Services
(704) 543-7103

PAGE 116

Kotopoulos                                                                 116

1     A.  You know, there's a process in place and
2  everybody had a fair shot and, you know, see it to its
3  end.
4     Q.  In other words, that Mr. Kincaid should be
5  given the full 90 days?
6     A.  Yeah.
7     Q.  And was Mr. Kincaid given the full 90 days?
8     A.  I don't remember.  Honestly, I don't
9  remember.
10    Q.  Well --
11    A.  Sheila will know.
12    Q.  Was it your practice when you decided that an
13 employee should be given 90 days that the employee
14 was, in fact, given the full 90 days?
15    A.  Absolutely.
16    Q.  Did it ever come to your attention that a
17 lawyer retained by Mr. Kincaid wrote a letter to the
18 bank of America making certain claims about the way
19 that he had been treated?
20    A.  No.
21    Q.  I take it -- do you know that today, that
22 such a letter was sent?
23    A.  I do know that today.
24    Q.  When did you first learn that?
25    A.  Well, today.  This morning.  Actually, I do

Miller Reporting Services
(704) 543-7103

PAGE 117

Kotopoulos                                                     117

1  know because of the Eric Montgomery meeting that
2  something had happened. I didn't know any details,
3  just that something had happened. I'm sorry, I
4  misspoke.
5      Q.  Okay. And the Eric Montgomery meeting was
6  after Mr. Kincaid had already been terminated?
7      A.  Yes.
8      Q.  Now that you know --
9      A.  Right.
10     Q.  -- that such a letter was sent by
11 Mr. Kincaid's lawyer to the Bank of America, is that
12 letter something that you would have wanted to know
13 about at the time?
14     A.  At what time? I'm sorry.
15     Q.  At the time that it was sent?
16     A.  Not necessarily, no.
17     Q.  Well --
18     A.  This is a legal issue. To me, it's HR and
19 legal. It's not my area of expertise.
20     Q.  Have you read the letter that Mr. Kincaid's
21 lawyer sent to the bank?
22     A.  I have never read the letter. I've never
23 seen the letter.
24     Q.  Okay. At some point did you have a further
25 discussion with Sheila Burroughs on the subject of

Miller Reporting Services
(704) 543-7103

PAGE 118

Kotopoulos                                                     118

1  terminating Mr. Kincaid?
2      A.  I don't understand the question. At some
3  point?
4      Q.  Well, you've talked about this initial
5  meeting where the subject first came up?
6      A.  Correct.
7      Q.  You talked about weekly reports that you got
8  from Sheila about his performance?
9      A.  Yes.
10     Q.  You've spoken about this conversation that
11 you had with Sheila about the falling off?
12     A.  Yes.
13     Q.  After that discussion --
14     A.  Right.
15     Q.  -- when was the next time you spoke to
16 Ms. Burroughs on the subject of possibly terminating
17 Mr. Kincaid?
18     A.  I believe on the day that Sheila terminated
19 Mr. Kincaid.
20     Q.  Okay.
21     A.  Or early -- a period probably within that day
22 prior to the time that she terminated him.
23     Q.  Who initiated that discussion?
24     A.  Sheila.
25     Q.  And what did Sheila say to you and what did

Miller Reporting Services
(704) 543-7103

PAGE 119

Kotopoulos                                                     119

1  you say to her?
2      A.  She let me know that today was going to be
3  the day that Steve was going to be terminated. I
4  believe she said there would be somebody either in the
5  room or on the phone from advice and counsel, and that
6  was it, or HR, I forget.
7      Q.  Okay. And did Sheila Burroughs tell you how
8  it was that she had selected that particular day to
9  terminate Mr. Kincaid?
10     A.  I believe it was the end of the period.
11     Q.  The end of the 90 days?
12     A.  I believe so.
13     Q.  And so she said to you in words or substance,
14 "Today being the end of the 90-day period, we should
15 terminate Mr. Kincaid today"?
16     A.  No. I think it was more -- again, we had
17 kept a weekly communication and, you know, we both
18 knew that this was it.
19     Q.  And why was it that you both knew that this
20 was it?
21     A.  Because we communicated. I would communicate
22 with her. She would communicate with me.
23     Q.  Who made the decision -- as between you and
24 Ms. Burroughs, who made the decision that, okay, now
25 it was the time to really terminate Mr. Kincaid?

Miller Reporting Services
(704) 543-7103

PAGE 120

Kotopoulos                                                     120

1      A.  Well, I made the ultimate decision, yes.
2      Q.  Now, earlier you spoke about a conversation
3  that you had with Vipin Mayar about terminating
4  Mr. Kincaid; right?
5      A.  Uh-huh.
6      Q.  After that conversation when was the next
7  time that you discussed terminating Mr. Kincaid with
8  Vipin Mayar?
9      A.  I don't remember. I don't remember.
10     Q.  Was there another such discussion?
11     A.  There was certainly a discussion, I'm sure,
12 before -- just before the termination.
13     Q.  And you're sure of that because that was your
14 practice?
15     A.  That was the standard practice, yes.
16     Q.  Do you, in fact, remember anything that was
17 said in that discussion with Mr. Mayar?
18     A.  Just that Mr. Kincaid was going to be
19 terminated on, you know, this date. It was maybe the
20 next day but very close in time, and that's it, so
21 that he was aware.
22     Q.  When was the first time that you discussed
23 with anybody the subject of finding a replacement for
24 Mr. Kincaid?
25     A.  I don't know.

Miller Reporting Services
(704) 543-7103

PAGE 121 SHEET 16

Kotopoulos                                                      121

1   Q. Did you, in fact, ever have such a
2   discussion?
3   A. About finding a replacement for Mr. Kincaid?
4   Q. Yes.
5   A. Sure. After Mr. Kincaid was gone.
6   Q. Who did you have the discussion with?
7   A. Recruiters.
8   Q. How many such discussions did you have?
9   A. A couple.
10  Q. Who did you have the discussions with?
11  A. This gentleman, Frank Black, and probably
12  Paul Fafard, two recruiters.
13  Q. And was a replacement for Mr. Kincaid
14  ultimately hired?
15  A. No.
16  Q. Why not?
17  A. Because we brought -- because Sheila moved on
18  and we brought somebody into Sheila's old role and we
19  brought Leroy Lelker over, and we never replaced
20  Mr. Kincaid's position.
21  Q. My question is: Why did you never replace
22  his position?
23  A. Because the gentleman who had come in, Gerry
24  McDonough, basically had lots of customer satisfaction
25  and loyalty background. We felt comfortable with his

Miller Reporting Services
(704) 543-7103

PAGE 122

Kotopoulos                                                      122

1   background and comfortable enough with what he needed
2   to do at the bank to get things done going forward.
3   Q. And so it was no longer necessary to have
4   someone in Mr. Kincaid's position; right?
5   A. Well, we had a number of Ph.D. statisticians
6   in the CAMR unit including Mr. --
7   Q. Can you answer my question, please?
8   A. Say it again, please.
9   Q. And so you decided it was no longer necessary
10  to have someone in Mr. Kincaid's position?
11  A. Yes.
12  Q. Now, stepping back from the situation and
13  looking at all the facts that we've talked about
14  today, isn't it consistent with those facts that what
15  really happened here was you decided to lay
16  Mr. Kincaid off because you had made a determination
17  that it was no longer necessary to have someone in his
18  position?
19      MR. KANE: Object to the form. Go ahead and
20  answer if you know, if you understand.
21      THE WITNESS: The answer is no.
22      BY MR. FINE:
23  Q. What about the facts is inconsistent with
24  that?
25  A. It was pretty simple, black and white to me

Miller Reporting Services
(704) 543-7103

PAGE 123

Kotopoulos                                                      123

1   Performance. Performance. Performance. Significant
2   underperformance; significant internal client opinion
3   that was not positive; you know, significant opinion
4   of the person who was directly managing him, Sheila
5   Burroughs, on a daily basis, performance was an issue.
6   Q. And you were concerned about the performance
7   because the kinds of things that Mr. Kincaid were
8   doing were important; right?
9   A. Yes.
10  Q. They were integral to the operation of the
11  group; right?
12  A. Yes.
13  Q. So why didn't you hire a replacement?
14  A. We found other ways to get it done. We had
15  vendors. We had some internal Ph.D.s. We brought in
16  Gerry McDonough who had a very solid background.
17  Business needs sometimes shift.
18  Q. And the perception that you no longer needed
19  somebody in Mr. Kincaid's position was a perception
20  that you had no inkling of prior to Mr. Kincaid's
21  termination?
22  A. I'm sorry. Break it down for me. I
23  understand it, but I don't want to answer unless I
24  really got it.
25  Q. Ultimately you came to the conclusion that

Miller Reporting Services
(704) 543-7103

PAGE 124

Kotopoulos                                                      124

1   you no longer needed somebody in Mr. Kincaid's
2   position; right?
3   A. I don't agree with that. We found other ways
4   to get done what Steve was doing but in a much
5   superior way without the underperformance.
6   Q. And --
7   A. We have lots of smart people.
8   Q. So what you found was that you could get the
9   work of this group -- the work that had been done by
10  four employees, you could have it done by three
11  employees; right?
12  A. No, because we brought in -- we brought Leroy
13  over, we brought Gerry in, we worked more with the
14  vendor or vendors.
15  Q. Well, Mr. Kotopoulos, prior to the time that
16  Mr. Kincaid was terminated there were four people in
17  this group; there was Sheila Burroughs --
18  A. I know the names.
19  Q. -- Allison Hart, Susan Haloulos, and there
20  was Steve Kincaid?
21  A. Correct.
22  Q. After Mr. Kincaid was terminated there were
23  only three people in that group; correct?
24  A. Right after, yes.
25  Q. And it continued that way; right?

Miller Reporting Services
(704) 543-7103

PAGE 125

Kotopoulos                                                      125

1    A.   No. Gerry brought some people over too.
2  Gerry brought over -- oh, God, I forget the
3  gentleman's name. He brought in a Ph.D. stats guy.
4  Was it -- this is terrible, I cannot remember the
5  gentleman's name. He brought in an individual.
6    Q.   And when did he do that?
7    A.   I don't know. I don't remember.
8    Q.   What's this Ph.D. stats guy's name?
9    A.   That's what I can't remember, I apologize.
10 I'm not purposefully forgetting. I just don't
11 remember.
12   Q.   By the way, that's what you considered
13 Mr. Kincaid to be, a Ph.D. stats guy; right?
14   A.   I did not know about Steve's -- I didn't even
15 know what Steve had a Ph.D. in. I did not hire Steve.
16   Q.   Well, you referred to this guy that Gerry
17 brought in as a Ph.D. stats guy; right?
18   A.   Yeah.
19   Q.   When you said that, did you have in mind that
20 that Ph.D. stats guy was comparable to what
21 Mr. Kincaid was?
22   A.   Yes.
23   Q.   Okay. And you say that you don't know the
24 name of this Ph.D. stats guy?
25   A.   I can't remember.

Miller Reporting Services
(704) 543-7103

PAGE 126

Kotopoulos                                                      126

1    Q.   If somebody at the bank were going to try to
2  find out the name of that Ph.D. stats guy, what would
3  they do?
4    A.   Call Gerry McDonough.
5    Q.   And what's Gerry McDonough's position?
6    A.   He's -- I don't know exactly what his
7  position is right now, but he's involved in customer
8  satisfaction and loyalty, measurement.
9    Q.   How old is Gerry McDonough?
10   A.   Well in his forties.
11   Q.   How old is this new Ph.D. stats guy?
12   A.   Probably in his fifties. Well in his
13 fifties, mid fifties, I think.
14   Q.   Are you guessing or do you know that?
15   A.   Well, he's got grown kids, so I'm guessing
16 intelligently and he looks the part.
17   Q.   Okay. You were last at the bank how long
18 ago?
19   A.   February.
20   Q.   February of?
21   A.   What are we in now? '05. So '04.
22   Q.   So when is the last time that you saw this
23 Ph.D. stats guy?
24   A.   It would have been, you know, December,
25 January of that period.

Miller Reporting Services
(704) 543-7103

PAGE 127

Kotopoulos                                                      127

1    Q.   December, January of 2003 -- December 2003,
2  January 2004?
3    A.   Right.
4    Q.   And on how many occasions did you see that
5  person?
6    A.   I saw him a fair amount because Gerry -- he
7  and I were working together on some important stuff.
8    Q.   And what was the important stuff that you
9  were working on with this person?
10   A.   Gerry was working heavily on drivers of
11 satisfaction and loyalty, models to try to predict the
12 stuff.
13   Q.   And what was the Ph.D. stats guy working on?
14   A.   Well, he was the modeler, if you will, the
15 person doing the pure analytics and building the
16 models. Gerry was more the strategist and the direct
17 face-to-face with the internal clients.
18   Q.   You were let go in February of 2004?
19   A.   Correct. Yeah.
20   Q.   Was anybody in Gerry McDonough's group let go
21 at the same time?
22   A.   Not that I know of, no.
23   Q.   Do you know who's in that group today?
24   A.   Well, the group has been taken out of CAMR
25 and put into the six sigma world. That's all I know.

Miller Reporting Services
(704) 543-7103

PAGE 128

Kotopoulos                                                      128

1    Q.   When was that done?
2    A.   I have no idea.
3    Q.   How do you know that it was done?
4    A.   Because I hear from people all the time here
5  and there.
6    Q.   From people still at the bank?
7    A.   Sure.
8    Q.   Can you name any of the people who told you
9  that?
10   A.   No.
11   Q.   Now, earlier you testified that initially you
12 made two telephone calls to try to find a replacement
13 for Mr. Kincaid; right?
14   A.   Yes.
15   Q.   And you testified that you stopped doing that
16 because you made a determination that it was not
17 necessary to fill his position; right?
18   A.   Yes.
19   Q.   Okay. And later on at some point, you don't
20 know when, Gerry McDonough made a different decision?
21   A.   Different decision meaning?
22   Q.   He decided that it would be good to fill that
23 position?
24   A.   Yes.
25   Q.   Did he discuss that with you?

Miller Reporting Services
(704) 543-7103

PAGE 153 SHEET 20

Kotopoulos                                                    153

1  complaint is going to do nobody any good; right?
2       A.   I would say yes.
3       Q.   If you would look at Exhibit 9 under
4  leadership, if you look at the first bullet point, it
5  says, "Needs to identify improvement opportunities and
6  proactively show initiative to figure out how to get
7  them done." And then there's a sub bullet point
8  referencing "Hoshin" goals; do you see that?
9       A.   I do.
10      Q.   Does that strike you as being a clear and
11 easily understandable criticism of an employee's
12 performance?
13      A.   Yes. If you understand Hoshin metrics.
14      Q.   Let's look at -- where are the Hoshin --
15      A.   On Exhibit 8.
16      Q.   And there are -- it's on this page with the
17 2003 customer satisfaction?
18      A.   You got it.
19      Q.   Okay. Now, has your performance -- has your
20 job performance ever been criticized?
21      A.   Has my job performance ever been criticized?
22      Q.   Yes.
23      A.   No. I'm sorry, in a negative fashion?
24      Q.   Has anybody at work ever made suggestions to
25 you about how you could perform better?

Miller Reporting Services
(704) 543-7103

PAGE 154

Kotopoulos                                                    154

1       A.   Oh, sure.
2       Q.   And when somebody makes a suggestion as to
3  how you should perform better, in your experience is
4  it more helpful to get that information in general
5  terms or in specific terms?
6       A.   Specific.
7       Q.   Does Exhibit 9 meet the criteria of being
8  specific?
9       A.   Yes. I mean, two things. Exhibit 9 was not
10 a standalone, there was also verbal feedback from
11 Sheila to Steve very directly, that's qualitative
12 feedback, and that had a strong bases.
13      Q.   Was there some practice at Bank of America
14 that prohibited supervisors from putting specifics in
15 these written things?
16      A.   No.
17      Q.   Does it strike you as being the least bit
18 strange that there is not mention of a single person
19 by name in any of these documents?
20      A.   It's different a bit.
21      Q.   Well, in other words, one of the things that
22 you've been testifying to today is that Mr. Kincaid
23 had problems with certain clients?
24      A.   (Witness nodded head.)
25      Q.   Is there a single client identified by name

Miller Reporting Services
(704) 543-7103

PAGE 155

Kotopoulos                                                    155

1  in any of these documents?
2       A.   By name, no. I'm sure Sheila would have
3  mentioned in person to Steve there are issues with an
4  area and/or the people associated with those areas.
5       Q.   My question to you is: Was it a practice at
6  Bank of America to keep out of the written documents
7  any specifics?
8       A.   Not that I know, no. I don't think that was
9  a practice at all.
10      Q.   Right. And the written document, I mean can
11 we agree that the more specific a written document is,
12 the more valuable and useful it is; right?
13      A.   Generally speaking, yes.
14      Q.   Are either of these documents meet any
15 criteria of specificity?
16      A.   In my mind they do, yes.
17      Q.   Is there a single name of a client?
18      A.   I haven't studied it. Probably not.
19      Q.   What I'd like you to do, Mr. Kotopoulos, is
20 I'd like you to take a few moments to read through
21 these documents for the purpose of determining whether
22 there is a reference to a single individual by name, a
23 single client by name, a single project by name, a
24 single meeting by name, a single thing specifically
25 that Mr. Kincaid didn't do that he should have done.

Miller Reporting Services
(704) 543-7103

PAGE 156

Kotopoulos                                                    156

1            MR. KANE: Object to the form.
2            BY MR. FINE:
3       Q.   Do you understand --
4            MR. KANE: Do you want to take one of those
5  at a time?
6            BY MR. FINE:
7       Q.   Well, Mr. Kotopoulos, do you have any trouble
8  understanding my question?
9       A.   I understand your question.
10      Q.   Okay.
11           (Witness reviewed documents.)
12           MR. KANE: Are those copies he can mark on?
13           MR. FINE: Sure. Yes.
14           (Witness reviewed documents.)
15           THE WITNESS: Okay. The first -- you had
16 four pieces to your question, right? One was specific
17 names, no.
18           BY MR. FINE:
19      Q.   Is that a defect?
20      A.   No.
21      Q.   Wouldn't this have been more useful if
22 Ms. Burroughs had named names?
23      A.   Ms. Burroughs most likely named names in
24 person to Steve during the performance review session
25 and also named names by naming groups of areas of the

Miller Reporting Services
(704) 543-7103

PAGE 157

Kotopoulos                                                  157

1  bank.
2      Q.  I'd like you, if you could, to focus on my
3  question and answer it if you can. If you can't
4  answer it, tell me you can't answer it.
5          My question to you is: Wouldn't this have
6  been more useful, these two documents, if they had
7  named names?
8      A.  Yes.
9      Q.  And the fact that they don't name names is a
10 defect; right?
11     A.  I'm not to judge that. I'm not an HR person.
12 You're out of my league.
13     Q.  You're Ms. Burroughs' supervisor; right?
14     A.  Correct.
15     Q.  You were the person who reviewed these
16 things; right?
17     A.  Yes.
18     Q.  If you're not going to tell Ms. Burroughs
19 these things are too general, you've got to be more
20 specific, who's going to tell her that?
21     A.  This is the bank's format.
22     Q.  What I'm asking you is: Was there some rule
23 at the bank that prohibited supervisors from naming
24 names in these kinds of reports?
25     A.  No, not that I personally know of.

Miller Reporting Services
(704) 543-7103

PAGE 158

Kotopoulos                                                  158

1      Q.  And your view as you sit here today is that
2  these forms would have been more useful if
3  Ms. Burroughs had named names; right?
4      A.  Yes, that's fair.
5      Q.  Please continue. What other specifics do you
6  see or not see?
7      A.  I see references to, you know, particular
8  areas. Franchise -- 1.1, "provide accurate inside
9  analysis of franchise-wide data," that would be
10 touching many constituencies within the bank.
11     Q.  But that's just a goal; right? That's not a
12 reflection on Mr. Kincaid's performance, is it?
13     A.  Well, she says in 1.1 to the right, "has not
14 yet provided analysis across studies."
15     Q.  Let's take a look at that. "Has not yet
16 provided analysis across studies."
17     A.  Right. Then she says later on here in the
18 performance review, "needs to identify improvement
19 opportunities and proactively show initiative to
20 figure out how to get them done in reference Hoshin
21 goals 1.1," and so on.
22     Q.  Okay.
23     A.  "After seven months still unable to
24 determine, you know, who in the organization to
25 involve various projects, activities, should be

Miller Reporting Services
(704) 543-7103

PAGE 159

Kotopoulos                                                  159

1  linking loyalty project to valuation work." That all
2  ties back to this.
3      Q.  Let's go back to the 1.1 under Q1, 2003
4  results where Ms. Burroughs has written, "has not yet
5  provided analysis across studies."
6      A.  Yes.
7      Q.  Does she identify the studies?
8      A.  I don't think she does on the paper. No, not
9  on this paper. But there would have been -- Sheila
10 would have communicated what those studies were,
11 believe me, and Steve would have known because the
12 clients would be involved in those too.
13     Q.  You weren't at the session between
14 Ms. Burroughs and Mr. Kincaid where Ms. Burroughs
15 discussed this review with Mr. Kincaid, were you?
16     A.  No.
17     Q.  So you are saying what Ms. Burroughs
18 discussed with Steve Kincaid is just speculation,
19 right? You have no idea what she actually said? You
20 weren't there.
21     A.  You can ask her. Feel free.
22     Q.  Yes, but you don't know, do you?
23     A.  I don't, no.
24     Q.  Okay. Now, what you do know is what she
25 provided to Mr. Kincaid in writing?

Miller Reporting Services
(704) 543-7103

PAGE 160

Kotopoulos                                                  160

1      A.  Yes.
2      Q.  That's in front of you right now; right?
3      A.  Yes.
4      Q.  And what you do know is she has the statement
5  "has not yet provided analysis across studies," and
6  she doesn't identify the studies, does she?
7      A.  Not on this piece of paper, no.
8      Q.  Would this document have been more useful if
9  she had identified the studies?
10     A.  I can give you a yes/no answer, but --
11     Q.  Please do.
12     A.  I think there's more to it than that because
13 there might have other documentation.
14     Q.  Mr. Kotopoulos, with all due respect, I don't
15 think I'm asking an extremely difficult question here.
16 I'm asking you what I am trying to make a very
17 straightforward question. Would this document have
18 been more useful if it identified the studies
19 specifically?
20     A.  Yes.
21     Q.  Okay. What other specifics do you find or
22 not find in these documents?
23     A.  Well, just that there's lots of reference to
24 groups and/or areas within the bank that Steve would
25 have had significant interaction with and had

Miller Reporting Services
(704) 543-7103

PAGE 161 SHEET 21

Kotopoulos 161

1 significant responsibility from a service delivery
2 standpoint to impact in a positive way.
3  Q. I want you to find for me the most specific
4 reference to that kind of thing that you see in these
5 documents?
6  A. Well, you know, new banking center initiative
7 measure.
8  Q. Where are you?
9  A. 2.1.
10  Q. On which document?
11  A. 8. Yeah, 8.
12  Q. 2.1.
13  A. New banking center initiative.
14  Q. We're in the Q1 2003 results column?
15  A. Right.
16  Q. 2.1, I see accomplished in 2002. Oh, I see
17 in the metric?
18  A. Right.
19  Q. New BC incentive measure in place; right?
20  A. That's the metric. That doesn't mean that it
21 was necessarily achieved.
22  Q. Well, what it says in Q1 2003 results is
23 accomplished in 2002?
24  A. Oh, I see. I missed it.
25  Q. So the one place that you identified so far

PAGE 162

Kotopoulos 162

1 where she's specific is she's praising Mr. Kincaid,
2 this is something that you did that was good; right?
3  A. Yeah, she said it got done.
4  Q. I want you to find for me the most specific
5 thing that you can find where she's criticizing
6 Mr. Kincaid's performance?
7  A. On the first page and the second page. All
8 of these does not meet expectations. There's three,
9 four, five of them.
10  Q. Let's start with number 1 on the first page;
11 okay?
12  A. Uh-huh.
13  Q. It says, "business goal;" right?
14  A. Yes.
15  Q. "Provide integrated view of customer
16 satisfaction loyalty for the franchise." That wasn't
17 something that Ms. Burroughs drafted for this? That
18 was a Hoshin goal; right?
19  A. Yeah, it is a Hoshin goal.
20  Q. So this wasn't something specific she drafted
21 for this document, this goal was something already in
22 existence?
23  A. Right, but as part of the person's
24 performance you look at the Hoshin goal relative to
25 their individual performance against that criteria.

PAGE 163

Kotopoulos 163

1  Q. And how does she say that Mr. Kincaid did not
2 meet expectations with regard to that business goal?
3  A. On this document I don't think she does.
4  Q. No, she doesn't. She doesn't provide any
5 specifics; right?
6  A. Uh-huh.
7  Q. Would this document have been more useful if
8 she had provided specifics?
9  A. Yes.
10  Q. Mr. Kotopoulos, do you see my point here yet?
11  A. I get your point.
12  Q. These documents are nonspecific; right?
13  A. I think that's fair.
14  Q. And nonspecific documents are not as helpful
15 as specific documents, are they?
16  A. Correct.
17  Q. And one of the problems with nonspecific
18 documents is that it's very difficult for an employee
19 to demonstrate that, in fact, he has improved his
20 performance in accordance with the recommendations and
21 advice that he's gotten because he can't say, look,
22 you said here that I should do this and I did this;
23 right?
24  A. Yes.
25  Q. And you can't do that with documents that are

PAGE 164

Kotopoulos 164

1 as unspecific as these documents, can you?
2  A. I think it's difficult, but I think that
3 there are other factors that go into determining.
4  Q. Right. And among the factors were what
5 Ms. Burroughs actually said to Mr. Kincaid when she
6 met with him; right?
7  A. What Ms. Burroughs would have said to
8 Mr. Kincaid on many, many, many, many, many noon --
9 many occasions, I'm sorry, in meeting with him, what
10 clients were telling Ms. Burroughs on many occasions,
11 which was not positive, on what internal feedback we
12 had at the senior leadership level, on what feedback
13 came through the talent planning session that we had.
14 I'm trying to think if there's anything else. That's
15 a lot.
16  Q. All of those things are inputs. Well, first
17 of all, when you decided that the termination of
18 Mr. Kincaid was a possibility, one of the things that
19 you also decided was that Mr. Kincaid must be given an
20 opportunity and a fair opportunity to bring his
21 performance into compliance so that he is not
22 terminated; right?
23  A. Yes.
24  Q. And a nonspecific document is not helpful in
25 giving Mr. Kincaid a fair opportunity to bring his

DEPOSITION OF ALEX KOTOPOULOS

PAGE 165

Kotopoulos 165

1  performance into compliance with expectations, is it?
2     A.  Again, to me, there's a pie here. This is a
3  piece of the pie.
4     Q.  I understand that. I am just asking you --
5     A.  It doesn't make it as easy. Let's put it
6  that way.
7     Q.  I'm asking you about a piece of the pie, but
8  I want your candid assessment in retrospect of this
9  piece of the pie. And I'm asking you: Was this piece
10 of the pie helpful in the process of giving
11 Mr. Kincaid a fair opportunity to bring his
12 performance into compliance with expectations?
13        MR. KANE: Helpful to who?
14        THE WITNESS: Sorry.
15        MR. KANE: Objection to form. Helpful to
16 whom, Mr. Kincaid or Mr. Kotopoulos?
17        BY MR. FINE:
18    Q.  Was it helpful -- well, let me back up this
19 way.
20    A.  Yeah.
21    Q.  Is it not true that among the problems that
22 you have with a nonspecific document like this is it
23 makes it more difficult for the employee to know
24 precisely what he's expected to do and for the
25 employee to document that he has indeed made progress

Miller Reporting Services
(704) 543-7103

PAGE 166

Kotopoulos 166

1  regarding the advice that he's been given; isn't that
2  fair?
3     A.  You don't want to hear a run-on response.
4     Q.  No, I want --
5        MR. KANE: He wants as to that piece.
6        MR. FINE: Yes.
7        THE WITNESS: As to that piece, your point is
8  valid.
9        BY MR. FINE:
10    Q.  And isn't another problem with a nonspecific
11 document that when you are trying to evaluate --
12    A.  Yes.
13    Q.  -- whether Mr. Kincaid is making progress, it
14 makes it more difficult for you to perform that
15 evaluation fairly?
16    A.  Specific to this, yes.
17    Q.  So when Ms. Burroughs came to you and said,
18 as you testified earlier, "it seems like Mr. Kincaid
19 has given up," if she had had a specific document, you
20 would have been able to say, well, has Mr. Kincaid
21 done this, has Mr. Kincaid done that; right?
22    A.  Well, this was -- Exhibit 9 was the specific
23 document that allowed us to determine progress against
24 these goals.
25    Q.  Yes. But you've already acknowledged there

Miller Reporting Services
(704) 543-7103

PAGE 167

Kotopoulos 167

1  are no names in that document, are there?
2     A.  No, there are no names. But you don't need
3  names. What you need is the projects and progress
4  against these goals and projects because they're all
5  attached to names.
6     Q.  Mr. Kotopoulos, do you consider yourself to
7  be a fairly straightforward person?
8     A.  Absolutely.
9     Q.  Applying your most candid straightforward
10 assessment of these documents, can you agree with me
11 that these documents were not very good in giving
12 Mr. Kincaid specific guidance?
13        MR. KANE: Object to the form. How can he
14 testify as to what Mr. Kincaid concluded from these
15 documents? And that's what you're asking, did he
16 understand. He doesn't know if he understood or not.
17        MR. FINE: No.
18        MR. KANE: I don't understand the question.
19        MR. FINE: What I'm asking Mr. Kotopoulos is
20 Mr. Kotopoulos was in a situation where Ms. Burroughs,
21 a report of his, was giving an evaluation to
22 Mr. Kincaid. Mr. Kotopoulos and Ms. Burroughs had
23 discussed the possibility of Mr. Kincaid being
24 terminated, and Ms. Burroughs and Mr. Kotopoulos had
25 also spoken of the fact that in fairness Mr. Kincaid

Miller Reporting Services
(704) 543-7103

PAGE 168

Kotopoulos 168

1  must be given a fair opportunity to turn his
2  performance around.
3        Therefore, Mr. Kotopoulos was put in the
4  position where he, as a responsible supervisor, had to
5  be able to evaluate whether Mr. Kincaid was actually
6  doing that. And when the documents are as unspecific
7  as these documents are, that makes Mr. Kotopoulos's
8  job in that respect more difficult, doesn't it?
9        Can you answer that question?
10       THE WITNESS: With Exhibit 8, I completely
11 agree with you. Exhibit 9, I disagree with you
12 respectfully.
13       BY MR. FINE:
14    Q.  With regard to Exhibit 8, we can agree that
15 this is not a very helpful document; right?
16    A.  It's not as direct -- we agree it's not as
17 direct as it should be.
18    Q.  Now, with regard to Exhibit 9, tell me what's
19 so specific about Exhibit 9, please.
20    A.  Again this is the roadmap. It's saying
21 Steve, Sally, Sam, whomever, you've got to get these
22 Hoshin goals done, you've got to show proactivity
23 against them and improvement against them, you've been
24 unable to appropriately determine who within the
25 organization to involve in these project activities,

Miller Reporting Services
(704) 543-7103

DEPOSITION OF ALEX KOTOPOULOS

PAGE 169 SHEET 22

Kotopoulos                                                      169

1   which is not a good thing, especially at a vice
2   president level with a certain amount of experience in
3   the seat there. You're not linking the loyalty work
4   to the valuation work, I mean that's damn specific.
5       Q.  Okay.
6       A.  Has not shown ability to lead.
7       Q.  Let's focus on the thing that you just
8   identified as being, what, "damn specific," is that
9   what you said?
10      A.  Pardon my --
11      Q.  No, that's fine. What I want is some candor
12  and some directness, and you have identified something
13  in this Exhibit 9 that you characterize as being damn
14  specific. I want to know exactly what you say is damn
15  specific here.
16      A.  Should be linking loyalty project to
17  valuation work. If I'm the employee looking at that,
18  it's saying I haven't done it.
19      Q.  Now, you say that this bullet point, "should
20  be linking loyalty project to valuation work" is damn
21  specific?
22      A.  Yes.
23      Q.  You're sticking by that, huh?
24      A.  To me it's specific. It's talking about a
25  particular project and what you haven't been able to

Miller Reporting Services
(704) 543-7103

PAGE 170

Kotopoulos                                                      170

1   do.
2       Q.  Does this bullet point give Mr. Kincaid any
3   specific guidance as to how to link the loyalty
4   project to the valuation work?
5       A.  I'm reading.
6           (Witness reviewed document.)
7           No.
8       Q.  So would you agree with me that your
9   statement that this was damn specific was a little bit
10  of an overstatement?
11      A.  No, I will not agree with you, with all due
12  respect.
13      Q.  What was the loyalty project?
14      A.  It's basically trying to understand what
15  makes -- and this is very basic -- trying to
16  understand what makes customers loyal to the bank such
17  that they'll increase wallet share, that they'll stay
18  with the bank, they won't attrite or leave.
19      Q.  I understand that's the loyalty project.
20  What was the valuation work?
21      A.  Valuation work was a little bit more
22  complicated. That's trying to understand the value of
23  a particular relationship or relationships in a
24  household. So what does this particular cohort, if
25  you will, or individual household look like, okay,

Miller Reporting Services
(704) 543-7103

PAGE 171

Kotopoulos                                                      171

1   from a profitability standpoint, okay, from a
2   particular lifetime profitability and value to the
3   organization of the bank.
4       Q.  Okay. All right. Now, she identifies the
5   loyalty project and she identifies the valuation work;
6   right?
7       A.  Correct.
8       Q.  And Mr. Kincaid would have known what she was
9   referring to; right?
10      A.  Absolutely.
11      Q.  But what's not clear and what's not specified
12  is what Ms. Burroughs has in mind when she says that
13  Mr. Kincaid should be linking those two things; right?
14      A.  Yes.
15      Q.  Do you understand what she means here when
16  she says that Mr. Kincaid should be linking the
17  loyalty project to the valuation work?
18      A.  Yes.
19      Q.  Tell me the specific things that Mr. Kincaid
20  had not done that he should be doing to link those two
21  things?
22      A.  The first and foremost issue should have been
23  that Steve was working with the key constituents
24  within the bank to put together a strategy for how we
25  can link these two very important parts of our job, if

Miller Reporting Services
(704) 543-7103

PAGE 172

Kotopoulos                                                      172

1   you will.
2       Q.  And you knew that he was working on that?
3       A.  He was on a community of practice. He was
4   also working on lots of satisfaction stuff.
5       Q.  So he was working on linking those two
6   things; right?
7       A.  Yes. He should have been working on linking
8   those things, yes.
9       Q.  And so what does this tell Mr. Kincaid about
10  what he was doing that was not optimal?
11      A.  This doesn't get that specific.
12      Q.  No, it doesn't, does it? In fact, it's not
13  specific at all. You know the difference between
14  difference and not specific, don't you?
15      A.  Yes.
16      Q.  This is not specific, is it?
17      A.  It's not specific.
18      Q.  Right. And this is what you described as the
19  most damn specific thing in this memo; right?
20      A.  No, I don't think I said the most. I think I
21  said damn specific.
22      Q.  And it turns out, doesn't it, Mr. Kotopoulos,
23  that when you look at it a little closer, the thing
24  that struck you initially as being dam specific is not
25  really specific at all?

Miller Reporting Services
(704) 543-7103

PAGE 173

Kotopoulos                                                      173

1    A.   Again it comes down to the point of the pie
2  to me.
3    Q.   I'm just asking you about --
4    A.   Because there are so many other factors.
5    Q.   I'm just asking you about --
6    A.   As to the piece of pie, yes.
7    Q.   We can take this Exhibit 8 and we can take
8  this Exhibit 9 and we can put them both in the
9  wastepaper basket because neither of them is going to
10 be very helpful here, is it?
11   A.   In the one slice of the pie, sure, I agree
12 with you. But there are seven-eighths to the rest of
13 the pie that go into these things.
14   Q.   And one of the problems here by virtue of the
15 fact that those two documents are so unspecific --
16   A.   Yes.
17   Q.   -- is when the jury in this case is trying to
18 figure out whether all those reasons were just
19 manufactured by Ms. Burroughs as a way of justifying
20 this determination, the jury is not going to be able
21 to get much help from those documents itself, is it?
22   A.   If they were standalone documents and there
23 weren't a lot of pieces of information that came into
24 the picture, probably not.
25   Q.   Right. And Ms. Burroughs was probably smart

Miller Reporting Services
(704) 543-7103

PAGE 174

Kotopoulos                                                      174

1  enough to understand that; right?
2         MR. KANE:  Objection.
3         THE WITNESS:  I don't know.
4         MR. KANE:  Speculation.
5         BY MR. FINE:
6    Q.   In other words, Mr. Kotopoulos, if
7  Ms. Burroughs had known that she really didn't have a
8  valid basis for terminating Mr. Kincaid, that's
9  exactly the kind of documents she would have tried to
10 write, isn't it?
11   A.   I have absolutely no idea. You're asking me
12 to guess and speculate, make things up that I don't
13 know.
14        MR. FINE:  I'd like to take a brief break.
15 I'm close to the end.
16     (Recess taken from 1:41 p.m. until 1:50 p.m.)
17        MR. FINE:  I have no further questions.
18        MR. KANE:  I have no questions.
19        (Whereupon, the taking of the deposition was
20 concluded at 1:50 p.m.)
21
22
23
24
25

Miller Reporting Services
(704) 543-7103

PAGE 175

Kotopoulos                                                      175

1      I have read the foregoing pages, 1 through 175
2  inclusive, and find that they contain a correct
3  transcription of the answers made by me to the
4  questions therein recorded, with the exception of
5  corrections as listed on a separate sheet of paper and
6  incorporated into this record.
7         This the          day of            , 2005.
8
9
10
11
12                             ALEC KOTOPOULOS
13
14
15
16
17
18
19
20
21
22
23
24
25  CAT

Miller Reporting Services
(704) 543-7103

PAGE 176

Kotopoulos                                                      176

1                       ERRATA SHEET
2
3  Please read your deposition carefully. Do not mark
4  or write on the deposition itself. List any
5  corrections you may have by page and line number on
6  this sheet and return to Miller Reporting Services,
7  P.O. Box 471222, Charlotte, NC 28247 within 30 days.
8
9  PAGE NO.    LINE NO.       CORRECTIONS
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Miller Reporting Services
(704) 543-7103

DEPOSITION OF ALEX KOTOPOULOS

PAGE 177 SHEET 23

Kotopoulos                                    177

1  STATE OF NORTH CAROLINA        C E R T I F I C A T E
2  COUNTY OF UNION
3
4
5       I, CHRISTINE A. TAYLOR, do hereby certify that
6  ALEC KOTOPOULOS was duly sworn by me prior to the taking
7  of the foregoing deposition; and that said deposition was
8  taken and transcribed under my supervision and direction;
9  and the foregoing 177 pages constitute a true and
10 accurate transcript of the testimony of the testimony of
11 the said witness.
12      I do further certify that the parties were
13 present as stated in the caption.
14      I do further certify that I am not of counsel
15 for or in the employment of either of the parties to this
16 action, nor am I interested in the results of
17 said action.
18      IN WITNESS WHEREOF, I have hereunto subscribed
19 my name this the 16th day of June, 2005.
20
21
22
23              CHRISTINE A. TAYLOR
                Notary Public
24
25 My Commission expires: March 24, 2009.

            Miller Reporting Services
                (704) 543-7103