UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STEVEN R. KINCAID,<br><br>Plaintiff,<br><br><br>BANK OF AMERICA<br>CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-11522-WGY |

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
PRODUCTION OF DOCUMENTS EVIDENCING THE FACTUAL BASIS AND
REASONS FOR DEFENDANT'S DECISION TO ASK ALEC KOTOPOULOS TO RESIGN

David J. Fine, BBO # 165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA  02108
(617) 720-2941

Attorney for Plaintiff

## Table of Contents

Discovery Conference ................    1

Nature of the Case and Statement of Facts    1

Facts Relevant to Discovery Matters to be Decided ..................    1

Argument    ......................... 2


I.    The Bank Should be Compelled to Produce the Erin
McCarthy Memorandum and all Documents Evidencing
the Factual Basis and Reasons for the Bank's Decision
to Ask Alec Kotopoulos to Resign. ...................................    2

    A.    Document Request and Response Raising Issue ...............    2

    B.    Mr. Kincaid's Position ....    .......... 2

        Mr. Kincaid is Entitled to Production of the
Documents He Seeks ..........................    2

        2.    The Bank's Procedural Objections to Mr.
Kincaid's Document Request Are Meritless .........    8

## Discovery Conference

The parties held a discovery conference by telephone on December 22, 2005 at approximately 9:30 a.m.  The conference lasted about 20 minutes.  Mr. Kincaid was represented by undersigned counsel, David J. Fine.  The Bank was represented by Siobhan M. Sweeney of Edwards Angell Palmer & Dodge.  The parties were unable to reach agreement on any issue.  The issues to be decided by the Court are described in this Memorandum.

## Nature of the Case and Statement of Facts

Mr. Kincaid incorporates herein by reference the "Nature of the Case" and "Statement of Facts" sections from Mr. Kincaid's August 11, 2005 Memorandum in support of his first Motion to Compel Discovery.  Mr. Kincaid also incorporates herein by reference the discussion of the facts of this case contained in his November 28, 2005 Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## Facts Relevant to Discovery Matters to be Decided

These facts are set out in the argument sections of this Memorandum below

---

<u>Argument</u>

I.    THE BANK SHOULD BE COMPELLED TO PRODUCE THE
ERIN MCCARTHY MEMORANDUM AND ALL
DOCUMENTS EVIDENCING THE FACTUAL BASIS AND
REASONS FOR THE BANK'S DECISION TO ASK ALEC
<u>KOTOPOULOS TO RESIGN.</u>

A.    <u>Document Request and Response Raising Issue</u>

<u>Mr. Kincaid's Third Request for Production of Documents, Item 1 (the sole item)</u>

1.    In the second session of his deposition, on October 17, 2005, Alec Kotopoulos
testified at some length about a detailed memorandum Erin McCarthy had written about alleged
gender discrimination and other alleged misconduct by Vipin Mayar, John Kuntz, and Alec
Kotopoulos.  Mr. Kotopoulos also testified about the role he believed Erin McCarthy's
complaints about the CAMR department had played in defendant's decision to ask Mr.
Kotopoulos to resign.  Plaintiff requests that defendant produce:

a.    the memorandum written by Erin McCarthy described by Mr. Kotopoulos;
and
b.    any and all documents that evidence, discuss, describe, mention or refer
to:  (i) defendant's decision to ask Alec Kotopoulos to resign; (ii) the factual basis for that
decision; or (iii) the reasons for that decision.

<u>Bank's Response</u>

Defendant objects to this request, including each of its sub-parts, on the grounds that it is
overly broad, not reasonably calculated to lead to the discovery or admissible or relevant
evidence in this matter, is beyond the scope and limits of discovery permitted under the Federal
Rules of Civil Procedure and the Local Rules of the District of Massachusetts, including without
limitation Fed.R.Civ.P. 26(b) and Local Rule 26.1(A) and (C), is beyond the scope of discovery
permitted under the scheduling order, as the time for response under Fed.R.Civ.P. 34 is beyond
the close of discovery in this case (October 28, 2005) and such request was served without leave
of court and/or stipulation of the parties.

B.    <u>Mr. Kincaid's Position</u>

1    <u>Mr. Kincaid is Entitled to Production of the Documents He Seeks</u>

As demonstrated in section I.B.4.c. of Plaintiff's Memorandum in Opposition to

Defendant's Motion for Summary Judgment (at pages 15-17), which section is incorporated

herein by reference, Alec Kotopoulos was the Bank executive who made the decision to fire Mr

2

Kincaid. Consequently, Mr. Kotopoulos's own performance at the Bank, complaints about Mr. Kotopoulos' conduct toward his subordinates, biases that may affect Mr. Kotopoulos' testimony at trial, and other facts that might bear on Mr. Kotopoulos' credibility, are all highly pertinent to this case. Given this, the Bank should plainly be compelled to produce the documents Mr. Kincaid is seeking. The value and significance of these documents, and Mr. Kincaid's right to have them produced, become especially clear in light of Mr. Kotopoulos' testimony at the two sessions of his deposition regarding the circumstances of his leaving the Bank

When Mr. Kotopoulos was asked, at the first session of his deposition, on June 2, 2005, about the circumstances of his leaving the Bank, he testified as follows:

> Q.    When did you leave the bank in 2004?
> A.    February.
> Q.    What were the circumstances of your leaving?
> A.    Merger.
> Q.    Who merged with whom?
> A.    Fleet with Bank of America. Bank of America bought Fleet.
> Q.    And at the time of the merger various people at Bank of America were let go?
> A.    That's my understanding.
> Q.    Did you receive a severance package?
> A.    I received a package. I was offered a package and accepted the package.
> Q.    What were the terms of the package?
> A.    That's private between the bank and I.
> Q.    Well --
> A.    There were monetary, if that's what you're asking.
> Q.    Well, you're being called to testify as a witness in this case and the financial terms would be potentially relevant to your bias in the case, so I think that it is a fair subject of examination.
> MR. KANE:  Bias to?
> MR. FINE:    How he feels about the bank. If he got a good severance package, he might be more inclined to testify in the bank's favor.
> MR. KANE:  What details do you want from him? I want to know how far you're going with it.

3

MR. FINE:    I want to know what the elements of the severance package were. If the bank is giving Mr. Kotopoulos two years salary, I want to know that, and I want to know what the salary was. And if in addition to that they're giving him other consideration, I want to know that. And if he has an agreement to consult with the bank, I want to know that.

MR. KANE:   Okay. At this point it's your decision, but I don't see any harm in it.

THE WITNESS:    Well, financially, I was offered -- it was something over $100,000. I think it was a hundred -- I don't remember exactly. Call it $125,000, somewhere around that.

BY MR. FINE:

Q.    How did that compare with your yearly salary at the time?

A.    I think my annual salary was $175,000 base salary.

Q.    And in addition to the $125,000, were there any other elements of the severance package?

A.    I was able to cash out of some options, you know, they had many hadn't vested yet because nominal amount of money maybe $18,000 and a few months I believe of health insurance, and then of course the standard COBRA type stuff.

Q.    Did you enter into any kind of consulting agreement with the bank?

A.    No. No.

6/2/05 Kotopoulos Dep. 4-6, reproduced in Exhibit 1 to this Memorandum.

When Mr. Kotopoulos was questioned at the second session of his deposition, on October 17, 2005, about the circumstances of his leaving the Bank, in light of the General Release and Separation Agreement he had entered into with the Bank (a document the Bank produced after the first session of Mr. Kotopoulos' deposition), Mr. Kotopoulos testified very differently

Q.    Okay. All right. Now, turning to the first page of this document, Bank of America 919 --

A.    Yes.

Q.    -- okay, the first numbered paragraph says, and let me quote it for the record and then I have some questions.

"In consideration of the promises I have made herein, I voluntarily tender and Bank hereby accepts the

4

mutual consent resignation of my employment effective February 5 2004;" do you see that?

A.    I do.

Q.    Okay.  How did it come about that you resigned your employment with the bank?

A.    I'm not sure I understand the question.

Q.    Okay.  Let me break it down.  Were you asked to resign?

A.    Yes.

Q.    Okay.  Who asked you to resign?

A.    Mr. Marino.

Q.    And what position did Mr. Marino have at the

A.    Human Resources

\*       \*

Q.    What did Mr. Marino say when you got to his office?

A.    I'm sorry, what did he say?

Q.    Yes.

A.    God's honest truth is I have blanked out anything from back then from my complete memory on purpose.

Q.    Okay.  And --

A.    It was a very brief conversation.

Q.    Okay.  You say that you purposely blanked things out from your memory?

A.    Yes.

Q.    Is there a reason why you purposely did that?

A.    I don't like to orient towards the past.

\*       \*

Q.    Did you ask Mr. Marino why you were being asked to resign?

A.    The conversation never went there.  It was very

Q.    Okay.

A.    I felt Mr. Marino was very -- I thought he was trying to intimidate me.  I don't deal well with intimidation.

\*       \*

Q.    . . . Did anybody ever tell you why the bank wanted you to resign and to resign so quickly?

A.    No.

5

Q.      Did you have any idea at the time as to why you were being asked to resign?

A.      Yes.

Q.      What was the idea that you had?

A.      My estimation at that point in time was that I was becoming the fall guy for Vipin Mayar and HR.

Q.      You said the fall guy for Vipin Mayar and HR?

A.      Correct.  Human Resources.

Q.      Okay.  And the fall guy in what sense?

A.      They needed to blame somebody within the CAMR organization and the associated HR personnel people who were attached to it for personnel problems.

Q.      What personnel problems?

A.      My understanding was as a senior manager that certain actions were being taken against the bank by CAMR employees, some of whom were with the bank, some of whom were not with the bank at that time.

*      *

Q.      . . . Can you identify by name any of the people that you're talking about?

A.      I saw a memo, which to this day I would say it was purposely left in a place where people could see it or whoever put it there wanted it to be seen if you will.

It was typed up by an employee that made many comments.  And I'm not a lawyer, but many points, if you will, and comments about times when that individual felt they were not properly treated.  And also a lot of energy, if you will, and angst towards not being promoted and ideas as to why.

Mr. Mayer's name was listed innumerable times.  My name was definitely mentioned, but maybe once or twice.  And there was a third -- a second peer of mine, John Kuntz, K-U-N-T-Z, his name was mentioned as well.

*      *      *

Q.      . . . What was the name of the employee

A.      Erin McCarthy, female, E-R-I-N.

*      *      *

Q.      To the best of your knowledge and belief, did the memo have anything to do with Vipin Mayar's leaving the bank?

A.      I would assume absolutely.

6

\*        \*

Q.      Did you regard the bank asking you to agree in writing that you would at no time seek employment with the bank as a routine request?

A.      No.  It's probably not routine.

\*        \*        \*

Q.      In agreeing to sign an agreement with a provision such as this in it, did you recognize that this agreement could be understood as an acknowledgment by you that you had done something wrong?

MS. SWEENEY:      Objection.

A.      Yes.

Q.      You did recognize that?

A.      Yes.

Q.      And did you believe that you had done something wrong?

A.      Sure.

\*        \*        \*

Q.      . . . You do acknowledge that there was something wrong with language that you used on certain occasions?

A.      Sure.

Q.      Other than that, was there anything else wrong that you acknowledge that you did?

A.      No.  Nothing was brought to my attention and I don't recall anything.

\*        \*        \*

Q.      Well, Mr. Kotopoulos you signed an agreement --

A.      Yes.

Q.      -- where you promised that you would never apply for employment with the Bank of America again, right?

A.      Correct.

Q.      That was a pretty strong thing for you to agree to, wasn't it?

A.      No.  Sir, I'll mention again.  I had had enough.  It was actually easy.  I had had enough.

7

> I wanted to move on with my life. I didn't want my
> wife and my kids to be stressed with a husband and father who was
> coming home stressed. It was time to move on.
>
> > 10/17/05 Kotopoulos Dep. 199-200,
> > 201-202, 203, 215-216, 217-218,
> > 222, 246-247, 248-249, 252, 253-
> > 254, reproduced in Exhibit 2 to this
> > Memorandum.

Given Mr. Kotopoulos' foregoing October 17, 2005 deposition testimony, and the fact

that this testimony reveals Mr. Kotopoulos' June 2, 2005 deposition testimony to have been

highly misleading, if not perjurious, there can be no doubt that Mr. Kincaid is, indeed, entitled to

production of the documents he seeks. According to his deposition testimony, Mr. Kotopoulos

does not know the factual basis for the Bank's decision to ask him to resign and to require Mr

Kotopoulos to promise in writing that he would never seek employment with the Bank again.

Surely, in view of Mr. Kotopoulos' importance in this case, as the Bank executive who made the

decision to fire Mr. Kincaid, Mr. Kincaid is entitled to see the documents showing the foregoing

factual basis, and showing the Bank's reasons for acting toward Mr. Kotopoulos as it did.

Further, given Mr. Kotopoulos' extensive deposition testimony regarding Erin McCarthy's

memorandum and the critical role that Mr. Kotopoulos believes that memorandum played in both

his departure, and Vipin Mayar's departure, from the Bank, Mr. Kincaid is also entitled to see

that memorandum.

> 2.    The Bank's Procedural Objections to Mr. Kincaid's Document Request Are
> Meritless.

The document request that is the subject of Mr. Kincaid's present Motion to Compel was

contained in a Third Request for Production of Documents that Mr. Kincaid served by e-mail and

by hand on October 26, 2005. The Bank has objected to the document request procedurally on

the ground that Local Rule 26.1 (C) allows only "two (2) separate sets of requests for

8

production," and on the ground that the request was allegedly untimely because the time for

response to the October 26, 2005 request under Fed.R.Civ.P. 34 was beyond October 28, 2005

the date set by the Court's September 28, 2005 scheduling order for the close of fact discovery

The Bank's foregoing objections are meritless because Mr. Kincaid was put in the

position of having to make the document request at issue in a third request for production, as late

as October 26, 2005, by the Bank's own discovery misconduct.  As described in detail in Mr

Kincaid's December 23, 2005 Memorandum in Support of Motion for Sanctions Based on

Bank's Unjustified Failure to Make Critical Fed.R.Civ.P. 26(a)(1) Disclosures, the Bank's

discovery misconduct <u>began</u> with the Bank's failure to identify Alec Kotopoulos and the

Personnel Center's Performance Management Memorandum regarding Mr. Kincaid in the

Bank's November 30, 2004 Rule 26(a)(1) Initial Disclosures.  And, as described at pages 4 - 8 of

Mr. Kincaid's August 11, 2005 Memorandum in Support of Motion to Compel Discovery and

for Sanctions, the Bank's discovery misconduct <u>continued</u> when the Bank made a woefully

deficient production of documents, in response to Mr. Kincaid's First Request for Production, on

May 9, 2005, producing a grand total of 56 Bates-numbered pages that failed to include a single

e-mail or any documents from the Bank's Personnel Center.

Consequently, when Mr. Kincaid took Alec Kotopoulos's deposition in Charlotte on June

2, 2005, he was precluded from taking a full or adequate deposition by the deficiency in the

Bank's document production.  Indeed, the Bank implicitly acknowledged this by consenting to

Mr. Kincaid's taking a supplemental deposition of Mr. Kotopoulos after the Bank produced more

documents.  As it turned out, Mr. Kincaid was not able to do the supplemental deposition of Mr

Kotopoulos agreed to by the Bank, until October 17, 2005 because the Bank <u>continued to drag its</u>

<u>feet</u> in producing the documents and providing the interrogatory answers Mr. Kincaid needed to

9

do so.  Thus, even after this Court issued its September 8, 2005 Order compelling the Bank to produce certain documents and provide certain supplemental interrogatory answers regarding other claims of age discrimination made against the Bank, the Bank failed to provide <u>any</u> such documents or interrogatory answers until October 10, 2005, three days <u>after</u> Mr. Kincaid's undersigned counsel formally advised the Bank's counsel in an October 7, 2005 e-mail (reproduced as Exhibit 3 to this Memorandum) that unless such documents and interrogatory answers were delivered by 12:00 noon on October 10, 2005, "plaintiff will file with the Court on October 11 a motion for sanctions, the requested sanctions to include, without limitation, a finding of contempt . . . ."  Moreover, the documents and interrogatory answers the Bank provided on October 10, 2005 were, by the Bank's own admission, incomplete.  The Bank provided further documents on October 14, 2005, and yet further information to Mr. Kincaid on December 14 and 22, 2005.  Moreover, the Bank has stated it will be providing further information still in the coming days, to complete its compliance with the Court's September 8 Order.

Given the foregoing, the Bank bears full responsibility for Mr. Kincaid's not being able to take Alec Kotopoulos' supplemental deposition until October 17, 2005.  Indeed, even on October 17, 2005, Mr. Kincaid did not have all the information he should have had from the Bank under the Court's September 8, 2005 Order.

It was not until Mr. Kincaid took Mr. Kotopoulos' supplemental deposition on October 17, 2005 that Mr. Kincaid's need for the Erin McCarthy memorandum and the documents showing the factual basis for the Bank's asking for Mr. Kotopoulos' resignation, became apparent.  It is an understatement to say that, based on what Mr. Kincaid knew prior to the deposition, Mr. Kincaid could not have foreseen that Mr. Kotopoulos would testify as he did

10

Consequently, Mr. Kincaid's serving a third request for production of documents was plainly

justified, and serving it on October 26, 2005, less than 10 days after Mr. Kotopoulos

supplemental deposition, was surely timely.

The Bank's procedural objections to Mr. Kincaid's third request for production must,

therefore, be rejected, especially because, if the Court were to allow the Bank to use these

objections to frustrate Mr. Kincaid's access to documents of such importance, it would, in effect,

be rewarding the Bank for discovery misconduct that put Mr. Kincaid in the position of having to

make his document request as late in this action as he did.

Dated: December 27, 2005

Respectfully submitted,

David J. Fine, BBO #165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Attorney for Plaintiff

Certificate of Service

I hereby certify that I have this day served the foregoing by causing true copies thereof to
be transmitted electronically and mailed, first class postage prepaid, to Siobhan M. Sweeney,
Esq., Edwards & Angell, LLP, 101 Federal Street, Boston, Massachusetts 02110 and Mark A.
Pogue, Esq., Edwards & Angell, LLP, 2800 Financial Plaza, Providence, Rhode Island, 02903,
attorneys for defendant.

Dated: December 27, 2005

David J. Fine