# EXHIBIT 2

178

```
 1                    VOL. II
 2                 PAGES 178-314
 3                  EXHIBITS 1-8
 4
 5         UNITED STATES DISTRICT COURT
 6       FOR THE DISTRICT OF MASSACHUSETTS
 7          Civil Action No. 04-11522-WGY
 8
 9   STEVEN R. KINCAID           )
10            Plaintiff,         )
11      vs                       )
12   BANK OF AMERICA             )
     CORPORATION,                )
13            Defendant.         )
14
15        CONTINUED VIDEOTAPED DEPOSITION OF
16   ALEC KOTOPOULOS, taken on behalf of the plaintiff,
17   pursuant to the applicable provisions of the
18   Massachusetts Rules of Civil Procedure, before
19   Patricia L. Henneberry a Certified Shorthand
20   Reporter and Notary Public in and for the
21   Commonwealth of Massachusetts, at the Law Office
22   of David J. Fine 3 Center Plaza, Boston,
23   Massachusetts, on Monday, October 17, 2005
24   commencing at 11:08 a.m.
```

180

```
 1     I N D E X (Continued)
 2   Exhibits                                    Page
 3     No. 3   Letter dated August 20, 2002
 4             To Alec Kotopoulos from Patrick
               Wright with attachments Bates
 5             Nos. 906 to 929                    192
 6     No. 4   Letter dated June 3, 2004 to
               Eric Montgomery from Vicki B.
 7             Rowan with attachments Bates
               Nos. 659 to 668                    236
 8
       No. 5   E-mail dated November 6, 2002
 9             to Vipin Mayar from Erik Fine
               with attachment Bates Nos.
10             903 to 905                         255
11     No. 6   E-mail dated August 18, 2003
               to Elizabeth Janak from Alec
12             Kotopoulos Bates No. 116           277
13     No. 7   CAMR Turnover as of
               August 11, 2003 Bates No. 117      278
14
       No. 8   Service Request Activity (All)
15             consisting of five pages           284
```

179

```
 1   APPEARANCES:
 2      Law Office of David J. Fine, (by David
     J. Fine, Esq.), 3 Center Plaza, Suite 400, Boston,
 3   Massachusetts, 02108, for the plaintiff.
 4      Edwards & Angell, LLP, (by Siobhan M.
     Sweeney, Esq.), 101 Federal Street, Boston,
 5   Massachusetts, 02110, for the defendant.
 6
 7      ALSO PRESENT: National Video
     Reporters, Inc., (Adam Cook, Legal Video
 8   Specialist), 58 Batterymarch Street, Suite 243,
     Boston, Massachusetts, 02110.
 9
10
11
12            I N D E X
13   Deposition of:                           Page
     ALEC KOTOPOULOS
14
15      Examination by Mr. Fine               182
16
17
18   Exhibits                                 Page
19     No. 1  Sheila Burroughs Job Bids
              Page/Summary Bates Nos. 672
20            to 674                          183
21     No. 2  Allison Hart Job Bids
              Page/Summary Bates Nos. 669
22            to 671                          189
23
24
```

181

```
 1            THE VIDEOGRAPHER: We are now
 2   recording and on the record. My name is Adam
 3   Cook. I'm a legal video specialist for National
 4   Video Reporters. Our business address is at 58
 5   Batterymarch Street, Suite 243, Boston,
 6   Massachusetts 02110.
 7            Today is October 17, 2005 and the time
 8   is 11:08 a.m. This is the continued deposition of
 9   Alec Kotopoulos in the matter of Steven R. Kincaid
10   versus Bank of America Corporation in the U.S.
11   District Court for the District of Massachusetts,
12   No. 04-11522-WGY.
13            This deposition is being taken at
14   Three Center Place, Boston, Massachusetts on
15   behalf of the plaintiff. The court reporter is
16   Patricia Henneberry of Mahaney Reporting Services.
17            Counsel will state their appearances
18   and the court reporter will administer the oath.
19            MR. FINE: David Fine for the
20   plaintiff, Steven Kincaid.
21            MS. SWEENEY: Siobhan Sweeney for the
22   defendant, Bank of America Corporation.
23            THE WITNESS: Alec Kotopoulos.
24
```

**Page 198**

1  Q. Okay. And did you get a bonus for 2003?
2  A. That would have been paid when, in February
3  of 2004?
4  Q. My understanding is yes.
5  A. No.
6  Q. All right. I think there's something in
7  here that may cast light on this, and I don't want
8  to be unfair to you. So why don't we go to that
9  part of the personnel file.
10    If you look at -- go to the page
11 that's Bates marked Bank of America 919.
12 A. Yes.
13 Q. Okay. And this is the document that's
14 headed General Release and Separation Agreement --
15 A. Yes, I see that.
16 Q. -- do you see that?
17 A. Yes.
18 Q. And then if you could just turn initially
19 to --
20 A. You've jogged my memory. Okay. That's
21 fair.
22 Q. Okay. Before we get back to that, if you
23 could just look to Bank of America Page 925.
24 A. Yes.

**Page 199**

1  Q. Is that your signature?
2  A. That is.
3  Q. And if you look at the next page, does your
4  signature appear on the next page as well?
5  A. Yes.
6  Q. All right. Now, going back to bank of
7  America Page 920 --
8  A. Yes.
9  Q. -- is there a reference to a bonus payment?
10 A. Yes.
11 Q. Okay. And what is --
12 A. $75,000.
13 Q. Okay. And does that accord with your
14 recollection?
15 A. That does, yes.
16 Q. Okay. And do you recall what percentage of
17 your salary that bonus payment was?
18 A. I believe at that time my base was 175. So
19 if you cut that by 75,000 and do the math, what do
20 we have --
21 Q. Okay. So --
22 A. -- 40 odd percent.
23 Q. Okay. All right. Now, turning to the first
24 page of this document, Bank of America 919 --

**Page 200**

1  A. Yes.
2  Q. -- okay, the first numbered paragraph says,
3  and let me quote it for the record and then I have
4  some questions.
5     "In consideration of the promises I
6  have made herein, I voluntarily tender and Bank
7  hereby accepts the mutual consent resignation of
8  my employment effective February 5, 2004;" do you
9  see that?
10 A. I do.
11 Q. Okay. How did it come about that you
12 resigned your employment with the bank?
13 A. I'm not sure I understand the question.
14 Q. Okay. Let me break it down. Were you asked
15 to resign?
16 A. Yes.
17 Q. Okay. Who asked you to resign?
18 A. Mr. Marino.
19 Q. And what position did Mr. Marino have at the
20 bank?
21 A. Human Resources.
22 Q. Okay. When did he ask you to resign?
23 A. It would have been right around the time
24 that this letter is dated.

**Page 201**

1  Q. Okay. When Mr. Marino asked you to resign,
2  did he do that orally?
3  A. Yes.
4  Q. Was anybody else present?
5  A. Yes.
6  Q. Who else was present?
7  A. A lady. I think she was a paralegal.
8  Q. Okay. And where did this take place that
9  you were asked to resign?
10 A. I believe it was his office.
11 Q. Okay. Did he ask you to come to his office?
12 A. He did indeed.
13 Q. Did he tell you why he was asking you to
14 come to his office?
15 A. No, he did not.
16 Q. Okay. What did he say when you got to his
17 office?
18 A. I'm sorry, what did he say?
19 Q. Yes.
20 A. God's honest truth is I have blanked out
21 anything from back then from my complete memory on
22 purpose.
23 Q. Okay. And --
24 A. It was a very brief conversation.

202

1  Q.  Okay. You say that you purposely blanked
2  things out from your memory?
3  A.  Yes.
4  Q.  Is there a reason why you purposely did
5  that?
6  A.  I don't like to orient towards the past.
7  Q.  Okay. You do remember that in that
8  conversation Mr. Marino asked you to resign?
9  A.  Yes.
10 Q.  Did you agree to resign in that meeting?
11 A.  No, I did not.
12 Q.  Okay. Do you remember anything that you
13 said in response to his requesting you to resign?
14 A.  I remember pieces. I can't -- I can
15 paraphrase. I can't give you exact language in
16 all fairness.
17 Q.  Okay. Please do your best to paraphrase
18 what was said.
19 A.  You know a couple of bullet points would be,
20 I work incredibly hard here.
21 Q.  This is what you're saying?
22 A.  Alec, yes, personally.
23     And then I remember telling him that I
24 wanted a night to sleep on this.

203

1  Q.  Okay. Do you remember anything else that
2  you said?
3  A.  No. Honestly.
4  Q.  Did you ask Mr. Marino why you were being
5  asked to resign?
6  A.  The conversation never went there. It was
7  very brief.
8  Q.  Okay.
9  A.  I felt Mr. Marino was very -- I thought he
10 was trying to intimidate me. I don't deal well
11 with intimidation.
12 Q.  Okay. And what about Mr. Marino's conduct
13 suggested to you that he was trying to intimidate
14 you?
15 A.  When he asked me to come to his office, he
16 called me on my cell phone which is standard.
17 We're running around from meeting to meeting and
18 whatever else.
19     The way he talked to me was as though
20 I were his two-year-old son which I found very
21 unprofessional and didn't appreciate essentially
22 ordering me to come to his office. That was the
23 first thing.
24     And then just his -- and I'm not a

204

1  little person. Just his physical attitude to me
2  appeared to be someone who was trying to
3  intimidate another person.
4  Q.  What is Mr. Marino like physically; is he a
5  big man?
6  A.  He's probably a little smaller than I. I'm
7  six-one, 210, 215 pounds.
8  Q.  Okay. When you came into -- was this his
9  office?
10 A.  I believe it was his -- it was definitely an
11 office that he was sitting behind a table -- a
12 desk I mean.
13 Q.  Okay. Did he ask you to sit down?
14 A.  He did.
15 Q.  The other person who was in the room, was
16 this a person that was known to you?
17 A.  I've never met her in my life before.
18 Q.  Was she identified by name to you?
19 A.  She was.
20 Q.  But you don't recall her name?
21 A.  I honestly don't, no.
22 Q.  Okay. Prior to this meeting where you were
23 being asked to resign, had you received a
24 performance review at the bank?

205

1  A.  I don't believe I did. I don't believe
2  Vipin Mayar sat me down, he was my boss, M-A-Y-A-R
3  V-I-P-I-N.
4      I don't believe he sat me down at the
5  end of the year to have a performance review. I
6  don't recall that.
7  Q.  Okay. From the time that you started at the
8  bank on September 30, 2002 to this meeting in
9  early 2004 where you were asked to resign, did you
10 ever have a performance review in that period?
11 A.  I did.
12 Q.  Okay. And when did you have a performance
13 review?
14 A.  I certainly had one at the end of my first
15 quarter, so that would have been -- when did I
16 start, 2002?
17 Q.  Yes.
18 A.  Okay. So the end of 2002 somewhere near the
19 holiday period, Christmas holiday period. Then I
20 had another performance review somewhere into
21 2003, and I honestly do not recall exactly when.
22 Q.  Okay. The performance review that you got
23 at the end of 2002, who gave that to you?
24 A.  Vipin Mayar.

**214**

1  A.  No.
2  Q.  Did you speak to anybody at the bank about
3  what had occurred?
4  A.  No. Because I went home and I did not come
5  back.
6  Q.  You never came back to the bank?
7  A.  Nope.
8  Q.  Okay. Now, you see that if you go to page
9  Bank of America 925, your signature is dated
10 February 8, 2004; do you see that?
11 A.  Correct.
12 Q.  How much time elapsed between the date of
13 the meeting that you've described and February 8,
14 2004 when you signed this agreement?
15 A.  I can't tell you exactly cause I can't
16 remember, but I will tell you that it was -- it
17 was a relatively short amount of time.
18 Q.  Okay. And was the bank applying any time
19 pressure on you to get this done?
20 A.  Oh, indeed.
21 Q.  And how were they doing that?
22 A.  They basically said you have X days to sign
23 this thing.
24 Q.  Okay.

**215**

1  A.  Isn't there a clause in here that says
2  that -- from what I remember. Wasn't there some,
3  you know, X period of time?
4  Q.  Well, I don't know if this is what you're
5  referring to, Mr. Kotopoulos, but --
6  A.  Right here.
7  Q.  What --
8  A.  No. 2, Time to sign a return agreement.
9  Q.  Ah, all right. This is on BA 9/19?
10 A.  21 days.
11 Q.  Okay. Paragraph 2 recites that you first
12 received the original of this agreement on or
13 before February 5, 2004; do you recall how much
14 time elapsed between the time of the meeting you
15 described and the time that you got this document
16 to review or your lawyer got this document to
17 review?
18 A.  It wasn't long. It was a matter of days.
19 Q.  Okay. Did anybody ever tell you why the
20 bank wanted you to resign and to resign so
21 quickly?
22 A.  No.
23 Q.  Did you have any idea at the time as to why
24 you were being asked to resign?

**216**

1  A.  Yes.
2  Q.  What was the idea that you had?
3  A.  My estimation at that point in time was that
4  I was becoming the fall guy for Vipin Mayar and
5  HR.
6  Q.  You said the fall guy for Vipin Mayar and
7  HR?
8  A.  Correct. Human Resources.
9  Q.  Okay. And the fall guy in what sense?
10 A.  They needed to blame somebody within the
11 CAMR organization and the associated HR personnel
12 people who were attached to it for personnel
13 problems.
14 Q.  What personnel problems?
15 A.  My understanding was as a senior manager
16 that certain actions were being taken against the
17 bank by CAMR employees, some of whom were with the
18 bank, some of whom were not with the bank at that
19 time.
20 Q.  Did you finish your --
21 A.  I did.
22 Q.  Okay. You said these people were taking
23 certain actions against the bank, what actions?
24 A.  My assumption was, you know, making noise

**217**

1  and complaints about discharge or -- discharge in
2  some cases and in other cases unsatisfactory
3  performance reviews.
4  Q.  Okay. And when you say making noise and
5  complaints, do you mean among other things filing
6  charges with the EEOC?
7  A.  I never saw anything officially nor was that
8  mentioned to me. I do know however that in an
9  organization that large, I think we had 120, 130,
10 people, there are avenues for rumor that run
11 around not unlike in any organization that size or
12 even bigger.
13         And there was strong word that people
14 were seeking or had sought legal representation.
15 Q.  Okay. Can you identify by name any of the
16 people that you're talking about?
17 A.  I saw a memo, which to this day I would say
18 it was purposely left in a place where people
19 could see it or whoever put it there wanted it to
20 be seen if you will.
21         It was typed up by an employee that
22 made many comments. And I'm not a lawyer, but
23 many points, if you will, and comments about times
24 when that individual felt they were not properly

Page 218

1  treated. And also a lot of energy, if you will,
2  and angst towards not being promoted and ideas as
3  to why.
4         Mr. Mayar's name was listed
5  innumerable times. My name was definitely
6  mentioned, but maybe once or twice. And there was
7  a third -- a second peer of mine, John Kuntz,
8  K-U-N-T-Z, his name was mentioned as well.
9  Q.  Okay. Have you finished?
10 A.  I'm done.
11 Q.  Okay. All right. So this memo that was
12 left in a place where people could see it
13 complained about three people, Vipin Mayar
14 primarily?
15 A.  Predominantly.
16 Q.  Predominantly.
17 A.  John Kuntz secondarily and Alec on a very
18 tertiary, you know, small basis.
19 Q.  Okay. What was the name of the employee who
20 left?
21 A.  Erin McCarthy, female, E-R-I-N.
22 Q.  Okay. And in this memo, was she complaining
23 in effect about gender discrimination?
24 A.  Yes. That it was difficult for females

Page 219

1  within that department, CAMR, to get promoted and
2  have positions of -- status is the wrong word --
3  but senior positions.
4  Q.  Did Miss McCarthy complain in words or
5  substance about sexual harassment?
6  A.  That I don't remember. Honestly. I will
7  tell you that I wouldn't rule it out because I
8  remember it being at least three pages, maybe
9  four.
10 Q.  Okay. And the claims of -- the possible
11 claims of sexual harassment, were they made
12 against --
13         MS. SWEENEY: Objection.
14         MR. FINE: Pardon?
15         MS. SWEENEY: Go ahead and finish the
16 question.
17         MR. FINE: All right. Let me rephrase
18 it.
19 Q.  You said that you wouldn't rule out the
20 possibility of claims of sexual harassment having
21 been made in this memo, correct?
22 A.  That's correct.
23 Q.  Okay. What's the basis for your saying that
24 you wouldn't rule that out?

Page 220

1  A.  Because I vaguely -- I remember the memo
2  being long, first. I remember there being
3  multiple, multiple angles leading up to -- let me
4  do it differently. And I'm not trying to retract.
5  I'm trying to give you a more succinct opinion.
6         The memo to me appeared as though
7  somebody was trying to prove a point, and to prove
8  that point there were multiple kind of ways to
9  prove the same point.
10        The same point being, women were not
11 afforded similar opportunities within the group,
12 CAMR.
13        This particular individual felt
14 discriminated upon I think. So I believe, and
15 again this is a few years ago, I believe the
16 person used different angles or ways to get at
17 that issue.
18 Q.  Did you ever have in your possession a copy
19 of this memo?
20 A.  I had it the day I saw it on the
21 whatchamacallit. I think it was on a Xerox
22 machine, and I think I put it in my desk.
23 Q.  Did you ever give a copy of that memo to
24 your lawyer?

Page 221

1  A.  No.
2  Q.  What happened to the copy of the memo that
3  was in your desk?
4  A.  Your guess is as good as mine.
5  Q.  You didn't take it with you when you left
6  the bank?
7  A.  I did. I did. I had it in my briefcase. I
8  did. I did take it with me.
9  Q.  Do you still have a copy of it today?
10 A.  No. I've thrown everything away.
11 Q.  Do you recall when you threw this memo away?
12 A.  A year ago or something maybe.
13 Q.  Was there something that caused you to throw
14 it away at that time?
15 A.  Life moved on.
16 Q.  How much before the date that you were
17 called into Mr. Marino's office did you see this
18 memo?
19 A.  I don't know. I mean, it wasn't weeks. It
20 was probably, you know, a fair amount of time
21 prior to that.
22 Q.  Was it close enough in time to the meeting
23 that you knew that that memo must be one of the
24 reasons why you were being asked to resign?

**222**

1  A.  A memo like that does not escape your memory
2  while you're an employee of an organization in a
3  senior position. So I think irrespective of time,
4  and I don't mean to be rude, you know, that's
5  almost timeless because it's serious.
6  Q.  Did Mr. Marino make any reference to this
7  memo --
8  A.  No.
9  Q.  -- in the meeting with you?
10 A.  He did not.
11 Q.  Is John Kuntz still employed by the bank?
12 A.  He is.
13 Q.  Is Vipin Mayar still employed by the bank?
14 A.  No.
15 Q.  To the best of your knowledge and belief,
16 did the memo have anything to do with Vipin
17 Mayar's leaving the bank?
18 A.  I would assume absolutely.
19 Q.  Okay. And why do you assume that?
20 A.  Because the memo again had a lot of comments
21 about him. And once the merger happened with
22 Fleet Bank, when announcements came out about
23 where people were going to land, if you will,
24 Vipin Mayar was not on the chart. Twice.

**223**

1       There were two. There were two
2  actually. The first memo that said, you know,
3  here's the big, big, big picture, no mention of
4  Vipin. And he's a pretty senior guy.
5       And then there was a more scaled down
6  kind of underneath the big house schematic, and
7  again no mention of Vipin Mayar.
8  Q.  Okay. What you were just referring to was
9  organizational charts?
10 A.  No. A memo coming from I believe the head
11 of marketing for the organization, Cathy Bessant,
12 B-E-S-S-A-N-T.
13 Q.  All right. And the big memo that you
14 referred to, when did that come out?
15 A.  Well, I think the merger announcement was
16 made somewhere around Thanksgiving of -- what
17 would have that been, two thousand and --
18 Q.  Four perhaps?
19 A.  Yes. So somewhere around Thanksgiving. And
20 then the second memo would have been right into
21 the new year, early in the new year from what I
22 remember.
23 Q.  All right. And these memos essentially
24 indicated that Vipin Mayar was not in the bank's

**224**

1  future plans?
2  A.  Well, no, no, no. These memos were
3  distributed to all. And essentially they said,
4  Here's the new structure of the organization going
5  forward.
6       We still have more -- "we," meaning
7  Human Resources, have more work to do to fill in
8  some blanks underneath, but for the medastructure,
9  if you will, the, you know, the grand structure of
10 the organization, the building blocks were filled
11 in and his name was not on one.
12      Therefore, one would very easily
13 assume that something happened.
14 Q.  Okay. Now, when these memos came out you
15 were no longer employed by the bank yourself,
16 correct?
17 A.  No. I was with the bank, yes.
18      I mean, one was around Thanksgiving.
19 I was there when the merger was announced. It was
20 right after the merger. Weeks I think. And then
21 the second memo. I was definitely there for the
22 second memo as well.
23 Q.  All right. So the way that you interpreted
24 these memos the handwriting was on the wall for

**225**

1  Vipin Mayar?
2  A.  I've been part of major corporations in the
3  past, and I've been through plenty of reorgs, and
4  mergers and when someone that senior does not end
5  up on a org chart, it's not good.
6  Q.  Okay. Now, in the first session of your
7  deposition you mentioned that about a year --
8  what's now a year and a half ago, Vipin Mayar
9  called you to get together and you declined to get
10 together with him?
11 A.  That's correct.
12 Q.  Did your declining to get together with him
13 have anything to do with what happened with regard
14 to Erin McCarthy's complaint?
15 A.  Absolutely nothing.
16 Q.  Okay. How do you account for John Kuntz
17 still being at the bank since he was also
18 mentioned in Erin McCarthy's memo?
19      MS. SWEENEY: Objection.
20 Q.  I think Miss Sweeney is objecting for the
21 record and you can answer the question.
22      THE WITNESS: Oh, okay. It's just
23 bizarre. You're not representing me, but you can
24 object. I understand. Okay.

Page 246

1  Q.  Well, you were involved in the decision to
2  terminate certain employees, correct?
3  A.  Absolutely.
4  Q.  Did it ever come up in the discussions with
5  regard to the termination of certain employees as
6  to whether they would be eligible for rehire?
7  A.  I don't recall that coming up.
8  Q.  Ever?
9  A.  I honestly do not recall that coming up. My
10 assumption is that it was an HR function.
11 Q.  Mr. Kotopoulos, wasn't it one of the
12 standard things that was always asked with regard
13 to the termination of an employee whether the
14 employee would be eligible for rehire?
15 A.  I do not recall a single instance where an
16 HR person asked me that question. That is the
17 truth.
18 Q.  Okay. Did you ever communicate with anybody
19 to the effect that a particular employee should be
20 eligible for rehire?
21 A.  I don't recall. I don't recall.
22 Q.  Did you regard the bank asking you to agree
23 in writing that you would at no time seek
24 employment with the bank as a routine request?

Page 247

1  A.  No. It's probably not routine.
2  Q.  Okay. Did anybody at the bank say to you or
3  to your lawyer to your knowledge why the bank was
4  asking for this?
5  A.  I'm sorry, say that again please.
6  Q.  Did anybody at the bank say to you or to
7  your lawyer to your knowledge why the bank was
8  asking you to agree to this in writing?
9  A.  Oh, I'm sure they said it to my lawyer.
10 Q.  And do you have any understanding as to the
11 explanation as to why the bank was asking for
12 this?
13 A.  No.
14 Q.  No idea?
15 A.  My lawyer essentially said to me that -- a
16 couple of things.
17 Q.  Okay. I'm not asking you to disclose a
18 communication that you had with your lawyer. I'm
19 simply asking you whether you have an
20 understanding as to why the bank was asking for
21 this?
22 A.  I think the answer is yes.
23 Q.  And what was your understanding?
24 A.  They didn't want me around.

Page 248

1  Q.  All right. Did this suggest to you that the
2  bank was extremely displeased with some aspect of
3  your performance?
4  A.  Yes.
5  Q.  And what aspect of your performance did you
6  understand the bank to be displeased with?
7  A.  Again, I think it all had to go back to the
8  people who were unhappy about performance ratings
9  and things like that and this issue of me becoming
10 a fall guy.
11 Q.  Did you ever say to Mr. Marino or did you
12 ever direct your lawyer to communicate to the bank
13 in words or substance that in no way were you
14 going to agree to something like this?
15 A.  No. I had had enough. It was time to move
16 on with my life. It was over respectfully.
17 There's a point in time where you just say enough
18 is enough.
19 Q.  In agreeing to sign an agreement with a
20 provision such as this in it, did you recognize
21 that this agreement could be understood as an
22 acknowledgment by you that you had done something
23 wrong?
24      MS. SWEENEY: Objection.

Page 249

1  A.  Yes.
2  Q.  You did recognize that?
3  A.  Yes.
4  Q.  And did you believe that you had done
5  something wrong?
6  A.  Sure.
7  Q.  What had you done wrong?
8  A.  When you're managing 36 people, no one's
9  perfect. You'll make mistakes.
10     If a company doesn't want you around,
11 it's very easy to come up with something in this
12 day and age.
13 Q.  Okay.
14 A.  So, you know, in their eyes I did something
15 wrong. We're also tenants -- not tenants at will,
16 but employees at will.
17 Q.  Okay. And what was it that you did that you
18 felt that you can acknowledge that you had done
19 that was wrong?
20     MS. SWEENEY: Objection.
21 A.  I'm going to ask you respectfully why I have
22 to answer a question like that when it has nothing
23 to do -- this is now becoming personal and
24 private, and in my eyes -- don't take this the

**250**

1  wrong way. I don't mean to be disrespectful, but
2  this is a private matter.
3      Why do I have to disclose anything
4  beyond what I've disclosed which I don't feel
5  comfortable disclosing?
6  Q.  Well, Mr. Kotopoulos, you testified that
7  when you were asked to resign you felt that you
8  were being intimidated, right?
9  A.  Yes.
10 Q.  You felt that Mr. Marino was being unfair to
11 you, right?
12 A.  I thought he was intimidating and I don't
13 think he had -- I don't think he did his homework.
14 Q.  Well, do you think that in asking for your
15 resignation the bank was being unfair to you?
16 A.  Yes.
17 Q.  Okay. How do you square that statement on
18 the one hand with your acknowledgment on the other
19 hand that you had done nothing wrong?
20 A.  Well, because to me it's a question of
21 degree. One should look at the whole picture.
22 Q.  Okay. So notwithstanding your recognition
23 that you had done something wrong, you felt that
24 in the totality of things the bank should regard

**251**

1  whatever you had done wrong as being excusable?
2  A.  I come back to the same answer. The bank
3  did not want me around. At the end of the day I'm
4  a smart person. They're smart people. It was
5  just time to end everything and move on.
6  Q.  Okay.
7  A.  You know, am I flawed as a person, a human,
8  sure. I've made some mistakes, but, you know --
9  Q.  Okay. Can you identify for us the mistakes
10 that you made that led you to accept this
11 particular provision of this agreement?
12 A.  Sure. I can tell you that, you know, on a
13 few occasions I may have used some language --
14 Q.  Okay.
15 A.  -- because I was under intense pressure.
16 It's not excusable, but I may have used some
17 language that was inappropriate.
18     You know I can also tell you that from
19 a management style I worked very hard myself
20 personally, set a very strong example with respect
21 to working hard and performing. Pushed people
22 hard but rewarded them very well, particularly
23 those who performed.
24 Q.  All right. You didn't think that there was

**252**

1  anything wrong with that, did you?
2  A.  No.
3  Q.  Okay. You do acknowledge that there was
4  something wrong with language that you used on
5  certain occasions?
6  A.  Sure.
7  Q.  Other than that, was there anything else
8  wrong that you acknowledge that you did?
9  A.  No. Nothing was brought to my attention and
10 I don't recall anything.
11 Q.  Okay. What was the language that you used
12 that you regarded as wrong?
13 A.  I mean I might have said, you know, F every
14 once in a while.
15 Q.  And did you ever say that to Erin McCarthy?
16 A.  No.
17 Q.  Did you ever say that in Erin McCarthy's
18 presence.
19 A.  No.
20 Q.  Okay. Other than that, did you -- what
21 other instances were there of using language that
22 you regarded as being wrong?
23 A.  I mean, I don't know. I don't know. This
24 is two, three years ago.

**253**

1  Q.  Okay. So you remember that you used
2  language that you thought was wrong, but as you
3  sit here today you don't remember what it was?
4  A.  I just told you that I may have used the F
5  word on occasion. If you want the specifics of
6  what date, with whom, where, all that, I can't
7  remember that stuff.
8  Q.  Well, Mr. Kotopoulos, I think that the
9  members of the jury will be familiar with the fact
10 that people use profanity from time to time. All
11 of us do.
12 A.  Yeah.
13 Q.  So there must have been something other than
14 the mere use of profanity which caused you to say
15 a moment ago that you used language that was
16 wrong; isn't that fair?
17 A.  I don't know what you're trying to get at.
18 I mean, I just mentioned nicely a couple of times
19 I used language on occasion here and there.
20     A couple of times I can remember it
21 was an issue to myself, and that's, you know, one
22 of the things I'm sure the bank said oops, no
23 good.
24 Q.  Well, Mr. Kotopoulos you signed an

### Page 254

1    agreement --
2    A.   Yes.
3    Q.   -- where you promised that you would never
4    apply for employment with the Bank of America
5    again, right?
6    A.   Correct.
7    Q.   That was a pretty strong thing for you to
8    agree to, wasn't it?
9    A.   No. Sir, I'll mention again. I had had
10   enough. It was actually easy. I had had enough.
11        I wanted to move on with my life. I
12   didn't want my wife and my kids to be stressed
13   with a husband and a father who was coming home
14   stressed. It was time to move on.
15   Q.   I'd like you to turn to the page that's
16   Bates marked Bank of America 924. You see there's
17   a provision here in Paragraph 24, Attorneys' Fees
18   and Costs?
19   A.   Yes.
20   Q.   And each party agrees to be responsible for
21   your own attorneys' fees?
22   A.   Yes.
23   Q.   Did your attorney request any change in this
24   paragraph?

### Page 255

1    A.   No, not to my recollection.
2    Q.   Did your attorney ever suggest to the bank
3    to the best of your knowledge that you might sue
4    the bank?
5    A.   No.
6    Q.   Did the bank ever suggest to you or your
7    attorney to your knowledge that the bank might sue
8    you?
9    A.   No.
10   Q.   Did it ever come to your attention that Erin
11   McCarthy was considering suing you or the bank?
12   A.   No.
13        MR. FINE: I'd like to have marked as
14   the next exhibit pages that are Bates marked Bank
15   of America 903 to 905.
16        (Exhibit No. 5 E-mail dated November
17   6, 2002 to Vipin Mayer from Erik Fine with
18   attachment Bates Nos. 903 to 905 marked)
19   Q.   Mr. Kotopoulos, I show you what's been
20   marked as an exhibit, and I would ask you to read
21   the three pages of this exhibit to yourself and
22   then I have a series of questions for you about
23   it.
24   A.   Okay. Okay.

### Page 256

1    Q.   Okay. I want you to go to the first page of
2    this exhibit, and first of all I want to direct
3    your attention to the date that Erik Fine
4    apparently sent this e-mail to Vipin Mayar; do you
5    see that date?
6    A.   I do.
7    Q.   November 6, 2002?
8    A.   Yes.
9    Q.   Okay. Now, you had started with the bank on
10   September 30, 2002, correct?
11   A.   Yes.
12   Q.   So at the time of this e-mail you had been
13   at the bank for a little more than a month,
14   correct?
15   A.   Yes.
16   Q.   Okay. Now, if you go to the bottom of the
17   page, No. 1 --
18   A.   Yes.
19   Q.   -- the second sentence, you see where it
20   says, "You can use the attached spreadsheet that
21   Alec and I started"?
22   A.   I do.
23   Q.   Is the Alec that's being referred to there
24   you?

### Page 257

1    A.   Yes.
2    Q.   Okay. Do you remember working on this
3    spreadsheet with Erik Fine?
4    A.   Yes.
5    Q.   Okay. How soon after you started working at
6    the bank did you first work with Erik Fine on this
7    spreadsheet?
8    A.   I don't recall, but it would have been
9    somewhere around a little bit -- probably a little
10   bit before the memo came out.
11   Q.   Okay. All right. And what did you
12   understand the objective of preparing this
13   spreadsheet was?
14   A.   Vipin was informing my manager of several
15   people, all of whom are listed here, of the
16   financial impact I guess on his -- I don't know
17   what it was called, but his ledger, if you will,
18   if these folks were out.
19   Q.   Okay. I think you said Vipin was informing
20   your manager, but did you not in fact --
21   A.   I'm sorry, Erik. Erik was informing Vipin,
22   my manager.
23   Q.   Okay. All right. But what role did you
24   have in preparing this spreadsheet?