# EXHIBIT A

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Steven R. Kincaid

**DEFENDANTS**

Bank of America Corporation

2004 JUL -7 P 2:36

U.S. DISTRICT COURT
DISTRICT OF MASS.

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
John Harkavy, Esq.   Bernkopf Goodman LLP
125 Summer Str., 13th Fl., Boston MA 02110   617-790-3000
Deborah Martin Norcross, Esq.
60 Marion Rd. West, Princeton, NJ 08540   609-279-0191

Attorneys (If Known)

# 04 CV 11522 JLT

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☒ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Age Discrimination in Employment Act of 1967 for unlawful discrimination and retaliation

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ To be determined
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE July 7, 2004

SIGNATURE OF ATTORNEY OF RECORD _John Hark_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)  Steven R. Kincaid vs. Bank of America Corporation

FILED
IN CLERKS OFFICE

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

2004 JUL 12 P 2:36

☐ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.  U.S. DISTRICT COURT

DISTRICT OF MASS.

☒ II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
        740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

☐ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
        315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
        380, 385, 450, 891.

☐ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
        690, 810, 861-865, 870, 871, 875, 900.

☐ V.    150, 152, 153.

04 CV 11522 JLT

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   None

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                YES ☐    NO ☒

   A.  If yes, in which division do all of the non-governmental parties reside?

       Eastern Division ☐        Central Division ☐          Western Division ☐

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,  residing in Massachusetts reside?

       Eastern Division ☒        Central Division ☐          Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                                                YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME     John Harkavy

ADDRESS    125 Summer Str., 13th Fl. Boston, MA 02110

TELEPHONE NO.    617-790-3000

(Coversheetlocal.wpd - 10/17/02)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2001 JUL -7 P 2: 46

U.S. DISTRICT COURT
DISTRICT OF MASS.

STEVEN R. KINCAID,                    )
                                      )
              Plaintiff,              )
                                      )
       vs.                            )      Civil Action No.
                                      )
                                      )
BANK OF AMERICA CORPORATION,          )      COMPLAINT AND JURY
                                      )      DEMAND
              Defendant.              )
_____)      04cv11522 JLT

## NATURE OF THE ACTION

1.     This is an employment termination action brought under the Age
Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 *et seq.* (ADEA)
for unlawful discrimination and retaliation; and for wrongful discharge in violation of
public policy and breach of the implied covenant of good faith and fair dealing under
state law.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over Plaintiff's federal law claims under 28
U.S.C. §1331 and supplemental jurisdiction over Plaintiff's pendant state law claims
under 28 U.S.C. §1367(a).

3.     Plaintiff has complied with all conditions precedent to the filing of this
action:

a.    On July 25, 2003, Plaintiff filed a timely charge of employment discrimination on the bases of age and retaliation with the Equal Employment Opportunity Commission (EEOC).

b.    On April 8, 2004, Plaintiff received a Notice of Right to Sue issued by the EEOC.

c.    This complaint is filed within ninety (90) days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

4.    Plaintiff resides, and Defendant maintains offices and conducts substantial business, within the District of Massachusetts. Venue therefore is proper in this District under 28 U.S.C. §§1391(b) and (c).

## PARTIES

5.    Plaintiff Steven R. Kincaid is a citizen of the United States and resides at 8 Towne Lane, Topsfield, Massachusetts.

6.    Plaintiff's date of birth is July 19, 1953.

7.    At all times relevant to this action, Plaintiff was and is a member of the class of persons protected by the ADEA.

8.    Upon information and belief, Defendant Bank of America Corporation is a Delaware corporation with its principal place of business located at 201 North Tryon Street, Charlotte, North Carolina.

9.    Upon information and belief, Defendant owns and operates more than 250 banking centers and more than 1290 automated teller machines (ATMs) within the District of Massachusetts.

10.    Defendant is engaged in an industry affecting commerce.

2

11.    Defendant employs twenty (20) or more employees.

12.    Defendant is an employer within the meaning of §11(b) of the ADEA, 29 U.S.C. §630(b).

## FACTS

13.    In and before 2002, Plaintiff operated a consulting business located at 11 Carleton Circle, Boxford, Massachusetts, where Plaintiff also resided.

14.    In or around the spring of 2002, a management recruiting firm contacted Plaintiff at his Massachusetts office/residence for the purpose of recruiting Plaintiff for employment with Defendant.

15.    Thereafter, the recruiter and representatives of Defendant interviewed Plaintiff in telephone conferences placed to Plaintiff's office/residence in Massachusetts. Defendant also paid for Plaintiff to travel to North Carolina for in-person interviews.

16.    In or around July 2002, Defendant offered Plaintiff a position as Vice President, Market Information Manager in Charlotte, North Carolina.  The offer was extended through a telephone call placed to Plaintiff's office/residence in Massachusetts and confirmed in a letter sent to Plaintiff in Massachusetts.

17.    In seeking to persuade Plaintiff to relocate from Massachusetts to North Carolina and thereby obtain for itself a statistical analysis methodology Plaintiff had developed, Defendant promised Plaintiff long-term employment and fair treatment free of unlawful discrimination.

18.    The recruiter asked Plaintiff if he would be comfortable reporting to someone with less experience.

3

19.     Defendant advised Plaintiff he would have three primary projects:  to develop a definition of customer loyalty, to develop a statistical driver monograph, and to develop a means of valuing loyalty.

20.     Defendant promised to continue to employ Plaintiff in a position commensurate with his experience and background once the primary projects were completed.

21.     In reliance on Defendant's promises, Plaintiff relocated to North Carolina and commenced employment with Defendant on or about August 20, 2002.

22.     Plaintiff's area of expertise was and is the design and overhaul of methodology used to perform statistical analyses. Plaintiff's first assignment after commencing employment with Defendant was to create a statistical driver monograph detailing this methodology.

23.     Plaintiff's immediate supervisor was Sheila Burroughs (Burroughs). Upon information and belief, during the time Plaintiff was employed by Defendant, Ms. Burroughs was approximately 33 years old.

24.     Burroughs and other management directed Plaintiff to write the monograph "as if he would be hit by a bus" as soon as it was completed.

25.     Plaintiff began writing the monograph and working on the definition of loyalty project soon after beginning his employment with Defendant.

26.     Plaintiff completed the monograph in or around January 2003.

27.     Between Plaintiff's date of hire and the date on which he completed the monograph, Burroughs praised Plaintiff's work performance as excellent and did not, on any occasion, criticize any substantive aspect of Plaintiff's performance.

4

28.    After completing the monograph, and performing substantial work on the loyalty definition project, and after Defendant had obtained the benefit of Plaintiff's years of experience, knowledge, and expertise, Burroughs' approach to Plaintiff and his work performance changed dramatically.

29.    Burroughs began harassing Plaintiff and giving him conflicting instructions in an effort to ensure that Plaintiff would be unable to meet his 2003 performance goals. For example:

a.    Burroughs delayed release of the statistical driver monograph for more than ten weeks after its completion, thus preventing Plaintiff from demonstrating his leadership and consulting skills on the main project in which he was engaged.

b.    Burroughs ordered Plaintiff not to attempt to lead the loyalty valuation work, then improperly criticized him for not showing "ability to lead the valuation topic."

c.    Burroughs ignored or rejected Plaintiff's suggestions relating to, for example, scales in measurement and customer satisfaction surveys, then improperly criticized him for failing to exhibit and communicate strategic thinking.

d.    Burroughs ordered Plaintiff not to engage other financial staff in the definition of loyalty project, saying she wished to do so herself. She failed to follow through at all, making it impossible for Plaintiff to complete the project. Burroughs then criticized Plaintiff for not concluding the project.

5

e.   When Plaintiff requested time off to attend his grandmother's funeral in Oklahoma, Burroughs set an arbitrary deadline for a small work project and made it clear that he would not be able to complete the work on time if he attended the funeral.

30.   Upon information and belief, Plaintiff was the oldest employee, and most highly compensated employee at his level, in his department.

31.   Upon information and belief, Defendant, having obtained Plaintiff's unique methodology, began harassing Plaintiff in an attempt to force him to resign and thereby rid itself of an older, highly compensated employee.

32.   Upon information and belief, Defendant's treatment of Plaintiff was consistent with its pattern of forcing the resignations of other employees in the protected age group.

33.   Upon information and belief, Defendant had a practice of firing older workers to manipulate earning results and to avoid the severance payments and financial accountability that would accompany layoffs.

34.   By letter dated April 25, 2003, Plaintiff, through his counsel, registered a written discrimination complaint with J. Steele Alphin, Corporate Personnel Executive for Defendant.

35.   By letter dated April 30, 2003, Eric A. Montgomery, Assistant General Counsel for Defendant, acknowledged receipt of Plaintiff's complaint and advised, "We are investigating the facts and circumstances of your client's claim and will respond to your letter shortly."

6

36.    Defendant never responded to Plaintiff's complaint. Upon information and belief, Defendant did not conduct any investigation into Plaintiff's discrimination claims.

37.    Instead, Defendant terminated Plaintiff's employment, without notice or cause, on June 13, 2003. Upon information and belief, Defendant retained younger, less qualified similarly situated employees who had not complained of discrimination.

38.    Upon information and belief, Defendant harassed and discharged Plaintiff because of Plaintiff's age, in retaliation for Plaintiff's complaint of unlawful discrimination, in violation of public policy, and in violation of the implied covenant of good faith and fair dealing.

39.    In engaging in the acts described above, Defendant acted knowingly, willfully, and maliciously.

40.    As a result of Defendant's acts as described above, Plaintiff has suffered damage, including without limitation: termination of employment; deprivation of income and benefits; loss of future earning capacity; loss of future income and benefits; damage to career and reputation;  and pain and suffering, emotional distress, and mental anguish.


## COUNT ONE
## AGE DISCRIMINATION IN VIOLATION OF 29 U.S.C. §621 *ET SEQ.*

41.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42.    Defendant harassed Plaintiff and terminated Plaintiff's employment because of Plaintiff's age.

7

43.    Defendant's termination of Plaintiff because of his age violated §4(a)(1) of the ADEA, 29 U.S.C. §623(a)(1).

44.    Defendant's discrimination against Plaintiff was willful and undertaken with malice and reckless indifference to Plaintiff's federally protected rights.

45.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

## COUNT TWO
### RETALIATION IN VIOLATION OF 29 U.S.C. §623(d)

46.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 above as if fully set forth herein.

47.    Defendant harassed Plaintiff and terminated Plaintiff's employment because Plaintiff opposed Defendant's discriminatory practices and because of Plaintiff's assertion of his rights under the ADEA, in violation of §4(d) of the ADEA, 29 U.S.C. §623(d).

48.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

## COUNT THREE
### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

49.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 above as if fully set forth herein.

50.    Defendant's harassment of Plaintiff and termination of Plaintiff's employment violated public policy as set forth in the North Carolina Equal Employment

8

Practices Act, Ch. 143, Secs.143-422.1 through 143-422.3 of the North Carolina General Statutes, and in the North Carolina Retaliatory Employment Discrimination Law, Ch. 95, Sec. 95-240 through 95-245 of the North Carolina General Statutes.

51.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

## COUNT FOUR
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

52.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51 above as if fully set forth herein.

53.    Defendant's acts as described above breached the implied covenant of good faith and fair dealing that existed in Plaintiff's at-will employment contact.

54.    As a result of Defendant's unlawful acts, Plaintiff has been damaged as described above.

**WHEREFORE,** Plaintiff respectfully requests that the Court award the following relief:

1)    Judgment declaring that Defendant's acts violated Plaintiff's rights as secured by applicable federal and state laws;

2)    Damages to make Plaintiff whole, including but not limited to back pay with interest, adjusted for any increase Plaintiff would have received had he not been unlawfully terminated;   reimbursement of Plaintiff's lost benefits and replacement costs; and reimbursement for medical, relocation, and other costs

9

resulting from Plaintiff's termination, all in an amount to be determined at trial;

3) Front pay in lieu of reinstatement;

4) Compensatory damages, including but not limited to emotional distress, pain and suffering, and mental anguish; and relocation, job search, business development, and other damages incurred by Plaintiff as a result of his unlawful termination.

5) Punitive damages in an amount not less than $5,000,000;

6) Liquidated damages for Defendant's willful violation of the ADEA;

7) Attorneys' fees, interest, costs, and disbursements; and

8) Such other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS TRIAL BY JURY**

Plaintiff,
STEVEN R. KINCAID
By his attorneys,

_John Harkavy_
John B. Harkavy, Esquire, BBO No. 541900
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

Of Counsel:
DEBORAH MARTIN NORCROSS, ESQ.
60 Marion Road West
Princeton, New Jersey 08540
Telephone:    (609) 279-0191
Facsimile:    (609) 279-0526
*(Motion for Admission Pro Hac Vice to be Filed)*
#294004 v1/99999/1

Dated: July 6, 2004

10

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STEVEN R. KINCAID, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 04-11522-WGY |
| BANK OF AMERICA CORPORATION, | ) |
| Defendant. | ) |

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

Interrogatory No. 4

Describe each way you contend you were injured or have suffered damages, including but not limited to, (a) state the total amount of damages claimed and a computation of each category of damages you claim; (b) STATE THE BASIS upon which you rely to support each element of damages claimed; (c) state the methods, theories and calculations by which you arrived at the claimed dollar amounts of each element of damages claimed; (d) IDENTIFY any person whom you know of whom you believe has the knowledge of the basis for and calculation of such damages; and (e) IDENTIFY the person(s) who calculated the amount of each such element of damages.

Answer No. 4

Plaintiff objects to this interrogatory on the ground it is premature. Plaintiff will

seasonably supplement this Answer in the near future.

Supplemental Answer No. 4

Plaintiff contends that he has suffered the following categories of damages: (1) back pay with interest, adjusted for any increases plaintiff would have received had he not been unlawfully terminated; (2) lost bonuses; (3) replacement cost for lost benefits; (4) front pay in lieu of reinstatement; (5) compensation for loss of pension and other benefits in retirement; (6) reimbursement for relocation and other costs resulting from plaintiff's termination; (7) compensation for vocal cord paralysis plaintiff suffered as a result of defendant's tortious conduct; (8) compensatory damages for emotional distress, pain and suffering, and mental anguish; (9) relocation, job search, business development and other damages incurred by plaintiff as a result of his unlawful termination; (10) punitive damages; (11) liquidated damages for defendant's willful violation of the ADEA; and (12) attorney's fees, interest, costs and disbursements.

As to the amount of, and calculation of, each category of damages, and as to the basis for plaintiff's claim in each case, plaintiff anticipates relying on further fact discovery (in addition to the fact discovery to date) and on expert testimony. Accordingly, plaintiff will seasonably supplement this Answer when he completes his fact discovery and submits the reports from his experts.

Interrogatory No. 6

State whether Plaintiff ever destroyed or deleted any documents, including e-mails, CONCERNING Plaintiff's employment with Bank of America and IDENTIFY each such document and/or e-mail; and state the date or approximate date on which it what [sic] destroyed and/or deleted.

Answer No. 6

Plaintiff objects to this interrogatory on the ground it is vague and overbroad.

Without waiving the foregoing objection, and construing the interrogatory as referring to the time period during which plaintiff was employed by defendant, plaintiff states:

Plaintiff's usual practice was to retain all substantive e-mails until they were automatically deleted, after 90 days, by defendant's system. Plaintiff would delete non-substantive broadcast e-mails, like the announcement of the corporate blood drive or the United Way campaign, as soon as he had read them. Plaintiff used e-mails as a filing system rather than printing out e-mails and putting them into a paper file.

On June 13, 2003, the day of plaintiff's termination, plaintiff did not have the opportunity to print out or otherwise save e-mails because he was required to leave the premises in under two hours. Had plaintiff been given the opportunity to go through his files and e-mails, he would have printed out relevant e-mails, and retrieved and saved other important documents.

Supplemental Answer No. 6

Renewing his original objection and without waiving that objection, plaintiff states: Construing defendant's Interrogatory in response to defendant's request as also referring to the time period since plaintiff was terminated by defendant, plaintiff supplements his original Answer to state that, since being terminated by defendant, plaintiff has not destroyed or deleted any documents concerning plaintiff's employment with defendant.

Interrogatory No. 7

IDENTIFY any and all e-mail communications you believe are relevant to your claims which could have been found at any time within the Bank of America electronic e-mail system.

3

Answer No. 7

Plaintiff objects to this interrogatory as vague and overbroad.

Without waiving the foregoing objection, plaintiff states that the relevant e-mail communications ("e-mails") which could have been found include, without limitation: (i) e-mails showing the work done by plaintiff for defendant, and the quality of that work; (ii) e-mails showing the positive feedback plaintiff received regarding his work from a wide array of individuals including, without limitation, Sheila Burroughs and Alec Kotopoulos; (iii) e-mails showing that the criticisms of plaintiff's work made by Sheila Burroughs starting in April 2003 were vague, unspecific, inconsistent, undocumented and/or inaccurate; (iv) e-mails exhibiting age bias in plaintiff's case and in the case of other employees of the defendant; (v) e-mails concerning claims of age discrimination, retaliation and harassment made by other employees of the defendant; (vi) e-mails supporting each point enumerated in Answer No. 1 above.

Supplemental Answer No. 7

Renewing his original objection and without waiving that objection, plaintiff states: In response to defendant's request that plaintiff identify specific e-mail communications to the extent plaintiff is able to do so, and believing that the Interrogatory does not ask plaintiff to identify communications that defendant has produced in discovery, plaintiff supplements his original Answer to identify the following specific e-mail communications that plaintiff believes could have been found (assuming they were not deleted or otherwise destroyed) but which defendant has not produced:

4

1.    Alec Kotopolous's cover e-mail (dated, to the best of plaintiff's recollection in February 2003) that accompanied the general sendout of plaintiff's statistical monograph to the entire CAMR department;

2.    Sheila Burrough's e-mail to plaintiff in October or November 2002 congratulating plaintiff on plaintiff's idea regarding replacing confidence intervals in the branch customer satisfaction work;

3.    E-mail to plaintiff in February or March 2003 from Kim Steinbruck (member of Alan Church's work group ) regarding plaintiff's work helping her rewrite survey questions and conduct statistical analysis for her clients;

4.    E-mail (possibly several ) to plaintiff from Bonnie Harrell in January or February 2003 (after she left CAMR) regarding plaintiff's work helping her rewrite survey questions and conduct statistical analysis for her clients;

5.    Chuck Andrew's e-mail to plaintiff in December 2002 thanking plaintiff for testing plaintiff's driver methodology on his credit card data and congratulating plaintiff on the success of the methodology;

6.    E-mail to plaintiff from Maggie Huggins in March or April 2003 (after she left CAMR) thanking plaintiff for helping her rework her analysis plan for customer data gathered in the bank's Online business; and

7.    E-mail (possibly several) to plaintiff from David Lee in March or April 2003 in the Investment area thanking plaintiff for helping him revise his area's customer satisfaction questions, and their driver analysis plan, to fit into the new customer satisfaction research standards.

OCT-3-2005  03:09P FROM:STEVE KINCAID        978-887-2927        TO:16177200987        P.1

<u>Verification</u>

I, Steven R. Kincaid, am the plaintiff in this action.  I have read the foregoing

Supplemental Answers to Interrogatories.  To the best of my present recollection,

knowledge, understanding and belief, the foregoing Supplemental Answers are true.

Signed under the penalties of perjury this ___3rd___ day of October, 2005.

*Steven R. Kincaid*

Steven R. Kincaid

As to objections:

_____

David J. Fine, BBO #165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Attorney for Plaintiff

<u>Certificate of Service</u>

I hereby certify that I have this day served the foregoing by causing true copies
thereof to be transmitted electronically and mailed, first class postage prepaid, to Richard
F. Kane and Steven T. Ackermann, Esqs., McGuire Woods LLP, Bank of America
Corporate Center, 100 North Tryon Street, Suite 2900, Charlotte, NC 28202, attorneys
for defendant.

Dated: October ____, 2005

_____

David J. Fine

6

<u>Verification</u>

I, Steven R. Kincaid, am the plaintiff in this action. I have read the foregoing

Supplemental Answers to Interrogatories. To the best of my present recollection,

knowledge, understanding and belief, the foregoing Supplemental Answers are true.

Signed under the penalties of perjury this _____ day of October, 2005.

_____
Steven R. Kincaid

As to objections:

David J. Fine, BBO #165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Attorney for Plaintiff

<u>Certificate of Service</u>

I hereby certify that I have this day served the foregoing by causing true copies
thereof to be transmitted electronically and mailed, first class postage prepaid, to Richard
F. Kane and Steven T. Ackermann, Esqs., McGuire Woods LLP, Bank of America
Corporate Center, 100 North Tryon Street, Suite 2900, Charlotte, NC 28202, attorneys
for defendant.

Dated: October _3_, 2005

David J. Fine

6

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STEVEN R. KINCAID, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04CV11522 WGY |
| | ) | |
| vs. | ) | |
| | ) | |
| BANK OF AMERICA CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT PRETRIAL MEMORANDUM**

1. **Concise Summary Of The Evidence To Be Offered**

     a.     **Plaintiff**

     b.     **Defendant**

Defendant expects to offer evidence that Plaintiff was hired by Sheila Burroughs in August 2002, when he was 49 years of age and that he was terminated by Ms. Burroughs in June 2003, when he was still 49 years old. In his position, Ms. Burroughs expected Plaintiff to be a leader within the Bank and to work with and influence the Bank's senior executives across its various product lines to identify and implement strategies to increase the satisfaction the Bank's customer's felt for the Bank.

Although Plaintiff was good at analyzing data about the Bank's customers and demonstrated a high competency at being a project manager, his job required more. Specifically, the job required an ability to translate the customer survey data into relevant information and communicate that relevant information to the Bank's senior executives to influence their business decisions.

1

Throughout Plaintiff's employment, he and Ms. Burroughs met on a weekly basis to develop his performance goals and to discuss his progress against those goals. In October or November, after only a couple of months in his position, Ms. Burroughs rated Plaintiff "solid," or in the middle of a 5 point performance rating scale. Over the course of the next several months, it became clear to Ms. Burroughs that Plaintiff was not demonstrating the leadership within the Bank that his position required. As a result, Ms. Burroughs rated Plaintiff as "needs improvement" in his performance review for the first quarter of 2003 and put him on a written performance warning. Ms. Burroughs continued to meet with Plaintiff on a weekly basis and coached and counseled him in the areas of his performance that needed improvement. After two months and no sustained improvement in Plaintiff's performance, Ms. Burroughs terminated Plaintiff's employment with the Bank.

Plaintiff did not complain directly to anyone at the Bank that he felt Ms. Burroughs' criticisms of him were motivated by her age discrimination. Instead, Plaintiff retained an attorney who wrote a letter to another the Bank's highest ranking personnel executive, who forwarded it to the Bank's in-house counsel, Eric Montgomery. Mr. Montgomery did not share the contents of the attorney letter with Ms. Burroughs until after the Plaintiff's termination, and Ms. Burroughs knew nothing of the Plaintiff's allegations from any other source until after his termination.

Plaintiff has failed to mitigate his damages by failing to look for comparable work. Defendant expects the evidence to show that in the more than two years since his termination, Plaintiff has looked for work at only a handful of companies and instead of taking a different type of position, he has accepted work teaching a GED course at a much reduced salary and has not searched diligently for comparable work. Plaintiff did not sustain any damages related to

emotional distress and any distress he was feeling was associated with his divorce and custody and visitation issues related to his children.

**2.    Established Facts**

a.    Plaintiff was hired in August 2002 as a market information manager for Bank of America in its customer satisfaction group.

b.    Plaintiff's supervisor was Sheila Burroughs.

c.    At the time of hire by Bank of America, Plaintiff was 49 years old.

d.    At the time of his termination by Bank of America, Plaintiff was 49 years old.

e.    Plaintiff received a rating of "needs improvement" for his first quarter 2003 performance review.   The rating was prepared by Sheila Burroughs.

f.    Plaintiff was given a written performance warning by Sheila Burroughs in April 2003.

g.    Plaintiff was terminated by Sheila Burroughs on June 13, 2003.

**3.    Contested Issues Of Fact**

a.    Whether Plaintiff was terminated because of his age.

b.    Whether Plaintiff was terminated because his attorney wrote a letter to the Bank complaining about age discrimination with respect to his performance review and rating and performance warning.

c.    Whether Plaintiff suffered any damages because of his termination.

d.    Whether Plaintiff failed to mitigate his damages.

**4.    Jurisdictional Questions**

a.    Whether Plaintiff failed to file his Complaint alleging age discrimination and retaliation within the time period allowed under ADEA and therefore whether this court has

3

jurisdiction over Plaintiff's claims under ADEA.  29 U.S.C. § 616(d) and (e).  See Defendant's

Motion For Summary Judgment.

5.    **Questions Raised By Pending Motions**

Defendant has filed a motion for summary judgment.  That motion raises the following

issues with respect to liability:

6.    **Issues of Law/Evidentiary Questions**

    a.    **Plaintiff—**

        1.    Whether the Massachusetts law of privilege applies to this case such that,

an adverse inference may be drawn against the Bank based on the Bank's withholding, on

ground of privilege, documents reflecting the Bank's internal investigation of Mr. Kincaid's

claims of age discrimination, retaliation and harassment.

        2.    Whether the jury should be instructed that an inference adverse to the

Bank may be drawn based on the Bank's failure to issue a preserve-evidence instruction to its

employees and based on the Bank's destruction of e-mail evidence.

            See Zubulake v. UBS Warburg LLC, 2004 WL 1620866 (U.S.Dist.Ct., S.D.N.Y.
            2004)

        3.    Whether the Bank should be ordered to pay the costs of depositions or re-

depositions required on account of the Bank's late production of discovery.

            See id.

    b.    **Defendant--**

        1.    Whether Defendant is entitled to judgment as a matter of law on Plaintiff's

claim under ADEA for age discrimination because Plaintiff is not able to produce sufficient

evidence from which a reasonable jury could find that he was terminated because of his age.

2.    Whether Defendant is entitled to judgment as a matter of law on Plaintiff's claim under ADEA for retaliation because Plaintiff is not able to produce sufficient evidence from which a reasonable jury could find that he was terminated in retaliation for his attorney's letter.

3.    Whether Defendant is entitled to judgment as a matter of law on Plaintiff's claim for wrongful termination in violation of public policy under North Carolina law because he is not able to produce sufficient evidence from which a reasonable jury could find he was terminated because of his age.

4.    Whether Defendant is entitled to judgment as a matter of law on Plaintiff's claim for violation of the implied covenant of good faith and fair dealing under North Carolina law because North Carolina does not recognize such a covenant in at-will employment.

5.    Whether Plaintiff failed to file his Complaint alleging age discrimination and retaliation within the time period allowed under ADEA and therefore whether this court has jurisdiction over Plaintiff's claims under ADEA. 29 U.S.C. § 616(d) and (e). See Defendant's Motion For Summary Judgment.

Defendant expects to contest the admissibility and relevance of documents Plaintiff seeks to enter as evidence. When Defendant receives Plaintiff's list of proposed exhibits, Defendant will supplement this section of the pretrial memorandum.

**7.    Requested Amendments To The Pleadings**

**a.    Plaintiff—**

Plaintiff requests leave to amend his Complaint to add the following Count for negligent infliction of emotional distress under North Carolina law:

COUNT FIVE
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

5

55.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs of this Complaint.

56.    In acting as it did, defendant:  (a) negligently engaged in conduct; (b) it was reasonably foreseeable that such conduct would cause the plaintiff severe mental anguish and emotional distress; and (3) the conduct did in fact cause the plaintiff severe mental anguish and emotional distress.

57.    The acts of defendant that foreseeably caused plaintiff severe mental anguish and emotional distress included, without limitation,

a.    pressuring plaintiff not to attend the funeral of his grandmother;

b.    threatening to terminate plaintiff's employment, and then actually terminating plaintiff's employment, on the purported ground that his job performance had been substandard, deficient and unsatisfactory, when, in actuality, his job performance had been excellent and the reasons for threatening to terminate his employment, and actually terminating his employment, had nothing to do with the quality of his work;

c.    assuring plaintiff that he would have 90 days to improve the quality of his job performance to a satisfactory level and then terminating his employment in fewer than 90 days on the purported basis that it had become clear that plaintiff was not making sufficient progress in improving the quality of his performance when the actual reason for cutting short his time to improve, was defendant's fear the plaintiff was about to file a disability claim and defendant wanted to be sure to terminate plaintiff's performance before he could do so;

d.    assuring plaintiff in writing on April 30, 2003 that defendant was "investigating the facts and circumstances" of plaintiff's written April 25, 2003 discrimination claim and that defendant would "respond" to that claim "shortly" when, in actuality, defendant

had done nothing to investigate plaintiff's claim and would do nothing to investigate or respond to plaintiff's claim until _after_ plaintiff was terminated on June 13, 2003.

58.    The mental anguish and emotional distress resulting from defendant's actions caused plaintiff to sustain, among other things, a voice disorder in December 2004 which made it extremely difficult for plaintiff to speak at all for several months and which has continued to have an adverse impact on plaintiff's ability to speak to this day.

    **b.**    **Defendant—none.**

**8.**    **Additional Matters To Aid Disposition**

    **a.**    **Remaining Discovery Plaintiff is Expecting**

        i.    Supplemental deposition of Vipin Mayar

        ii.    Defendant's providing remainder of discovery compelled by Court's 9/8/05 Order

        iii.    Defendant's providing information re posting and filling of positions of Sheila Burroughs and Allison Hart in Customer Satisfaction unit

        iv.    Defendant's supplementation of privilege log

        v.    Defendant's production of written complaint made by Erin McCarthy referred to by Alec Kotopoulos in his deposition

    **b.**    **Remaining Discovery Defendant is Expecting**

        i.    Supplemental deposition of plaintiff

        ii.    Plaintiff's supplementation of interrogatory answer regarding damages

**9.**    **Probable Length Of Jury/Non-Jury Trial**

Jury trial

Plaintiff's estimate of length:  8 days

Defendant's estimate of length:  8 days

**10.    Witnesses**

    **a.    Plaintiff**

      <u>Fact Witnesses</u>

        i.    Plaintiff Steven R. Kincaid
            8 Towne Lane
            Topsfield, MA 01983

        ii.    Alec Kotopoulos (former Bank employee)
            [to be inserted]
            _____, MA

            live or by deposition

        iii.    Sheila Burroughs (current Bank employee)
            Charlotte, NC

            live or by deposition

        iv.    Vipin Mayar (former Bank employee)
            [to be inserted]

            live or by deposition

        v.    Elizabeth Janak (current Bank employee)
            Davidson, North Carolina

            live or by deposition

        vi.    Eric Montgomery (current Bank employee)
            Charlotte, NC

            live or by deposition

        vii.    Daniel Dupre (current Bank employee)
            Charlotte, NC

            live or by deposition

        viii.    Christine Lamano (current Bank employee)
            Charlotte, NC

            live or by deposition

ix.    Timothy Megyesy (current Bank employee)
       Pittsburgh, PA

       live or by deposition

x.     Erik Fine (current Bank employee)
       Charlotte, NC

       live or by deposition

xi.    Marilyn Kincaid (plaintiff's sister)
       120 Settlers Trail
       Morgantown, PA 19543

xii.   other fact witnesses
       [to be inserted]


Expert Witnesses

[to be inserted]


**b.      Defendant's Witnesses**

Sheila Burroughs
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Eric Montgomery
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Allison Hart
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

9

Susan Haloulos
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Tim Megyesy
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Elizabeth Janak
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Kathryn Little
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Daniel Dupre
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Erik Fine
Current employee of Defendant
C/o Siobhan Sweeney
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110

Vipin Mayar
New York, New York

Alec Kotopoulos
Marlborough, MA

Other Fact Witnesses:

[To be inserted]

Expert Witnesses:

[To be inserted].

Defendant reserves the right to amend and supplement this list of witnesses.  Defendant reserves the right to call any witness listed by Plaintiff.


**11.**    **Proposed exhibits—Not Agreed To**

Not Yet Evaluated for Potential Objections

1.    Bank of America Applicant Acknowledgment Form for Steven Kincaid dated 6/27/02

2.    7/22/02 job offer letter from Bank of America to Steven Kincaid

3.    10/4/02 Nomination of Steven Kincaid by Susan Haloulos for recognition

4.    11/6/02 e-mail from Erik Fine to Vipin Mayar

5.    4/3/03 e-mail from Alan Church to Steven Kincaid

6.    Pages regarding posting of new position applied for and ultimately obtained by Allison Hart

7.    April 2003 Performance Plan & Evaluation Form for Steven Kincaid for review period QI 2003

8.    April 2003 memorandum entitled "Overall Rating:  Needs Improvement/Does Not Meet Expectations"

9.    4/16/04 [actually 4/16/03] Associate Counseling memorandum regarding Steven Kincaid

10.    Performance management memorandum regarding Steven Kincaid opened 4/8/03, closed 7/8/03

11.    4/25/03 letter from Deborah Martin Norcross to J. Steele Alphin regarding
       Steven Kincaid

12.    4/30/03 letter from Eric Montgomery to Deborah Martin Norcross regarding
       Steven Kincaid

13.    5/20/03 letter from Deborah Martin Norcross to Eric Montgomery regarding
       Steven Kincaid

14.    6/12/03 e-mail from Allison Hart to team (including Steven Kincaid) regarding
       her new position

15.    Pages regarding posting of new position applied for and ultimately obtained by
       Sheila Burroughs

16.    7/22/03 letter from Martha W. Moore to Deborah Martin Norcross regarding
       Steven Kincaid

17.    8/18/03 e-mail from Elizabeth Janak to Alec Kotopoulos  and 8/18/03 responding
       e-mail from Alec Kotopoulos to Elizabeth Janak

18.    Personnel file for Alec Kotopoulos

19.    6/3/04 letter from Vicki Rowan to Eric Montgomery regarding Emil Becker

20.    Sexual Harassment and Discrimination Policy for Bank of America


Defendant reserves the right to review this list and to object to any documents and to

propose other documents not included herein.



Steven R. Kincaid                          Bank of America Corp.
Plaintiff                                  Defendant
By his attorneys                           By its attorneys




_____                _____
David J. Fine  (BBO No. 165120)            Siobhan Sweeney (BBO No. 562118)
Law Offices of David J. Fine               Edwards & Angell, LLP


12

Three Center Plaza, Suite 400
Boston, MA  02108
(617) 720-2941

101 Federal Street
Boston, MA  02110
(617) 439-4444

Mark Pogue
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI  02903
(401) 274-9200

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
NO. 04 CV 11522 (JLT)

STEVEN R. KINCAID,                      )
                                        )
           Plaintiff,                   )
                                        )
vs.                                     )
                                        )
BANK OF AMERICA CORPORATION,            )
                                        )
           Defendant.                   )
                                        )

### AFFIDAVIT OF RICHARD F. KANE

I, Richard F. Kane, declare as follows:

1. I am a partner with the law firm of McGuireWoods LLP, which is counsel to Defendant Bank of America in this case. I have personal knowledge of the facts set forth below.

2. On March 9, 2005, Plaintiff served his responses to Defendant's First Requests For Production of Documents. Defendant's requests included a demand for the production of medical records. Plaintiff objected to the requests but did provide a document reflecting a scheduled appointment with Joseph Parisi, Ph.D. On March 18, 2005, my law firm prepared the attached Release for use in this case and sent it to the Plaintiff's lawyer, David Fine, to be executed by the Plaintiff. Mr. Fine returned the release, signed by his client, on May 19, 2005.

3. Because the Health Insurance Portability and Accountability Act of 1996 (HIPAA) requires that releases authorizing the release of medical information contain an expiration date, we included in the release provided to the Plaintiff an expiration date of September 15, 2005. The September 15, 2005 date was selected because, at the time the release was prepared, discovery in this case was scheduled to close on July 2, 2005. At the time the

release was prepared, therefore, the September 15, 2005 expiration date was more than sufficient to enable Bank of America to obtain records from Dr. Parisi during the discovery period. Once such records were properly obtained pursuant to the release, my view was that they could be used in this case without the necessity of obtaining a separate, additional release from the Plaintiff.

_____
Richard F. Kane

SWORN TO and subscribed
before me this the 4th day
of January, 2006.


_____
Notary Public

My Commission expires: 12/21/09

OFFICIAL SEAL
Notary Public, North Carolina
County of Mecklenburg
CONNIE R. HARTSELL
My Commission Expires 12/21/09

# EXHIBIT E

# HIPAA AUTHORIZATION FORM FOR
# RELEASE OF MEDICAL INFORMATION

I, Steven R. Kincaid, hereby authorize the use or disclosure of my individually identifiable health information as described below. I understand that this authorization is voluntary. I understand that if the organization authorized to receive the information is not a health plan or health care provider, the released information may no longer be protected by federal privacy regulations.

1.    The following specific person or class of persons or facility is authorized to make the requested use or disclosure:

### NAME OF PERSON OR FACILITY:

Joseph A. Parisi, Ph.D.

### ADDRESS:

Charlotte Behavioral Health Associates
517 South Sharon Amity Road, Suite 105
Charlotte, North Carolina 28211

2.    The following persons or class of persons may receive disclosure of protected health information about me:

Richard F. Kane                         David J. Fine
Steve Ackermann                        Law Offices of David J. Fine
McGuire Woods LLP                      3 Center Plaza, Suite 400
100 N. Tryon Street, Suite 2900        Boston, Massachusetts 02108
Bank of America Corporate Center
Charlotte, North Carolina 28202

George P. Kostakos
Edwards & Angell, LLP
2800 Financial Plaza
Providence, Rhode Island 02903

3.    The specific information that should be disclosed is:  All medical or psychological or counseling records, x-rays, diagnostic studies, laboratory slides, documents, reports, clinical abstracts, histories, intake forms, charts and billing records which they may request relative to my past, present or future physical condition, treatment, care and/or hospitalizations and to allow them to procure or copy whatever medical records, x-rays, slides or other documents you have. I understand that I am authorizing the release of medical records which may contain

information relating to the results of blood testing, including results of HIV testing.

4.   I understand that the documents disclosed may be subject to re-disclosure by the person or class of persons or facility receiving them, and would then no longer be protected by federal privacy regulations.

5.   I may revoke this authorization by notifying Joseph A. Parisi, Ph.D. in writing of my desire to revoke it.  However, I understand that any action already taken in reliance on this authorization cannot be reversed, and my revocation will not affect those actions.  I understand that the medical provider to whom this authorization is furnished may not condition his treatment of me on whether or not I sign the authorization.

6.   This authorization expires on September 15, 2005.

_Steven R. Kincaid_

Steven R. Kincaid

_5/9/05_

Date

_7/19/53_

Date of Birth:  7/9/53

_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_

Social Security Number:  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

**EXHIBIT F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN R. KINCAID, ) | |
| ) | |
| Plaintiff, ) | CA No. 04 CV 11522 WGY |
| ) | |
| vs. ) | |
| ) | |
| BANK OF AMERICA CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S MOTION FOR PERMISSION TO FILE
## TREATMENT NOTES UNDER SEAL

Defendant Bank of America Corporation ("Bank of America" or "the Bank") hereby moves for permission to file treatment notes under seal. The Bank states that said treatment notes (the "Notes") are presently the subject of its motion for leave to utilize previously disclosed psychiatric treatment notes pertaining to the Plaintiff, and to question the Plaintiff's psychiatrist regarding those Notes, during the trial of this case ("Motion").

Out of an abundance of caution, the Bank requests the Court's permission to file these Notes contemporaneously with its Motion, but under seal. Accordingly, the Bank attaches the Notes hereto in a separate, sealed envelope marked as Exhibit 1. If the Court grants the Banks Motion, and allows the use of previously disclosed psychiatric treatment notes pertaining to Plaintiff, and to question Plaintiff's psychiatrist regarding those Notes, during trial of this case, the Bank respectfully requests that the Court unseal the Notes for use in this case.

BANK OF AMERICA CORPORATION,
Defendant
By its attorneys,


/s/Siobhan Sweeney
Siobhan Sweeney
BBO No. 562118
Mark Pogue
BBO No.
Edwards Angell Palmer & Dodge, LLP
101 Federal Street
Boston, MA 02110
Phone:          617.439.4444
Fax:            617.439.4170

Richard F. Kane (admitted pro hac vice)
Steven T. Ackermann (admitted pro hac vice)
McGuireWoods LLP
Bank of America Corporate Center
100 North Tryon Street, Suite 2900
Charlotte, North Carolina 28210
Telephone:    704.373.8999
Facsimile:    704.373.8827

Dated:  January 4, 2006.

### Certification of Conference Pursuant to LR 7.1

I hereby certify that prior to filing, the parties, through their counsel, have conferred with respect to Defendant's Motion For Permission To File Treatment Notes Under Seal and the issues raised therein, in an effort to narrow the areas of disagreement.


_/s/ Siobhan Sweeney_

2

# EXHIBIT G

1

Volume II, Pages 1-125

Exhibits 10-11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NO. 04 CV 11522 (WGY)

_____

STEVEN R. KINCAID,                    )

     Plaintiff,                      )

Vs.                                   )

BANK OF AMERICA CORPORATION, )

     Defendant.                      )

_____ )

DEPOSITION OF:  STEVEN R. KINCAID

EDWARDS, ANGELL, PALMER & DODGE, LLP

101 Federal Street

Boston, Massachusetts

November 8, 2005        11:15 a.m.

REPORTED BY: SONYA LOPES/CSR

APPEARANCES:


Representing the Plaintiff:

      LAW OFFICES OF DAVID J. FINE

      BY:  DAVID J. FINE, ESQ.

      Three Center Plaza, Suite 400

      Boston, Massachusetts  02108-2003

      (617) 720-2942


Representing the Defendant:

      EDWARDS, ANGELL, PALMER & DODGE, LLP

      BY:  SIOBHAN SWEENEY, ESQ.

      101 Federal Street

      Boston, Massachusetts  02110

      (617) 439-4444

Steven R. Kincaid
November 8, 2005

3

I N D E X

WITNESS:                    EXAMINATION BY:                    PAGE:

STEVEN R. KINCAID     MS. SWEENEY                    5


EXHIBITS:                                             PAGE:

Exhibit 10, report.........................68

Exhibit 11, Answers to Interrogatories......120


(All exhibits retained by Ms. Sweeney)

67

1    Q.    What do you mean by that?

2    A.    We communicate for business purposes,

3    purposes of child transportation, child care, child

4    welfare.

5    Q.    Did you ever seek any counseling with

6    respect to any emotional distress damages you allege

7    you suffered?

8    A.    Yes, I did.

9    Q.    And when did you do that?

10    A.    It was in the early part of the year in

11    2003.  It was after I had been notified by the bank

12    that my performance was being questioned by

13    Ms. Burroughs?

14    Q.    And who did you seek counseling with?

15    A.    Well, I had one appointment with a

16    gentleman named Dr. Parisi.

17    Q.    And did you have any other counseling?

18    A.    No, I did not.

19    Q.    So Dr. Parisi was the only doctor that you

20    sought counseling from --

21    A.    That's right.

22    Q.    -- with respect to alleged emotional

23    distress?  Yes?

24    A.    Yes.

 1              MS. SWEENEY:  Can I get this one marked?

 2              (Report, Exhibit 10, marked)

 3   BY MS. SWEENEY:

 4     Q.    Do you want to take a look at Exhibit

 5   No. 10?  And if you could read that over for me.

 6   Let me know when you're done.

 7     A.    Okay.

 8     Q.    You've read the entire document?

 9     A.    Yes, I've read it.

10   *    Q.    And is this the consultation you had with

11   Dr. Parisi that you testified about related to

12   emotional distress as a result of anything that Bank

13   of America did to you?

14              MR. FINE:  Objection.

15     A.    Yes.

16              MR. FINE:  Miss Sweeney asked a long

17   question.

18              MS. SWEENEY:  David, under the federal

19   rules, you may object to the form of the question.

20   But you cannot instruct your client how to answer it

21   or to coach your client.

22              MR. FINE:  Miss Sweeney, I think it was

23   an unfair question.

24              MS. SWEENEY:  Fine.  Duly noted.

```
 1              MR. FINE:  Could you please read back

 2   the question?  And, Mr. Kincaid, please listen to

 3   the whole question.

 4              MS. SWEENEY:  Enough David.

 5              *  (Question read back)

 6      A.   I guess I don't recall testifying about

 7   this, so I guess the answer's no.

 8   BY MS. SWEENEY:

 9      Q.   Did you just testify that you saw

10   Dr. Parisi in 2003 for counseling?

11      A.   Uh-huh.

12              MR. FINE:  You need to verbalize.

13      A.   Yes, I did.

14   BY MS. SWEENEY:

15      Q.   And was that counseling related to

16   emotional distress that you are claiming was caused

17   by Bank of America?

18              MR. FINE:  Objection.  And let the

19   record note that at the time that Mr. Kincaid sought

20   this counseling, he had made -- filed no lawsuit

21   against the Bank of America.

22              MS. SWEENEY:  David, enough.

23              MR. FINE:  Miss Sweeney, you're asking

24   an unfair question in an unfair way.
```

1    BY MS. SWEENEY:

2        Q.    Mr. Kincaid --

3                MR. FINE:  In fact -- excuse me.  In

4    fact --

5                MS. SWEENEY:  Enough.

6                MR. FINE:  You're raising your voice

7    now, which is inappropriate.  What the record does

8    not reflect because there isn't a tape-recording was

9    that when Miss Sweeney first asked this question,

10   she asked the first part of the question in a

11   regular tone of voice.  And then when she added the

12   coda at the end with regard to emotional distress

13   caused by the Bank of America, she dropped her

14   voice.

15               So it seemed to me that there was an

16   effort on the part of Ms. Sweeney in the way that

17   she asked the question to mislead the witness and to

18   ask an unfair question.

19   BY MS. SWEENEY:

20       Q.    Mr. Kincaid, did you suffer any emotional

21   distress as a result --

22               MR. FINE:  Excuse me.  Let the record

23   reflect that Miss Sweeney's tone of voice has

24   changed.  She's now speaking in a loud and

Steven R. Kincaid
November 8, 2005

71

```
 1   aggressive way, which is totally out of keeping with
 2   the way that she's asked questions up until now.
 3   And I object to the tone of voice and to the way
 4   she's asking the question.  There's no need --
 5             MS. SWEENEY:  You have cut me off
 6   enough, David.
 7   BY MS. SWEENEY:
 8     Q.   Mr. Kincaid --
 9             MR. FINE:  Excuse me.  Excuse me.  Let
10   the record reflect that notwithstanding my request
11   that Miss Sweeney use a normal tone of voice, she
12   continues to raise her voice and speak in a loud and
13   aggressive fashion, which I believe is totally
14   inappropriate for a deposition.  And if she does not
15   stop doing that, we're just going to walk out.
16   BY MS. SWEENEY:
17     Q.   Mr. Kincaid, did you suffer any emotional
18   distress as a result of anything that Bank of
19   America did to you?  Yes or no?
20             MR. FINE:  Let the record reflect that
21   when Miss Sweeney added the yes or no, she reverted
22   to the loud and aggressive tone she had used before
23   that I asked her to stop using.
24   BY MS. SWEENEY:
```

72

1    Q.    Please answer the question, Mr. Kincaid.

2    A.    Yes.

3    Q.    What emotional distress did you suffer?

4    A.    I suffered emotional distress as a result

5    of being without a job; as a result of, you know,

6    loss of self-esteem among people I spent time with

7    and social friends in my community because I was

8    unemployed for a period of time.

9          I felt that my children looked at me

10   differently because I was at least for a while not a

11   breadwinner and not somebody who was a person they

12   could look up to.

13         I felt like the incidents of harassment I

14   had been through at the Bank of America kind of left

15   me with, I guess you could say, emotional scars.

16   Because I guess I kind of had been turned on, I

17   guess you might say, by people I had trusted and

18   that I had sacrificed a great deal for, moved to

19   another state, been separated from my family, et

20   cetera.  So there are a number of different ways, I

21   guess, I felt like that it affected me.

22   Q.    Did you consult with anyone as a result of

23   that emotional distress?

24   A.    During the time I was employed by the bank,

**Eppley Court Reporting**
**(508) 478-9795**

1    I went to see Dr. Parisi.

2        Q.    Did you consult with Dr. Parisi as a result

3    of emotional distress you claim you suffered due to

4    Bank of America?

5        A.    When I talked to Dr. Parisi, the purpose

6    for the visit was to see if it was fruitful or

7    helpful for us to continue or to establish an, I

8    guess you'd call it, doctor-patient relationship.

9            The reason of the visit wasn't, I guess you

10   might say, to reach a therapeutic outcome.  It was

11   more to see whether or not it was desirable or

12   helpful to meet again.

13       Q.    And what did you tell Dr. Parisi about Bank

14   of America?

15       A.    Well, I told him that I was going through a

16   very difficult time at my job and that I felt like I

17   was being treated very unfairly.  And I felt like

18   because my actions the things I could control at

19   work that would -- well, not that I could control at

20   work but didn't really have any affect on the

21   outcome.  I felt that my supervisor had already

22   decided that she wanted me to leave the employ of

23   the Bank of America, that it made me feel depressed

24   because I couldn't really do anything to alter the

Steven R. Kincaid
November 8, 2005

74

1    outcome.   I felt like the decision had already been

2    made.

3        Q.    Did you tell them anything about your

4    ex-wife and your children?

5        A.    I mentioned that I missed my children.   I

6    didn't miss my ex-wife, but I did miss my children.

7        Q.    How did you get referred to Dr. Parisi?

8        A.    There were a list of doctors or

9    psychologists that were in a book that the health

10   plan -- I think it was UnitedHealthcare -- provided.

11   And I called several until I found one that would

12   see me and that was close by.

13       Q.    What other doctors did you call for

14   appointments?

15       A.    Oh, I really can't remember.   It was too

16   long ago.   I probably called a couple of others and

17   settled on Dr. Parisi.

18       Q.    And was Dr. Parisi a psychologist?

19       A.    I believe that he was, yeah.

20       Q.    And how old was Dr. Parisi?

21       A.    I guess he was in his 40s, maybe early 50s.

22       Q.    Isn't it true at the time that you saw

23   Dr. Parisi, your chief complaint was about your wife

24   and your children?

Steven R. Kincaid
November 8, 2005

75

1                MR. FINE:  Objection.

2       A.   No.  I would say that wasn't true.

3   BY MS. SWEENEY:

4   *    Q.   Can you provide any explanation as to why

5   it is that Dr. Parisi doesn't mention anything in

6   his record about the troubles you were having at

7   work?

8                MR. FINE:  I want to object again.  For

9   some reason, Miss Sweeney, in the last ten

10  minutes --

11               MS. SWEENEY:  David -- David --

12               MR. FINE:  Excuse me.

13               MS. SWEENEY:  Can we ask your client to

14  leave the room while you put your long, expansive

15  objection on the record?

16               MR. FINE:  No.

17               MS. SWEENEY:  Then I am going to ask you

18  to please stop coaching your witness.

19               MR. FINE:  Miss Sweeney, I will say what

20  I feel it is my -- it is appropriate for me to say.

21  I'm not going to be censored or lectured by you.

22               MS. SWEENEY:  By rules of civil

23  procedure?

24               MR. FINE:  One of the things that it is

1    completely appropriate to do under the rules of

2    civil procedure in every decision that I've read is

3    that when you feel that a questioner is abusing your

4    client, harassing your client, asking questions in

5    an inappropriate way, it is perfectly appropriate to

6    point that out on the record.  And that's what I'm

7    doing.

8              For some reason, you asked your

9    questions for the first hour and a half of this

10   deposition in a totally appropriate, factual way.

11   For some reason, in the last 15 minutes, you have

12   become rhetorical.  You've become aggressive.  And

13   you've become harassing, particularly given the

14   sensitivity of the subject matter which is -- now

15   you're asking the witness about a psychological

16   evaluation that deals with extremely personal

17   information.

18              The fact that you have become rhetorical

19   on this subject is really unaccountable,

20   inappropriate.  And I ask you to stop it.  And if

21   you don't, we are walking out.

22              MS. SWEENEY:  Could you read back the

23   question, please?

24              *   (Question read back.)

77

1    A.    My memory from my visit with Dr. Parisi was

2    that he seemed more interested in things that had a

3    personal, emotional basis. And he seemed to have

4    less interest in things related to jobs and

5    profession.

6          I got the feeling during the

7    conversation that he kind of steered the

8    conversation more toward my personal situation with

9    my family. I distinctly recall because I was under

10   severe pressure at my job that I mentioned to him at

11   the outset of the meeting that that was one of the

12   reasons that I was there.

13         My answer to your question can I provide

14   any explanation about this is that I think -- I

15   speculate, I guess, as a psychologist he seemed more

16   interested in things that had an emotional basis

17   with my family than with my job.

18   BY MS. SWEENEY:

19   Q.    Did you report to him that you were having

20   -- that your difficulties began three years ago when

21   you divorced your wife?

22   A.    When I went to Dr. Parisi, I mentioned that

23   I was having a great deal of problems --

24   Q.    I'm sorry. I'm going to stop you there.

1              MR. FINE:  No.  Excuse me.  It's

2     inappropriate.  You asked a question.

3              MS. SWEENEY:  David.

4              MR. FINE:  You're raising your voice.

5     You are raising your voice again.

6              MS. SWEENEY:  How can I be raising my

7     voice when I can't even get a word in.

8              MR. FINE:  You asked a question.  The

9     witness was in the middle of answering the question.

10    It is inappropriate, in my opinion, for you to cut

11    the witness off in the middle of his answering the

12    question.  I would --

13             MS. SWEENEY:  Tell me when you're done.

14             MR. FINE:  I will.  If after the witness

15    completes his answer to your question you feel that

16    the answer was somehow non-responsive or

17    inappropriate, then that is the time to point it out

18    to the witness after he completes his answer, not to

19    cut him off.

20    BY MS. SWEENEY:

21       Q.   Let me ask my question another way.  You

22    did report to Dr. Parisi that you began having

23    difficulty three years ago when you divorced your

24    wife; correct?

```
 1          MR.  FINE:   Objection.

 2     A.    What I reported to Dr. Parisi when I went

 3   for my visit was I was having a great deal of

 4   trouble at work and that problems currently occupied

 5   me, things at that time, things that were kind of

 6   present in my day-to-day life were the main reason I

 7   had come to see him.

 8          As he questioned me about things bothering

 9   me, he asked me about my past and about other things

10   that could be intermingled or mixed in with the

11   problems I was having now.  In response to questions

12   like that, I told him about my personal history.

13   BY MS. SWEENEY:

14     Q.    Could you read the first sentence of the

15   paragraph called history of the problem?

16     A.    Okay.

17     Q.    Could you read that into the record?

18     A.    David report --

19          MR.  FINE:   Excuse me.  I object to this

20   question.  And I would like to note for the record

21   that if Miss Sweeney is embarking upon a

22   line-by-line exploration of this report as if it was

23   a transcript of a deposition, at some point I am

24   going to simply object and direct the witness not to
```

```
 1   answer the question because I think it's abusive.    I

 2   think that Miss Sweeney's whole line of questioning

 3   about this has been remarkably insensitive.

 4   BY MS. SWEENEY:

 5        Q.    Could you read that first line, please?

 6        A.    Dave reports he began to have difficulty

 7   three years ago when he divorced his wife.

 8        Q.    Is that a true statement?

 9             MR. FINE:   Objection.   Mr. Kincaid has

10   already given an account of how -- what happened

11   during the interview to elicit the information that

12   is recorded there.   I think that Miss Sweeney --

13   essentially what Miss Sweeney is doing is attempting

14   to cross-examine Mr. Kincaid and badger Mr. Kincaid.

15             It is not the purpose of a discovery

16   deposition and is certainly not the circumstance

17   under which I agreed to permit the bank to have a

18   supplementary deposition of Mr. Kincaid.

19   BY MS. SWEENEY:

20        Q.    Mr. Kincaid, can you answer my question?

21             MR. FINE:   Do you have the question in

22   mind, Mr. Kincaid?

23        A.    You're asking me if the first statement is

24   true?
```

1    BY MS. SWEENEY:

2        Q.    Yes.    Is that a true statement?

3        A.    Yes.    I would say that's a true statement.

4        Q.    And did you report to Dr. Parisi that the

5    divorce was your wife's idea and she never told you

6    why she wanted it?

7            MR. FINE:    Before Mr. Kincaid asks --

8    answers this question, I'm going to ask you,

9    Miss Sweeney, why are you asking that question.

10   What relevance does this have to this case?    And why

11   is it that you feel that you are justified in asking

12   questions based on this report when if the Bank of

13   America had wanted to, they could have delayed

14   Mr. Kincaid's deposition the first time until after

15   this report was provided?

16           And I simply need to have an answer to that

17   question because I am considering at this point

18   simply directing the witness not to answer any

19   further questions on this subject.

20   BY MS. SWEENEY:

21       Q.    Mr. Kincaid, did you understand my

22   question?

23           MR. FINE:    I direct the witness not to

24   answer the question.

```
 1   BY MS. SWEENEY:

 2      Q.    Mr. Kincaid, did you report --

 3              MR. FINE:  Miss Sweeney --

 4              MS. SWEENEY:  I want to put --

 5              MR. FINE:  No.  No.  No.  I have a

 6   question for you.  Do you have any other subjects to

 7   cover other than this report?

 8              MS. SWEENEY:  Yes, I do, David.  But I

 9   would like to get --

10              MR. FINE:  Then --

11              MS. SWEENEY:  David --

12              MR. FINE:  Then fine.  Then let's -- I'm

13   directing the witness not to answer any further

14   questions about this report.  Shame on you,

15   Miss Sweeney.  Go on to another subject.

16              MS. SWEENEY:  As to any question -- I

17   just want to be clear for the record.  As to any

18   question I have about this particular report, which

19   has been marked as Exhibit 10, you are stating that

20   you will instruct your client not to answer those

21   questions; correct?

22              MR. FINE:  I'll tell you what.  I will

23   permit you to ask further questions to see whether

24   you can do it in an appropriate way.  If in my
```

1  judgment you continue to be insensitive and abusive,

2  I will direct the witness not to answer any other

3  questions.  Essentially, I will give you one more

4  chance.

5           MS. SWEENEY:  Well, then, David, I think

6  it's probably worth putting on the record what it is

7  you will allow him to answer and what you won't.  So

8  I'll ask a series of questions, and you can simply

9  direct him not to answer.  And we will have it on

10  the record.

11          MR. FINE:  And please note, I mean, you

12  seem to be particularly opaque about this,

13  Miss Sweeney.  If you have read this entire report

14  from beginning to end, you know that this report

15  contains enormously sensitive material.  And the

16  fact that of all the subjects in this case, you have

17  chosen to be rhetorical about this subject in my

18  view exhibits an extraordinary lack of judgment and

19  insensitivity.

20  BY MS. SWEENEY:

21    Q.    Did you report to Dr. Parisi that you had

22  been in Charlotte for nine months and you missed

23  your children so much that you planned to move back

24  to the Boston area in August?

84

1   A.   No.   I didn't report that to him.

2   Q.   Did you report anything similar along those

3   lines to Dr. Parisi?

4   A.   I said that I missed my children a great

5   deal and that it had crossed my mind that it would

6   be good to move back at some time to Massachusetts.

7   I didn't say what's on this sheet of paper here.

8   Q.   Do you have any idea where it is -- did you

9   talk at all about the month of August with

10  Dr. Parisi?

11  A.   I said that -- in the context of describing

12  the difficulties at work, I said that -- I said that

13  I was considering the possibility that things might

14  end badly at the Bank of America because I felt like

15  they were really intent on driving me out of the

16  organization.   But I said sometimes things like this

17  turn out differently than you think.

18       And as a supervisor that supervised other

19  people, I myself in the past have had situations

20  where a situation with an employee looked bleak and

21  very dark and in the end it turned out okay.   And I

22  told him that based on my own experiences as a

23  supervisor that I didn't want to toss out -- I

24  wanted to keep my options open with the Bank of

85

1    America and I wanted to believe that despite the

2    present bleak situation I could work things out with

3    Sheila Burroughs and the bank and continue my

4    employment.

5          I think this mention of Massachusetts and

6    moving was in the context of a consideration or

7    possibility, but I know I never said I was planning

8    on leaving.  My primary emphasis was on working out

9    things with the Bank of America, not foreclosing the

10   possibility.

11      Q.   Did you tell Dr. Parisi that you planned to

12   move back to the Boston area and live on the income

13   generated from the sale of your home in

14   Massachusetts?

15      A.   I didn't say I planned to do it, no.

16      Q.   Did you say that you were thinking about

17   doing that?

18      A.   I said it was a possibility if the

19   situation with the bank in the last analysis or the

20   way it finally turned out, if the situation turned

21   out badly.  But I did not say I planned to do it.

22   *    Q.   And as compared to how you felt about

23   yourself and your work and family lives before you

24   moved to Charlotte, how did you feel while you were

1    there?

2                MR. FINE:  Can we read back the

3    question, please?

4                *  (Question read back)

5                MR. FINE:  I'm going to direct the

6    witness not to answer the question on the grounds

7    that this is a subject that Mr. Kean could have

8    covered at Mr. Kincaid's -- the first session of

9    Mr. Kincaid's deposition.

10   BY MS. SWEENEY:

11     Q.   At any time during your employment with

12   Bank of America, did you have negative or angry

13   feelings?

14               MR. FINE:  I'm going to object and

15   direct the witness not to answer the question on the

16   same grounds, that Mr. Kean had an opportunity to

17   take a full deposition of Mr. Kincaid.  He did so.

18   This is something he could have covered then, if he

19   had wished.

20   BY MS. SWEENEY:

21     Q.   Do you have negative and angry feelings

22   now?

23               MR. FINE:  Objection.

24     A.   Sometimes, yeah.

87

BY MS. SWEENEY:

Q.    And are they directed at anyone in particular?

A.    Bank of America.

Q.    Anyone else?

A.    No.  I guess I can't think of anybody right now.

Q.    Have you ever considered taking medication for depression?

A.    No one's ever suggested to me that I'd considered it.  No.  No medical person's ever suggested it to me, so I guess I can't say I have since no medical person's ever suggested it.

Q.    Do you consider yourself to suffer from depression?

A.    I guess I would say no.

Q.    Have you ever considered yourself to suffer from depression?

A.    I think there is short periods of time or events that have caused me to feel depressed, but I always bounced back eventually.

Q.    And do you feel you've bounced back now from any depression you may have suffered as a result of your employment with Bank of America?

Steven R. Kincaid
November 8, 2005

88

1          MR. FINE:  Objection.

2     A.   I'm going to say not completely, to some

3 extent.

4 BY MS. SWEENEY:

5 *    Q.   Can you tell me how it is that that

6 depression manifest itself?

7          MR. FINE:  Objection.  Well, please, I'm

8 going to make a comment for the record because I

9 don't think that the questioner is being fair to the

10 witness.  The questioner first asked the witness a

11 series of questions about depression.  Witness

12 answered those questions.

13          Now the questioner is asking further

14 questions which seem not to take into account the

15 answers that Mr. Kincaid gave previously.

16          MS. SWEENEY:  Do you want to read back

17 the question?

18          *   (Question read back.)

19     A.   I guess I can just tell you I'm not a

20 medical person, so I don't know all the medical

21 details about depression.  Compared to before I was

22 with the Bank of America, I'm more reclusive.  I

23 don't spend time around people.

24          I guess I have some sense of loss of

89

```
 1    confidence in myself professionally because I got

 2    such a browbeating from Sheila Burroughs when I left

 3    the bank.  Even when you believe in yourself and

 4    think you're a competent professional, when someone

 5    really goes out of their way to belittle you and to

 6    make you feel bad, some of it rubs off.  I think

 7    some of it did rub off from Sheila Burroughs.

 8            Some trouble sleeping, little loss of

 9    appetite.  So there are different ways, I guess, in

10    response to your question about manifest.  When I

11    think about the ways it shows up in my behavior, my

12    physical life, that's what I would answer.

13    BY MS. SWEENEY:

14      Q.   And how often does it manifest presently?

15      A.   Well, it's on my mind a lot because with

16    the Bank of America, because of the situation that

17    occurred there -- the nature of my termination, in

18    effect -- that was the end of my statistical market

19    research career.

20            I'd been doing it 25 years.  And when your

21    career comes to a halt, kind of a screeching halt,

22    that's kind of -- it leaves a mark on me.  I don't

23    know if other people react the same way but that was

24    --
```

1     Q.    Go ahead.

2     A.    That's -- I spent decades doing that.   I

3 feel like the nature of Bank of America's action

4 kind of met the end of that.

5     Q.    What did Bank of America --

6           MR. FINE:   Had you finished your answer?

7     A.    I finished, yeah.

8 BY MS. SWEENEY:

9     Q.    Tell me what Bank of America did to keep

10 you from continuing your career.

11          MR. FINE:   I'm going to direct the

12 witness not to answer the question.   This is

13 something Mr. Kean could have asked in the first

14 session of his deposition.

15 BY MS. SWEENEY:

16    Q.    You said your career came to a screeching

17 halt.   What did you mean by that?

18          MR. FINE:   Object.   Direct the witness

19 to not answer the question.   This all could have

20 been covered in the first session of his deposition.

21          MS. SWEENEY:   Not if he didn't testify

22 to it.

23          MR. FINE:   Move on, Miss Sweeney.   Move

24 on.

91

1    BY MS. SWEENEY:

2        Q.    Other than seeing Dr. Parisi, have you

3    sought any other professional help with respect to

4    any emotional distress you've suffered from any

5    cause?

6        A.    Well, I guess indirectly I feel like the

7    Bank of America's action had a result on my voice

8    situation.  So I went to see Dr. Postal, Dr. Farzan,

9    Sheila Therrin.  Aside from that series of doctor

10   visits, no, I haven't.

11       Q.    And when you saw Dr. Farzan and Dr. Postal

12   and Sheila Therrin and now Dr., is it, Lucas?

13       A.    Dr. Burns.

14       Q.    Dr. Burns.  When you saw them, did you tell

15   them about what happened to you at Bank of America?

16       A.    I told -- I mentioned it to Dr., I believe,

17   Dr. Postal.  But I may -- I know I mentioned it to

18   Sheila Therrin because Dr. Postal was somewhat

19   disinterested, I guess, in the nature of the cause

20   of my voice problem.  And he was more interested in

21   just explaining what my options were.

22           Sheila, I guess, since she's a therapist

23   had more interest in what caused it or inquired

24   about what caused it.  So I did talk to her about