VOL. II

PAGES 178-314

EXHIBITS 1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11522-WGY

| | | |
|---|---|---|
| STEVEN R. KINCAID | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | |
| | ) | |
| BANK OF AMERICA | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

CONTINUED VIDEOTAPED DEPOSITION OF

ALEC KOTOPOULOS, taken on behalf of the plaintiff,

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Patricia L. Henneberry a Certified Shorthand

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at The Law Office

of David J. Fine 3 Center Plaza, Boston,

Massachusetts, on Monday, October 17, 2005

commencing at 11:08 a.m.

**10/17/2005  Alec Kotopoulos Volume II**

APPEARANCES:

           Law Office of David J. Fine, (by David
J. Fine, Esq.), 3 Center Plaza, Suite 400, Boston,
Massachusetts, 02108, for the plaintiff.

           Edwards & Angell, LLP, (by Siobhan M.
Sweeney, Esq.), 101 Federal Street, Boston,
Massachusetts, 02110, for the defendant.

           ALSO PRESENT:  National Video
Reporters, Inc., (Adam Cook, Legal Video
Specialist), 58 Batterymarch Street, Suite 243,
Boston, Massachusetts, 02110.

           I N D E X

Deposition of:                          Page

ALEC KOTOPOULOS

           Examination by Mr. Fine          182

Exhibits                                Page

No. 1   Sheila Burroughs Job Bids

       Page/Summary Bates Nos. 672

       to 674                           183

No. 2   Allison Hart Job Bids

       Page/Summary Bates Nos. 669

       to 671                           189

1    Q.    Okay.  And did you get a bonus for 2003?

2    A.    That would have been paid when, in February

3    of 2004?

4    Q.    My understanding is yes.

5    A.    No.

6    Q.    All right.  I think there's something in

7    here that may cast light on this, and I don't want

8    to be unfair to you.  So why don't we go to that

9    part of the personnel file.

10            If you look at -- go to the page

11   that's Bates marked Bank of America 919.

12   A.    Yes.

13   Q.    Okay.  And this is the document that's

14   headed General Release and Separation Agreement --

15   A.    Yes, I see that.

16   Q.    -- do you see that?

17   A.    Yes.

18   Q.    And then if you could just turn initially

19   to --

20   A.    You've jogged my memory.  Okay.  That's

21   fair.

22   Q.    Okay.  Before we get back to that, if you

23   could just look to Bank of America Page 925.

24   A.    Yes.

**10/17/2005  Alec Kotopoulos Volume II**

1    Q.    Is that your signature?

2    A.    That is.

3    Q.    And if you look at the next page, does your

4    signature appear on the next page as well?

5    A.    Yes.

6    Q.    All right.  Now, going back to bank of

7    America Page 920 --

8    A.    Yes.

9    Q.    -- is there a reference to a bonus payment?

10    A.    Yes.

11    Q.    Okay.  And what is --

12    A.    $75,000.

13    Q.    Okay.  And does that accord with your

14    recollection?

15    A.    That does, yes.

16    Q.    Okay.  And do you recall what percentage of

17    your salary that bonus payment was?

18    A.    I believe at that time my base was 175.  So

19    if you cut that by 75,000 and do the math, what do

20    we have --

21    Q.    Okay.  So --

22    A.    -- 40 odd percent.

23    Q.    Okay.  All right.  Now, turning to the first

24    page of this document, Bank of America 919 --

1    A.    Yes.

2    Q.    -- okay, the first numbered paragraph says,

3    and let me quote it for the record and then I have

4    some questions.

5              "In consideration of the promises I

6    have made herein, I voluntarily tender and Bank

7    hereby accepts the mutual consent resignation of

8    my employment effective February 5, 2004;" do you

9    see that?

10    A.    I do.

11    Q.    Okay.  How did it come about that you

12    resigned your employment with the bank?

13    A.    I'm not sure I understand the question.

14    Q.    Okay.  Let me break it down.  Were you asked

15    to resign?

16    A.    Yes.

17    Q.    Okay.  Who asked you to resign?

18    A.    Mr. Marino.

19    Q.    And what position did Mr. Marino have at the

20    bank?

21    A.    Human Resources.

22    Q.    Okay.  When did he ask you to resign?

23    A.    It would have been right around the time

24    that this letter is dated.

1    Q.    Okay.  When Mr. Marino asked you to resign,

2    did he do that orally?

3    A.    Yes.

4    Q.    Was anybody else present?

5    A.    Yes.

6    Q.    Who else was present?

7    A.    A lady.  I think she was a paralegal.

8    Q.    Okay.  And where did this take place that

9    you were asked to resign?

10   A.    I believe it was his office.

11   Q.    Okay.  Did he ask you to come to his office?

12   A.    He did indeed.

13   Q.    Did he tell you why he was asking you to

14   come to his office?

15   A.    No, he did not.

16   Q.    Okay.  What did he say when you got to his

17   office?

18   A.    I'm sorry, what did he say?

19   Q.    Yes.

20   A.    God's honest truth is I have blanked out

21   anything from back then from my complete memory on

22   purpose.

23   Q.    Okay.  And --

24   A.    It was a very brief conversation.

1    Q.    Okay.  You say that you purposely blanked

2    things out from your memory?

3    A.    Yes.

4    Q.    Is there a reason why you purposely did

5    that?

6    A.    I don't like to orient towards the past.

7    Q.    Okay.  You do remember that in that

8    conversation Mr. Marino asked you to resign?

9    A.    Yes.

10   Q.    Did you agree to resign in that meeting?

11   A.    No, I did not.

12   Q.    Okay.  Do you remember anything that you

13   said in response to his requesting you to resign?

14   A.    I remember pieces.  I can't -- I can

15   paraphrase.  I can't give you exact language in

16   all fairness.

17   Q.    Okay.  Please do your best to paraphrase

18   what was said.

19   A.    You know a couple of bullet points would be,

20   I work incredibly hard here.

21   Q.    This is what you're saying?

22   A.    Alec, yes, personally.

23          And then I remember telling him that I

24   wanted a night to sleep on this.

1    Q.    Okay.  Do you remember anything else that

2    you said?

3    A.    No.  Honestly.

4    Q.    Did you ask Mr. Marino why you were being

5    asked to resign?

6    A.    The conversation never went there.  It was

7    very brief.

8    Q.    Okay.

9    A.    I felt Mr. Marino was very -- I thought he

10   was trying to intimidate me.  I don't deal well

11   with intimidation.

12   Q.    Okay.  And what about Mr. Marino's conduct

13   suggested to you that he was trying to intimidate

14   you?

15   A.    When he asked me to come to his office, he

16   called me on my cell phone which is standard.

17   We're running around from meeting to meeting and

18   whatever else.

19              The way he talked to me was as though

20   I were his two-year-old son which I found very

21   unprofessional and didn't appreciate essentially

22   ordering me to come to his office.  That was the

23   first thing.

24              And then just his -- and I'm not a

**10/17/2005 Alec Kotopoulos Volume II**

1    little person.  Just his physical attitude to me

2    appeared to be someone who was trying to

3    intimidate another person.

4    Q.    What is Mr. Marino like physically; is he a

5    big man?

6    A.    He's probably a little smaller than I.  I'm

7    six-one, 210, 215 pounds.

8    Q.    Okay.  When you came into -- was this his

9    office?

10   A.    I believe it was his -- it was definitely an

11   office that he was-sitting behind a table -- a

12   desk I mean.

13   Q.    Okay.  Did he ask you to sit down?

14   A.    He did.

15   Q.    The other person who was in the room, was

16   this a person that was known to you?

17   A.    I've never met her in my life before.

18   Q.    Was she identified by name to you?

19   A.    She was.

20   Q.    But you don't recall her name?

21   A.    I honestly don't, no.

22   Q.    Okay.  Prior to this meeting where you were

23   being asked to resign, had you received a

24   performance review at the bank?

1    A.    I don't believe I did.  I don't believe

2    Vipin Mayar sat me down, he was my boss, M-A-Y-A-R

3    V-I-P-I-N.

4              I don't believe he sat me down at the

5    end of the year to have a performance review.  I

6    don't recall that.

7    Q.    Okay.  From the time that you started at the

8    bank on September 30, 2002 to this meeting in

9    early 2004 where you were asked to resign, did you

10   ever have a performance review in that period?

11   A.    I did.

12   Q.    Okay.  And when did you have a performance

13   review?

14   A.    I certainly had one at the end of my first

15   quarter, so that would have been -- when did I

16   start, 2002?

17   Q.    Yes.

18   A.    Okay.  So the end of 2002 somewhere near the

19   holiday period, Christmas holiday period.  Then I

20   had another performance review somewhere into

21   2003, and I honestly do not recall exactly when.

22   Q.    Okay.  The performance review that you got

23   at the end of 2002, who gave that to you?

24   A.    Vipin Mayar.

**10/17/2005 Alec Kotopoulos Volume II**

1    Q.    Okay.  Was there anything in writing in

2    connection with that review?

3    A.    I don't recall.  I don't recall.

4    Q.    Okay.  With regard to the performance review

5    that you got in 2003, was there anything in

6    writing in connection with that performance

7    review?

8    A.    Yes.  Because we, meaning the employee or

9    subordinate in this case, if you will, had to fill

10   out a form similar to what you showed me back in

11   Charlotte --

12   Q.    Yes.

13   A.    -- with Mr. Kincaid.  And that was to be

14   reviewed by your superior or your supervisor or

15   boss.

16   Q.    Okay.  And your boss at that time was also

17   Vipin Mayar?

18   A.    Correct.

19   Q.    Okay.  Do you recall reviewing the writing

20   that you had prepared with him?

21   A.    I know that I sent the information to him.

22   Whether or not he actually sat down with me and

23   went over it, I don't recall that.  I don't recall

24   that.

**10/17/2005  Alec Kotopoulos Volume II**

1    Q.    Okay.  With regard to the performance review

2    that you got at the end of 2002, did you regard it

3    as a positive performance review?

4    A.    I was on top of the world.

5    Q.    Okay.

6    A.    And the bonus reflected that.  It was a very

7    high pro rata bonus for someone who walked in and

8    was working three months.

9    Q.    Okay.  And did you get any feedback by way

10   of a performance review in 2003?

11   A.    Yes.

12   Q.    And how did you get that feedback?

13   A.    I can remember Vipin Mayar saying to me, it

14   might have been late string, early summer, things

15   like you've done a phenomenal job.  Where do you

16   get your magic?

17              Can you help some of your peers,

18   meaning his other three direct -- I think he had

19   four direct reports to him.  I forget.

20              Can you help your magic rub off on

21   them?

22              Ask the question again because there

23   was one other thing.  I don't want to go off.

24   Q.    Right.  I was asking about did you get

**10/17/2005  Alec Kotopoulos Volume II**

1     positive feedback.

2        A.    Necessarily from Vipin or --

3        Q.    Vipin or anyone else.

4        A.    I can also tell you that in parts of the

5     organization that my group, if you will, was

6     charged with, impacted in a positive way because

7     we were essentially an internal consult.  They are

8     a service organization.  I knew I was in very high

9     regard with a couple of folks.

10       Q.    And by "a couple of folks," who do you mean?

11       A.    Percy Simpson, who ran the -- what was his

12    title?  Very high up.  Consumer Segment I think it

13    was called back then.

14       Q.    Was there another person as well?

15       A.    Yes.  I think Elizabeth Chambers as well,

16    Libby.

17             I think I was in high regard, as were

18    my group, with those two individuals who probably

19    comprised, you know, certainly the lion's share of

20    the work we were charged with.

21       Q.    What was Elizabeth Chambers' position at the

22    bank?

23       A.    She was head of Enterprise Marketing.

24       Q.    And you said Percy Simpson was the head of

1    the Consumer Segment?

2    A.    Consumer Segment, yes.

3    Q.    Okay.  Did either Elizabeth Chambers or

4    Percy Simpson ever give you positive feedback in

5    writing?

6    A.    No.

7    Q.    Okay.  Going back to this meeting that you

8    had with Mr. Marino --

9    A.    Yes.

10    Q.    -- did he raise his voice to you?

11    A.    Yes.  Again a form of intimidation.

12    Q.    Okay.  Other than raising his voice and

13    telling you in a peremptory way to come to his

14    office, can you point to anything else that you

15    perceived as intimidating on his part?

16    A.    His body language.

17    Q.    And what about his body language?

18    A.    I'm not a psychologist, but normally when

19    you engage in a conversation with another human

20    being, particularly on a professional level, you

21    talk as though you and I are talking right now.

22              We may not be friends.  We may have

23    opposing positions, but we have this tone of

24    voice.  We have -- I'm sitting back, but you

1    certainly may have this body language.

2              I felt his body language was very

3    excited, excitable, and very -- I'm not saying the

4    gentleman was going to do anything physically, of

5    course not or hopefully not, but he was just not

6    -- it was not a professional body language.

7              It's hard to explain.  It is almost

8    like you have to see the tape or the movie.

9    Q.   Okay.  Prior to being called by Mr. Marino

10   to his office so to speak, had you received any

11   suggestion from Vipin Mayar or anybody else that

12   this might be coming that you might be asked to

13   resign?

14   A.   No.  Absolutely positively not.

15   Q.   Okay.  Did you say to Mr. Marino when he

16   asked you to resign, did you refer to Vipin Mayar

17   and Percy Simpson or Elizabeth Chambers and the

18   positive feedback they had given you?

19   A.   I recall saying I work very hard in this

20   organization.  My people have done a great job,

21   and I just shut up after that.  I just had had

22   enough.

23   Q.   Okay.  Did the woman who was also present in

24   the meeting, did she say anything?

33

**10/17/2005 Alec Kotopoulos Volume II**

1    A.    No, she did not.

2    Q.    Okay.  Have you now told us everything that

3    you remember about that meeting?

4    A.    She had a laptop and started to take notes.

5    Q.    Okay.  Was that one of the things that was

6    intimidating?

7    A.    Absolutely.

8    Q.    Okay.  Do you remember anything else about

9    the meeting?

10   A.    Let me jog my memory.

11              Oh, I do remember -- I believe, yes.

12   Marino made some type of, I don't know if the

13   right word is compensatory, but a financial offer

14   to me, and I said that was not what I expected my

15   bonus to be.

16              He stepped out of his office.  Told me

17   he had to make a call I believe to Mr. Mayar.

18   Came back within five, seven minutes and came up

19   with a different number.

20   Q.    Okay.

21   A.    And the number was this number here, this

22   75,000.

23   Q.    Okay.  And did he say anything about weeks

24   of severance that you were going to be given?

1      A.    He talked about being paid out for my, you

2      know, vacation time and all that standard stuff.

3      And I think this is No. 3 here, right?

4      Q.    Yes, No. 3 refers to six weeks?

5      A.    Correct.

6      Q.    Was that something that Mr. Marino mentioned

7      in that meeting?

8      A.    Yes.  And I asked him about health care, and

9      I believe he said three months.  And I know my

10     reaction was negative.  Professional but negative.

11               I'm not ignoring you.  I'm thinking.

12               That's what I recall.

13     Q.    Okay.  All right.  Was there any reference

14     to the possibility of your hiring a lawyer in that

15     meeting?

16     A.    I'm sorry, the possibility of my hiring a

17     lawyer?

18     Q.    Yes.

19     A.    Meaning did he say anything about that?

20     Q.    Did he say or did you say?

21     A.    I didn't say anything and I don't remember

22     him saying anything to that effect.

23     Q.    Okay.  Following that meeting, did you talk

24     to anybody about what had occurred?

1    A.    Absolutely.

2    Q.    Who did you speak to?

3    A.    I called my wife.

4    Q.    Okay.  Other than your wife, did you speak

5    to anybody else?

6    A.    I called a lawyer.

7    Q.    Okay.  Without revealing what you said to

8    the lawyer or what the lawyer said to you, can you

9    tell me the name of the lawyer that you contacted?

10              THE WITNESS:  Is that something I

11    should do?

12              MS. SWEENEY:  I can't advise you.

13    A.    Isn't that private between the lawyer and I

14    just like with the position?

15    Q.    Obviously you need to make your own decision

16    about this.  But since I'm not asking you and will

17    not ask you anything about what you said to the

18    lawyer or the lawyer said to you, I'm just asking

19    for the name of the lawyer.  I do not think that

20    that encroaches on a privilege.

21    A.    I'd rather not.

22    Q.    Okay.  You spoke to a lawyer?

23    A.    Yes.

24    Q.    Did you speak to Vipin Mayar?

**10/17/2005 Alec Kotopoulos Volume II**

1    A.    No.

2    Q.    Did you speak to anybody at the bank about

3    what had occurred?

4    A.    No.   Because I went home and I did not come

5    back.

6    Q.    You never came back to the bank?

7    A.    Nope.

8    Q.    Okay.  Now, you see that if you go to page

9    Bank of America 925, your signature is dated

10   February 8, 2004; do you see that?

11   A.    Correct.

12   Q.    How much time elapsed between the date of

13   the meeting that you've described and February 8,

14   2004 when you signed this agreement?

15   A.    I can't tell you exactly cause I can't

16   remember, but I will tell you that it was -- it

17   was a relatively short amount of time.

18   Q.    Okay.  And was the bank applying any time

19   pressure on you to get this done?

20   A.    Oh, indeed.

21   Q.    And how were they doing that?

22   A.    They basically said you have X days to sign

23   this thing.

24   Q.    Okay.

1    A.    Isn't there a clause in here that says

2    that -- from what I remember.  Wasn't there some,

3    you know, X period of time?

4    Q.    Well, I don't know if this is what you're

5    referring to, Mr. Kotopoulos, but --

6    A.    Right here.

7    Q.    What --

8    A.    No. 2, Time to sign a return agreement.

9    Q.    Ah, all right.  This is on BA 9/19?

10   A.    21 days.

11   Q.    Okay.  Paragraph 2 recites that you first

12   received the original of this agreement on or

13   before February 5, 2004; do you recall how much

14   time elapsed between the time of the meeting you

15   described and the time that you got this document

16   to review or your lawyer got this document to

17   review?

18   A.    It wasn't long.  It was a matter of days.

19   Q.    Okay.  Did anybody ever tell you why the

20   bank wanted you to resign and to resign so

21   quickly?

22   A.    No.

23   Q.    Did you have any idea at the time as to why

24   you were being asked to resign?

1    A.    Yes.

2    Q.    What was the idea that you had?

3    A.    My estimation at that point in time was that

4    I was becoming the fall guy for Vipin Mayar and

5    HR.

6    Q.    You said the fall guy for Vipin Mayar and

7    HR?

8    A.    Correct.  Human Resources.

9    Q.    Okay.  And the fall guy in what sense?

10    A.    They needed to blame somebody within the

11    CAMR organization and the associated HR personnel

12    people who were attached to it for personnel

13    problems.

14    Q.    What personnel problems?

15    A.    My understanding was as a senior manager

16    that certain actions were being taken against the

17    bank by CAMR employees, some of whom were with the

18    bank, some of whom were not with the bank at that

19    time.

20    Q.    Did you finish your --

21    A.    I did.

22    Q.    Okay.  You said these people were taking

23    certain actions against the bank, what actions?

24    A.    My assumption was, you know, making noise

1    and complaints about discharge or -- discharge in

2    some cases and in other cases unsatisfactory

3    performance reviews.

4    Q.   Okay.  And when you say making noise and

5    complaints, do you mean among other things filing

6    charges with the EEOC?

7    A.   I never saw anything officially nor was that

8    mentioned to me.  I do know however that in an

9    organization that large, I think we had 120, 130,

10   people, there are avenues for rumor that run

11   around not unlike in any organization that size or

12   even bigger.

13            And there was strong word that people

14   were seeking or had sought legal representation.

15   Q.   Okay.  Can you identify by name any of the

16   people that you're talking about?

17   A.   I saw a memo, which to this day I would say

18   it was purposely left in a place where people

19   could see it or whoever put it there wanted it to

20   be seen if you will.

21            It was typed up by an employee that

22   made many comments.  And I'm not a lawyer, but

23   many points, if you will, and comments about times

24   when that individual felt they were not properly

40

1    treated.  And also a lot of energy, if you will,

2    and angst towards not being promoted and ideas as

3    to why.

4              Mr. Mayar's name was listed

5    innumerable times.  My name was definitely

6    mentioned, but maybe once or twice.  And there was

7    a third -- a second peer of mine, John Kuntz,

8    K-U-N-T-Z, his name was mentioned as well.

9    Q.    Okay.  Have you finished?

10   A.    I'm done.

11   Q.    Okay.  All right.  So this memo that was

12   left in a place where people could see it

13   complained about three people, Vipin Mayar

14   primarily?

15   A.    Predominantly.

16   Q.    Predominantly.

17   A.    John Kuntz secondarily and Alec on a very

18   tertiary, you know, small basis.

19   Q.    Okay.  What was the name of the employee who

20   left?

21   A.    Erin McCarthy, female, E-R-I-N.

22   Q.    Okay.  And in this memo, was she complaining

23   in effect about gender discrimination?

24   A.    Yes.  That it was difficult for females

1    within that department, CAMR, to get promoted and

2    have positions of -- status is the wrong word --

3    but senior positions.

4    Q.    Did Miss McCarthy complain in words or

5    substance about sexual harassment?

6    A.    That I don't remember.  Honestly.  I will

7    tell you that I wouldn't rule it out because I

8    remember it being at least three pages, maybe

9    four.

10   Q.    Okay.  And the claims of -- the possible

11   claims of sexual harassment, were they made

12   against --

13              MS. SWEENEY:  Objection.

14              MR. FINE:  Pardon?

15              MS. SWEENEY:  Go ahead and finish the

16   question.

17              MR. FINE:  All right.  Let me rephrase

18   it.

19   Q.    You said that you wouldn't rule out the

20   possibility of claims of sexual harassment having

21   been made in this memo, correct?

22   A.    That's correct.

23   Q.    Okay.  What's the basis for your saying that

24   you wouldn't rule that out?

1    A.   Because I vaguely -- I remember the memo

2    being long, first.  I remember there being

3    multiple, multiple angles leading up to -- let me

4    do it differently.  And I'm not trying to retract.

5    I'm trying to give you a more succinct opinion.

6              The memo to me appeared as though

7    somebody was trying to prove a point, and to prove

8    that point there were multiple kind of ways to

9    prove the same point.

10             The same point being, women were not

11   afforded similar opportunities within the group,

12   CAMR.

13             This particular individual felt

14   discriminated upon I think.  So I believe, and

15   again this is a few years ago, I believe the

16   person used different angles or ways to get at

17   that issue.

18   Q.   Did you ever have in your possession a copy

19   of this memo?

20   A.   I had it the day I saw it on the

21   whatchamacallit.  I think it was on a Xerox

22   machine, and I think I put it in my desk.

23   Q.   Did you ever give a copy of that memo to

24   your lawyer?

1    A.    No.

2    Q.    What happened to the copy of the memo that

3    was in your desk?

4    A.    Your guess is as good as mine.

5    Q.    You didn't take it with you when you left

6    the bank?

7    A.    I did.  I did.  I had it in my briefcase.  I

8    did.  I did take it with me.

9    Q.    Do you still have a copy of it today?

10   A.    No.  I've thrown everything away.

11   Q.    Do you recall when you threw this memo away?

12   A.    A year ago or something maybe.

13   Q.    Was there something that caused you to throw

14   it away at that time?

15   A.    Life moved on.

16   Q.    How much before the date that you were

17   called into Mr. Marino's office did you see this

18   memo?

19   A.    I don't know.  I mean, it wasn't weeks.  It

20   was probably, you know, a fair amount of time

21   prior to that.

22   Q.    Was it close enough in time to the meeting

23   that you knew that that memo must be one of the

24   reasons why you were being asked to resign?

44

1    A.    A memo like that does not escape your memory

2    while you're an employee of an organization in a

3    senior position.  So I think irrespective of time,

4    and I don't mean to be rude, you know, that's

5    almost timeless because it's serious.

6    Q.    Did Mr. Marino make any reference to this

7    memo --

8    A.    No.

9    Q.    -- in the meeting with you?

10    A.    He did not.

11    Q.    Is John Kuntz still employed by the bank?

12    A.    He is.

13    Q.    Is Vipin Mayar still employed by the bank?

14    A.    No.

15    Q.    To the best of your knowledge and belief,

16    did the memo have anything to do with Vipin

17    Mayar's leaving the bank?

18    A.    I would assume absolutely.

19    Q.    Okay.  And why do you assume that?

20    A.    Because the memo again had a lot of comments

21    about him.  And once the merger happened with

22    Fleet Bank, when announcements came out about

23    where people were going to land, if you will,

24    Vipin Mayar was not on the chart.  Twice.

45

1              There were two.  There were two

2    actually.  The first memo that said, you know,

3    here's the big, big, big picture, no mention of

4    Vipin.  And he's a pretty senior guy.

5              And then there was a more scaled down

6    kind of underneath the big house schematic, and

7    again no mention of Vipin Mayar.

8    Q.   Okay.  What you were just referring to was

9    organizational charts?

10   A.   No.  A memo coming from I believe the head

11   of marketing for the organization, Cathy Bessant,

12   B-E-S-S-A-N-T.

13   Q.   All right.  And the big memo that you

14   referred to, when did that come out?

15   A.   Well, I think the merger announcement was

16   made somewhere around Thanksgiving of -- what

17   would have that been, two thousand and --

18   Q.   Four perhaps?

19   A.   Yes.  So somewhere around Thanksgiving.  And

20   then the second memo would have been right into

21   the new year, early in the new year from what I

22   remember.

23   Q.   All right.  And these memos essentially

24   indicated that Vipin Mayar was not in the bank's

1    future plans?

2    A.    Well, no, no, no.    These memos were

3    distributed to all.   And essentially they said,

4    Here's the new structure of the organization going

5    forward.

6            We still have more -- "we," meaning

7    Human Resources, have more work to do to fill in

8    some blanks underneath, but for the medastructure,

9    if you will, the, you know, the grand structure of

10   the organization, the building blocks were filled

11   in and his name was not on one.

12           Therefore, one would very easily

13   assume that something happened.

14   Q.    Okay.   Now, when these memos came out you

15   were no longer employed by the bank yourself,

16   correct?

17   A.    No.   I was with the bank, yes.

18           I mean, one was around Thanksgiving.

19   I was there when the merger was announced.   It was

20   right after the merger.   Weeks I think.   And then

21   the second memo.   I was definitely there for the

22   second memo as well.

23   Q.    All right.   So the way that you interpreted

24   these memos the handwriting was on the wall for