**EXHIBIT A**

# VICKI B. ROWAN
## Attorney at Law

*1515 Mockingbird Lane, Suite 400*
*Charlotte, North Carolina 28209*
*704-525-4110*
*Fax 704-525-4301*
*Email: VBRowan@bellsouth.net*

June 3, 2004

<u>Via Facsimile 704-602-5752</u>

Mr. Eric Montgomery
Legal Department
Bank Of America
NC1-002-29-01
101 S. Tryon Street
Charlotte, NC 28255-0000

RE:   Emil Becker

Dear Mr. Montgomery:

I have been asked by Mr. Becker to review his separation from employment by Bank of America, the circumstances surrounding his employment, and the severance agreement.

As you know Mr. Becker worked for CAMR (Customer Analysis Market Research) for Manager Paul Rubenstein in Charlotte, North Carolina, as a Market Information Manager II according to his card. He had been employed since September 2003. He was recruited from Virginia (the DC area) and hired by Mr. Rubenstein. In order to take the position, he closed down his own business, gave up his health insurance, and sold a $400,000 house which closed in January 2004. A few days after reporting for work and while he was still in corporate housing, Rubenstein told him that a more senior manager did not want to hire him and had in fact tried to get Rubenstein to rescind the offer because Becker was "different" and "old." When Becker mentioned purchasing in Charlotte, Mr. Rubenstein told him he would be "crazy to buy." In early April, Rubenstein announced that he would be leaving the Bank.

At the end of April, Mr. Becker was told that he was selected as one of a number of persons who were being displaced in his department due to the merger with Fleet. At that time he was not aware of who else was being displaced. One other person, well over 40, came by his desk and asked him what he was offered. Becker asked why he asked him, and the response was that he had gray hair. On Thursday April 27, 2004, he received the attached severance agreement and the date information required under the OWBPA which indicates that out of 42 employees in his department or unit, only 35.7% were over age 40 and yet 100% (all 4) of those selected for displacement were over age 40 and three of the four were over age 55. That is

Mr. Eric Montgomery  
Legal Department  
Bank Of America  
June 3, 2004  
Page 2

beyond any reasonable probability of randomness.

    Given the comments allegedly made by a senior person, the statistics, and the circumstances of his hire, while we reject nothing at this point, we feel that the offer is unreasonable. I would be willing to discuss the amicable resolution of these issues. As only 8 weeks severance was offered, I think the first thing to consider is what is appropriate given the circumstances. Relocation to the DC area and insurance must be considerations. If one looks at Becker's salary of over $100,000, using the rule of thumb of one month per $10,000 to obtain comparable employment, 10 months salary and medical insurance would be a more reasonable figure.

    I look forward to hearing from you at your earliest convenience.

                                      Sincerely,

                                      Vicki B. Rowan

VBR/mj

Encl.

xc:    Emil Becker

**EXHIBIT B**

Case 1:04-cv-11522-WGY   Document 67   Filed 01/20/2006   Page 4 of 6

## Expert Report
## Kincaid v. Bank of America

**Statement of Opinion:**
It is my opinion that Mr. Kincaid's voice problem is primarily due to a muscle tension factor that has affected his ability to speak or phonate. I have come to this opinion based on information provided to me regarding Mr. Kincaid's past medical and voice history. I have considered the following data and information in coming to this conclusion:
- Charlotte Behavioral Health Associates. 6-4-03.
- Andover Ear, Nose and Throat Center. 12-17-04; 12-22-04; 12-30-04.
- CT Scan of Neck w Contrast. Lawrence General Hospital. 12-29-04.
- CT Chest w/o Contrast. Lawrence General Hospital. 4-7-05.
- Speech and Language Center. North Andover. May 2005-July 2005.
- Massachusetts General Hospital - Institute of Laryngology. 11-3-05.
- Facts received from Mr. Kincaid provided by his attorney, David Fine.

It is my opinion that the underlying factor to Mr. Kincaid's acute voice problem is primarily a stress-induced muscle tension dysphonia, which began in late November and early December 2004. According to Mr. Kincaid's past medical and voice history (which I have obtained from Mr. Kincaid's medical records and from facts provided by Mr. Kincaid's attorney), his voice difficulties began acutely following a series of stressful events in his life surrounding his past employment and pending legal matters especially during late November and early December 2004. Mr. Kincaid's voice history is positive for acute voice loss with severe pain of the larynx or neck region when speaking under pressure or when triggered by stress. He underwent an Otolaryngology evaluation on December 17, 2004 that revealed unilateral left vocal fold paralysis of indeterminate origin. He was seen for two additional follow-up appointments on December 22 and December 30, 2004. No additional testing was conducted at that time to differentially diagnose a true vocal fold paralysis or weakness definitively (such as EMG, Electromyography) or FEESST testing (Flexible Endoscopic Evaluation of Swallowing with Sensory Testing). Furthermore, on exam during the 12-17-04 Otolaryngology evaluation, the voice problem was reported to become better for a few seconds, which then worsened. Movement of the arytenoids was noted on exam.

There were no findings reported on December 17th, 22nd, and 30th, 2004 that supported the presence of shortness of breath (dyspnea), swallowing difficulties (dysphagia), difficulty clearing one's throat, redness (erythema), or inflammation (edema) of the larynx or vocal folds. These findings and symptoms are common and frequently reported and found on exam among those individuals that exhibit unilateral vocal fold paralysis and gastroesophageal or laryngeal pharyngeal reflux. Also on exam, the Otolaryngologist reported that Mr. Kincaid was able to prolong a vowel for 15-17 seconds during maximum phonation time, he was able to gargle well, clear his throat, and he demonstrated a good cough. More often than not, individuals with unilateral vocal fold weakness or paralysis exhibit a weak cough, difficulty clearing one's throat and poor or significantly reduced maximum duration or phonation times. On 4-4-05, the

1

Otolaryngology records reported that the left vocal fold paralysis had resolved without medical, surgical, or behavioral-symptomatic speech therapy. On November 3, 2005, Mr. Kincaid sought a second opinion by an Otolaryngologist at Massachusetts General Hospital's Institute of Laryngology that confirmed a muscle tension dysphonia. On exam, both vocal folds were noted to be symmetric with normal mucosal wave forms in amplitude and magnitude, and normal bilateral arytenoid motion during rigid video-strobo-endoscopy. Follow-up speech therapy was recommended to alleviate strained speaking patterns and pain associated with muscle tension factors.

Mr. Kincaid's vocal history with respect to the constellation of symptoms associated with his dysphonia (marked by a waxing and waning pattern of vocal difficulties, as well as the abrupt onset and worsening of his vocal symptoms under stressful speaking situations as noted over the past year and more recently on August 24, 2005 and October 20, 2005) supports a stress-induced muscle tension dysphonia.

**Qualifications:** My qualifications are enumerated in my Curriculum Vitae (CV) that is attached to this report. In reaching my opinions that I have stated above, I have relied among on my clinical expertise that includes 17 years of clinical experience in evaluating and treating over 5,000 patients with speech disorders, my post-doctoral training at the Mayo Clinic in Rochester, MN in Neurology and Medical Speech Pathology specifically with motor speech and voice disorders, and several empirical investigations and scientific conference presentations on various forms of voice disorders and more recently on, Evidence-Based Practice in Speech Pathology.

**Publications:** Please refer to my Curriculum Vitae (CV) for a list of my publications, national and international refereed scientific conference presentations.

**Compensation:** The fee for my professional services in the form of diagnostic and consultative services at $100 per hour.

**Listing of previous cases in the preceding four years:** None.

*Mary V. Andrianopoulos*

Mary V. Andrianopoulos, Ph.D., CCC-SLP
November 11, 2005