**Expert Report in Response to Dr. Weisberg's Expert Report in the
Matter of Kincaid v. Bank of America**

Joel P. Wiesen, Ph.D.
January 19, 2006

## Table of Contents

1. Summary .................................................................. Page 1

2. Dr. Weisberg Does Not Re-analyze the Largest Group of Employees ............. Page 1

3. Some Critiques and Changes Suggested by Dr. Weisberg Are Illogical or Wrong .... Page 2

4. Dr. Weisberg Makes Some Uncorroborated Assumptions ........................ Page 3

5. A Response to Dr. Weisberg's Call for More Evidence ........................ Page 4

6. Dr. Weisberg Reports Large Differences in Rates for Younger and Older Employees . Page 4

7. Confirmatory Analyses of Vice-Presidents and Higher, July, 2002 ................. Page 4

8. CAMR Department, Data Summary Dated May 14, 2004 ...................... Page 6

9. Unsubstantiated Comments ............................................... Page 6

10. Conclusions ............................................................. Page 7

11. Supporting Exhibits ..................................................... Page 7

Attachment: Groupings of Jobs, Vice-President and Higher ......................... Page 8

**Expert Report in Response to Dr. Weisberg's Expert Report in the
Matter of Kincaid v. Bank of America**

Joel P. Wiesen, Ph.D.
January 19, 2006

1. **Summary**

    Dr. Weisberg raised several issues, some partly correct, some incorrect, and some merely unsubstantiated comments, and all relatively minor in terms of the big picture. After considering the report of Dr. Weisberg, and after doing some additional analyses (described below) to address issues he raises, I am of the opinion that there is statistically significant indication of age discrimination at the Bank of America: employees age 40 and older were involuntarily terminated at a higher rate than employees under the age of 40.

2. **Dr. Weisberg Does Not Re-analyze the Largest Group of Employees**

    A. The largest group of employees I analyzed is based on a listing of 800 employees at the level of Vice-President and higher. All my other analyses are on groups of fewer than about 100 employees, and some were on groups as small as 38. Statistical analyses done on small groups of employees can be strongly influenced by changes such as the inclusion or omission of a small number of people. That is not generally so for statistical analyses done on larger numbers of employees. Dr. Weisberg does not report any analysis of this largest group of employees.

    B. Dr. Weisberg says it is his understanding that the positions at the level of Vice-President and higher encompass "a wide variety of levels and functions", and that decisions were made by many different executives in the bank, and so interpreting patterns for this group is difficult without additional information (see his paragraph numbered 24 on page 8). To the contrary, it is appropriate for the plaintiff to analyze this grouping since the plaintiff was working at this level, and it is a centrally important analysis, as it examines involuntary terminations for employees at a level comparable to the plaintiff. How the bank treated lower level employees is less relevant. As to the variety of jobs, it is only at the lower levels of the organization (e.g., bank teller) that we find large groups of employees doing homogeneous work. Jobs at high levels are largely unique. Of the 228 job titles in the listing of Vice-Presidents and higher, 118 are single occupant titles, and another 28 have only two occupants. There is no one job title with more than 30 incumbents. Thus, it is necessary to look across different jobs to see any overall patterns in the actions of the defendant concerning its higher level employees. It is illogical for Dr. Weisberg to suggest that plaintiffs can only conduct statistical analyses on groups of employees doing homogeneous work. That would preclude plaintiffs at higher levels in organizations doing statistical analyses on workforce data, since typically jobs at the higher levels in any organization have but one incumbent.

Page 1

C. In treating employees at the level of Vice-President and higher together, the plaintiff is relying on the defendant's own human resources classifications. It is the defendant that classifies employees at various levels, and here the defendant has said the employees are at the level of Vice-President or higher. If I made an ad-hoc classification of employees and created a diverse grouping of employees with no logical coherence, then Dr. Weisberg's criticism would be valid. That was not done here. It was the defendant, as part of its routine human resources system, that identified these employees as working at a certain level.

D. Dr. Weisberg critiqued my analysis of all employees at the level of Vice-President, saying the positions encompass a wide variety of functions (see his paragraph 24, page 8). In response to this, I grouped 99 of the 229 job titles into 7 groupings of apparently relatively similar content based on the wording of the job titles. For example, I formed a grouping for jobs with the word "audit" in the title, and formed a grouping for jobs involving human resources functions. (I am not sufficiently familiar with the defendant's jargon to know how to group some of the other jobs, such as "Captain Hawker" or "Black Belt.") A list of these 7 groupings of job titles is attached to this report. For all 7 groupings, the rate of involuntary termination was lower for younger employees than for employees age 40 or older. The probability of this happening by chance is 1 in 128, or .008, which is less than .05, the most universally recognized standard for statistical significance. That the individual statistical analyses for these 7 job groupings do not individually rise to the level of statistical significance may be partially due to the smaller number of employees in each of the groupings. I also looked at the 267 employees who do not fall into any of the 7 job groupings I identified. For these 267 employees also, the involuntary termination rate for employees age 40 or older was greater than for younger employees (20.0% as compared to 10.3%).

3. **Some Critiques and Changes Suggested by Dr. Weisberg Are Illogical or Wrong**

A. Dr. Weisberg criticized my report by saying, in part, that my method of determining age is biased in favor of the plaintiff (see his page 6, paragraph numbered 18). He said that a better approach would be to determine age at one point in time (see his page 6, paragraph numbered 18). When Dr. Weisberg re-analyzed the data, he calculated all ages as of 8/20/02 (see his page 9, paragraph numbered 28). This is illogical and results in the counter-intuitive categorizing as young (i.e., under age 40) 2 employees who were terminated when they were over the age of 40. Person number 26064000 was terminated at age 40.7 but Dr. Weisberg counts this person as being terminated at age 39.3. Person number 21039471 was terminated at age 42.3 but Dr. Weisberg counts this person as being terminated at age 39.8. I suggest Dr. Weisberg's method of determining age is flawed.

B. Dr. Weisberg suggests that it is more conventional to collect data from snapshots in time (see his page 5, paragraph numbered 15). A snapshot approach may be applicable when there is a reduction in force at one point in time (as Dr. Weisberg says in his paragraph numbered 17 on page 6), but in the matter at hand employees may be terminated at any

Page 2

    time during any year.  Thus snapshots in time are of little relevance here.  Rather, it is terminations that are relevant, whenever they may occur.

    C. Dr. Weisberg suggests omitting from the analyses one person over the age of 40 who was terminated involuntarily.  Dr. Weisberg says "this involuntary decision was apparently made based on objective data" related to attendance (see his paragraph numbered 22 on page 7).  Indeed, the plaintiff relied on the human resources data provided by the company, even though it is possible that younger employees with similar attendance records were not terminated.  It is logical for the plaintiff to at least begin with the assumption that all involuntary terminations of older persons are potentially motivated, at least in part, by age.  As I see it, the company can then challenge this assumption.

    I note that the plaintiff does not challenge any of the terminations the company classified as "voluntary."  It would have been possible for the plaintiff to question the voluntary nature of terminations of older employees who were listed as voluntary resignations.  Among 23 employees born before 1960 and classified as voluntary resignations, there are 7 with terminations classified as "Vol - Other," and 1 employee with termination classified as "Mutual Consent."  (These employees are numbered: 10102795, 10107905, 10133644, 10141481, 10202784, 10279621, 10298313, and 28331018.)  One can infer from this classification that these terminations were not for any of the reasons specified in the human resources records: for salary reasons, to take a similar position, to relocate, for a career change, to go back to school, or for personal reasons.  It is hard to imagine what the "other" reasons might be.  It is conceivable that some of these older employees were virtually forced out or, at least, experienced pressure from the company to leave, but the plaintiff accepted the company's termination classifications at face value and counts all these as voluntary resignations.  There are also at least 7 employees who are indicated as retiring before the age of 60 (employees numbered 10316513, 10172836, 10555781, 10229111, 10160567, and 10178623).  It might be that some of these older employees were pressured to retire, but the plaintiff accepted the company's classification at face value and counts all these as voluntary retirements.

    D. Dr. Weisberg said that if the defendant was trying to achieve a younger workforce he would expect to see evidence of that in terms of hiring.  That is not necessarily so.  Older employees can bring valuable expertise to a company.  In any case, an employer can hire some people over age 40 and still be terminating older workers at a higher rate than younger workers.  The two are not mathematically related.

4. **Dr. Weisberg Makes Some Uncorroborated Assumptions**
For example, in his paragraph numbered 25, Dr. Weisberg says, "It can be assumed that the great majority of these individuals were already included in the CAMR dataset."  I do not understand why he makes this assumption rather than verifying it using his client's human resources files.

Page 3

5. **A Response to Dr. Weisberg's Call for More Evidence**
   Dr. Weisberg says I "failed to consider more broadly whether the available data suggest any recent trend at the Bank of America to systematically weed out older employees" (see his paragraph numbered 11, on page 3).  Although (as Dr. Weisberg points out) only sparse data are available, in response to his critique I compared the average ages of the people retained and those involuntarily terminated among the Market Information Managers.  The average age of the 7 people terminated was 47.1, while the average age of the 57 people retained was 38.2, a difference of 8.9 years.  This difference in average age is statistically significant (F=10.975, p=.002, df=1, 62).

   Also in response to Dr. Weisberg's critique, I compared the average ages of the people retained and those involuntarily terminated in the CAMR Department.  The average age of the 18 people terminated was 46, while the average age of the 87 people retained was 40.5, a difference of 5.5 years.  This difference in average age is statistically significant (F=6.953, p=.01, df = 1, 103).

   This is statistically significant evidence that terminated employees are older, on average, than retained employees.

6. **Dr. Weisberg Reports Large Differences in Rates for Younger and Older Employees**
   A. In his Exhibit 2, Dr. Weisberg reports the rate of involuntary terminations for younger employees is 4.7%, and the rate for employees 40 and over is 22.2%.  In his Exhibit 3, Dr. Weisberg reports a similarly large difference in rates of involuntary terminations: 4.7% versus 17.6%.  These are large differences, even if they do not rise to the level of statistical significance in these relatively small samples.

   B. In his Exhibit 4, Dr. Weisberg states that the rate for involuntary terminations for younger employees is 11.3%, and 25.6% for employees age 40 and older.  In his Exhibit 5, Dr. Weisberg reports a similarly large difference in rates of involuntary terminations: 11.3% versus 23.8%.  These are large differences, even if they do not rise to the level of statistical significance in these relatively small samples.

7. **Confirmatory Analyses of Vice-Presidents and Higher, July, 2002**
   A. The analysis of the data from employees at the level of Vice-President and higher that I reported in my earlier report was based on tallies compiled by the law office of David Fine.  As I said I would in my report, I am now presenting my own tallies of these data.  In so doing, I will address Dr. Weisberg's critique.

   B. One person under age 40 had an ambiguous entry of "O" in the "Term Reason" column. In my analyses I treated him as an involuntary termination, a categorization that favors the defendant.

Page 4

C. Dr. Weisberg said that the only way to perform a fair comparison is to calculate age for everyone as of the same point in time (his paragraph numbered 18 on page 6). For this group of Vice-Presidents, I did five analyses of the termination rates of younger and older employees, based on calculating age as of five dates from 2002 to 2005, including 8/20/02 (the date used by Dr. Weisberg in his report), and these five analyses are in agreement: each shows statistically reliable indication of adverse impact against employees 40 years of age or older.

D. As has been noted, some employees would be classified as under age 40 based on calculating age on one date, but as age 40 or older based on calculating age based another date. In an attempt to address this, I also ran these analyses omitting the 104 persons whose age category changed from under 40 to 40 or older when age was calculated using a 2002 or a 2005 date (the end points of five dates I considered), and these five analyses also are in agreement: each shows statistically reliable indication of adverse impact against employees 40 years of age or older.

E. I report here the results of the analysis using age calculated as of 8/20/02, including all employees. As Table 1 shows, 334 of the Vice-Presidents employed during this time period were age 40 or older, while the remaining 367 Vice-Presidents were under the age of 40. Of the 334 persons age 40 or older, 68 were involuntarily terminated. As such, the termination rate for these older employees was 20.4%. By comparison, 38 of the 367 younger employees were terminated. The termination rate for the employees under age 40 was 10.4%.

**Table 1. Crosstabulation of Age Group and Employment Decision: Vice-Presidents and Higher**

|     |          | OUTCOME  |            |       |
|-----|----------|----------|------------|-------|
|     |          | Retained | Invol Term | Total |
| AGE | Under 40 | 329      | 38         | 367   |
|     | 40+      | 266      | 68         | 334   |
| Total |        | 595      | 106        | 701   |

F. I subjected the above data to statistical analysis through the use of a well-recognized and accepted statistical test known as the Chi-Square test. The results of this statistical test are shown in Table 2, below.

**Table 2. Summary of Chi-Square Analysis for Vice-Presidents and Higher**

|  | Value | df | Asymp. Sig. (2-sided) |
|---|---|---|---|
| Pearson Chi-Square with continuity correction | 12.869 | 1 | .000 |
| N of Valid Cases | 701 | | |

    G. The number .000 in Table 2 represents the probability that a difference in termination rates as large as that observed might have occurred by chance. When assessing statistical significance in a case such as this, the most universally recognized standard is .05. That is, if the statistical test yields a result of .05 or less, the result is statistically significant. As .000 is less than .05, the observed difference in termination rates is statistically significant. This test establishes that the difference in termination rates for older and younger Vice-Presidents and higher level employees is not likely to have occurred by chance.

8. **CAMR Department, Data Summary Dated May 14, 2004**
   A. Dr. Weisberg comments on this analysis only briefly (in his paragraph numbered 25), and does not offer any rebuttal to my finding of statistical significance for the difference in termination rates (zero for younger employees, and 30.8% for employees age 40 and older).

   B. Dr. Weisberg comments that the age for each employee is "as of an unspecified time, possibly 5/14/04." If Dr. Weisberg is of the opinion that the age reported by the defendant on the form is incorrect or misleading, he did not say so. Further, since Dr. Weisberg works for the defendant, he is in a position to verify any such information with the defendant. Since he did not say the ages were inaccurate, I presume he accepts the ages as accurate.

   C. This analysis is important even if some of the employees were included in other of my analyses. This data summary is one the defendant is legally required to provide to terminated employees. By looking at this report, the defendant could see that involuntary terminations are affecting <u>only</u> employees age 40 and over; no younger employees were terminated.

9. **Unsubstantiated Comments**
   Dr. Weisberg stated that I did not "consider in any way the possible legitimate reasons why such a pattern might exist" (the pattern being higher termination rates for older employees, see the Weisberg report, paragraph 11 on page 3). It is in the interest of the defendant to find potentially legitimate reasons for otherwise illegal actions. Dr. Weisberg does not present any such reasons. This is mystifying because it is the defendant that has easy access to all the human resources files and other files of the company. So it is the defendants in cases such as

Page 6

this, and the defendant in this case, that are in the position to identify any such possible legitimate reasons. (The plaintiffs in such cases, on the other hand, have relatively limited access to human resources files. I reported analyses on all the data available to me. Dr. Weisberg clearly did not report analyses of all the data available to him.) That Dr. Weisberg does not provide data on any such "possible legitimate reasons" suggests that there are none.

Dr. Weisberg said the "apparent patterns for this group" (the Vice Presidents and higher) "would be hard to interpret without much more detailed data." If Dr. Weisberg is suggesting that there are possibly legitimate reasons for the higher termination rates for the older employees in this group of 800 employees, he should identify those reasons and provide supporting data. As the expert for the defendant, he is in a position to have ready access to all company records, without any formal interrogatory process. If there is "more detailed data" that presents the company in a more favorable light concerning this large group of employees, Dr. Weisberg should have presented those data. He presents none. This suggests that there is no such more detailed data that is favorable to the company.

10. **Conclusions**

I am of the opinion that the termination data I analyzed show statistically significant adverse impact on employees age 40 and over, as compared with younger employees.

11. **Supporting Exhibits**

Formal exhibits have not yet been developed for use at trial; however, I anticipate that exhibits will be created which depict the tables and percentages in this report.

Signature: _____     Date: January 19, 2006
           Joel P. Wiesen, Ph.D.

# Expert Report in Response to Dr. Weisberg's Expert Report in the Matter of Kincaid v. Bank of America

Joel P. Wiesen, Ph.D.
January 19, 2006

## Attachment: Groupings of Jobs, Vice-President and Higher

**Group 1: Audit**
Audit Consultant
Audit Director
Audit Manager
Audit Specialist
Senior Audit Consultant
Senior Audit Director
Senior Audit Manager

**Group 2: Communications**
Communications Generalist
Communications Manager I
Communications Manager II
Communications Specialist I
Communications Specialist II
Mgr Communications Mgt

**Group 3: Marketing Information**
Market Information Analyst I
Market Information Analyst II
Market Information Mgr
Market Information Mgr I
Market Information Mgr II

**Group 4: Marketing Product**
Marketing Product Mgr I
Marketing Product Mgr II
Marketing Program Manager
Marketing Programs Dev Mgr 1
Marketing Programs Dev Mgr 11
Marketing Programs Dev Mgr I
Marketing Programs Dev Mgr II
Regional Marketing Mgr I
Regional Marketing Mgr III
Regional Marketing Specialist

**Group 5: Human Resources**
Benefits Consultant
Change Consultant
Change Manager
Compensation Consultant I
Compensation Consultant II
Compensation Executive I
Compensation Executive II
Compensation Manager
IntI Compensation Executive
Manager-Training & Developmen
Non-US Compensation Analyst
Personnel Advisor II
Personnel Advisor III
Personnel Executive 11
Personnel Executive I
Personnel Executive II
Personnel Manager 11
Personnel Manager II
Personnel Svcs Case Mgr II
Prin Corp Personnel Officer
Prin Corp Personnel Officer
Recruiter 11
Recruiter II
Sr Benefits Consultant
Sr Comp and Benefits Executiv
Sr Personnel Executive
Staffing Executive
Staffing Manager 1
Staffing Manager 11
Staffing Manager I
Staffing Manager II
Training Delivery Mgr I
Training Delivery Mgr II
Training Delivery Mgr III

**Group 6: Design**
Process Design Consultant
Process Design Exec
Process Design Manager
Senior Process Design Consult
Senior Process Design Exec
Senior Process Design Manager
Strategic Process Executive

**Group 7: Finance**
Acct Finance Executive
Analyst II - BusAnly
Asset Liability Manager
Bus Support Finance Executive
Chief Accounting Officer
Fin Exec-Asset Securitzatn
Finance Exec - Fin Analysis
Finance Exec - T&O/Staff Sppt
Finance Executive - Cap Mkts
Finance Executive - Card Svcs
Finance Executive - CCB
Finance Executive - GCIB
Finance Executive - Risk Mgmt
Finance Executive - Treasury
GCIB Finance Executive
Mgr - Finance Business Suppor
Mgr- Finance Business Support
Quantitative Finance Analyst
Quantitative Finance Manager
Senior Financial Analyst - Ta
Sr Fin Analyst - Fin Bus Supp
Sr Fin Analyst-Plan & Analysi
Sr Fin Analyst-Rpt/Acct Polic
Sr Fin Mgr - Financial System
Sr Fin Mgr of Plan & Analysis
Sr Fin Mgr Rpt/Acct Policy
Sr Fin Mgr-Perform Measuremen
Sr Finance Mgr-Bus Fin Suppor
Sr Financial Mgr of Tax